Exhibit 28

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 54
-----------------------------------------------------------------X
GERALD S. KAUFMAN, et al.

                 Plaintiff,            Index No.: 601320/01

       -against-               **DECISION and ORDER**

IRWIN B. COHEN, et al.,

               Defendants.
-----------------------------------------------------------------X

**HON. SHIRLEY WERNER KORNREICH, J.:**

     Before the court are two motions by plaintiffs (Motion Sequence #004 and Motion

Sequence #005), both seeking document discovery and depositions from defendant Irwin B.

Cohen and certain related non-parties. The motions are consolidated herein for unitary

disposition.

*I.  FACTUAL AND PROCEDURAL BACKGROUND:*

     In 1985, plaintiffs Gerald Kaufman and Stuart Seigel ("plaintiffs") formed with defendant

Irwin Cohen ("Cohen") a partnership, "SIG," for the purpose, inter alia, of developing a

commercial property known as "the Falchi Building" located at 31-02 47th Avenue, Long Island

City, New York. SIG and a subsidiary of its financing partner, East River Savings Bank (East

River), formed a limited partnership known as 31-02 47th Avenue Associates, L.P. ("31-02"),

which, on December 22, 1986, purchased the Falchi Building with a $15 million mortgage from

East River.

     In early 1992, 31-02 defaulted on its outstanding $30,250,000 mortgage, which at that

time was held by Equitable Life Assurance Society of the United States ("Equitable"). When

Equitable commenced a foreclosure action in May 1992, 31-02 failed to answer the complaint or raise any objection to the foreclosure proceeding. Plaintiffs contend that they were the "out of town" SIG partners, while Cohen, the local New York SIG partner, was involved in managing the building and in exercising "hands on" supervision of the partnership's interests. Plaintiffs allege that Cohen falsely represented to plaintiffs that SIG's partnership interest in 31-02 could not be salvaged and was not worth trying to salvage, and that SIG should let its interest in the property lapse. Plaintiffs claim to have relied upon Cohen's allegedly fraudulent advice to their detriment. Meantime, according to plaintiffs, Cohen was secretly agreeing with new financial partners to exclude plaintiffs from his proposed deal to reacquire the Falchi Building out of foreclosure at a substantial discount.

Following entry of a judgment of foreclosure, the Falchi Building was publicly noticed for sale on October 27, 1993. However, before the foreclosure sale took place, Equitable's mortgage was purchased for $14,500,000 by "a group of Russian investors" operating through an entity known as "Blonde Management" ("Blonde"), in cooperation with "a series of closely-related entities created for the purpose of purchasing the mortgage and, later, holding title to the Falchi Building." See Flumenbaum Affidavit in Opposition dated June 3, 2004 at 4. The latter entities included defendant CMC Falchi Holding Co., L.L.C. ("CMC") – an entity in which Cohen allegedly had a direct or beneficial interest. Defendant Cohen admits that CMC's office address was c/o Blonde Management, and that "title to the Falchi Building was ultimately transferred" to CMC. Id. At the foreclosure sale on December 8, 1994, LIC Mortgage Corporation ("LIC") (apparently another nominee for the Russian investors) purchased the Falchi Building for $14,500,000 (the cost of the mortgage). See Exhibit 17 to Mahler Affidavit in

2

Support.   The Falchi Building was thereafter bought and sold several times, purportedly by

businesses in which defendant Cohen had a covert interest, culminating in the transfer to CMC.

It is plaintiffs' contention that during these years Cohen concealed his interest in the

Falchi Building by putting it in the names of certain family members (e.g., his wife and

daughter), as well as in the aforementioned elaborate network of corporations controlled by either

himself or by members of his family.   Cohen, for his part, counters that, with plaintiffs'

knowledge, he merely "managed" "the Russians investors'" property until,

> [b]y agreement dated as of June 1, 1996, Mr. Cohen received (through his wife)
> an ownership interest in CMC, the LLC that owned the Falchi Building.   The LLC
> agreement provided that Keenewood L.P., a company owned by Mr. Cohen's
> wife, became a member of CMC with a limited contingent right to receive future
> profits .... Specifically, the agreement gave Keenewood L.P. the potential right to
> receive 11.3% of distributions from CMC, but only after a guaranteed return of
> 10% to 18.87% per year to the Russian investors and their recoupment of their
> initial capital contribution.   The agreement also reflects the fact that Mr. Cohen
> himself became the manager of CMC and that he would continue to manage the
> Falchi Building.
>      ... Thus, following the June 1, 1996 agreement and continuing until the
> November 10, 1998 sale, Mr. Cohen was not only the manager of the Falchi
> Building, but also the manager and the holder of an interest in CMC itself.

Id. at 4-6; see also Exhibit A to Flumenbaum Affidavit in Opposition.

The last Cohen-affiliated company to own the Falchi Building – CFG/AGSCB Falchi,

L.L.C. ("CF") – sold the property to an unnamed third party for $55 million in April 2001.

Altogether, defendant Cohen is alleged to have personally realized some $6 million in profits

from the two sales of the Falchi Building in which he participated – the one in 1998 and the

second in 2001.   Plaintiffs claim that it was only when they read about this last sale in the

newspapers that they learned of Cohen's continuing interest in the Falchi Building.   In June

2001, plaintiffs sued Cohen and a number of his corporations and affiliates, seeking, inter alia,

3

damages for fraud and breach of fiduciary duty, as well as an accounting.

The subpoenas at issue in the instant applications represent the latest in plaintiffs' continuing efforts to track Cohen's "concealed" interest in the Falchi building between 1992 and June 1, 1996, when Cohen admits to receiving an ownership interest from his wife.

### A.  Motion Sequence #4:

#### 1.  Additional Facts:

On or around December 23, 2003, plaintiffs served on Weil, Gotshal & Manges, LLP ("WGM") – attorneys for the so-called "Russian investors" who had purchased Equitable's mortgage for $14,500,000 on April 28, 1994 (collectively "the Russian investors")[1] -- subpoenas seeking disclosure of, inter alia, documents reflecting ownership of the Falchi Building by Cohen, members of his family and/or corporations controlled by him.[2]  See Exhibit 2 to Mahler Affidavit in Support of Order to Show Cause dated April 28, 2004.

On or around February 23, 2004, plaintiffs served similar subpoenas, combined with deposition subpoenas, on Cohen's wife, Jill Cohen, and on Cohen's adult daughter, Cheryl Cohen Effron.  See id., Exhibits 18, 19.  The subpoenas sought, inter alia, documentary evidence reflecting the acquisition and transfers of ownership interests in the Falchi Building by the Cohen family and/or Cohen-family-owned entities.  Id.

On February 6, 2004, WGM attorney Jeremy Goldman wrote to plaintiffs' counsel that "an attorney representing Irwin B. Cohen has reviewed our records and has determined that certain documents must be withheld on the assertion of attorney-client privilege by Irwin B.

---

[1] Neither the identity nor even the number of these "Russian investors" is ever made clear.

[2] The "Russian investor" corporations include LIC and Blonde.

4

Cohen. A privileged log will be prepared describing those documents being withheld." Id. at

Exhibit 3. Thereafter, on February 19, 2004, documents not denominated "confidential" by

Cohen's counsel (the firm of Paul, Weiss, Rifkind, Wharton & Harrison, LLP, hereinafter "Paul

Weiss") were made available at WGM's offices, where they were viewed by plaintiff Seigel and

his attorney Mahler. A quantity of the disclosed documents (apparently some 1807 pages) were

also photocopied by plaintiffs. However, on February 20, 2004, WGM forwarded a 14-page, 99-

item "privilege log," "describing documents reviewed by Michael Ng, Esq. of Paul, Weiss,

attorney for Irwin B. Cohen, and withheld on the assertion of privilege by Irwin B. Cohen." Id. at

Exhibits 4, 5. On yet other documents that were produced (e.g., billing records for Blonde

Management), narrative descriptions of legal services were redacted on the ground of "privilege."

Id. at Exhibit 6.

In response to Mahler's written query as to how Cohen qualified as WGM's client with

respect to its legal services relating to the Falchi Building, WGM's Samantha Fishman, Esq.

responded on February 27, 2004:

> It is our understanding that Mr. Cohen's interests were aligned with those
> of our client, Blonde Management, at the time of the transaction at issue. The
> documents that WGM has withheld reflect attorney communications with Mr.
> Cohen and/or Blonde Management principals, Arik Kislin and Michael Cherney,
> in furtherance of that transaction.
> I have been informed that both Mr. Kislin and Mr. Cherney are currently
> out of the country and unreachable at this time. Since our position is that the
> privilege is theirs to waive, we are not able to produce to you any of the withheld
> documents at this time.

Id. at Exhibits 7, 8.

Mahler then turned to Paul Weiss to ascertain if indeed its client, defendant Irwin Cohen,

was asserting a privilege with respect to WGM's documents. Paul Weiss attorney Melissa Rose

McClammy responded by letter dated March 22, 2004:

> It is our position that [WGM] properly withheld the documents listed on the privilege log on the ground of attorney-client privilege. We understand (as stated in [WGM's] February 27, 2004 letter to you) that Blonde Management and its principals, Arik Kislin and Michael Cherney, have not authorized [WGM] to waive the privilege. (Nor have they so authorized our client Irwin Cohen.) Accordingly, the privilege was properly asserted on their behalf.

Id. at Exhibits 9, 10.

Mahler promptly wrote back to Paul Weiss to confirm that the foregoing correspondence meant "that your client, Irwin Cohen, is not asserting any privilege of his own as to the [WGM] documents. If I misunderstand please advise immediately." Id. at Exhibit 11; emphasis supplied. When Mahler received no clarification to the contrary, on March 24, 2004 he wrote to WGM that he had confirmed with Paul Weiss that (1) Irwin Cohen was not asserting any privilege of his own; and (2) any privilege belonging to WGM's clients had been abrogated by the firm's voluntary disclosure to Mr. Cohen's Paul Weiss counsel. Id. at Exhibit 12. In response, WGM reiterated that it considered its documents to be privileged, that "the privilege is not ours to waive," and that the firm of Roberts & Holland was "current counsel" for Messrs. Kislin and Cherney. Neither WGM nor Roberts & Holland responded to Mahler's query as to how "any privilege belonging to Blonde Management or its principals survives [WGM's] disclosure to someone outside the attorney-client relationship?" Id. at Exhibits 13, 14.

On or around March 29, 2004, Paul Weiss – representing itself as attorneys for the non-party wife and daughter of its client Irwin Cohen – served on plaintiffs' counsel essentially identical "Responses and Objections to Combined Deposition Subpoena and Subpoena Duces Tecum." See Exhibits 20 and 21 to Mahler Affidavit in Support. In the "Responses," Paul

6

Weiss declined to respond to any of plaintiffs' demands, complaining that each and every request was overbroad, unduly burdensome, oppressive, harassing, not reasonably calculated to lead to the discovery of admissible evidence, irrelevant, sought documents already produced, sought documents in the public domain or in the hands of third parties, constituted an infringement of privacy, and/or sought confidential material.

Plaintiffs brought on the instant application to compel compliance on April 28, 2004.

### 2. Discussion:

#### I. WGM's assertions of "privilege":

The proponent of an attorney-client privilege bears the burden to establish the existence of the privilege. To invoke the privilege, a party must show that there was (a) a communication between client and counsel, (b) which was intended to be and was in fact kept confidential, and (c) which was made for the purpose of obtaining or providing legal advice. See United States v. International Brotherhood of Teamsters, 119 F.3d 210, 214 (2d Cir. 1997) ("The broad outlines of the attorney-client privilege are clear: '(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived.'"); ; People v. Osorio, 75 N.Y.2d 80, 84 (1989); CPLR §4503(a)(1). Because the privilege is an obstacle to the ascertainment of truth, New York Courts agree that it should be strictly confined within the narrowest possible limits consistent with the logic of its underlying principle. See Spectrum Systems International Corp. v. Chemical Bank, 78 N.Y.2d 371, 377-380 (1991).

Lawyer-client communications that relate to non-legal business matters are not privileged

7

-- although the privilege will be extended where the communication is a mixture of business and legal affairs and the "legal character" of the communication predominates. See Rossi v. Blue Cross and Blue Shield of Greater New York, 73 N.Y.2d 588, 594 (1989); People v. Belge, 59 A.D.2d 307 (1997). The presence of a third party, including a co-party or a co-party's counsel, will destroy any expectation of confidentiality, and result in a "waiver" of confidentiality. See People v. Osorio, supra, at 84-85. An exception to such "waiver" is the "joint defense" rule, in which two or more parties, represented by separate counsel, share a common defense in pending litigation and participate in joint attorney-client consultations. This last rule is strictly construed, however, and applies only to communications exchanged when the parties were in the process of mounting a common legal defense together. See, e.g., Robert V. Straus Productions., Inc. v. Pollard, 289 A.D.2d 130, 131 (1st Dept. 2001); Stroh v. General Motors Corp., 213 A.D.2d 267, 268 (1st Dept. 1995).

As a threshold matter, neither WGM (who has not opposed plaintiffs' motion) nor Paul Weiss (which has opposed it but arguably has no standing to do so) has carried its burden of establishing that the documents appearing on its "privileged" log and/or the text-deletions from its bills are protected by the attorney-client privilege. Firstly, the privilege is invokable only by the client, and WGM admits that the clients in question – Arik Kislin and Michael Cherney – have not weighed in on the issue as they are incommunicado in another country.[3] Although these same clients purportedly now have new counsel, Roberts & Holland, the latter have been no

---

[3] WGM does not explain how, in this age of cell phones and faxes, anyone can be beyond contact for such long periods of time; nor does WGM indicate what efforts it has made to reach its clients.

more forthcoming than WGM.

In addition to the fact that the privilege has not been invoked, as it must be, by the clients themselves, there is no representation as to the nature of their communications with their attorneys. Since Kislin and Cherney, Blonde and LIC, were primarily involved in real estate deals – viz., business pursuits – there is no reason for the Court to conclude, in the absence of any evidence at all to the contrary, that their communications with WGM were anything other than business-related.

To the extent that the withheld communications and the redacted billing legends might be characterized as relating to "legal advice" sought from WGM by Kislin, Cherney, Blonde and/or LIC, the attorney-client privilege has been waived by disclosure of these materials to Irwin Cohen, a third party, and/or to Cohen's counsel, Mr. Ng from Paul Weiss. Whatever their common interest in, e.g., the buying and selling of the Falchi Building, it has not been claimed by anybody that Cohen's assertion of a privilege on Kislin's, Cherney's, Blonde's and/or LIC's behalf derives from joint attorney-client conversations in which all were collaborating on a common defense for pending litigation.[4] Even if litigation was pending during the subject communications, it is entirely possible that these individuals and entities had defenses opposed to Cohen's.

The foregoing analysis is not altered by Paul Weiss counsel's most recent theory that Cohen is shielded by whatever privilege might cover Kislin et al. because he "managed" the

---

[4]For example, the documents sought by plaintiffs relate principally to the period 1993-April 2001. The within litigation was not commenced until June 7, 2001. Accordingly, this litigation was not within the contemplation of the parties if and when they jointly conferred about their plans for the Falchi Building.

9

Falchi Building for the "Russian investors," and then became a part owner of the property in 1996, such that he is protected as an "agent" of Kislin et al.[5]  The fact remains that there is no indication that WGM's communications with its own clients were legal rather than business.

Accordingly, WGM has not carried its burden of demonstrating that the documents and parts of documents it has shielded from discovery as "privileged" are in fact qualified for such protection, and the Court directs disclosure of the documents listed on WGM's "privilege log" as they relate to the Falchi Building, as well as copies of the relevant bills that it has expurgated, subject to the terms of the below-quoted July 29, 2004 stipulation (redacted as to the names of the "Russian investors").

### ii. The Jill and Cheryl Cohen Subpoenas:

The bulk of this issue was settled in paragraph #1 of a stipulation that was so-ordered by the Court on July 29, 2004, as follows:

> 1. Defendant Cohen shall by 8/20/04 produce federal tax returns of Irwin, Jill [and Cheryl][6] Cohen & Keenewood (L.P. and/or L.L.C.), Salem F.P. L.P. & Hourglass (L.P. and/or L.L.C.) for the years 1993-2001, but only limited to the following: information reflecting expenses or income for the Falchi Bldg. [not including any SIG Partners information], however, insofar as such information is included with non-Falchi related information, such will be redacted and counsel

---

[5]The Court notes that the record contains no affidavit from Irwin Cohen attesting to his "agency" role, or to the "legal" nature of the "joint" discussions that he and/or his Paul Weiss attorneys supposedly had with WGM and their clients during the period for which plaintiffs are seeking documents.  In addition, the identities of the "Russian investors" remain unknown.  Cohen cannot claim "privilege" as the "agent" of a multitude of unnamed "principals."  Finally, none of "the Russians" has submitted a sworn statement identifying Cohen as his "agent"; and it is not even alleged that Paul Weiss attorney Ng, who reviewed WGM's documents on Cohen's behalf, was an "agent" of "the Russians."

[6]The "and Cheryl" language of this part of the stipulation has been crossed out, it is not clear when or by whom.  The Court hereby reinserts it.

10

will confer in an effort to provide the Falchi component of that information by alternative means between party counsel.

The Court intends to hold the parties to the foregoing agreement (inclusive of Cheryl Cohen). In addition, the Court declares "unprivileged" and exchangeable any document(s) shown to defendant Cohen and/or his counsel, as well as any pertinent SIG documents since plaintiffs were partners in SIG. Each document as to which a privilege is <u>currently</u> being invoked and which falls outside the above order must be listed on a new "privilege log," accompanied by a clear legend explaining why it is deemed "privileged."

### *B. Motion Sequence #5:*

#### *1. Additional Facts:*

On May 28, 2004, plaintiffs served subpoenas <u>duces tecum</u> seeking production of corporate and financial records (including tax returns) concerning, <u>inter alia</u>, the acquisition, maintenance and sale of the Cohen family interests in the Falchi Building from (1) Roberts & Holland L.L.P. ("Roberts") ("the Russians'"s current attorneys), (2) Siller Wilk L.L.P. ("Siller Wilk") (the law firm that negotiated the 1996 transfer of Jill Cohen's interest in the Falchi Building to Irwin Cohen), and (3) accounting firm Raich Ender Malter & Co. L.L.P. ("Raich"). In addition, on the same date, plaintiffs served "deposition subpoenas" on (1) Stuart J. Gross, (2) Larry Wilk (a tax accountant who sat in on critical SIG meetings and will testify at trial), (3) Jack Wilk (the Siller Wilk attorney who negotiated the 1996 deal), and (4) defendant Cohen's son-in-law Alan D. Zuckerbrod, Esq. of Siller Wilk. <u>See</u> Exhibits 3-9 to Mahler Affirmation in Support dated July 12, 2004.

11

By letter dated June 15, 2004, attorney McClammy of Paul Weiss, counsel for defendant Cohen, objected to all of these subpoenas. With respect to the document subpoenas, McClammy protested that plaintiffs' demands were "overbroad, vague and ambiguous, seek privileged documents, seek documents that are not relevant to the claims in this action and are not calculated to lead to the discovery of admissible evidence," and requested documents that had already been demanded and/or supplied. See id. at Exhibit 10. According to McClammy, the subpoenaed individuals would not appear for deposition because the dates for which they were noticed (in July 2004) fell outside the June 30, 2004 "close of discovery" deadline in the Court's Compliance Conference Order of March 4, 2004. Id. In the ensuing days, essentially verbatim letters rejecting plaintiffs' subpoenas was sent to Mahler from Alan Zuckerbrod on behalf of himself and Siller Wilk, and from Stuart Gross on behalf of himself and Roberts. Id. at Exhibits 11, 13.[7] Both individuals declared that they would be guided as to whether or not to appear for depositions by defendant Cohen's counsel or else by the Court. Id.

In order to facilitate the non-party witness depositions, the Court extended discovery to the end of July 2004. Id. at Exhibit 14. When the individuals noticed for deposition gave various reasons why they would not or could not be deposed before the end of July, Mahler noticed the instant motion to compel on July 12, 2004.

   *2. Discussion:*

According to paragraph #2 of the so-ordered July 29, 2004 stipulation, discussed above:

---

[7]Counsel for Raich sent a similar litany of objections, but concluded by agreeing to cooperate with plaintiffs' document subpoena if counsel could agree in writing to the terms of the exchange or, in the alternative, subject to Court Order. Id. at Exhibit 12.

2. Defendant Cohen and non-party respondents Siller Wilk shall by 8/25/04 produce all non-privileged documents reflecting the evolution of the interests in the Falchi Building held by any of the Cohens [meaning Irwin, Jill and Cheryl Cohen] or their above-identified entities in the period 1993-1996. Documents withheld as privileged shall be identified in a privilege log.

As above, the Court will enforce the stipulation. The subpoenaed entities are directed to produce all documents, including tax returns, reflecting the acquisition, maintenance, and sales of the Falchi Building by defendant Irwin Cohen, his wife Jill Cohen, his daughter Cheryl Cohen Effron, and/or any corporations in which the Cohens had an interest during 1993-1996. This information is clearly relevant to plaintiffs' case, as well as central to plaintiffs' investigation of and ability to prove their claim. See Miller v. Waters, 1 A.D.3d 829 (3d Dept. 2003). In addition, although the disclosure of personal tax returns is often disfavored due to their confidential and private nature, where, as here, the party seeking to compel their production makes a strong showing of necessity as well as the desirability of such disclosure, release is properly directed. See Donald Rubin, Inc. v. Schwartz, 220 A.D.2d 323 (1st Dept. 1995); Donald Rubin, Inc. v. Schwartz, 191 A.D.2d 171, 172 (1st Dept. 1993); cf. Walter Karl, Inc. v. Wood, 161 A.D.2d 704, 705 (2d Dept. 1990).

At issue here is an alleged fraud, in which ownership interests in the Falchi Building were purportedly concealed by the subpoenaed non-parties. The latter's "stonewalling" – i.e., their refusal to produce any and all of the documents requested, citing far too many and even mutually contradictory reasons therefor – has served to support plaintiffs' arguments that the within subpoenas are in fact necessary. Moreover, to the extent that the subpoenaed non-parties complain that production would be unwieldy and/or expensive,

13

plaintiffs are directed to pay for the material's "reasonable production expenses." CPLR 3122(d).

As set out in paragraph #1 of the so-ordered stipulation, where "Falchi Building" information is contained on documents that also contains "non-Falchi" information, the latter should be redacted or else the "Falchi-related" information should be provided by alternative means. Each document or segment of document as to which a privilege is being invoked must be listed on a new "privilege log," accompanied by a clear legend explaining why it is deemed "privileged." Once the log is compiled, the Court directs that defendant Cohen and the non-parties submit it to the Court, along with copies of the purportedly "privileged" materials, for in camera review.

Finally, non-party Raich has represented that it is willing to cooperate with plaintiffs' subpoenas – provided that plaintiffs reimburse it for its costs pursuant to CPLR 3122(d) -- subject to "written authorization and instructions agreed to and signed by counsel" or else pursuant to Court order. Te record before the Court suggests that no agreement by counsel has ever been reached. Moreover, until Raich produces the requested documents, Larry Wilk refuses to appear for deposition. The Court therefore directs Raich to produce the requested discovery on or before September 1, 2004. Non-parties Roberts and Siller Wilk are directed to comply with plaintiffs' subpoenas by the same date. Upon production of the discovery, plaintiffs shall compensate these non-parties for their "reasonable expenses."

The Court further directs that Larry Wilk, Jack Wilk, Stuart Gross, Alan Zuckerbrod, Jill Cohen, Cheryl Cohen Effron and defendant Irwin Cohen appear for and complete their

14

depositions (without time limitation) by September 24, 2004.  Accordingly it is

ORDERED that WGM is directed to produce unredacted copies of all documents on its original "privilege log" that were disclosed to defendant Cohen or his counsel; and it is further

ORDERED that defendant Cohen is directed to comply with the terms of the so-ordered stipulation of July 29, 2004 to the extent of producing by August 20, 2004 copies of the federal tax returns of himself, Jill Cohen, Cheryl Cohen Effron, and the Cohen entities Keenewood L.P. and/or L.L.C., Salem F.P.L.P., and Hourglass L.P. and/or L.L.C. for the years 1993-2001, but limited to information reflecting expenses or income for the Falchi Building; and it is further

ORDERED that defendant Cohen and non-party respondent Siller Wilk shall by August 25, 2004 produce all non-privileged documents reflecting the evolution of the interests in the Falchi Building held by any of the Cohens (Irwin, Jill and/or Cheryl) or by the entities identified in paragraph #1 of the July 29, 2005 so-ordered stipulation as Cohen entities during the period 1993-1996 – with said documents to include Falchi-related SIG documents; and it is further

ORDERED that non-parties Raich, Roberts and Siller Wilk are directed to comply with plaintiffs' subpoenas by September 1, 2004; and it is further

ORDERED that plaintiffs shall promptly compensate the non-parties for their reasonable expenses in producing the discovery; and it is further

ORDERED that defendant Cohen and all subpoenaed non-parties are directed to draft a new "privilege log" covering all documents currently claimed to be privileged, and to produce a copy of it, along with copies of all allegedly privileged or redacted Falchi-related documents belonging to the Cohens or to the corporate entities owned or controlled by them, to the Court on

15

or before September 1, 2004; and it is further

ORDERED that Larry Wilk, Jack Wilk, Stuart Gross, Alan Zuckerbrod, Jill Cohen, Cheryl Cohen Effron and defendant Irwin Cohen appear for and complete their depositions (without time limitation) by September 24, 2004; and it is further

ORDERED that counsel for the parties and non-parties, should they be so advised, are directed to appear for a conference at 11:00 a.m. on September 30, 2004 in Part 54, Supreme Court, New York County, Room 1227, 111 Centre Street, New York, New York.

The foregoing constitutes the Decision and Order of the Court.

Date: August 10, 2004
New York, New York

SHIRLEY WERNER KORNREICH

FILED

AUG 24 2004

NEW YORK
COUNTY CLERK'S OFFICE

16