# Exhibit 32

Susan Rachel Prevezer QC
Defendant
Third
SRP3
1 November 2011

IN THE HIGH COURT OF JUSTICE                    Claim No 2006 Folio 1218
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

BETWEEN:

MICHAEL CHERNEY

                                                                    **Claimant**

-and-

OLEG VLADIMIROVICH DERIPASKA

                                                                    **Defendant**

---

**THIRD WITNESS STATEMENT
OF SUSAN RACHEL PREVEZER QC**

---

I, **SUSAN RACHEL PREVEZER QC**, of 16 Old Bailey, London EC4M 7EG
**WILL SAY AS FOLLOWS:**

1.  I am a partner in the firm of Quinn Emanuel Urquhart & Sullivan UK LLP
    ("Quinn Emanuel"), the Defendant's solicitors.  I am one of the partners at
    Quinn Emanuel with the conduct of these proceedings on behalf of the
    Defendant.  This is the third Witness Statement that I have made in these
    proceedings on behalf of the Defendant.

2.  I am authorised by the Defendant to make this Witness Statement. I am making
    this statement in support of the Defendant's application for disclosure dated 1
    November 2011.

3.  I make this Witness Statement from facts and matters within my own
    knowledge and on the basis of documents and information provided to me by

others. Where the facts and matters are within my own knowledge, they are true. Where the facts and matters are derived from information provided to me by others, they are true to the best of my knowledge and belief based on the sources that I have identified.  During the course of this statement I refer to various documents, true copies of which are attached hereto marked Exhibit "SRP3". Page references in this statement are to pages of that exhibit unless otherwise stated.

**I.**   **The Claimant's Disclosure**

4.   Draft lists of documents and copies of the disclosed documents were exchanged by the parties in February and March 2011. The Claimant's solicitors served their client's Disclosure Statement and List of Documents on 1 April 2011 and supplemental lists of documents on 25 July, 11 August, 2 September, 16 September, 6 October and 18 October 2011.

5.   In a case of this size it is only to be expected that some supplementary disclosure is likely to be required. However, the extent of the later disclosure by the Claimant has been significant. Standard disclosure was received from the Claimant on a rolling basis between February and April 2011. This amounted to 216 folders containing what were classified as 11,164 documents. The Claimant served his disclosure statement on 1 April 2011. Between 1 April and 6 October 2011, a further 89 folders containing 6,089 documents were served in hard copy. On 22 and 23 August 2011, additional documents, approximately 19,000, were served electronically on CD-rom and DVD. The Claimant has not served a copy of these in hard copy. There have been considerable difficulties in accessing this data and it is only very recently that access has been gained to these electronic files. The review of these files is ongoing. During the drafting of this Witness Statement, a further 11 folders of documents and CD-roms were disclosed by the Claimant, on 18 October 2011. A significant quantity of this material is in Russian and Hebrew and its review is ongoing.

6.   The late disclosure has included important documents. For instance:

(a) Travel agency documents (referred to, for example, at paras. 40 and 175 below) which show that the Claimant was involved in providing travel to Anton Malevsky ("Malevsky")[1], Sergei Popov ("Popov") and a number of other people reputedly related to Russian speaking organised criminal groups ("OCGs") were only disclosed on 2 September 2011.

(b) Surveillance photographs taken by the Israeli authorities showing the Claimant in the company of, amongst others, Malevsky and Salim Abduvaliev ("Abduvaliev") (a reputed leader of the Uzbek mafia) were only disclosed on 18 October 2011 (see para. 218 below).

(c) Documents which show that loans to companies associated with Malevsky and Popov were written off in late 1999, some months after they were made, were not disclosed until 16 September 2011 (see paras. 69 and 71 below).

(d) A fourth Russian passport held by the Claimant in the early to mid 1990s was only disclosed on 18 October 2011 (referred to at para. 310 below).

7.   There are also significant categories and sources of documents which the Claimant maintains he cannot now provide for various reasons. With one exception, these explanations are not directly in issue for present purposes. I mention them here because they demonstrate that, in point of fact, the Claimant accepts that his disclosure has significant gaps, albeit he says they are not his responsibility.

(a) There was a company called Blonde Management Corporation ("Blonde Management") (not to be confused with Blonde Investment Corporation Ltd ("Blonde Investment")) which, in the past, the Claimant asserted was his company. In a declaration given by the Claimant to the Swiss police on 22 May 1994, it is recorded that he described Blonde Management as a Russian-American company based in New York of which he was the vice-president, and for which he gave a postal address, a telephone

---

[1]   Unless otherwise stated, all references to "Malevsky" are references to Anton Malevsky, not his brother, Andrei Malevsky.

number and a fax number (**pages 944-949 at 948, Vol. 4**). In his statement made before the Swiss investigating judge on 26 May 1994, following his arrest in connection with the use of a false Polish passport, the Claimant twice described Blonde Management as "my company" (**pages 950-961 at 959, Vol. 4**). When he was questioned by an investigating judge in Switzerland on 21 November 1996, the Claimant stated that Blonde Management was a company that represented his interests in America and which "did me some personal favours" but he was never a shareholder in it or Blonde Investment (**pages 979-990 at 987, Vol. 4**). Joseph Karam ("Karam"), the Claimant's fiduciary in Switzerland, was questioned in the same proceedings and explained that Blonde Management was run by a cousin of the Claimant called Arik Kislin (**pages 993-996 at 995, Vol. 4**). Blonde Management is a potentially important company because it was evidently, at the material time, an important part of the Claimant's empire and because it has also been linked to Malevsky, whom it sponsored for a US Visa (**pages 1-52 at 16, Vol. 1**). But the Claimant has stated that Arik Kislin has not cooperated with his request for documents for the purposes of disclosure in these proceedings (**pages 2979-2985 at 2979, Vol. 11**), and Blonde Management's documents are therefore not part of the disclosure.

(b)   Elena Skir ("Skir") has been the Claimant's personal assistant for many years. But the Claimant says that many of her documents were seized by the Israeli police (but he cannot identify exactly what was seized) (**pages 3026-3034 at 3031, para. 22, Vol. 11**), and that neither he, nor his staff on his behalf, maintained personal ledgers (**pages 3026-3034 at 3027, para. 6, Vol. 11**). The Claimant says that the Israeli police seized documents from Skir, himself and "offices [at Koifman 2, Beit HaTextile, Tel Aviv which ] were used by [him] and his representatives", in 2001 in respect of two investigations and that under Israeli law, he is not entitled to be given access to all of those documents, further documents were seized in 2007 in respect of which, he says, neither he nor his lawyers "have, to date, been given access to those documents at

all because they are not currently entitled to such access under Israeli law" (**pages 2986-2995 at 2987, para.3, Vol. 11; see also pages 3026-3034 at 3031, paras. 22-24, Vol. 11**).

(c)   Karam acted as a fiduciary of the Claimant for many years. But the Claimant says that Karam will not cooperate with him, and has not produced his documents (**pages 3026-3034 at 3032, para. 29, Vol. 11**). The Claimant has disclosed documents showing that the Swiss authorities seized documents from Karam and says that he has disclosed copies of relevant documents from the Swiss court's file. He has not, however, contacted the Swiss authorities to ask whether they have retained any documents from their searches of Karam's premises. The Claimant understands that there are approximately 100,000 pages of material on the Swiss court's file of which he does not have copies. He has been informed by his Swiss lawyers that there is no index of this material and he does not intend to seek copies of it (**pages 2986-2995 at 2987, para. 2.3, Vol. 11**).

8.   On 15 August 2011 my firm sent a letter to the Claimant's solicitors setting out the categories of documents to which the Defendant is entitled to disclosure by the Claimant and a short summary of the reasons for that entitlement (**pages 2996 to 3018, Vol. 11**).

9.   The Claimant has made further disclosure since receipt of that letter, on 2, 16 22 and 23 September, and on 6 and 18 October 2011. The Claimant's solicitors answered the letter on 9 September 2011. The response indicated some cases in which further searches or attempts to find documents are going to be made. But it also identified various areas where the Claimant is not prepared to carry out further searches. Since receiving that letter, the objections made and additional documents disclosed have been considered, and the further disclosure sought in this application takes those matters into account.

10.   Moreover, further work on the Claimant's disclosure (including the disclosure received only recently) has brought to light some additional areas where the Claimant's disclosure is inadequate, and those too are included in this

6

application. Although most of the items sought have been the subject of correspondence, there are some cases where they have not. However, because of the urgency of preparing for trial it seemed sensible to make this application now, and to include in it as many as possible categories of document of which we are currently aware where further disclosure is required as soon as possible. As I will seek to demonstrate below, these categories go to the heart of the parties' respective cases and their disclosure by the Claimant is therefore necessary to ensure a fair trial of the action.

11. A number of documents have been identified within the Claimant's disclosure that appear on their face to be false or falsely dated. Only one of these is identified for the purpose of this disclosure application. Work is, however, ongoing in respect of this wider category of documents, which may form the basis of a separate application in due course.

## II.   The Categories of Document Sought

12. In broad terms, this application seeks disclosure of documents (or, in some cases, specific confirmation by a disclosure statement that all relevant documents have been searched for or disclosed) in the following categories.

(a)   Documents concerning the Claimant's relationship with individuals and companies alleged to be involved in OCGs. That in turn is subdivided into two classes. The first consists of certain documents concerning Malevsky and Popov, in respect of whom the Claimant has agreed to give disclosure but where the disclosure given appears to be incomplete. The second consists of documents concerning the Claimant's relationship with other individuals reputed to be leading figures in Russian-speaking OCGs, in respect of whom the Claimant has refused to give disclosure. (See paras. 58 to 266 below.)

(b)   Documents which are likely to assist in identifying the Claimant's whereabouts and his activities at particular periods of time which have special relevance to the Defendant's case. (See paras. 267 to 295 below.)

(c)   Documents relating to travel arrangements made by the Claimant (or by his agents or employees) for third parties, where the disclosure that has recently been given is incomplete. (See paras. 296 to 307 below.)

(d)   Specific disclosure by disclosure statement and the provision of information concerning the Defendant's passports, where it appears that the disclosure given to date is incomplete. (See paras. 308 to 318 below.)

(e)   Specific disclosure by way of further searches and specific disclosure statements relating to the Claimant's computers, email accounts and office premises. (See paras. 319 to 365 below.)

(f)   Documents relating to the Claimant's partnerships with others and his sources of wealth, in particular concerning (i) his alleged partnership with Semyon (Sam) Kislin[2] in "Trans Commodities Inc" between 1989 and 1992; (ii) his alleged partnership with his brother Lev Cherney (Chernoy) and David and Simon Reuben in the Trans World Group ("TWG") between 1992 and 1997; (iii) his alleged partnership with Iskander Makhmudov and others between 1992 and 2000. Within this category, the Defendant also seeks specific disclosure of documents relevant to a particular series of transactions which seems to have involved the Makhmudov partnership, concerning an oil company known as TNK. (See paras. 372 to 467 below.)

(g)   Disclosure of certain documents relating to the Claimant's negotiation of a settlement of his tax affairs with the Israeli authorities in 2002 and 2003. (See paras. 468 to 473 below.)

(h)   Missing bank accounts and financial documents relating to the Claimant's companies, which are required by forensic accountants. (See paras. 474 to 479 below.)

(i)   The Claimant's personal bank accounts up to the end of December 2002, in so far as not already disclosed. (See paras. 480 to 487 below.)

---

[2]   Unless otherwise stated, all references to "Kislin" are references to Sam (Semyon) Kislin, and not his nephew Arik Kislin or his brother Michael Kislin.

13.   The Defendant also seeks an order that the Claimant make an application to the Israeli court to obtain access to all documents seized from him and his agents or employees by the Israeli authorities, for the purpose of disclosure in these proceedings; and, thereafter, that he promptly disclose any documents obtained by means of that application which are required to be disclosed as standard disclosure under CPR 31.6. (See paras. 366 to 371 below.)

**Category 1:   The Claimant's relationship with individuals and companies alleged to be involved in OCGs**

A.   **Introduction**

14.   The Defendant alleges that the Claimant was a representative of organised crime groups, and had long-standing relationships with individuals who are themselves part of and/or associated with Russian-speaking OCGs. By dint of these connections, the Claimant was able, together with Malevsky and Popov, to subject the Defendant to "*krysha*" arrangements.

15.   Some of the documents which I describe in this statement also contain allegations that the Defendant was linked to OCGs, as well as the Claimant. The Defendant denies emphatically that he was ever a representative of OCGs, or in any partnership with the Claimant. There was no link between the Defendant and organised crime other than as result of the *krysha* arrangements to which he was subject, which brought him into unwilling contact with certain OCG figures including the Claimant. In any event, these matters are irrelevant to the present application, in which it is the Claimant's links to OCGs that are in issue.

16.   The Claimant now accepts that he has an obligation to disclose all documents relating to his relationship and dealings with Malevsky and his brother Andrei Malevsky, Popov and Anatoly Bykov ("Bykov") (**pages 3026-3034 at 3027, 3030, paras. 4, 17, Vol. 11**). (As explained below, Malevsky was associated with the *Ismailovskaya* OCG, Popov is associated with the *Podolsk* OCG, and Bykov was a gang leader associated with the Krasnoyarsk region.) The Claimant refuses, however, to make disclosure in respect of his relationships with any other individuals associated with, or said to be associated with

organised crime, asserting that in seeking disclosure of these documents the Defendant is attempting to rely on "unpleaded assertions" and that the Claimant is "not required to give disclosure in respect of unpleaded allegations" (**pages 3026-3034 at 3027, para. 4, Vol. 11**).

17. This characterisation either of the pleaded case or of the Claimant's disclosure obligations is not accepted. The Defendant's pleaded case is that the Defendant was subjected to *krysha* arrangements by a number of OCGs, for whom Malevsky, Popov and the Claimant acted as representatives, with the Claimant as the "primary representative" (**Defence, paras. 8.8 and 8.11, Vol. 13/B3**)[3]. The Defendant has made it clear that he identifies, for the purposes of this action, the representatives of the OCGs as the Claimant, Malevsky and Popov (**Further Information of 16 August 2010, response 23, Vol. 13/B4**). But he has always made it clear that the allegation is that the Claimant represented the OCGs. In Paragraph 15.5 of the Defence it is pleaded, for example, that the Claimant applied the USD 250 million received pursuant to Agreement No. 1 ("the final *krysha* payment payable to Mr Cherney") for his benefit and that of his associates (**Defence, para. 15.5, Vol. 13/B3**) For his part, the Claimant's position in this action has been – and presumably will be at trial – that there is no truth whatsoever in the allegation that he had any connection with organised crime – allegations which he has described in his evidence in these proceedings as "nonsense" (**Claimant's Second Witness Statement, para. 60, Vol. 12/A3**). He has also maintained that position in other court proceedings (e.g., **pages 2366-2379 at 2367, Vol. 9**).

18. The question whether the Claimant had connections with OCGs, making him a representative of the OCGs vis-à-vis the Defendant, is squarely raised on the pleadings. That question evidently should not be answered simply by examining the Claimant's connections with Malevsky and Popov (important as those are); it requires the Court to consider (a) the connections the Claimant had with other members of OCGs and (b) the connections that Malevsky and

---

[3] The pleadings, witness statements and transcripts of hearings in this action referred to in this Witness Statement are contained within volumes 12 and 13, sections A, B, and C, separated by numbered tabs. For example, the Defence is contained within volume 13, section B, tab 3: "Vol. 13/B3".

Popov had with OCGs. As a matter of disclosure, any material tending to show that the Claimant did, as the Defendant alleges, have connections with and represent OCGs is material that ought to be disclosed.

19.   Equally, of course, it is accepted that this cannot be a mere 'fishing expedition'. It is not. The purpose of this section of my witness statement is to explain why particular individuals and companies have been identified as being relevant, and as being persons in relation to whom the Claimant can reasonably be expected to have documents which should be properly searched for and disclosed.

20.   In order to explain the basis for the disclosure that is being sought, it has been necessary to put before the Court a large amount of evidence, assembled from a variety of different sources. That evidence is set out in detail at paragraphs 26 to 305 below. However, important as the detail is, the wider picture is also important. To assist in understanding that picture a *dramatis personae*, cross-referenced to the witness statement, has been prepared and is Appendix 1 to this Witness Statement[4]. In addition, a chart showing various connections between individuals and companies has been prepared and is Appendix 2 to this Witness Statement.

21.   In the evidence that follows, I identify:

(a)   the general background evidence relating to Russian OCGs and their leadership;

(b)   the evidence that demonstrates a connection between particular individuals and companies I have identified above, and one or more organized crime groups;

(c)   the evidence already available which demonstrates (in the case of all the individuals other than Semion Mogilevich ("Mogilevich") and Vyacheslav Ivankov ("Ivankov")) direct connections between the Claimant and those individuals or companies; and

---

[4]  The *dramatis personae* also notes variations in spellings of Russian names in the Latin alphabet.

(d)    in the case of Mogilevich and Ivankov, the evidence which strongly suggests indirect connections between the Claimant and those individuals, and which justifies the order sought.

22.    Although I have organised the evidence in this way, there are various interconnections between different parts of it which make it important to see the overall picture.

23.    On the Defendant's case, the overall picture is one in which the Claimant can be seen to have frequent contact, communication and financial dealings with a large number of reputed OCG leaders.

(a)    Malevsky was the leader of the *Ismailovskaya* OCG, and operated its "treasury", Trenton Business Corporation ("Trenton"). His deputies and successors were Sergei Aksenov ("Aksenov") and Dimitry Pavlov ("Pavlov"). The Claimant had extensive financial dealings with Trenton and Malevsky. He made payments to Aksenov and Pavlov, and made travel arrangements for Malevsky, Pavlov and their families.

(b)    Popov and Sergei Lalakin ("Lalakin")[5] were the reputed leaders of the *Podolskaya* (*Podolsk*) OCG. The Claimant had extensive financial dealings with Popov. He made travel arrangements for Popov, Lalakin and their families; and stayed at the same time as Lalakin and other OCG representatives at La Reserve Hotel in Geneva, and paid the school fees of a relative of Lalakin who attended the same school as his daughter. On 18 October 2011, the Claimant disclosed a document which purports to be a letter from the Podolsk City Court, Moscow and which refers to the quashing, in October 1998, of Popov's 1991 conviction, the remission of the case back to the Podolsk City Court, and the court's decision of 1 February 1999 discharging the case against him (**pages 2350-2351, Vol. 9**). It is reported in a book on Russian criminality by Andrey Maximov published in 1997 by Eksmo Publishing[6] that Popov's conviction related

---

[5]  Unless otherwise stated, all references to "Lalakin" are references to Sergei Lalakin, not Maxim Lalakin.

[6]  Andrey Makimov, *Russian Criminality*, ISBN 5-251-00593-8.

to offences of extortion, for which he served approximately two and a half years in prison and was released in 1993 (**pages 1704-1709 at 1708, 1709, Vol. 7**).

(c)   Sergei Mikhailov ("Mikhailov") was a reputed leader of the *Solntsevskaya* OCG. The Claimant stayed at the La Reserve hotel at the same time as Mikhailov (and other OCG leaders) and is reported to have met him there. His companies made at least one payment to a company linked to Mikhailov.

(d)   Alimjhan Tokhtakhounov ("Tokhtakhounov") has been identified as leading member of the Uzbek mafia. He is a friend of the Claimant, and they were staying at the La Reserve hotel at the same time as other OCG leaders, in 1994. The Claimant's companies made various payments to Tokhtakhounov between 1995 and 1997, and also made very substantial payments to a company said to be linked to Tokhtakhounov, which has been implicated (with Arik Kislin, a relative and agent of the Claimant) in money laundering.

(e)   Abduvaliev was another identified leader of the Uzbek mafia. The Claimant made payments to companies controlled by Abduvaliev, made travel arrangements for him, and seems to have been in a joint venture with him.

(f)   Akmal Gaziev ("Gaziev") was yet another reputed leader of the Uzbek mafia. The Claimant was staying with him at La Reserve hotel in 1994 (at the same time as other OCG members were present; and seems likely to have paid for or arranged for Gaziev to be there) and allowed him to operate a "sub-account" with and funded by one of the Claimant's companies.

(g)   Vladimir Tiourine ("Tiourine") was a reputed OCG leader from Bratsk. The Claimant provided him with a credit card and allowed him to operate a funded sub-fund in one of the Claimant's companies, and organized and paid for travel for him (apparently in the company of Abduvaliev).

(h)    Vladimir Poliakov ("Poliakov") was identified as an OCG member associated with Malevsky. The Claimant used the services of a company operated by Poliakov to rent a flat and buy a car, and made large payments to that company.

(i)    Ivankov was an OCG leader in the United States, connected with Popov and also connected with Poliakov. The Claimant admits to having possibly met his son, but denies knowing Ivankov himself, but has been identified as associated with him and seems to have been present in South Florida in late 1993 and early 1994 when a meeting of OCG leaders attended by Ivankov took place.

(j)    Semion Mogilevich was a reputed OCG leader with close connections to the Uzbek mafia, with which the Claimant also had close connections, through Tokhtakhounov, Abduvaliev and Gaziev.

24.    Apart from the various cases in which direct financial relations (such as payments, the provision of travel arrangements, credit cards, or access to money) can be identified, there are occasions when the Claimant can be placed in the same location (for instance, the same hotel) as a number of reputed OCG figures – for instance in early 1994, at La Reserve hotel. The Claimant's involvement in making travel arrangements suggests that these are not mere coincidences.

25.    In many cases the Claimant has been evasive or untruthful when asked about his relationship with these people. He has presented meetings as casual encounters and, denied or downplayed friendships and financial connections. The evidence – even that assembled to date on the limited disclosure that has been given – suggests that the Claimant was at the centre of a network of interconnected OCG figures, consistent with the Defendant's case that he was a representative of organised crime.

**B.    The Background: Russian Organised Crime**

26.    It is common ground on the pleadings that in the 1990s, Russia had a problem with organised criminal activities, including the protection system known as

"*krysha*". That is alleged in paragraph 8 of the Defence (**Vol. 13/B3**), and paragraph 5 of the Amended Reply (**Vol. 12/A4**) admits, that "in the 1980s and 1990s protection rackets (or krysha) were carried out by organised crime groups in Russia and elsewhere in the world". The problem, indeed, continues to be regarded as severe. The US Administration published its *Strategy to Combat Transnational Organized Crime* in July 2011, and describes the threat from Russian and Eurasian OCGs in the following terms (**pages 264-293 at 276, Vol. 2**):

> "Russian and Eurasian organized crime networks represent a significant threat to economic growth and democratic institutions. Russian organized crime syndicates and criminally linked oligarchs may attempt to collude with state or state-allied actors to undermine competition in strategic markets such as gas, oil, aluminium, and precious metals. At the same time, TOC networks in the region are establishing new ties to global drug trafficking networks. Nuclear material trafficking is an especially prominent concern in the former Soviet Union."

27.   At the jurisdictional stage of these proceedings, the Court had evidence from Professor Louise Shelley, of the George Mason University in Virginia, an expert in the development of organised crime in the former Soviet Union and Eastern Europe.

28.   Given the nature of the enquiry, it is very difficult to obtain direct evidence of the activities and connections of organised criminal groups in the former USSR. Nonetheless, there is also a body of other information from well-informed and serious sources (including academics who have conducted research in this area, investigative bodies, and judicial authorities which have heard direct evidence) that has been produced over time which speaks to the methods and structures of organised crime in Russia during the relevant period. This is not to say that these reports and other documents that make up this body are all necessarily wholly accurate, either in the facts they report or the conclusions they draw. It is precisely for this reason that disclosure is needed, namely to separate speculation from facts which can be established on evidence.

29.   Among the sources of information to which I shall refer are the following.

(a)   Professor Shelley's witness statement.

(b)   A report by Walter Kego and Alexandru Molcean entitled *Russian Speaking Organized Crime Groups in the EU*, ("the Kego Report"), published in March 2011 by the Institute for Security and Development Policy. The Institute is based in Stockholm, Sweden, and cooperates with research centres worldwide, such as the John Hopkins University in the United States (**pages 2928-2934, Vol. 10**). The Institute's core sponsor is the Swedish Ministry for Foreign Affairs (**page 2935, Vol. 10**).

(c)   Documents relating to a trial heard before the Stuttgart Regional Court (5th Criminal Division). The four defendants in those proceedings, Alexander Afanasyev, Alexander Lust, Oleg Riefert and Elena Riefert, were convicted in 2009 of money laundering offences committed through the management and investment of funds derived from the Russian OCG "Izmaylovskaya" (*Ismailovskaya*). The Court found that until his death, Malevsky, was the head of *Ismailovskaya*. The Court described *Ismailovskaya* as "a violent and armed wing of the consortium around Michael Chernoy" (**pages 679-901 at 809, Vol. 3**) As I describe below, the Court heard evidence that Trenton, an entity controlled by Malevsky, was the "treasury" or "war chest" (*obshchag*, also transliterated *obsheak* or *obchshak*) of the *Ismailovskaya* OCG (see para. 81 below). A copy of the Stuttgart Regional Court's Decision of 29 October 2009 (the "Stuttgart Decision") is at **pages 679-901, Vol. 3**. A copy of the Public Prosecutor's Statement of Charges is at **pages 515-606, Vol. 3**.

(d)   A report by the US Federal Bureau of Investigations (the "FBI") on Russian/Eurasian criminal organizations. It is entitled "The Ivankov Aka 'Yaponchik' Organization December 1994 Interim Report" (**pages 1-52, Vol. 1**). The content of the 1994 FBI Report on Ivankov seems to have been available since at least 1999. An article published by the Center for Public Integrity in Washington DC, USA on 14 December 1999 refers to a "confidential 1994 FBI intelligence report on the Brooklyn, N.Y., mob

organization headed by Vyacheslav Ivankov" (**pages 2047-2055, Vol. 8**) and an article by Richard Behar published in Fortune Magazine, "Capitalism in a Cold Climate" mentions an FBI report that names Sam Kislin as associate of an imprisoned Russian "godfather" (**pages 2127-2142, at 2139, Vol. 8**). (On Sam Kislin and his "partnership" with the Claimant see paragraphs 386 to 408 below.) The copy in the Defendant's possession is not wholly complete. The FBI's long running investigation into Russian and Eurasian criminal organizations is well known. Details of it are published on the FBI's website (**page 2864, Vol. 10**). The Stuttgart Court heard evidence from an FBI agent by the name of McCausland on the content and findings of an eleven-year FBI investigation into Russian speaking OCGs, including *Ismailovskaya* (**pages 679-901 at 851, Vol. 3**). Similarly, in the litigation in Delaware in the US, known as the "Davis litigation", an investigator named Robert Levinson who had been of one the FBI's principal specialists in Russian/Eurasian organised crime during the period 1992-1998, gave a statement, dated 27 May 2005, in relation to the prominent organised crime figure Vyacheslav "*Yaponchik*" Ivankov (**pages 192-205, Vol. 1**).

(e)   Documents disclosed by the Claimant that relate to the Swiss authorities' investigations from 1994 onwards into his conduct contain a number of references to various reports and briefings by INTERPOL national central bureaux and local police and law enforcement agencies.

(f)   News articles, some of which have been reprinted (in whole or in part) in translation in The Current Digest of the Russian Press, formerly The Current Digest of the Post-Soviet Press and before that The Current Digest of the Soviet Press (referred to collectively as "The Current Digest"). The Current Digest is a weekly collection of Russian language press materials translated into English for academic research and teaching that has been published since 1949 (**page 2926, Vol. 10**). It is available, for example, in the library of the London School of Economics and Political Science (**page 2927, Vol. 10**). Other news articles have

been obtained through the online publisher of The Current Digest, Eastview Information Services, and the online publisher Lexis Nexis.

(g) Papers from the Spanish investigation, "Operation Avispa", into alleged offences of money laundering by several individuals including the Claimant and the Defendant. In these proceedings an INTERPOL Red Notice and a European Arrest Warrant have been issued for the arrest of the Claimant for extradition to Spain. No such notices or arrest warrants have been issued for the Defendant.

30.   Professor Shelley explained in her witness statement that "[p]ost-Soviet Russian organized crime consists of many groups and has never been a single unified national organization" (**para. 35, Vol. 13/B1**). Russian OCGs, whilst having hierarchical structures, are less rigid than those in Italian mafia. They "operate much more as criminal networks that are fluid, flexible and cooperate with one another in their criminal activities on a case by case basis" (**para. 37, Vol. 13/B1**).

31.   At the beginning of the Kego Report, there is a useful overview of some of the distinctive elements of Russian speaking OCGs, including the class of criminal leaders known as "thieves in law" (*vory-v-zakone*) and the existence of collective criminal funds that they refer to as "*obsheak*" (**pages 207-263 at 216-217, Vol. 1**). As I identify below, other experts in this field and more recently the Stuttgart Regional Court, also refer to the phenomena of "thieves-in-law" and "*obsheak*", which is variously referred to as a war chest or mutual assistance fund.

32.   In his statement in the Davis litigation, Levinson gave an overview of common structural elements in Russian OCGs. He stated that these organisations were small groups prior to the break-up of the Soviet Union comprising professional criminals known as "*vory-v-zakone*" ("thieves-in-law") and other "*avtoritety*" ("criminal authorities"), but that then they were able to form into larger criminal organisations (**pages 192-205 at 195, para. 20, Vol. 1**).

33.  Levinson identified the largest of these OCGs as the *"Solntsevskaya"* or *"Solntsevo"* organisation led by Mikhailov, the *"Ismailovskaya"* or *"Ismailovo"* organisation led by Axenov (Aksenov) and the late Anton Malevskiy (Malevsky), and the *Ivankov* organisation headed by the "thief-in-law" Ivankov, also known as *"Yaponchik"* and *"Yaponets"* (**pages 192-205 at 195, para. 21, Vol. 1**). Levinson stated that both *Solntsevskaya* and *Ismailovskaya* each had over a thousand members and associates.

34.  Consistent with the evidence heard by the Stuttgart Regional Court, in his statement Levinson described the brigade structure within the organisations and the use of an *"obshak"* which he described as a "mutual assistance fund" (**pages 192-205 at 196, para. 22, Vol. 1**). Professor Shelley also commented on the use of *"obschak"* (which she translated as "common fund") at paragraph 46 of her witness statement (**Vol. 13/B1**).

35.  The material to which I refer above shows that Russian organised crime includes a number of recognised groups. I go into more detail about each of these below.

(a)  The *Ismailovskaya* or *Ismailovo* organization: see Professor Shelley's witness statement, para. 39 (**Vol. 13/B1**) and Levinson's witness statement in the Davis litigation, para. 22 (**pages 192-205 at 195, Vol. 1**). This organisation originated in Moscow. Its reputed leader was Malevsky and, after his death, Aksenov and Pavlov. Levinson's evidence was that this group had over a thousand members.

(b)  The *Podolsk* or *Podolskaya* crime group, which Popov helped to lead: see Professor Shelley's witness statement, para. 43 (**Vol. 13/B1**), which "consisted of about 500 members regarded as ruthless, well organized, and highly disciplined". Its international activities "included arms and drugs smuggling, and smuggling of oil".

(c)  The *Ivankov* organisation, headed by Vyacheslav Ivankov "(known usually by his nickname *"Yaponchik"*, meaning "little Japanese", but also sometimes called *"Yaponets"*), one of the leading "*vory-v-zakone*": see

Professor Shelley's witness statement, para. 43 (**Vol. 13/B1**) and Levinson's evidence in the *Davis* litigation, para. 21 (**pages 192-205 at 195, Vol. 1**). Professor Shelley regarded this group as connected to the *Podolsk* group, saying that Ivankov had "tried to extend the influence of the *Podolsk* group in the United States".

(d)   The *Solntsevo* organisation led by Mikhailov: see Levinson's witness statement in the *Davis* litigation, para. 21 (**pages 192-205 at 195, Vol. 1**).

(e)   The *Uzbek "Mafia"*: see Professor Shelley's witness statement, **paras. 18–24 (Vol. 13/B1)**. Among those associated with Uzbek Mafia was Tokhtakhounov (also known as "*Taiwanchik*" ("little Taiwanese"). Professor Shelley noted that "members of Uzbek organized crime operated not just in Moscow and other Russian cities, but in the United States, Israel and Europe to far a greater degree than other ethnic OCG such as the Chechens. Unlike other non-slavic criminals, Uzbeks also integrated with Russian OCG" (**para. 24, Vol. 13/B1**).

**C.**   **Documents relating to Malevsky and Popov**

(i)   *Disclosure given and sought*

36.   The Claimant has agreed to give disclosure in relation to just three figures associated with OCGs. These are Malevsky (associated with the *Ismailovskaya* organization), Popov (associated with the *Podolsk* organisation) and Bykov (a gang leader and former general director of the Krasnoyarsk aluminium plant convicted in 2002 of planning an attempted murder but released almost immediately[7] (**pages 2259-2260, Vol. 9**) and whose activities are described at paragraphs 63–75 of Professor Shelley's statement (**Vol. 13/B1**). Even with respect to Malevsky and Popov, the disclosure that has been provided is inadequate (see paragraphs 58 to 74 of this statement). Nevertheless it shows

---

[7]   Bykov subsequently brought proceedings against the Russian Federation before the European Court of Human Rights ("ECtHR"). The ECtHR found that the length of Bykov's pre-trial detention amounted to a breach of his right to liberty under Article 5 of the European Convention on Human Rights and the use of covert recording equipment breached his right to privacy under Article 8. However, the court found that there had not been any breach of Bykov's fair trial rights under Article 6 in the proceedings leading to his conviction. *Bykov v. Russia* (application no. 4378/02), Judgment of 10 March 2009.

(inconsistent with the tenor of the Claimant's evidence that Popov and Malevsky were introduced to the Radom partnership by the Defendant, albeit the Claimant knew them) multiple and close connections between the Claimant, Popov and Malevsky.

37. Disclosure of all documents evidencing the Claimant's relationships with Malevsky and Popov, whether directly or through entities controlled by them, is crucial in order to test the validity of the Claimant's allegation that his relationship with the Defendant was one of a partnership, which latterly also involved Malevsky and Popov at the Defendant's invitation not his, rather than one of *krysha* to which they (the Claimant, Malevsky and Popov) subjected the Defendant.

38. The Claimant initially proposed to make only limited disclosure of a sub-category of documents concerning his relationship with Malevsky and Popov **(pages 2936-2942 at 2942, paras. 24-25, Vol. 11)**. But, as I have noted above, he now accepts that he has an obligation to disclose all documents relating to Malevsky and Popov and entities controlled by them. He has asserted that he has done so. In a letter dated 9 September 2011, his solicitors stated that "[o]ur client has already disclosed documents evidencing communications and transactions between him (or entities in which he is interested) and Messrs Popov, Malevsky or Bykov" **(pages 3026-3034 at 3030, para. 17, Vol. 11)**. Similarly, in a letter of 25 July 2011, it was stated that "[s]uch documents as our client has within his control relating to Trenton Business Corporation, Reotan Foundation, Zlata Management, BCL Business Consulting [Malevsky] and Prival Services Limited [Popov] have been disclosed" **(pages 2979-2985 at 2983, para. 37, Vol. 11)**. In the same letter, the Claimant undertook to search for documents relating to a company referred to as Suned BV or Suned International BV which the Defendant alleges was related to Popov, although the Claimant does not accept that. It is not accepted that full disclosure has been made **(pages 2979-2985 at 2983, 2984, para. 38, Vol. 11)**.

(ii)    *The Claimant's close connections to Malevsky*

39.   The Claimant has, both in this action and elsewhere, tried to distance himself from Malevsky.

40.   When he was arrested by the Swiss Police on 21 May 1994, the Claimant was found in possession of airline tickets in the names of "Antony Malevsky" and "Janna Kharlanova" (**pages 913-914 at 914, Vol. 4**). The Claimant was questioned by the Swiss Examining Magistrate on 26 May 1994, when asked about who Anna (or Janna) Kharlanova (or Harlanova) was, he said "I don't really know Ms Anna Kharlanova. I don't remember this person. I may have paid for her hotel or airline ticket" (**page 959, Vol. 4**). In fact, I am told that Kharlanova is the maiden name of Malevsky's wife, Janna Malevskaya ("Malevskaya") and it seems unlikely that the Claimant did not realise this, since he was in possession of a ticket in her name (as well as that of Malevsky himself), and his daughters were staying with their grandmother in an apartment that was in her name (associated with that of Value Trust) (**pages 919-928 at 926, see also 934-935 at 935, Vol. 4**). The Claimant has also disclosed information said to be from an Israeli travel agency, Melamed Tours, which shows that travel arrangements were made for the Malevsky family (**page 492, Vol. 2**). The passengers' names that are recorded are Anton and Janna Malevsky, the children Roman and Nikita Malevsky and "Mrs HARLANOVA/VALENTI" (the remainder of the text is obscured). Also, I have been told by Arkady Rafikovich Sarkisyan, an employee of the Defendant and currently a member of the Russian Parliament, that Malevsky's mother-in-law was called Valentina. I understand from a Russian speaking employee of my firm that "Harlanova" and "Kharlanova" are different transliterations of the same Russian name.

41.   In 1996 the Claimant was asked directly about his relationship with Malevsky, following his arrest in Switzerland. A declaration by the Claimant dated 21 November 1996 records certain questions he was asked by Swiss police and the responses he gave (**pages 979-990, Vol. 4**). The Claimant declined to sign the declaration as he did not have a lawyer present (**page 990, Vol. 4**). The

declaration records that one of these questions was whether he knew Malevsky (Question number 15) and his response as follows.

> "Yes, in Israel. I first met him in Russia, about four years ago. I also met him in Switzerland and we play tennis together at LA RESERVE [hotel]. After that, we met in Israel. Sometimes we still play tennis. you could say he's a friend. I have no business relationship with him" (**page 988, Vol. 4**).

42.   The minutes of a hearing before the Swiss examining magistrate on 13 May 1997, which were signed by the Claimant, record that he was questioned about the statements he had made on 21 November 1996 in respect of his relationship with Malevsky. In respect of these, the Claimant is recorded as saying the following, amongst other things (**pages 997-1004 at 998, Vol. 4**).

> "Mr CHERNEY
>
> I can confirm that I have never entered into business relations with Mr Anton MALEVSKI. To be more accurate, I have never entered into business relations directly with him. On the other hand, it is possible within my own business activities that one or another of my companies have done business with one or other of the companies of Mr Anton MALEVSKI. I've never been associated with him in a company or in any other entity. There has never been any direct contractual link between him and me.
>
> Judge to MR CHERNEY
>
> Outside of the relations that you have described, has Anton MALEVSKI ever provided you with services?
>
> Mr CHERNEY
>
> Never. I would add in answering this question that I do not consider Mr Anton MALEVSKI a close friend. Since our emigration to Israel, our families have seen each other more frequently."

43.   In relation specifically to Malevsky's alleged links with organized crime, the Claimant stated

> "From what I know of Anton MALEVSKI, I would be very shocked if he would enter into relations with the world of organised crime." (**pages 997-1004 at 1000, Vol. 4**)

"As for the alleged connections of Mr Anton MALEVSKI with the world of organised crime, I maintain my previous statements." (**pages 997-1004 at 1004, Vol. 4**).

44. In his witness statements at the jurisdictional stage in this action, the Claimant took a similar position. His First Witness Statement did not even suggest a friendship with Malevsky, but attributed Malevsky's involvement in Radom to the Defendant (**Claimant's First Witness Statement, para. 34, Vol. 12/A1**)

"[i]n 1998 Mr Popov and Mr Malevsky were recommended as minority partners in Radom by Mr Deripaska. As they were influential people I had little choice but to agree to their participation as minority shareholders..."

45. The Defendant denied this characterisation of the introduction of Malevsky and Popov into the Radom Foundation. He said that the Claimant knew both Malevsky and Popov and that it was the Claimant that had introduced them to him (**Defendant's First Witness Statement, para. 23, Vol. 13/B2**). It was only in response to that evidence that the Claimant acknowledged his prior relationships with Malevsky and Popov. The relevant part of the Claimant's second witness statement reads (**Claimant's Second Witness Statement, para. 29, Vol. 12/A3**)

"I agree with Mr Deripaska that I knew both Anton Malevsky and Mr Popov before Mr Deripaska did. Indeed, my first witness statement did not suggest otherwise."

46. The Claimant has described his relationship with Malevsky from 1997 onwards in the following terms (**Claimant's Second Witness Statement, para. 31, Vol. 12/A3**)

"... I do not believe that I saw Anton Malevsky again after about 1997, although I did speak to him occasionally by telephone."

47. The Defendant's case is that this representation of the Claimant's relationship with Malevsky as a matter of social friendship alone is fundamentally dishonest. The Defendant's case is that the Claimant and Malevsky were close associates in the "business" of extortion.

48. For that reason, the documents disclosed by the Claimant which show payments made by him to Malevsky or Malevsky's companies, especially Trenton, are very important. (On Trenton, see, e.g., paras. 81 and 85.)

49. The disclosure already given by the Claimant demonstrates substantial financial connections between the Claimant and Malevsky (and his companies) dating back at least to early February 1994, which is some months before the earliest "investment" said to have been made by the Claimant in the Defendant's business. It also suggests that the Claimant and Malevsky had some joint control over Trenton up until 31 December 1994. Much of the work of establishing and managing "offshore" companies for the Claimant was carried out by a firm of Liechtenstein fiduciaries, Praisidial Anstalt. It had a sister company, Syndikus Treuhandanstalt. Although formally separate, these two fiduciary companies were within the same corporate group, and the same individuals (such as Hanspeter Stäger, Jean-Pierre Domenjoz, Dieter Strauss and Tony Wyss) were officers or employees of both. I refer to them collectively as "Syndikus". The Claimant has disclosed a considerable number of documents that have originated from Syndikus. It is not accepted that these are complete or wholly accurate.

50. Amongst the Claimant's disclosed documents is a file note that appears to have been prepared by Syndikus. This file note bears the dates 7 December 1994 and 9 December 1994. It records a conversation on 6 December 1994 between Syndikus officers Stäger, Domenjoz and Strauss, and Arik Kislin and Iskander Makhmoudov ("Makhmoudov"), the Claimant's agents/business managers, about a number of entities (**pages 1371-1374, Vol. 5**). Amongst these is Trenton (**page 1374, Vol. 5**). The note records that Syndikus were informed that that as of 31 December 1994 Arik Kislin would no longer have power of instruction in respect of Trenton and this would be held solely by Malevsky or a person nominated by him (see paragraph 257 below and **pages 1374, Vol. 5**). The Note then goes on to state that

"This also applies to the Reotan Foundation and Zlata Management Inc.

We have discussed the structure in general and it has been decided that the Hades Foundation set up several months ago will be activitated as a holding vehicle for the entire group, with no client or designated beneficiaries. A letter of intent is being drafted separately, confirming that the Galenit Foundation is the group's sole beneficiary." (**page 1374, Vol. 5**).

51.   Documents disclosed by the Claimant show that he controlled the Galenit Foundation and was, together with his partner (later, wife) Anna Tupikova ("Tupikova"), the Foundation's beneficiary (**pages 1177-1186, Vol. 5**). This suggests that, at least until 31 December 1994, Trenton, with Reotan Foundation ("Reotan") and Zlata Management Inc ("Zlata"), were part of the Claimant's group of entities, in which Malevsky was involved and exercised joint powers of instruction in respect of the three companies. This is at odds with the assertion made by the Claimant through his solicitors that "our client has never had a beneficial interest in any of these entities [including Trenton, Reotan Foundation and Zlata Management Inc] and nor has he exercised control over them" (**pages 2979-2985 at 2983, para. 37, Vol. 11**).

52.   Documents disclosed by the Claimant reflect that as of 21 November 1996 (the date of the Claimant's declaration to the Swiss police), the Claimant's companies Hiler Establishment, Blonde Investment, and Furlan Anstalt had made thirty payments to either Malevsky directly or to the entities Trenton and Reotan. These payments amounted to a sum of USD 4,973,426. A schedule of these payments is provided below.

53.   Copies of the documents showing these payments are contained at **pages 1242-1329 (Vol. 5)**. It is apparent that in respect of some of these transactions, the payment instructions were signed by the Claimant himself (**pages 1337-1342 Vol. 5**). At least one of these payment instructions, on 19 November 1995, was faxed from the number 972-3-5355405 (**page 1341, Vol. 5**). As I set out below in paragraph 264, this was the number at the Claimant's home address at 52 Ha-Giva St., Savyon, Israel.

54.   By way of example, there is a payment instruction dated 25 April 1994 that is signed by the Claimant, and, it appears also by Arik Kislin although the

signature is difficult to decipher, directing that a payment of SFR 30,000 be paid to Trenton's account at the Bank in Liechtenstein (**page 1337, Vol. 5**). This was less than one month before the Claimant was arrested for using a false Polish passport. Whilst the Claimant was still being held by the Swiss authorities the day before he stated that he did not really know and could not remember the person Kharlanova (Malevsky's wife, see paragraph 40 above), just over USD 1 million was transferred from Hiler Establishment to Malevsky's personal bank account and USD 50,000 was transferred to Malevsky's deputy in *Ismailovskaya*, Aksenov (**page 1370, Vol. 5**).

55. It is also apparent that the explanation given to Syndikus for at least some of the payments is that they represented "commissions" (**pages 1330, 1337, 1369, Vol. 5**). The Claimant has not disclosed any documents evidencing the nature of the services in respect of which Trenton received the "commission" payments.

56. I set out the payments identified in the table below. In this table, the name of the beneficiary is given as it appears on the relevant underlying document (or on at least one of the relevant underlying documents where reference is made to more than one). The "source" companies, Hiler Establishment, Furlan Anstalt and Blonde Investment Corporation, are identified in a letter sent by George Philippides to Domenjoz of Syndikus, dated 11 January 2002, as companies which the Claimant had described as being the most significant companies for Philippides' task of auditing his accumulation of wealth (**pages 2246 and 2247 ,Vol. 8**).

| DATE | SOURCE | RECIPIENT | AMOUNT | PAGE (Vol. 5) |
|---|---|---|---|---|
| 03/02/94 | Hiler Est. | Trenton Business Corp. (Blocking $) | USD 34,722.22 | **1242, 1244, 1245** |
| 09/02/94 | Hiler Est. | Trenton Business Corp. | USD 67,704.81 | **1242, 1246-1253** |
| 25/04/94 | Hiler Est. | Trenton Business Corp. | USD 30,000.00 | **1242, 1254-1257** |
| 24/05/94 | Hiler Est., | Anton Malevsky / | USD 1,000,003.55 | **1258, 1242** |

| DATE | SOURCE | RECIPIENT | AMOUNT | PAGE (Vol. 5) |
|---|---|---|---|---|
| | Vaduz | Anton Molevsky | | |
| 15/06/94 | Blonde Investment Corp. | Mr Akcyomov, Molevsky | USD 34,959.78 | **1259** |
| 22/09/94 | Hiler Est., Vaduz | A. Malevski, J. Malevski, Israel Discount Bank Ltd | USD 100,000.00 | **1260-1262** |
| 07/10/94 | Hiler Est., Vaduz | Trenton Business Corporation | USD 152,697.85 | **1263-1264** |
| 03/11/94 | Hiler Est., Vaduz | Trenton Business Corporation | USD 66,862.71 | **1265-1267** |
| 05/12/94 | Hiler Est., Vaduz | Trenton Business Corporation | USD 536.36 | **1268-1269** |
| 11/01/95 | Furlan Anstalt | Reotan Management, Liechtensteinische Landesbank | USD 83,334.00 | **1270-1271** |
| 16/01/95 | Hiler Est., Vaduz | Trenton Business Corp. | USD 42,588.45 | **1272-1274** |
| 24/01/95 | Furlan Anstalt | Reotan 01/12 | USD 83,334.00 | **1275** |
| 06/02/95 | Furlan Anstalt | Trenton Business Corporation 02/95 | USD 83,334.00 | **1267, 1277-1278, 1279** |
| 13/02/95 | Blonde Investment Corp. via. Hiler Est. | Trenton Business Corp. | USD 700,000.00 | **1280** |
| 05/03/95 | Furlan Anstalt | Reotan 3/95 | USD 83,334.00 | **1281** |
| 03/04/95 | Furlan Anstalt | Reotan Foundation, Liechtensteinische Landesbank | USD 83,334.00 | **1282-1283, 1284, 1285** |
| 05/05/95 | Furlan Anstalt | Reotan Foundation, Liechtensteinische Landesbank | USD 83,334.00 | **1286-1287, 1288, 1285** |
| 13/06/95 | Hiler Est., Vaduz | Reotan Foundation | USD 83,338.31 | **1289** |

| DATE | SOURCE | RECIPIENT | AMOUNT | PAGE (Vol. 5) |
|---|---|---|---|---|
| 30/06/95 | Furlan Anstalt (CCT Consul Consult & Trade Est.) | Reotan Foundation | USD 83,334.00 | **1290, 1293, 1297** |
| 28/07/95 | Furlan Anstalt | Reotan Foundation, Liechtensteinische Landesbank | USD 83,334.00 | **1298, 1299** |
| 23/08/95 | Hiler Est., Vaduz | Malevsky Anton, Israel Discount Bank Ltd | USD 150,000.00 | **1300-1303** |
| 28/08/95 | Furlan Anstalt | Reotan Foundation | USD 83,338.13 | **1304** |
| 28/09/95 | Furlan Anstalt | Malevsky Anton, Israel Discount Bank Ltd | USD 200,000.00 | **1305, 1306** |
| 28/09/95 | Furlan Anstalt | Reotan Foundation | USD 83,334.00 | **1306-1309** |
| 02/11/95 | Furlan Anstalt | Reotan | USD 83,334.00 | **1309, 1310** |
| 20/11/95 | Furlan Anstalt | Malevsky Anton, Israel Discount Bank Ltd | USD 100,000.00 | **1310-1314** |
| 01/12/95 | Furlan Anstalt | Reotan | USD 83,334.00 | **1310** |
| 22/12/95 | Hiler Est., Vaduz | Reotan Foundtion *(sic)* | USD 300,000.00 | **1315** |
| 29/03/96 | Furlan Anstalt | Anton Malevsky | USD 100,000.00 | **1316** |
| 14/05/96 | Hiler Est. Ltd BVI | Trenton Business Corporation | USD 810,000.00 | **1317-1319** |
| 16/06/97 | CCT Consul Consult | BCL Business Consulting Limite *(sic)* | USD 6,306,619.79 | **1320** |
| 06/08/97 | CCT Consul Consult | Mineral Resources Establishmen*(sic)* | USD 10,000,022.95 | **1321** |
| 05/01/98 | CCT Consul | Mineral Resources | USD 10,000,023.93 | **1322** |

| DATE | SOURCE | RECIPIENT | AMOUNT | PAGE (Vol. 5) |
|---|---|---|---|---|
|  | Consult | Establishmen *(sic)* |  |  |
| 05/01/98 | CCT Consul Consult | Mineral Resources Establishmen *(sic)* | USD 10,000,023.93 | **1322** |
| 01/07/98 | CCT Consul Consult | Mineral Resources Establishmen *(sic)* | USD 1,500,023.10 | **1323** |
| 30/07/98 | Operator Trade Centre | Trenton Business Corporation | USD 10,550,023.85 | **1324** |
| 14/10/98 | CCT Consul Consult | Mineral Resources Establishmen*(sic)* | USD 7,000,026.67 | **1325** |
| 15/10/98 | CCT Consul Consult | Mineral Resources Establishmen*(sic)* | USD 200,026.47 | **1325** |
| 11/03/99 | Operator Trade Centre | Trenton Business Corporation | USD 4,000,024.22 | **1326** |
| 07/04/99 | Operator Trade Centre | Trenton Business Corporation | USD 500,023.93 | **1327** |
| 24/05/99 | Operator Trade Centre | Trenton Business Corporation | USD 35,500,023.45 | **1328** |
| 03/02/00 | Operator Trade Centre | Trenton Business Corporation | USD 2,000,021.34 | **1329** |

57.  Since the Claimant has not disclosed any documents in which it is possible to identify the recipients of monies transferred from his personal accounts (see paragraphs 480 to 486 below) it is not possible to establish whether any payments from these accounts were received by Malevsky or any of his corporate entities.

(iii)   *Documents not disclosed: documents relating to the Claimant's Kazakh investment with Malevsky*

58.   A report prepared on the Claimant's instructions in 2001 and 2002 (which I describe in more detail at paragraph 382 below, and refer to after its author as the "Philippides Report") describes certain "investments in Kazakhstan" said to have been made in the period from 1997 to 1998 by CCT Consul Consult and Trade Establishment ("CCT") (**pages 294-336 at 329, Vol. 2**). It appears that CCT invested USD 38.7 million, the monies being paid to a company called Mineral Resources Establishment ("MRE"). This was used to buy shares in Kazakhstan metal producers which were sold towards the end of 1999 for USD 100 million. The Claimant's share is said to have been USD 50 million which was received by his company Operator Trade Center ("OTC") in 2000.

59.   For present purposes, the significance of this transaction is that the Claimant's partner in it was Malevsky, acting through his brother Andrei Malevsky. It is Malevsky who, according to the Philippides Report, held the only copy of the sale contract from 1999.

60.   It follows that, between 1997 and around 2000, the Claimant purportedly had a business partnership with Malevsky in Kazakh assets (including aluminium assets) with a value of USD 100 million. This is during a period when, according to the Claimant's evidence in these proceedings, he cannot recall ever seeing Malevsky after 1997, and spoke to him only occasionally on the telephone (**Claimant's Second Witness Statement, para. 31, Vol. 12/A3**).

61.   Very few documents relating to this partnership have been disclosed. Six documents have been identified within the Claimant's disclosed documents which reflect payments to MRE in 1997 and 1998 (**pages 1778-1781, Vol. 7; pages 2273-2323, Vol. 9; and pages 294-336, Vol. 2**). There are a number of other documents reflecting the payments to MRE, but these are from the Defendant's disclosed documents not the Claimant's (**pages 1933-1954, Vol. 7**). Some of these documents suggest that the payments comprise the repayment of a loan and interest on that loan pursuant to an agreement dated 15 December 1997 (**e.g., pages 1933 and 1935**). A copy of that agreement has not

been disclosed. Other documents, approximately three, provide as the payment details "PMT COVERING PURCHASE OF SHARES OF KAZAKHSTAN ENTERPRISES" (**pages 1779-1781, Vol. 7**). None of the transaction documents one would expect to see with payments of this size, such as share purchase agreements or documents relating to the entities in which the shares were bought, has been disclosed.

62.   Moreover, amongst the limited documents disclosed by the Claimant, none appears to evidence a receipt or receipts by OTC of USD 50 million in 2000 relating to these supposed Kazakh investments and MRE or any of the related entities identified in the Philippides Report (International Mineral Resources Ltd, Kazakh Mineral Resources Ltd, KMR-1 Ltd, Kazakh Mineral Resources Corporation ("KMRC")).

63.   On 18 October 2011, the Claimant disclosed a single document that relates to MRE and KMRC (**pages 1765-1777, Vol. 7**). It is an agreement between the four shareholders of KMRC (each holding a 25 percent stake) and MRE. The document is not dated although at the top of the first page the typed figure "1997" appears and at the top of the second page there is the typed figure "1977". The agreement states that one of the four shareholders, Ruslan Saidazimov, will gift his 25 percent shareholding to MRE which will, on the following day, sell that stake to the remaining three shareholders for USD 40 million (consisting of an initial payment of USD 21.5 million on or before the date of execution of the agreement, plus a balance of USD 18.5 million to be paid before a "deadline date" of 10 January 1998). The agreement also provides that should the remaining three shareholders not pay the consideration in the full amount to MRE, it shall retain USD 10 million of the initial payment, repay to the three shareholders any of the balance that they have paid and they will issue a share certificate in the name of MRE for 25 percent of the issued share capital of KMRC.

64.   This agreement raises a number of questions. For example, why would Saidazimov give shares apparently worth USD 40 million to MRE, a company associated with Andrei and Anton Malevsky? Why was the agreement

structured in the way that it was, by which MRE could ultimately obtain both USD 10 million and 25 percent of the shares of KMRC? How did this document come to be in the Claimant's control? What further documents relating to KMRC and the Claimant's Kazakh investment with Malevsky are in his control?

65. Although this agreement does not on its face concern the Claimant, Saidazimov is quite likely an associate of his who also used the name Orazakhoun Saidazimov. The agreement states that Saidazimov is also known as Roy Sadeh. A report by the Swiss police on organised crime from the former USSR, identified a Rouslan Roy Saidazimov, "04.01.1957", as associated with Lalakin (**pages 1065-1096 at 1088, Vol. 4**). In United States immigration proceedings relating to an appellant named Roy Azim, that individual was identified as also being known as Orazakhoun Faizievich Saidazimov having changed his name to Roy Azim after arriving in the US (**pages 2395-1 to 2395-6 at 2395-1 and 2395-2, Vol. 9**). A photocopy of a page from a USSR passport in the name of Orazakhoun Saidazimov amongst documents disclosed by the Claimant relating to his company Republic Establishment, gives Saidazimov's date of birth as "01.04.1957" (**page 1104, Vol. 5**).

66. There are other documents showing that Saidazimov was an associate of the Claimant. On 24 September 1991, Metall & Stahll-Handelsgesellschaft MbH, an Austrian company, issued a letter naming Orazakhoun Saidazimov, the Claimant, Tupikova, Makhmoudov and Alan Mihailovic Bekmurzov as being "invited [to Vienna for] business talks" during the period between 01 October and 31 December 1991 (**pages 1105-1106 at 1106, Vol. 5**). Orazakhoun Saidazimov was also issued with credit cards from the Claimant's company, Republic Establishment (**page 1202, Vol. 5**) and had access to a Republic Establishment sub-account (**pages 1417-1422, Vol. 6**). On 22 April 1994, a "Julia Saidazimova" was paid USD 100,028.91 by the Claimant's company, Hiler Establishment (**page 1343, Vol. 5**). It appears that "Julia Saidazimova" was the wife of Saidazimov. On 20 February 2001, an appellate court in the State of New York, USA, gave a declaratory judgment recognising a decree of divorce obtained in the "Republic of Kirgistan" (Kyrgyzstan) in the case of *Roy*

*Azim v Joulia Saidazimova* 280 A.D.2d 566, 720 N.Y.S.2d 561 (**pages 2155-2156, Vol. 8**). As noted above at paragraph 65, Roy Azim was the name that Saidazimov adopted in the US.

67. Given that the Philippides Report identifies the payments to MRE Establishment as pursuant to a joint venture with Malevsky, it is requested that the Claimant be ordered to disclose all documents relating to these payments and the supposed Kazakh investments. This should include those related to the agreement of 15 December 1997 and the agreement itself, share purchase and sales agreements, trust agreements, documents related to the entities identified in the Philippides Report, any communications with Philippides and his colleagues, and the Liechtenstein fiduciaries, Syndikus Treuhandanstalt and/or Praesidial-Anstalt or any other agent, about these payments. The Claimant should also disclose all further documents in his control relating to the dealings between MRE and Saidazimov and KMRC.

(iv) ***Documents not disclosed: documents relating to the writing off of "loans" to Malevsky and Popov companies***

68. On 2 September 2011, almost five months after initial disclosure was given, the Claimant disclosed File 296 entitled "Archers Trading Ltd vol. 3". This file included:

(a) pages stamped C61690-C61729 (**pages 1893-1932, Vol. 7**) which consist of various documents evidencing payments between Archers Trading Ltd, Prival Services Ltd ("Prival") (Popov) and a number of companies named Soyuzcontract (Popov); and

(b) pages stamped C61730-C61737 (**pages 2091-2106, Vol. 8**) which comprised a schedule of "missing contracts" for amounts (totaling over USD 101 million) that had been received by Archers Trading Ltd in 1999. The receipts that are reflected on these pages include USD 1.95 million from Prival (Popov).

69. The Claimant's solicitors had previously asserted (**page 2950 and 2980 para. 8, Vol. 11**) that all relevant documents relating to Malevsky and Popov and

their companies such as Trenton and Prival had been disclosed, and documents concerning the sums of USD 35.5 million and USD 20.1 million that the Claimant, through his company Operator Trade Center Ltd (OTC), had paid in May 1999 to Trenton (Malevsky) and Prival (Popov) respectively were included within this earlier disclosure. These disclosed documents comprised the bank transfer documents, bank statements and ledgers (showing the outflows of money) and two short loan agreements in respect of the amounts of USD 35.5 million and USD 20.1 million (**pages 2027-2038, Vol. 8**). This limited disclosure did not include any correspondence, notes of meetings or memoranda evidencing why these "loans" had been made and there were no documents evidencing any repayment of the capital or payments of interest (for which the loan agreements provided).

70.   However, on 16 September 2011, the Claimant disclosed further files including File 304, entitled "Ledgers and journals volume 2". This file contained various ledgers and journals for Hiler Establishment Ltd (BVI), Meganetty Foundation, Operator Trade Center and Republic Establishment. For OTC, the newly disclosed ledgers and journals for the period from 1 January 1997 to 2001/2002 showed those loans to Trenton and Prival as having been written off by "depreciation", within a few months of their being granted (**pages 2241-2242, Vol. 8**). Specifically, in relation to:

(a)   the loan of USD 35.5 million made by OTC to Trenton (Malevsky) in May 1999, the documents contained the entry "*depreciation loan Trenton - $35,500,000*" on 31 December 1999; and

(b)   the loan of USD 20.1 million made by OTC to Prival (Popov) in May 1999, this loan was written off by the entry "*depreciation loan Prival - $20,100,000*" also on 31 December 1999.

71.   Thus, it was only on 16 September 2011, that the Claimant disclosed the writing off by him of over USD 55 million in "loans" to companies operated by Malevsky and Popov.

72.   The Claimant has not disclosed any other documents about this writing off of these "loans". As noted above, no correspondence, notes or memoranda moving between the Claimant, Malevsky or Popov (or the people administering their companies) have been disclosed. The newly-disclosed ledgers appear to have been prepared by Syndikus. It is reasonable to assume that, as agents, Syndikus would only have written off these "loans" "by depreciation" in the ledgers if they had been instructed to do so. The Claimant has not disclosed any such instructions whether from his own files or from the files of Syndikus, nor any reason why the "loans" should have been written off.

73.   Accordingly, the Claimant should search for and disclose:

    (a)   any document explaining the reason why the "loans" referred to above were made in the first place (including any emails, minutes, notes or correspondence explaining them);

    (b)   any document explaining the reason why the "loans" referred to above were written off by "depreciation"; and

    (c)   any document giving instructions to Syndikus or any other fiduciary or agent in that regard

74.   That disclosure should be given specifically by a disclosure statement which identifies any missing or lost documents and explains why they cannot be found.

**D.   Evidence of the involvement of other OCG individuals in organised crime groups**

75.   As I noted above in paragraphs 14 to 25, it is part of the Defendant's case that the Claimant has had long-standing relationships with individuals, other than Malevsky, Popov and Bykov, who are themselves members of Russian-speaking OCGs. Accordingly, the Defendant seeks an order requiring the Claimant to disclose documents evidencing his dealings, directly or indirectly, with the individuals identified below and all documents relating to the particular transactions and other dealings that have been identified, including

payments by the Claimant to reputed OCG figures following his receipt of the "final *krysha* payment payable to [him]" of USD 250 million through Hillgate (**Defence, para. 15.5, Vol. 13/B3**). The Claimant has not asserted that such documents are not in his control; rather, his position is that they do not fall to be disclosed.

76.  These individuals are set out below together with particular entities with which they are apparently associated. Various alternative transliterations of their names are contained within the dramatis personae contained within Schedule 1 to this Witness Statement.

   (a)   Sergei Aksenov, Natalia Aksenova and Berger International Holding;

   (b)   Dimitri Pavlov and Nika Holding;

   (c)   Sergei Lalakin, Maxim Lalakin and Valentina Lalakina;

   (d)   Sergei Mikhailov and Rosides Establishment;

   (e)   Alimjhan Tokhtakhounov, ICC International Credit Corporation;

   (f)   Salim Abduvaliev, Beglane Investment Company Establishment and Vitash;

   (g)   Akmal Gaziev;

   (h)   Vladimir Tiourine;

   (i)   Vladimir Poliakov and Value Trust Services SA and Value Trust Services Ltd;

   (j)   Janna or Anna Malevskaya and Janna or Anna Kharlanova or Harlanova;

   (k)   Semion Mogilevich; and

   (l)   Vyacheslav Ivankov.

77.  In this section of my Witness Statement I explain the significance of each of the individuals concerned, and the evidence suggesting that they were members of or otherwise connected with OCGs.

(i)   *Ismailovskaya: Aksenov, Pavlov, Natalia Aksenova, Berger Holdings*

78.   The *Ismailovskaya* group has been described in paragraph 35(a) above, and in the material I refer to there. The defendants in the Stuttgart criminal proceedings were charged with laundering money on behalf of the *Ismailovskaya* group. The court heard evidence and made findings in respect of the structure of this organization. It is therefore a useful source of information about this group.

79.   Professor Shelley described *Ismailovskaya* as including some of the "most dangerous and brutal" groups in Moscow (**para. 38, Vol. 13/B1**). The Stuttgart Court found as proved to the criminal standard that, amongst other things, *Ismailovskaya* was responsible for the murder of several high-ranking businessmen, such as Felix Lvov, Oleg Kantor and Vadim Yafysov, because they opposed the group (**pages 679-901 at 810, Vol. 3**).

80.   Professor Shelley (**para. 40, Vol. 13/B1**) explained how the *Ismailovskaya* group was involved in *krysha* arrangements, including in the aluminium industry (**para. 61, Vol. 13/B1**). In its Decision, the Stuttgart Court described the "fight for privatized companies" in the early 1990s in the wake of the collapse of the Soviet Union and the role played in it by *Ismailovskaya*, for which, the Court noted, the group was richly compensated, in some cases with a share of up to 50 percent of a company that was taken over (**pages 679-901 at 808, 811, Vol. 3**).

81.   According to the Court, these assets were paid into a war chest, a so-called "*obshchag*", from which members of *Ismailovskaya* received their payments. The Court also described how this war chest provided an asset base from which the group could then diversify into other areas of organized criminal activity, in which it continues to operate now that the fight for privatized companies in the former Soviet Union has ended (**pages 679-901 at 811, Vol. 3**). The Stuttgart Regional Court's Decision makes reference (but does not recount the evidence in detail) to having heard evidence from Liechtenstein and Austrian investigations describing Trenton as being used as the "*obshchag*" (war chest) of *Ismailovskaya*, being concerned in the movement of funds to Germany, and

being used to finance the private bank accounts "of the Izmaylovskaya leaders Malevsky and Akysonov" (**pages 866-868, Vol. 3**). As I have noted above, Trenton is a company that the Claimant states was owned or controlled by Malevsky (**page 2980, para. 8, Vol. 11**) but over which it appears that the Claimant may have had control prior to 31 December 1994.

82. The Stuttgart Court found that at the time of the "privatization battles" following the end of the Soviet Union, the leader of *Ismailovskaya* was Malevsky (**pages 679-901 at 812, Vol. 3**). That evidence is consistent with the evidence of Professor Shelley (**paras. 38-42, Vol 13/B1**).

83. Malevsky left Russia for Israel in 1994; he was deported from Israel in 1998; he died in a parachuting incident in 2001. The Stuttgart Court found that, after 1994, the *Ismailovskaya* group in Russia was led by Aksyonov (Aksenov), also known as Aksyon and Akson, and Pavlov. They became the co-heads of *Ismailovskaya* as a whole following Malevsky's death in 2001 "under mysterious circumstances in a parachuting accident – as a trained paratrooper" (**pages 679-901 at 812, Vol. 3**).

84. In addition to hearing evidence of this from first-hand witnesses of fact, the Stuttgart Court heard evidence from the FBI agent McCausland. Amongst other things, McCausland said that he had been told by six other Russian informants that (i) *Ismailovskaya* was currently led by Aksenov and Pavlov, (ii) the former leader Malevsky had been killed in a parachuting accident, and (iii) the Moscow-based company Nika Holding was the official "figurehead" of the organisation. The Court's Decision records that McCausland told the Court that he had reason to believe the information provided by these people because they were longstanding informants whose information over time had been corroborated by other sources (**page 851, Vol. 3**). The Stuttgart Decision also records that the court heard evidence from the lead investigating officer, KHK Layher, of the information gathered by Europol about *Ismailovskaya*, which was described as one of the ten most powerful Russian OCGs; the former leader of *Ismailovskaya* was identified as Malevsky and the current leaders as Serge Aksynov (Aksenov) and Pavlov; there existed a joint fund of the

organisation; and a Moscow company Nika Holding was the organization's official "figurehead" (**pages 851-852, Vol. 3**). Pavlov had been identified by the Liechtenstein authorities as the General Director of Nika Holding (**pages 515-606 at 582-583, Vol. 3**).

85.  The Stuttgart Prosecutor's Statement of Charges records that payments in the sum of USD 1,687,098 were made from Trenton, the reputed "*obchshak*" of the *Ismailovskaya* OCG, to Pavlov (**pages 515-606 at 591-592, Vol. 3**).

86.  Pavlov appears to have made no secret in Russia of his relationship with Malevsky. He is identified as one of the sponsors of a parachuting award, said to have been established in the memory of Malevsky, which has featured in a Russian magazine website entitled "Elita Obshchestva". (I am told by a Russian speaking employee of my firm that the title of this magazine translates as "The Elite of Society"). The webpage which features this story contains pictures of persons said to have been present at the "Anton Malevsky Cup" meeting and includes pictures of Pavlov, Lalakin and Tokhtakhounov (**pages 2487-2490, Vol. 9**). (Lalakin and Tokhtakhounov are also reputed members of Russian-speaking OCGs and information in respect of them is given in paras. 90-91 and 116-128 .)

87.  Other material also establishes a link between *Ismailovskaya*, Malevsky and Aksenov:

(a)  The statement of Levinson in the Davis litigation, in relation to the prominent organised crime figure Vyacheslav "*Yaponchik*" Ivankov. In the course of his statement Levinson stated that "Sergey Axcnov ("Axenov")", also known as "Aksyon", was the joint head of the crime organisation *Ismailovskaya*, with the late "Anton Malevskiy" (**pages 192-205 at 192, 193, 195, 198, 199, Vol. 1**); and

(b)  In the European Arrest Warrant issued by the Spanish judicial authority on 20 May 2009 in respect of the Claimant, it is stated that the Claimant, Malevsky and Aksenov were the joint founders of the transnational criminal organisation *Ismailovskaya* (**pages 2645-2657 at 2648, Vol. 10**).

88.   In summary:

(a)   There is very strong evidence to show that the *Ismailovskaya* organization existed; that it was a criminal organization in the fullest possible sense of that term, being involved in the most serious crime including murder and violence; that its leader until his death was Malevsky; that its "*obshchag*" (or treasury) was Trenton; that it was involved in *krysha* and in the "aluminium wars"; and

(b)   There is strong evidence that Aksenov and Pavlov were senior figures in the *Ismailovskaya* organisation; that Aksenov and Pavlov ran that organisation in Russia from 1994, and that they became the leaders of the organisation in 2001, when Malevsky died.

89.   In addition to Aksenov and Pavlov, the Defendant seeks disclosure in relation to Berger International Holding, Natalia Aksenova and Nika Holding. The reasons for this are as follows.

(a)   Berger International Holding AG is a company which appears to have been owned or controlled by Aksenov, and used by him as a front. The prosecuting authorities in the Stuttgart case identified Berger International Holding as being controlled by Aksenov. In the Stuttgart Prosecutor's Statement of Charges it is stated that there was evidence of payments being made by Trenton, to Berger International Holding, which was described as "a front for Aksenov" (**pages 515-606 at 591-592, Vol. 3**). In a request to the Swiss authorities for mutual legal assistance in 2006, the Public Prosecutor at the District Court in Darmstadt, Germany, identified Serguei Michail Axenov as the beneficial owner of Berger International Holdings AG (**pages 508-514 at 511, Vol. 3**).

(b)   The name "Natalia Aksenova" seems likely to be a female relative of Aksenov. In the course of their investigations into the use of false Polish passports, the Swiss police sent a message to the INTERPOL national central bureaux in Russia and Poland (**pages 911-912, Vol. 4**). In this message, the Swiss police asked their counterparts in Russia for any

information relating to the following names: Malevski, Anton; Tohtahounov, Allgman; Tcherney, Michail; Popov, Sergei; Lalakina Valentina; <u>Aksenova, Natalia</u>; Klimova, Marianna (emphasis added). I have been told by a Russian speaking employee of my firm that the name Aksenova is the female form of the male name Aksenov.

(c)   The Stuttgart Court heard evidence from both the FBI agent McCausland and the lead investigating officer, Layher, that the Moscow-based company Nika Holding was the official "figurehead" of *Ismailovskaya* (**pages 679-901 at 851-852, Vol. 3**). The Liechtenstein authorities had previously identified that Pavlov was the general director of Nika Holding (**pages 515-606 at 583, Vol. 3**).

(ii)   *Podolskaya (Podolsk) group: Lalakin*

90.   As explained in paragraph 35(b) above, the *Podolsk* or *Podolskaya* group is an organized crime group. Professor Shelley identified Popov as one of its leaders. For the reasons given below, it is believed that Lalakin (also known as "*Lutchok*") was also a leader of that *Podolsk* group.

(a)   He has been identified as such in a Swiss Police report dated 22 March 2000 (**pages 1040-1052 at 1051, Vol. 4**) which refers to a company called Soyuzkontrakt (which the Claimant accepts was connected with Popov: see **pages 2979-2985 at 2980, para. 8, Vol 11**) as being "controlled by the criminal organisation PODOLSKAYA which is run by POPOV and Sergei LALAKIN".

(b)   A Swiss police report on organised crime in the former USSR, repeats this information (**pages 1059-1096 at 1087, 1093, Vol. 4**) and gives further information about Lalakin. It records that he was implicated in an extortion racket in 1995, in the sum of over USD 100,000 (**pages 1059-1096 at 1087, Vol. 4**) (see further below).

(c)   The Swiss report then records that Lalakin stayed at Hotel La Reserve in Geneva between 18 April and 15 May 1994 in the company of "TOKHTAKHOUNOV Alimjan Toursounovitch" and "TCHERNEY

Mikhail Semionovitch" (the Claimant) (**pages 1059-1096 at 1087, Vol. 4**). As discussed below, it is apparent from documents disclosed by the Claimant that he was present at La Reserve Hotel during this period. When he was arrested by the Swiss police on 21 May 1994, invoices from La Reserve Hotel were recovered from him which record stays by him and people identified as Gaziev and Haimoff (**pages 913-914 at 914, Vol. 4**). Tokhtakhounov and Gaziev are reputedly involved in organised crime, and information concerning them is given below in paragraphs 115-125 and 134-139.

(d)     The INTERPOL report certified by the Bulgarian National Security Directorate records that (**pages 158-191 at 189, Vol. 1**):

> "[Lalakin] is probably the godson of Ivankov. Lalakin appears to be one of the significant leaders of organized crime group Podolskaya or Podolsk after the brutal killings within the criminal circles (Meeting of the General Secretariat of ICPO INTERPOL and Switzerland, 12th April 2000)."

(e)     On 17 January 1995 Lalakin was "searched by INTERPOL Moscow for blackmailing (over USD 100 000) carried out in September 1993." (**pages 178-191 at 190, Vol. 1**) The General Secretariat of ICPO INTERPOL issued a "request for localization", pursuant to which he was "localized" (found) in Prague in December 1995. INTERPOL Moscow, however, ceased the search "due to the insufficient evidences" (**pages 158-191 at 190, Vol. 1** citing INTERPOL Moscow, 17th May 1995, Prague, 21st December 1995 and INTERPOL Moscow, 14th March 1996).

(f)     In the Spanish criminal proceedings, Lalakin is described as the chief of the criminal organisation "*Podolsky*" (**pages 2437-2480 at 2469, Vol. 9**).

(g)     Vadim Volkov's book published in 2002 by Cornell University Press, *Violent Entrepreneurs: The Use of Force in the Making of Russian Capitalism*, describes Lalakin ("Lutchok") as the leader of the *Podol'skaya* criminal group (**pages 2338-2340 at 2340, Vol. 9**).

(h)   The Israeli authorities (in a request for assistance dated 6 April 2000) (**pages 2118-2123 at 2120, Vol. 8**) identified Lalakin as one of "several leaders of organized crime organizations".

91.   In summary, both academic and police reports implicate Lalakin as a leader of the *Podolsk* group (of which Popov was also a leader), and circumstantial evidence shows a close association between Lalakin and other reputed OCG leaders.

(iii)   ***The Ivankov Organization: Vyachislav Ivankov***

Ivankov was convicted of extortion in the United States on 8 July 1996 (**page 2864, Vol. 10**).   He received a sentence of nine years and eight months in prison (**pages 192-205 at 192, para. 4, Vol. 1**). On his release from prison in 2004 he was deported to Russia (**pages 192-205 at 193, para. 7, Vol. 1**). Ivankov then stood trial for the murder of two Turkish businessmen in Moscow but was ultimately acquitted (**page 2664, Vol. 10**). He himself then died in hospital in October 2009 after an assassination attempt in Moscow (**page 2664, Vol. 10; 206-263 at 249, Vol. 1**).

92.   In a witness statement in which he described the *Ivankov* organisation, Levinson stated that the organisation in Russia was involved in extorting legitimate businessmen by operating a protection system called "*krisha*". Levinson described "*krisha*" as a system to ensure that the businessmen and their corporate entities were not threatened physically or economically either by that OCG or others (**pages 192-205 at 197, Vol. 1**). This is, in effect, a description of the same phenomenon to which the Defendant asserts he was made subject by the Claimant operating in conjunction with Malevsky and Popov.

93.   According to the FBI's online publication of the Ivankov investigation and prosecution, his organization specialised in extorting Russian business interests (**page 2864, Vol. 10**). The FBI's summary of the facts of the case reads as follows.

"The investigation proved that the Russian principals of Summit International in New York City were being extorted by Ivankov's organization. Summit International is an investment advisory firm for Russian emigres in the United States. Ivankov and five of his subordinates were arrested by FBI agents on June 8, 1995. This investigation utilized numerous sensitive investigative techniques."

94.   Giving evidence for the prosecution in Ivankov's trial in 1996 for this extortion, one of his lieutenants, Leonid Abelis, described Ivankov as "one of the heavyweights of the criminal world [who] has great power and authority" (**pages 1466-1608 at 1480-1482, Vol. 6**).

95.   The 1994 FBI Report describes Ivankov as the head of "*Organizatsiya*", the first and most significant Eurasian OCG in the United States and linked to the Moscow-based *Solntsevskaya* OCG, which itself included members with contacts at the highest level of governments around the world and leaders of other powerful Eurasian OCGs (**pages 1-52 at 2, Vol. 1**). According to the report, Ivankov was a "thief-in-law" (**pages 1-52 at 3, Vol. 1**); this term is described in some detail in the report (**pages 1-52 at 29-31, Vol. 1**) and also in the recently published Kego Report, which identifies Ivankov as a criminal leader amongst Russian speaking OCGs (**pages 206-263 at 216, 234, Vol. 1**). Ivankov is said to have been linked to a number of individuals including Arik Kislin, Michael Kislin, Malevsky, Poliakov, Tokhtakhounov and the Claimant, who was described in the 1994 FBI Report as one of his principal associates (**pages 1-52 at 6, 7, 12, 13, 15, 16, 31, Vol. 1**).

96.   In her witness statement in these proceedings, Professor Shelley noted the connection between the *Podolsk* group, led by amongst others Popov, and Ivankov operating in the United States (**para. 43, Vol. 13/B1**).

97.   Levinson, formerly of the FBI, also stated that there was a connection between *Ismailovskaya* and the OCG led by Ivankov and that he was aware of at least one meeting between representatives of the two OCGs, namely Axsenov (Aksenov) and Leonid Abelis (Ivankov's deputy), in Atlantic City, New Jersey sometime prior to Abelis's and Ivankov's arrest on 8 June 1995. According to

Levinson, it was Abelis who had provided this information to the FBI (**pages 192-205 at 193, 199, 201, paras. 6, 33, 39, Vol 1**).

98.   A news article entitled "Kingpin's Demise", originally published in *Vremya novostei* and reprinted in part in translation in The Current Digest of the Russian Press (2009) vol. 61, no. 42 (**page 2664, Vol. 10**), reported on Ivankov's death in October 2009. It described him in the following terms.

> "It is no exaggeration to say that Mr. Ivankov was a legendary figure in the world of the special services and among criminals. He earned a reputation back in the Soviet era as one of the most powerful bosses of the crime world, with extensive connections and influence over people ranging from performing artists to politicians and major businessmen, and he retained that reputation until just recently. He was also well known abroad, where the special services of many countries, including the US, considered him one of the kingpins of the "Russian mafia".
>
> … this notorious figure, who had become a kind of symbol of not one but several eras − from the days of the "Soviet mafia" to the "wild racketeering" of the 1990s …
>
> The case of the attack on Mr Ivankov has still not been solved. But investigators said almost immediately that their main theory involved the victim's "professional activities" in the criminal world. The investigation believes that Yaponchik had lately been playing the role of "referee" in conflicts between criminal gangs, and that he had come to Moscow from abroad shortly before the incident specifically to settle one of those disputes…"

99.   In summary, the evidence shows that:

(a)   Ivankov was a leader of organised crime. He was convicted in the United States in proceedings in which he was identified as such;

(b)   his activities included the operation of *krysha* protection rackets to extort money; and

(c)   Ivankov had connections with both the *Podolsk* group (led by Popov and Lalakin) and with the *Ismailovskaya* group (led by Malevsky, and latterly by Aksenov and Pavlov).

(iv)     *Solntsevskaya: Mikhailov and Mogilevich*

100. Levinson also provided details of the connections between the *Ivankov* organisation and *Solntsevskaya* led by Mikhailov and between the *Ivankov* organisation and *Ismailovskaya* led by Aksenov and Malevsky. According to a document that seems to be another report by the US FBI on Eurasian organized crime, "[t]he principal leaders of the Solntsevskaya organisation are Sergei Mikhailov and Viktor Averin. Information available to the FBI indicates that Semion Mogilevich is a partner of Sergei Mikhailov and Viktor Averin." **(pages 53-157 at 77, Vol. 1).**

101. A 1995 issue of The Current Digest of the Post-Soviet Press contains an article originally published in the Izvestia newspaper entitled "Russian Mafia 'Godfathers' Are Now Becoming Honorary Consuls" **(pages 1457-1459 at 1458, Vol. 6).** The article reports that Mikhailov, "the godfather of the Solntsevo mafia" had been appointed Costa Rica's honorary consul in Moscow. It also names a number of companies in which Mikhailov was said to hold an interest, including a Liechtenstein entity, Rosides Establishment (to which I refer below at para. 195).

102. At paragraphs 47 and 48 of his statement, Levinson referred to the criminal trial of Mikhailov in 1998 in Geneva on charges of money laundering and being a member of a criminal organisation. He stated that he gave evidence at this trial, together with an officer in the Russian Ministry of Interior's Organized Crime Control Division who had fled to Switzerland and granted residency there having received death threats and whose daughter had been subject to two kidnap attempts in Moscow **(pages 192-205 at 203, Vol. 1).**

103. I have seen two news reports by the British Broadcasting Corporation ("BBC") on this trial, at the end of which Mikhailov was acquitted of all but the most minor charge. In the first, immediately prior to the start of the trial, it is reported that the "BBC Geneva correspondent says the odds have been stacked against the Geneva authorities throughout the investigation who have complained of a lack of Russian cooperation with the enquiry" **(pages 1983-**

1984, Vol. 7). The second report, announcing Mikhailov's acquittal, contains the following text (**pages 1985-1986, Vol. 7**)

> "The authorities tried to bring a charge of money-laundering against him, but had difficulty when they tried to gather evidence in Russia …
> The 15-day trial featured 90 witnesses, with many receiving police protection after one was shot dead in Amsterdam last year.
> A former senior Moscow police investigator, said to have fled to Switzerland after his life was threatened, told the court the Solntsevo gang was involved in narcotics and arms trafficking.
> There were also letters from INTERPOL implicating Mr Mikhailov in the Russian mafia, while various passports said to have been used by the defendant were also produced."

104. There were a number of Russian news reports and wires on the Swiss trial. Reporting on the decision of the Swiss authorities to grant asylum to the Russian police officer prepared to testify in the trial against Mikhailov, an article by Larisa Kislinskaya, published by Itar-Tass on 29 October 1997 (**page 1698, Vol. 7**), described Mikhailov as

> "Sergei Mikhailov, the leader of the mighty Solntsevo group nicknamed after a Moscow city district. Mikhailov, known as "Mikhas" in the criminal world …"

105. Another article, reporting on the heightened security at the Swiss embassy in Moscow in the lead up to the trial, reads, in relevant part (**pages 1782-1783, Vol. 7**)

> "As Switzerland prepares to try one of Russia's most powerful alleged mafia bosses, security at the country's embassy in Moscow has been boosted following reported threats from Russian mafia groups.
>
> Viktor Schlumpf, a spokesman for the Swiss government's Department of Justice and Police said that "a few members" of the so-called Fortification Guard, an elite unit of mountain troopers, have already been dispatched to guard the Moscow embassy.
>
> Schlumpf said in a telephone interview from Bern that his government had decided to "boost security because of the threats" by Russian organized crime groups. He did not specify what the threats were or who had made them.

> Sergei Mikhailov, a Russian citizen who Swiss prosecutors suspect of links to organized crime, is currently awaiting trial in a Geneva area detention facility.
>
> Mikhailov, known in the Russian criminal underworld as Mikhas, is widely believed to have been the leader of the Moscow area's most powerful organized crime group the Solntsevskaya gang.
>
> Mikhailov's lawyers maintain that he is a law-abiding businessman and philanthropist who has not breached either Swiss or Russian laws. They denied Mikhailov's associates were behind the alleged threats on the embassy."

106.   A report of an investigation into the murder in 1995 of Vladislav Listyev, general director of the just created Public Russian Television (ORT), refers to Mikhailov as "the notorious Sergei Mikhailov (a.k.a. Mikhas, leader of the Solntsevo criminal group" (**pages 2113-2114, Vol. 8**).

107.   A report from the Moscow Times dated 26 June 2002 concerns a police raid of Mikhailov's home and offices in and near Moscow as part of an investigation into the kidnapping of two businessmen (**pages 2248-2249, Vol. 8**). The article describes Mikhailov in the following terms.

> "Mikhailov, 44, also known as Mikhas, is widely believed to be the leader of the powerful Solntsevo organized crime group. ...
>
> Mikhailov spent two years in a Swiss prison on charges of organized crime and violation of Swiss property rules in the 1990s. He was released after investigators failed to prove their case and won in 2000 about $500,000 in Swiss compensation for the time spent in jail.
>
> Mikhailov began his career as a waiter and is widely believed to be one of the founders of the Solntsevo organized crime group, which controlled many businesses, Kommersant reported. When his apartment in the Moscow suburb of Solntsevo was searched in 1994, police found, among other things, fake IDs for a presidential administration official and for a CNN correspondent.
>
> Mikhailov also attempted to get accredited as the honorary consul of Costa Rica, but was turned down by the Foreign Ministry, Kommersant said.
>
> Most recently, Mikhailov's name appeared in reports about an Italian-led crackdown on money laundering by Russian organized crime. Mikhailov,

who has been barred from the United States and most European countries, has denied that he laundered money."

108. The article also reports a response given by Mikhailov when asked about the *Solntsevskaya* OCG

"'There is no Solntsevo group as such,' Mikhailov was quoted as saying by Kommersant on Monday, the day of the search. 'At least there is not a single court verdict to prove it. There are people who live in the Solntsevo district and are friends and work together.'"

109. It appears from a number of press reports that on his return to Russia from Switzerland, Mikhailov sought to gain political office. He registered to stand for a state *Duma* (parliament) seat but was struck off the ballot ostensibly for failing to disclose that he held Greek as well as Russian citizenship. The first decision was overturned by the Supreme Court but a second decision was upheld by it. In one article, it was reported that Mikhailov was described by both "Swiss and Russian prosecutors as the leader of the Solntsevo criminal gang" (**pages 2125-2126, Vol. 8**). In another article dated 11 June 1999, which reported the original decision, it is stated that Mikhailov "within certain circles, is also known as <<Mikhas>>" (**pages 2045-2046 at 2046, Vol. 8**).

110. In summary, although Mikhailov was acquitted on all but a minor charge in the Swiss trial, there is evidence implicating him as a leader of the *Solntsevskaya* group. Whilst some of the Russian press articles reported a lack of evidence against Mikhailov in the Swiss proceedings, none questioned the existence of the *Solntsevo* or *Solntsevskaya* group.

111. There is also evidence of connections with other reputed OCG figures. As noted above, what appears to be an FBI Report dated 1996, suggests that Mikhailov was associated with Mogilevich (**pages 53-157 at 57, Vol. 1**). More recently, a news wire from Itar-Tass dated 28 January 2008 (**page 2491, Vol. 9**) explained that

"In the early 1990s Mogilevich was a ringleader of the notorious Solntsevo criminal group in Moscow responsible for dozens of grave crimes. Mogilevich had been on the wanted list for almost 20 years during which he changed around 17 names and surnames, with Semyon

> Schneider being the last one, a police source said. In recent years
> Mogilevich had been moving from one country to another in a bid to
> escape justice. He has citizenship of several countries."

112.   Mogilevich is described by Professor Shelley as a "notorious crime boss", who is "considered by many as the most significant Russian organized crime figure" (**para. 85, Vol. 13/B1**). As described below, he attended a "summit meeting" of Russian OCG figures in Israel from 10–19 October 1995 (**pages 53-157 at 80, Vol. 1**). Mogilevich is currently subject to an INTERPOL Red Notice for his arrest at the request of the United States' authorities, which states that he is an associate of another reputed OCG figure, Tokhtakhounov (who is discussed further below). The INTERPOL Red Notice for Mogilevich records that he is wanted in Pennsylvania, USA for offences including organised/transnational crime, fraud, money laundering, people smuggling, trafficking and illegal immigration, crimes involving weapons/explosives and theft (**page 2914-2915, Vol. 10**).

113.   In the report published by the US White House in July 2011 as part of the National Security Strategy, "Strategy to Combat Transnational Organized Crime", Mogilevich's organisation is specifically identified. The report states that he is on the FBI's Most Wanted list and that although he was arrested by Russian police in January 2008 on tax charges he was released pending trial in July 2009. It is said that he continues to expand his criminal empire (**pages 264-293 at 286, Vol. 2**). An article in *Rossiiskaya gazeta* reporting on the arrest of Mogilevich (aka Sergei Shnaider) stated that his net worth has been estimated at USD 10-12 billion (**page 2542, Vol. 9**).

(v)   *The Uzbek connections: Tokhtakhounov, Abduvaliev and Gaziev*

114.   As set out in paragraph 35 (e) above, another well-known criminal organisation originating in the Soviet Union is the Uzbek mafia. For present purposes, the Defendant seeks documents relating to three reputed members of the Uzbek mafia: Tokhtakhounov, Abduvaliev and Gaziev.

*Tokhtakhounov*

115. The evidence shows that Tokhtakhounov is a well-known figure in Russian speaking organised crime and he is reputed to be one of the world's most wanted criminals. He is also known as "*Taiwanchik*". Professor Shelley, in her witness statement given during the jurisdictional stage of these proceedings, identified Tokhtakhounov as a prominent member of the Uzbek mafia and friend of the Claimant who was born in Uzbekistan (**para. 22-23, Vol. 13/B1**).

116. Tokhtakhounov was born in Tashkent, Uzbekistan on 1 January 1949 and so is three years senior to the Claimant, who was born on 16 January 1952 and grew up in Uzbekistan (**para. 6, Vol. 12/A1**).

117. In the Kego Report (see paragraph 29(b) above), Tokhtakhounov is named as Tahtahunov Alimjan Ursulovici "Taiwancik" and is described as being part of a transnational network of Russian speaking criminal leaders in Europe with his particular responsibility being France and Germany (**pages 206-263 at 222, Vol. 1**). Further in the report, under a country heading of "Germany", it is said (**pages 206-263 at 234, Vol. 1**)

> "Later, in a short period of time the higher echelons of the Russian criminal world managed to settle in Germany. There were about fifteen Russian speaking 'thieves in law' living in Germany in 1997; among them the notorious 'Taiwanchik,' who had obtained legal residence permit."

118. Tokhtakhounov then settled in France. The Kego Report states (**pages 206-263 at 241, Vol. 1**) that

> "For a long time, the RSOCGs [Russian speaking organised criminal groups] in France was closely linked to the name of Alimjan Tohtahunov ("Taiwancik"), who was officially involved in the modeling industry, but was unofficially considered the RSOCG curator (smotreashii) for all of Europe."

119. The INTERPOL report certified by the Bulgarian authorities states that according to INTERPOL Kiev, Tokhtakhounov had been living in France since March or April 1993 but was deported on 17 April 1995 to Israel. He apparently returned to France in 1996 (**pages 158-191 at 189, Vol. 1**).

Tokhtakhounov was reported to have been arrested in Italy in 2002 (**pages 2329-2333 at 2333, Vol.9**)

120. A news article originally published in *Vremya novostei* on 2 August 2002, reported on Tokhtakhounov's arrest in Italy in 2002 (**pages 2270-2272 at 2272, Vol. 9**). The article contains a lengthy recitation of Tokhtakhounov's reputed position within Russian OCGs, which I reproduce below. It also refers to his close relationship with the Claimant.

> "On Wednesday [July 31], at the prestigious resort of Forte dei Marmi, Italian police, acting at the FBI's request, arrested Alimzhan Tokhtakhunov, 52, who holds both Russian and Israeli citizenship and is known in the Russian underworld circles as a crime boss and authoritative and influential figures nicknamed Taivanchik [Little Taiwanese]. ... Ostensibly, the FBI is asking the Italian authorities to extradite Mr. Tokhtakunov in connection with a specific scandalous charge – that he fixed the outcome of the figure skating competition, which, it may be recalled, was indeed marked by the clamorous saga of two "parallel" pairs of Olympic champions. ... According to Russian and foreign intelligence services, sports and show business have been a hobby of sorts for Mr. Tokhtakhunov. But he acquired his authority and respect (if we put aside his earlier, "Soviet" convictions) in far more substantial endeavors – namely, through his involvement in the Russian and international oil industry and in the future of Russia's giant metallurgical companies, his connections with prominent Russian politicians and oligarchs and, according to the FBI, his role in international drug trafficking and large-scale money laundering.
>
> Judging not only from information from special services, but also from open sources, Mr. Tokhtakhunov can indeed be regarded as one of the bosses of Russia's shadow economy and underworld. He earned his position of authority in the criminal world following two convictions back in the 1980s, when he acquired the status of crime kingpin. However, his name was heard in Russia only until the early 1990s, when he took up permanent residence in Europe – first in Belgium and France, and in recent years in Italy. From the very outset, he was known as an associate of Vyacheslav Ivankov, also known as Yaponchik [Little Japanese], who is now serving time in an American prison. But later he was mentioned more frequently as a partner or a close friend of leading Russian businessmen and politicians (with both quasicriminal and completely "spotless" reputations)... It is also known that Taivanchik played a very active role in the founding of the once-notorious National Sports Federation (NSF), and that he was acquainted with the head of the State Sports Committee, Shamil Tarpishchev ... Taivanchik is also a good friend of the Chernoi brothers (Lev and Mikhail), the iron and steel industry oligarchs, and has close business ties with them. ..."

121. I understand from a report in The Current Digest (2003) that whilst the first instance court in Italy granted the extradition request, that decision was overturned on appeal on the basis that the US offences did not satisfy the requirements of double criminality and were not, therefore, extradition offences (**pages 2348-2349 at 2349, Vol. 9**).

122. Tokhtakhounov is now the subject of an INTERPOL Red Notice. He is listed on the INTERPOL website as "Wanted" in New York, USA to face the following categories of offences: fraud, organized crime/transnational crime, thefts, crimes involving works of art, drug-related crimes, and money laundering (**page 2913, Vol. 10**).

123. The INTERPOL notice also records that Tokhtakhounov is associated with Mogilevich, who is mentioned in paragraphs 23(j) and 111 to 113 above. The INTERPOL report certified by the Bulgarian authorities dated 14 September 2000 noted that Tokhtakhounov was closely related to Ivankov's group in the US and to Mogilevich's organisation (**pages 158-191 at 189, Vol. 1**).

124. As described below, amongst the limited disclosure made so far by the Claimant, is one document which shows that on 20 April 1999 the Claimant, "TAKHTAHOUNOV/A" and Abduvaliev were booked on a flight between Charles De Gaulle airport in France (airport code CGD) and Munich in Germany (airport code MUC) (**pages 338-343 at 342, Vol. 2**). Abduvaliev is another reputed leader of the Uzbek mafia about whom further information is given below in paragraphs 126 to 133. It seems likely that the spelling of "Takhtahounov" in this document is an error in transliteration.

125. For reasons given in more detail below, it appears that Tokhtakhounov may have connections with a BVI company, ICC International Credit Corporation. Partly for that reason but also because of independent evidence suggesting that ICC International Credit Corporation is a front for organised crime, disclosure of documents in relation to that company should also be given. The evidence in relation to this is set out below in paragraphs 202 to 209.

*Abduvaliev*

54

126. Abduvaliev is reputed to be the leader of the "Uzbek" group and a leading member in Russian speaking organised crime. Born in May 1954 (**pages 2544-2552 at 2550, Vol. 9**), he is two years younger that the Claimant.

127. He was also so identified by the Office of the Attorney General of Jerusalem in a request for legal assistance in a criminal matter to the Swiss authorities in April 2000 (**pages 2118-2123 at 2120, Vol. 8**).

128. In three secret diplomatic cables which have been subsequently published as part of the 'Wikileaks' material, the US Ambassador to Uzbekistan, Jon Purnell, referred to Abduvaliyev (Abduvaliev) as a leader of organised crime in Uzbekistan.

   (a)   In a diplomatic cable of 9 March 2006, Ambassador Purnell stated (**pages 2424-2425 at 2424, Vol. 9**) that

   > "Post has obtained video footage of two events hosted by the family of Tashkent mafia chieftain **Salim Abduvaliyev**. (Note: Salim and his rival, Gafur Rakhimov, are Uzbekistan's top mobsters ...)"

   (b)   On 5 May 2006 in a further secret cable, Ambassador Purnell describes how the "mafia chieftain" and "crime boss" "Salim Abduvaliyev" facilitates bribery at the highest level, including a USD 700,000 bribe by Uzbek rail company Gemka (**pages 2433-2434 at 2433, Vol. 9**).

   (c)   In a confidential diplomatic cable of 18 April 2007, Ambassador Purnell describes the birthday party of the "Mafia chieftain Salim Abduvaliyev". He goes on to state that "the guests consisted of Russian, Georgian, and Ukrainian mafia and criminal figures including Lev Chorny". The Claimant sent his birthday wishes: "Singers included Gulom Yakubov and formerly New York based dissident Willy Tokarev, who appeared in poor health. Tokarev offered birthday wishes from Lev Chorny's older brother Mikhail, a Russian-Israeli businessman who heads a Russian crime syndicate" (**pages 2485-2486, Vol. 9**).

129. An article published by the Russian Trud newspaper on 18 October 2000 reported on the past criminal activities of Bykov, in respect of whom the Claimant accepts he is obliged to give disclosure. Within the article there is the following mention of Abduvaliev (**pages 2144-1 to 2144-5, Vol. 8**).

> "In the criminal world, leaders of the Uzbek organised crime group Salim Abdulayev – nicknamed Salim – and Tofik Arifov – simply Tofik to his own people – protected the Bykov "team"."

130. A BBC report on the press in Russia published on the Internet describes Trud as "[o]nce the official paper of the Soviet trade union movement, Trud has traditionally devoted much of its coverage to social affairs, and in particular the hardships faced by some of Russia's outlying regions" (**pages 2543-1 to 2543-4, Vol. 9**).

131. Similarly, Professor Shelley, in her witness statement in these proceedings, identified Abduvaliev as a prominent member of the Uzbek mafia who was associated with the Claimant (**para. 23, Vol. 13/B1**).

132. The Court will note that Professor Shelley, Ambassador Purnell, and the Swiss authorities all considered that there were connections between Abduvaliev and the Claimant. In addition to the travel in April 1999 by the Claimant, Abduvaliev and "Taktahounov" referred to above (paragraph 124) the further evidence of such a connection is described below, at paragraphs 209 to 223.

133. Abduvaliev appears to have connections with at least two companies: the Beglane Investment Company and Vitash. Disclosure is specifically sought in relation to those companies too. The evidence for this connection is set out below.

*Gaziev*

134. Gaziev was born on 16 October 1960 in Tashkent, Uzbekistan. He is the subject of an INTERPOL Red Notice, issued at the request of the Uzbek authorities, for offences against life and health, organised/transnational crime, theft and money laundering (**pages 2916-2917, Vol. 10**).

135. It is apparent from the decision of the US Board of Immigration Appeals in *Re Akmal Gaziev* (A74 963 627 et al.) of 30 July 2002 that Gaziev is wanted for prosecution in relation to "the Dendro Park shootout" in Tashkent on 12 April 1994. It is said that in this incident "two 'gangster' groups exchanged gunfire resulting in the death of five people and the wounding of two others" (**pages 2261-2269 at 2265-2266, Vol. 9**). The Board found that immediately after the shoot-out, Gaziev had left Uzbekistan, eventually arriving in the United States. Documents disclosed by the Claimant show that he paid for Gaziev's accommodation at La Reserve hotel in Geneva between 28 April 1994 and 2 May 1994 (**pages 913-914 at 914, para. 226 Vol. 4**). This was less than three weeks after the shoot-out in which Gaziev had been accused of being involved.)

136. It is set out in the Board's decision that on 5 May 1994, prosecution proceedings were initiated against Gaziev in Uzbekistan for "gangsterism" in connection with the Dendro Park shootout (**pages 2261-2269 at 2266, Vol. 9**). Amongst other things, the Board noted that "[a]llegedly, six or seven of the defendants [in the Uzbek trial in 1995] testified that the respondent [Gaziev] organized and planned the shootout" (**pages 2261-2269 at 2266, Vol. 9**).

137. In its Decision, the Board granted Gaziev's petition for deferral of a removal order to Uzbekistan on the basis of a well-founded fear of torture because the Uzbek government accused him of involvement in an organized criminal gang and being responsible for the death of five people in the Dendro Park shootout (**pages 2261-2269 at 2263, 2266, Vol. 9**). But the Board did not accept Gaziev's assertion that the accusation against him was politically motivated. Instead, the Board found that (**pages 2261-2269 at 2265, Vol. 9**)

> "we concur with the Immigration Judge, for the reasons set forth in his decision, that there are serious reasons for considering that the lead respondent has committed a serious nonpolitical crime outside the United States and that there are reasonable grounds for regarding him as a danger to the community."

138. Gaziev had been held in US immigration detention prior to the Board's decision. On 4 February 2003, Gaziev's petition was granted and he was

ordered to be released from custody under an order of supervision (**page 2341, Vol. 9**).

139. In summary:

(a)    there is substantial evidence from a number of sources that Tokhtakhounov, Abduvaliev and Gaziev are senior figures in the Uzbek mafia; and

(b)    in the cases of Tokhtakhounov and Abduvaliev there is also evidence (independently of the evidence uncovered as a result of the disclosure so far provided by the Claimant) of friendship or association with the Claimant and his brother.

(vi)    *The Bratsk connection: Tiourine*

140. The evidence shows that Tiourine is reputedly the leader of the *Bratskaya* criminal organisation. In an article dated 25 November 2010, following his arrest in Moscow pursuant to a Spanish request for his extradition, the Russian business oriented daily newspaper, *Kommersant*, provided a short biography of Tiourine. The article states that he was a known criminal in the Bratsk area in 1990 and that the press had, on the basis of information received from law enforcement agencies, accused him of involvement in large scale criminal activities in the Bratsk and Irkutsk regions at the beginning of 1990. In 1993, he moved to Moscow, where he was "crowned" as a "thief in law" and received the protection of Ivankov (*Yaponchik*) (**pages 2691-2694 at 2693, Vol. 10**). In an article dated 9 December 2010, *Kommersant* provided further information on the status of Tiourine's challenge to the Spanish extradition request and described him as "the former leader of the Bratskaya OCG, influential thief-in-law Vladimir Tiurine (Tiurik) age 51" (**pages 2695-2698 at 2697, Vol. 10**).

141. In a speech to the Russian Duma on 21 February 1997, then Deputy Prime Minister and Minister of Internal Affairs, S.A. Kulikov, spoke of aluminium based transactions at the Krasnoyarsk and Bratsk plants being controlled by criminal gangs. In relation to this, he named "Tyurik" (the nickname for

Tiourine) as "a thief from Bratsk" who, with others including the Chernyi brothers, was responsible for controlling aluminium output at the Bratsk plant (**pages 1616-1638 at 1631, Vol. 6**).

142. In the Kego Report (see paragraph 29(b) above), Tiourine is named as Vladimir Tiurin "Tiurik" and described as being part of a transnational network of Russian speaking criminal leaders in Europe, with his particular responsibility being Spain (**pages 206-263 at 222, Vol. 1**). The Report notes that according to certain sources he was party to an important gathering of "thieves-in-law" in Spain in March 2003 when a money laundering network was allegedly established (**pages 206-263 at 236, Vol. 1**).

143. Tiourine is a subject of the Spanish money laundering investigation – "Avispa" – in which the Claimant and the Defendant are also named. Like the Claimant (but unlike the Defendant), Tiourine's extradition had been requested by the Spanish judge (as referred to above in paragraph 141). Tiourine's arrest in Russia pursuant to that request is noted in the Kego Report (**pages 206-263 at 237, Vol. 1**). An article by *Kommersant* dated 1 August 2011 states that Tiourine is still being held in prison pursuant to that Spanish extradition request (**pages 2707-2710 at 2710, Vol. 10**)

(vii) *Value Trust Services: Poliakov*

144. The 1994 FBI Report describes Poliakov as a "thief-in-law" who "is believed to be overseer of Eurasian OC in Canada" (**pages 1-52 at 13, see also pages 17-18, Vol. 1**).

145. The INTERPOL report certified by the Bulgarian authorities refers to the Ukrainian, Poliakov, born on 15 March 1955, who is a qualified "thief-in-law" and one of the leaders in Russian crime in Canada, where he was then living (**pages 158-191 at 182, Vol. 1**). The report further states that he is close to Ivankov and has been banned from entering Switzerland, where he managed the Geneva company, Value Trust Services.

146. The connection between Poliakov and Ivankov is also suggested by the reports of Swiss investigators. Amongst the papers of the Swiss investigations is a

report from a Swiss police officer to the prosecutor dated 16 June 1995, which records that the officer has been told by the US FBI of the arrest of "Viatcheslav Ivankov", who is associated with Poliakov in Geneva (**pages 963-966 at 965, Vol. 4**).

147. The Swiss investigation into the use of false Polish passports by the Claimant linked Poliakov, through the company he managed, Value Trust Services, to various suspicious activities. This Swiss investigation centred upon two incidents, the first on 11 March 1994 and the second on 21 May 1994. These incidents are described at length in the Fifth Witness Statement of Alexander Joseph Gerbi dated 22 July 2011 (Vol.13/B5). These matters were raised before the Court (Flaux J) briefly on 20 June 2011 (**Vol. 13/C1**) and again on 26 July 2011 (**Vol. 13/C2**). I provide a summary here of the relevant facts.

148. On 11 March 1994, a vehicle was stopped and searched by Swiss officials at the border between Switzerland and Germany. The occupants of the car were two men calling themselves Pawel Wysocki and Edward Dutkowiak, and carrying Polish passports and Polish driving licences in the same names (**pages 902-905 at 904-905, Vol. 4**). The passport in the name of Wysocki was numbered AA 1451273, and the driving licence in that name was numbered B0408770. The passport in the name of Dutkowiak was numbered AA 1451789, and the driving licence in that name was numbered B090279.

149. A number of items were recovered from the car including a Walther PPK gun (6.35 calibre) and two silencers, six additional Polish passports and seven additional Polish driving licences, visiting cards for the Swiss Bank Corporation (Société de Banque Suisse), 1211 Geneva 20, 17 ch. Louis-Dunant, one in the name of Eugenisz Manikailo, and envelopes from hotels in Geneva called "La Réserve" and "Bristol" (**pages 902-905 at 905, Vol. 4**). The Polish passports (subsequently identified as having been stolen when blank) found in the car bore the following names and (partly sequential) numbers: "Czernyi Mihail", no. AA 2958585; "Tupikowa Anna", no. AA 2958586; "Taim Aleks", no. AA 2958587; "Czermaja Elina", no. AA 2958589; "Malewskaja Zanna", no. AA 2958609; "Czemaja Rina", no. AA 2713873

(pages 902-905 at 904-905, Vol. 4). The Polish driving licences (also subsequently identified as having been stolen when blank) found in the car bore the following names and (partly sequential) numbers: "Hotin Petr", no. J0840908; "Hotina Irina", no. J0840909; "Orlow Viktor", no. J08040910; "Taim Aleks", no. J0840917; "Malewskaja Zanna", no. J0840918; "Czernyi Mihail", no. J0840920; "Tupikowa Anna", no. J0840921 (**pages 902-905 at 904-905, Vol. 4**).

150. On 21 May 1994, the Claimant and Tupikova were refused entry into the United Kingdom and deported back to Switzerland after they had presented false Polish passports to immigration officers. They were arrested on their return to Switzerland; whilst the passports had been retained by the UK immigration officials, false Polish driving licences in the names of "Mihail CZORNY" (number J0774999) and "Anna TOUPIKOWA" (number J08040914) were recovered from the Claimant and Tupikova (**pages 936-943 at 940-943, Vol. 4**).

151. The false Polish passport presented by Tupikova at Heathrow airport on 21 May 1994 bore the number AA 2958591 (**pages 915-918 at 916, Vol. 4**). This falls within the sequence of the numbers of the passports recovered on 11 March 1994. The false Polish driving licence recovered from Tupikova's luggage on her arrest by the Swiss authorities on 21 May 1994 bore the number J08040914 (**pages 936-943 at 942, Vol. 4**). Similarly, this falls within the sequence of the numbers of the driving licences recovered on 11 March 1994.

152. The Swiss federal police concluded that the passport in the name "CZERNYJ Mikhail" (number AA 2958585) was intended for the Claimant and the passports in the names of "Czernaja Elina" (number AA 2958589) and "Czernaja Rina" (number AA 2713873) were intended for two family members of the Claimant (**pages 1031-1039 at 1036, Vol. 4**). Two of the Claimant's children are called Elina and Rina. Tupikova's Soviet passport, number 21 Nr. 1015578 contains the photograph and name of her daughter Elina Tchernaia (born in 1989) (**pages 901-1 to 901-3 at 901-3, Vol. 4**). In a statement given to Swiss police on 22 May 1994, Tupikova confirmed that she had one daughter

with the Claimant, called Elina Tchernaia (**pages 929-933 at 932, Vol. 4**). The Swiss authorities noted that Rina Chernaya is an older daughter of the Claimant who was a student at the Collège du Leman school in Versoix, Switzerland in 1994 (**pages 919-928 at 925, Vol. 4**, see also para. 184 below).

153.  The conclusion of the Swiss investigators was that "MALEWSKAJA Zanna" was most likely a relation of Malevsky (**pages 1031-1039 at 1037, Vol. 4**). (Malevsky's wife is Janna Malevskaya: see the witness statement of Janna Anatolyevna Malevskaya, served on the Claimant's behalf in these proceedings.)

154.  The Swiss police conducted investigations into Malevsky and discovered that a man had presented a Polish passport to two Swiss hotels in the name of "MALEWSKI Antoni" bearing the passport number AA 2958612, on 22 February 1994 (Hotel Moevenpick) and 2 March 1994 (Hotel La Reserve) (**pages 906-910 at 909-910, Vol. 4**). This passport number is only three digits away from the number of the passport bearing the name "MALEWSKAJA Zanna" (AA 2958609) that had been seized from the car on 11 March 1994. The Swiss police also recorded that this man, "MALEWSKI Antoni" had been in possession of a Polish driving licence, bearing the number J 0840925 (**pages 912, Vol. 4**). This is only seven digits away from the number of the false Polish driving licence in the name of "MALEWSKAJA Zanna" (J0840918) that had been recovered on 11 March 1994.

155.  One of the false Polish passports and one of the driving licences that were recovered on 11 March 1994 were in the name of Aleks Taim. A person with a similar name, that of Alex Taim, was described in a report in *The New York Daily News* from 21 April 1997 as (**page 1639, Vol. 6**)

> "[t]he key suspect in the slaying of a champion Russian boxer one of the most notorious killings in the history of Russian gang crime in New York [who] is a close associate of the 'thief in law' Vyacheslav Ivankov, …
>
> The suspect, Alex Taim, was on his way to the top of the Russian gang heap in Brighton Beach, Brooklyn, before Ivankov arrived in 1992 and assumed power…"

156. A Swiss federal police report dated 16 August 1997 records that the Swiss police concluded that the driving licences found in the car on 11 March 1994 in the names of "Orlow Viktor" (no. J08040910), "Hotina Irina" (no. J0840909) and "Hotin Petr" (no. J0840908), were intended for Victor Sergeevich Orlov, Irina Ivanovna Khotina and Petr Borisovich Khotine, respectively (**pages 1031-1039 at 1037, Vol. 4**). The Swiss authorities linked Orlov and Khotine to a company in Geneva called Value Trust Services SA and to a person by the name of Poliakov, the President of Value Trust Services SA. They noted that the names of Khotine and Orlov had arisen during a German investigation into the murder of Vitali Ljachovski on 3 December 1993 in Berlin. The Swiss authorities further noted that Orlov and Khotine were represented in Geneva by Poliakov and one Alexandre Mikhailovich Bushaev (date of birth: 06.07.70) and noted also that Bushaev was "known, in particular, for using a stolen blank Polish passport" (**page, Vol. 4**). (I understand that Bushaev was a senior employee of Trans World Group. As described below in paragraphs 254 to 269, whilst it is not said that Bushaev was himself a figure within Russian-speaking OCGs, it appears that he was linked both to Malevsky and to the Claimant and so an order is also sought that the Claimant disclose documents evidencing his dealings with Bushaev).

157. Malevsky and his wife Malevskaya appear also to be associated with Value Trust Services, both through the passport and driving licences in the name of "Zanna Malewskaja" referred to above and a false Polish passport used by Malevsky, and also through the apartment in Geneva in which one of Tupikova's Russian passports was found after her arrest in May 1994. I give these details, together with those of the Claimant's admissions and denials in respect of his knowledge of, and relationship with, Value Trust Services below in paragraphs 237 and 238.

## E.   Evidence of links between the individuals in question and the Claimant

158. Even though the Claimant refuses to make specific disclosure in respect of the individuals named above, from his limited disclosure to date it is possible to identify specific links between the Claimant and many of these individuals.

(viii)      *Aksenov*

159. As set out above in paragraphs 33, 35(a) and 81-84, 87, Aksenov was one of the leaders of the OCG *Ismailovskaya*. Aksenov was the deputy to Malevsky and, on Malevsky's death, he and Pavlov assumed joint leadership of *Ismailovskaya*.

160. The Claimant has disclosed substantial payments to Malevsky and his company Trenton, identified as the "*obschak*" of the *Ismailovskaya* OCG. Contrary to the impression given by the Claimant's First and Second Witness Statements, these show that Malevsky was not just a person the Claimant knew, but a person who he evidently knew well and had financial dealings with in the period before he met the Defendant. Given the position of Malevsky and Trenton in the *Ismailovskaya* structure, these payments suggest a close connection between the Claimant and that OCG, of which Aksenov was deputy leader.

161. Although the Claimant refuses to give disclosure in respect of Aksenov, from the limited documents he has disclosed, it has been possible to identify two payments that the Claimant made to Aksenov.

162. The first payment, of approximately USD 50,000 occurred on 24 May 1994, the same day as a payment of approximately USD 1,000,000 was made to Malevsky. A Bank in Liechtenstein statement for the Claimant's company Hiler Establishment records a payment on 24 May 1994, to "Aksenov Sergei" of USD 50,003.55 (**page 1356, Vol. 5**). This document also records that USD 1,000,003.55 was paid to "ANTON MALEVSKY". A spreadsheet disclosed by the Claimant entitled "Hiler Establishment 1994" records payments on the same date and for the same amounts to "AKSENOV SERGEI" and "ANTON MOLEVSKY", respectively (**pages 1369-1370 at 1370, Vol. 5**).

163. The second payment is recorded in the Claimant's documents as a joint payment to Aksenov and Malevsky, which occurred approximately three weeks after the first payment described above. An annual journal or spreadsheet extract ("*Jahresauszug*") relating to Blonde Investment account number

64

173.837.2-10.33.01 held at Bank in Liechtenstein (**page 1347, Vol. 5**) records a payment of USD 34,959.78 on 15 June 1994 to "AKCYOMOV, MOLEVSKY".

164. A payment of the same amount, USD 34,959.78, on the same date is reflected in an internal BIC "cash disbursement analysis report" within the Claimant's disclosure (**page 1412, Vol. 6**). This document records that the money was paid to "Tel Aviv Hilton". The relevant bank statement for the BIC account at the Bank in Liechtenstein also contains an entry for "Tel Aviv Hilton", of a slightly different amount at USD 34,974.22 (**page 1696, Vol. 6**). Information confirming Malevsky's presence in Israel in June 1994 is given in the judgment of the Israeli High Court of Justice of 12 November 1998 in proceedings brought by Malevsky against the Israeli Minister of Interior challenging the latter's decision to revoke his immigrant certificate and citizenship. It is stated in the judgment that (**pages 1955-1982 at 1958, Vol. 7**)

> "On June 20, 1994 while he was in Israel, the Petitioner applied to the Ministry of the Interior and requested an immigrant certificate and citizenship pursuant to the Law of Return."

165. Six days after the second payment and one day after Malevsky's citizenship application was lodged, a similar application was made by the Claimant. On 21 June 1994, he signed an application form to apply for Israeli citizenship stating his location to be Tel Aviv (**pages 1348-1355 at 1352, Vol. 5**). This is an application that would have been made in person, as set out in a letter from the Israeli Minister of the Interior to the Claimant dated 7 June 2004 in which it is stated that "[o]n June 21, 1994 you contacted the public office and applied for the status of an immigrant because you are Jewish" (**pages 2354-2365 at 2361, Vol. 9**).

166. The Claimant has not thus far disclosed any documents explaining his relationship with Aksenov or the reason for the payments to him and Malevsky. The Claimant should now disclose such documents, including but not limited to any documents evidencing any dealings with Aksenov's company Berger International Holding and any other companies that the

Claimant believes are connected to Aksenov. He should also disclose any payments made to Natalia Aksenova, who appears likely to have been a female relative of Aksenov.

(ix)     *Pavlov*

167. Pavlov was, with Aksenov, one of Malevsky's deputy leaders of the *Ismailovskaya* OCG. The Claimant's close financial and personal connections with Malevsky have been described above. The evidence of payments to Aksenov has also been described.

168. Documents disclosed by the Claimant shows a payment of USD 50,000 from Blonde Investment Corporation to a "D Pavlov" on 29 July 1994 (**pages 1413-1416, Vol. 6**).

169. In addition, documents recently disclosed by the Claimant reflect that the Claimant's company Furlan Anstalt paid travel expenses incurred by Pavlov. The Claimant has recently disclosed what appear to be the records of an Israeli travel agency, Melamed Tours, at which the Claimant's company Furlan Anstalt apparently held an account. These documents cover a period from December 1997 to sometime in 2001, although there appear to be some documents missing within that period (see paragraphs 296 to 307 below). One of these documents shows that on 29 December 1997, Pavlov flew from Tel Aviv (airport code "TLV") to Eilat (airport code "ETH") and that on 7 January 1998, he flew back from Eilat to Tel Aviv (**pages 344-346 at 344-345, Vol. 2**). This document also records that Malevsky's family flew to and from Tel Aviv and Eilat, on the same dates. The individuals listed as passengers are: Maryanna Klimova, Alexey Bakatin, Roman Malevsky, Anton Malevsky, Janna Malevsky, Nikita Malevsky and possibly also Valenti[na] Harlanova. The flights were apparently paid for by Furlan Anstalt.

170. The Claimant has not disclosed any documents explaining his relationship with Pavlov or the reason for the payment to him or the funding of his travel expenses.

(x)   *Lalakin*

171.   The evidence suggests that Lalakin is one of the leaders, with Popov, of the *Podolsk* OCG. The Claimant has disclosed documents showing payments to Popov, but has declined to disclose documents showing his relationship with Lalakin.

172.   The likelihood of a connection between the Claimant and Lalakin is attested by a number of sources. The Israeli Request for mutual assistance to the Swiss authorities said that the "Israel Police further holds information showing close contact between Cherney and several leaders of organized crime organizations, such as Anton Malevsky ... Sergei Lalakine and Salim Abdulaiev" (**pages 2118-2123 at 2120, Vol. 8**). A Swiss police report (**pages 1059-1096 at 1087, Vol. 4**) records that Lalakin stayed at the La Reserve hotel between 18 April and 15 May 1994 in the company of reputed OCG representative Tokhtakhounov and the Claimant. The Claimant was (as is explained above at paragraph 90(c)) at La Reserve during this period. Gaziev was certainly with him (an invoice for his stay was found when the Claimant was arrested on 21 May 1994). And as set out below, it is likely that Mikhailov was there too (at paras. 189 to 193 below).

173.   Documents recently disclosed by the Claimant do, moreover, show some payments made for the benefit of Lalakin or his relatives and also their travel expenses being paid by the Claimant.

174.   The Claimant's recently disclosed document entitled "Melamed Tours screenprints of travel arrangements for various individuals" contains a page that shows that on 11 July 1999, a "land arrangement" bearing the descriptive code "VIP UN 302" was booked for Popov, Lalakin and others (**pages 344-346 at 346, Vol. 2**). According to an internet flight information search facility, "UN 302" is the code for a flight from Tel Aviv to Moscow on Transaero Airlines (**pages 2837-2838, Vol. 10**). Page 346 (Vol. 2) also reflects that Popov had earlier taken a domestic flight within Israel from Tel Aviv Sde Dov (SDV) to Eilat (ETH) on 5 July 1999 (**pages 2871 and 2866, respectively, Vol. 10**).

175. The Claimant's disclosed document entitled "Schedule of Melamed Tours invoices for Furlan Anstalt in relation to travel arrangements for various individuals" reflects that persons named "LALAKINA, VALEN" and "LALAKIN, MAXIM" took the following flights at the expense of the Claimant's company Furlan Anstalt (**pages 371, 372, 372-1, 373, Vol. 2**):

| NAME | TRAVEL DATE | DESCRIPTION |
|------|-------------|-------------|
| "Lalakina/Valen" | 22/06/00 | "LY-612 Ben Gurion LA 22/06/00" |
| "Lalakina/Valen" | 22/06/00 | "NCE CDG AF" |
| "Lalakin/Maxim" | 02/07/00 | "ETH TLV IZ1618" |
| "Lalakin/Maxim" | 27/06/00 | "LY-018 Ben Gurion La 27/06/00" |
| "Lalakin/Maxim" | 27/06/00 | "Ben Gurion Dead Se 27/06/00" |

176. I understand the codes NCE, CDG, ETH and TLV to be airport codes for the following airports: NICE, Côte D'Azur, Charles De Gaulle, Eilat and Tel Aviv (**pages 2868, 2865, 2866 and 2870, respectively, Vol. 10**). As explained below, it appears that "Lalakina Valen" is most likely an abbreviation of the name Valentina Lalakina.

177. On **pages 349-367 at 357, Vol. 2**, which reflect the travel by Maxim Lalakin on 27 June 2000, the entry above that for Maxim Lalakin records that the same travel was taken by "POPOV/SERGEY" two days earlier, on 25 June 2000.

178. The Claimant's disclosed document entitled "Annotated screenprints of Princess Hotel reservations" shows that amongst the guests arriving at the hotel on 30 June 2000 were persons identified as "Lalkin Max", "Papov Sergei Mr" and "Lalkin Sergei Mr" (**pages 2143-2144, Vol. 8**). In light of the dates of the travel arrangements noted in the schedule above, it seems most likely that these are references to Sergei Lalakin, Maxim Lalakin and Popov.

179. Similarly, given the overlapping dates of travel, it seems likely that Maxim Lalakin and "Lalakina/Valen" are relatives of Lalakin. I note that a document

from the Swiss proceedings, namely a fax from the Swiss police, records the details of one Valentina Lalakina ("Lalakina"), as being born on 2 September 1957, of Russian nationality, living in Podolsk, Moscow, and holding Russian passport No 21 1021833 (**pages 911-912 at 912, Vol. 4**). A report on persons involved in organized crime in the former USSR compiled by the Swiss police gives a date of birth for Sergei "Lalakine" as 25 November 1956 (**pages 1059-1096 at 1068, Vol. 4**). Given this closeness in ages and the fact that Lalakina was travelling with Maxim Lalakin who was, as I explain below, of school age, it is likely that Lalakina is Lalakin's wife and the mother of Maxim Lalakin.

180.   Other documents in the Claimant's disclosure reflect that his company Furlan Anstalt made payments on behalf of Maxim Lalakin to the College du Leman, a school in Switzerland, as well as directly to Maxim Lalakin in Switzerland.

181.   Both "Lalakine Maxim" and "Tchernaia Rina" are named in the list disclosed by the Claimant within documents relating to Furlan Anstalt described in his index as "Schedule of bank accounts per individual and company", as having bank accounts in Geneva (**pages 2212, Vol. 8**). Also listed on this page after the entries for Maxim Lalakine and Tchernaia is an entry for "Lapchina Olga". Bank account statements for the Furlan Anstalt account held at the Bank in Liechtenstein reflect that in 1994 these three individuals received regular payments in both US dollars and Swiss francs. These payments are set out in the table below (**pages 1331-1336, Vol. 5**).

| DATE | SOURCE | RECIPIENT | AMOUNT |
|------|--------|-----------|--------|
| 03.02.94 | Furlan Anstalt | Maxim Lalakine | USD 350.69 |
| 03.02.94 | Furlan Anstalt | Rina Tchernaia | USD 350.69 |
| 03.02.94 | Furlan Anstalt | Olga Lapchina | USD 350.69 |
| 02.03.94 | Furlan Anstalt | Maxim Lalakine | USD 709.00 |
| 02.03.94 | Furlan Anstalt | Rina Tchernaia | USD 709.00 |
| 02.03.94 | Furlan Anstalt | Olga Lapchina | USD 709.00 |
| 23.06.94 | Furlan Anstalt | Maxim Lalakine | USD 1.005.00 |

| DATE | SOURCE | RECIPIENT | AMOUNT |
|---|---|---|---|
| 23.06.94 | Furlan Anstalt | Rina Tchernaia | USD 1,005.00 |
| 23.06.94 | Furlan Anstalt | Olga Lapchina | USD 1,035.00 |
| 29.07.94 | Furlan Anstalt | Maxim Lalakine | CHF 1,005.00 |
| 29.07.94 | Furlan Anstalt | Olga Lapchina | CHF 1,005.00 |
| 29.07.94 | Furlan Anstalt | Rina Tchernaia | CHF 1,018.00 |
| 17.08.94 | Furlan Anstalt | Maxim Lalakine | CHF 483.10 |
| 17.08.94 | Furlan Anstalt | Olga Lapchina | CHF 824.60 |
| 17.08.94 | Furlan Anstalt | Rina Tchernaia | CHF 873.90 |
| 04.10.94 | Furlan Anstalt | Maxim Lalakine | USD 1,018.00 |
| 04.10.94 | Furlan Anstalt | Rina Tchernaia | USD 1,005.00 |
| 04.10.94 | Furlan Anstalt | Olga Lapchina | USD 1,005.00 |
| 03.11.94 | Furlan Anstalt | Maxim Lalakine | USD 1,018.00 |
| 03.11.94 | Furlan Anstalt | Rina Tchernaia | USD 1,018.00 |
| 03.11.94 | Furlan Anstalt | Olga Lapchina | USD 1,018.00 |

182. Documents recently disclosed by the Claimant include ledgers for Furlan Anstalt for the year 1994, which reflect monthly payments to "MAXIM LALAKINE", "RINA TCHERNAIA" and "OLGA LAPCHINA" (in addition to those listed in the table above). These ledgers also reflect regular amounts being paid to College du Leman (**pages 1375-1387, Vol. 5**). One page includes the following information (**page 1380, Vol. 5**):

| DATE | SOURCE | RECIPIENT | AMOUNT |
|---|---|---|---|
| 29.04.94 | Furlan Anstalt | College du Leman C.R. | USD 542.76 |
| 29.04.94 | Furlan Anstalt | College du Leman L.M. | USD 533.57 |
| 29.04.94 | Furlan Anstalt | College du Leman L.O. | USD 533.57 |

183. These initials correlate to the names of Rina Cherney (CR), Maxim Lalakin (LM) and Olga Lapchina (LO). Accordingly, it appears that the Claimant was paying the school fees of Maxim Lalakin, probably a relative of Sergei Lalakin and possibly his son, as well as those of his own daughter Rina and another girl, Olga Lapchina.

184. In summary, the evidence already disclosed shows that the Claimant paid, on several occasions, for Lalakin or his family to travel (apparently in the company of his reputed co-leader of the *Podolsk* OCG, Popov, and in at least one case in the company of Malevsky), and that he paid school fees for Lalakin's relative at a Swiss school. Given what is known about Lalakin, the Claimant should make full disclosure of all payments made to him or his relatives or any company associated with him. The Claimant should be required to disclose all documents evidencing his relationship with Sergei Lalakin, Maxim Lalakin and Valentina Lalakin and all documents relating to the transactions and specific dealings identified above.

(xi)     *Mikhailov (Mihailov)*

185. As set out above, the evidence suggests that Mikhailov was the leader of the *Solntsevskaya* OCG.

186. There are a number of items of evidence demonstrating connections between the Claimant and Mikhailov.

187. Levinson has given details of the connections that the Claimant had with both groups, describing *Solntsevskaya* as providing protection for the Claimant's interests outside the Russian Federation, in particular by Mikhailov and his deputy, Averin, and stating that within the Russian Federation the Claimant's interests and those of his brother Lev Cherney were "protected" by Malevsky's group *Ismailovskaya* (**para. 32-33, pages 192-205 at 198-199, paras. 32-33, Vol. 1**).

188. There is evidence that Mikhailov and the Claimant met in 1994. A copy of a message from IP (INTERPOL) Vienna is contained within the records of the Swiss criminal proceedings that relates to the kidnapping of an Austrian businessman originally from Uzbekistan. It states that on 14 May 1994, Mikhailov checked into room 132 at La Reserve hotel and "[t]here he allegedly met CHERNY. A connection to the kidnapping was not established" (**page 962, Vol. 4**). Another document from the Swiss proceedings, which appears on its face to be a message from IP Vienna dated 23 October 1996 contains the same information (**pages 967-970, Vol. 4**). The records of the Spanish criminal proceedings record that the Stuttgart Regional Court also heard evidence from the INTERPOL national bureau in Austria ("IP Vienna") that on 14 May 1994, the Claimant met with Mikhailov in the hotel La Reserve in Geneva (**pages 2599-2644 at 2612, Vol. 10**).

189. A copy of one of the Claimant's passports within his disclosure shows that the Claimant left the United Kingdom on 14 May 1994 and then flew back to the United Kingdom from Geneva on 21 May 1994 (**page 1159, Vol. 5**). As noted above in paragraph 151 on 21 May 1994, the Claimant and his partner Tupikova were deported from the UK back to Switzerland. In a statement to the Swiss police on 22 May 1994 the Claimant stated, in response to questions concerning his activities in Switzerland, that he held many meetings with businessmen and that he conducted his dealings principally at the hotel La Reserve (**pages 944-949 at 948, Vol. 4**). In a statement made by Tupikova on the same date she told the police that she and the Claimant had been staying in Geneva, at the La Reserve hotel (**pages 929-932 at 931, Vol. 4**). Amongst the items seized from the Claimant on his arrest by the Swiss police were invoices from La Reserve hotel (**page 914, Vol. 4**). It accordingly seems likely that the Claimant was at La Reserve hotel on 14 May 1994 – the date when it is alleged he met Mikhailov there.

190. In a hearing before the Swiss examining magistrate on 21 November 1996, the Claimant was asked whether he knew Mikhailov, called Mikhas. The Claimant denied knowing him and said that the surname did not mean anything to him. He went on to say that whenever he read the Russian or Israeli papers

"sometimes they mention a certain Mikhas. I read a rather long article that said that he was arrested in Switzerland. During my last trip, I saw my lawyer, who told me that there were problems in Geneva because they had arrested a certain Mikhas and it was undoubtedly for this reason the police were checking everybody's papers" (**pages 979-990 at 987, Vol. 4**).

191. After it was put to the Claimant that he had met with Mikhailov at La Reserve hotel around 15 May 1994, he said it was possible that he had spoken to him at the hotel without knowing who he was but "[t]o this day, I have no friend, business associate, or acquaintance with that name". The Claimant said also that there were many Russian children at the school, the Leman, and it was possible that for this reason he may have said "hello" to him there (**pages 987-988, Vol. 4**).

192. The minutes of a hearing before a Swiss examining judge on 25 June 1997, which were signed by the Claimant, reflect that he was again asked whether he had been staying at La Reserve hotel, in Geneva, in May 1994 at the same time as Mikhailov. This time, the Claimant said in response

"I would regularly stay at the Hotel La Reserve because my daughters studied at the Collègue [sic] du Léman. It is possible that I resided at the Hotel La Reserve at the time that you mention. During a telephone conversation with my daughter, she informed me that a certain Michailov had been arrested in Geneva. She reminded me, on that occasion, that she had introduced him to me at the hotel as the father of two young girls who were also studying at the Collègue du Léman. We only exchanged a few words. It was only later that I learned that he was Mr Michailov, since he had been introduced to me, according to Russian custom, by his first names. By coincidence, I met him again later, one time in Israel. Our exchange was limited to a few sentences about our daughters." (**Pages 1005-1030 at 1024, Vol. 4.**)

193. The Claimant's evidence on this point to the Swiss magistrate seems, therefore, to have been inconsistent. Meanwhile there is other evidence (from the INTERPOL report and Levinson) which suggests connections between them which were far more than a casual chat in a hotel about family matters. I do not know what the Claimant will say about this. He may say that his evidence to the Swiss Magistrate was essentially correct, and that he did not know Mikhailov or had forgotten meeting him. But the matter is significant, and one that ought to be subject to proper disclosure.

194. A further document intensifies the Defendant's concerns that the Claimant has not been honest about his dealings with Mikhailov. Amongst the documents disclosed by the Claimant is a ledger from his company, Operator Trade Center ("OTC"), dated 21 December 2001. It reflects that on 21 December 1999, USD 100,022.26 was paid by OTC to Rosides Establishment (**page 2324, Vol. 9**). As set out above (see paragraph 102), Rosides is a company reportedly connected with Mikhailov.

195. In light of this evidence, the Claimant should disclose all documents evidencing his relationship with Mikhailov and all documents relating to the payment to Rosides Establishment in December 1999 and any other dealings with this entity.

    (xii)    *Tokhtakhounov*

196. Alimjhan (also spelled Alimzhan) Tokhtakhounov is reputed to be a leading figure in the Uzbek mafia. He is the subject of an INTERPOL Red Notice and is wanted for prosecution in the United States (**page 2913, Vol. 10**). The Claimant and Tokhtakhounov are reputed to be friends. Tokhtakhounov was staying at La Reserve hotel, as was the Claimant, in April and May 1994 (see paragraph 172). Lalakin, Mikhailov and Gaziev were also at La Reserve during this period.

197. From the limited documents disclosed by the Claimant to date it appears that he transferred over USD 216,000 to Tokhtakhounov between 1995 and 1997. The details of these payments are set out in the table below.

| DATE | SOURCE | RECIPIENT | AMOUNT | PAGE (Vol. 8) |
|---|---|---|---|---|
| 06.03.95 | Hiler Est., Vaduz | Alimjan Tokhtakhounov | USD 10,014.63 | **2147** |
| 06.03.95 | Hiler Est., Vaduz | Alimjan Tokhtakhounov | USD 20,300.99 | **2147** |
| 30.12.96 | Blofin SA, Morges | Alimkhan Tokhtakhounov | USD 50,000.00 | **2150** |

74

| DATE | SOURCE | RECIPIENT | AMOUNT | PAGE (Vol. 8) |
|------|--------|-----------|--------|---------------|
| 06.06.97 | Blonde Investment Corp. Ltd | Alimkhan Tokhtakhounov | USD 56,544.23 | **2152** |
| 07.08.97 | Operator Trade Center | A. Tokhtakhunov | USD 50,000.00 | **2153** |
| 22.09.97 | Operator Trade Center | Mr A. Tokhtakhunov | USD 30,000.00 | **2154** |

198. The relationship between the Claimant and Tokhtakhounov appears to have continued for many years. On 22 June 2011, Tokhtakhounov gave an interview to Radio Free Europe which suggests that he frequently dined out with the Claimant over a period when he was resident in France, which the Claimant apparently regarded as "business meetings" (**pages 2702-2704 at 2703, Vol. 10**).

> "I'll tell you, there was one businessman who lived near me in France for eight years by the name of Mikhail Chyorny. ... They were writing that he was a billionaire and I didn't believe it. I didn't believe it. When we ate in restaurants, I was always trying to pick up the check. When he wanted to pay, I'd say, 'Misha, it is awkward for me that you pay all the time.' He would say, 'Alik, this is a business meeting. I'll put it on the business credit card.' It was awkward for me, but it turned out he really was a billionaire. I didn't have that kind of money, but I didn't want to -- you understand -- I was thinking maybe he doesn't have that much money."

199. As noted above, there is evidence that on 20 April 1999 the Claimant, "TAKHTAHOUNOV/A" and Abduvaliev were booked on a flight between Charles De Gaulle airport in France (airport code CGD) and Munich in Germany (airport code MUC) (**page 342, Vol. 2; pages 2865 and 2867, Vol. 10**).

200. As well as documents relating to Tokhtakhounov, the Defendant seeks documents concerning the Claimant's dealings with a company called ICC. An article published recently on the Internet on Tokhtakhounov reports on new

asset freezing measures adopted by the United States against, amongst others "The Brothers' Circle", of which Tokhtakhounov is stated in the article to be a member. The article also states that "[t]o legalize proceeds from arms deals Gaydamak and Tokhtakhounov founded *ICC* in the Virgin Islands" (**pages 2817-2825 at 2820, Vol. 10**). Whilst it is not clear from the article exactly when this was said to have occurred, it features in a part of the article concerning alleged events in the late 1980s and early 1990s. A company search report for ICC International Credit Corporation obtained from the BVI Registry of Corporate Affairs shows that there was a company of that name in the BVI. It was incorporated on 3 April 1991 and struck off the register on 22 March 2001 following dissolution (**pages 2157-2203, Vol. 8**).

201. To date, no evidence has been found, apart from the article referred to above, which links ICC with Tokhtakhounov specifically. ICC has, however, been linked by the FBI with money-laundering and extortion, allegedly carried out by Arik Kislin (who acted as the Claimant's agent within Blonde Management Corporation during the 1990s). The 1994 FBI Report states (**pages 1-52 at 12-13, Vol. 1**) that in the early 1990s, Arik Kislin's name was listed on a bank account for Challenger International of Brooklyn, New York which was

> "a front company believed to be laundering [p]roceeds from extortion and other OC [organised criminal] activities. The account [re]tained almost $2 million of deposits with a $1.2 million [de]posit from ICC International Credit in the British Virgin [Isl]ands through a correspondent bank in Liechtenstein, and a 500,000 deposit from Credit Suisse in Switzerland..."

202. Thus:

    (a)    there is significant evidence that ICC International Credit, BVI, was a criminal company involved in extortion and money laundering, and that a company called Challenger International run by Arik Kislin was involved in money laundering for it; and

    (b)    there is some (though not at the moment, strong) evidence to connect ICC International Credit BVI with Tokhtakhounov.

203. There are a number of documents within the Claimant's disclosure which demonstrate that large sums were paid to two entities called ICC, one of which was incorporated in the British Virgin Islands. The Claimant has been asked to give disclosure in respect of these payments, but has refused to do so (**page 3017, Vol. 11**).

204. Amongst the documents disclosed by the Claimant relating to his company Furlan Anstalt, is a list of counterparties with details of their bank accounts. This list includes three bank accounts in the name of "ICC Int'l Credit Corp, BVI", held at (i) Schweiz Bankverein, Zurich (A/c no PO-451.187.0); (ii) LGT Bank in Liechtenstein, Vaduz (A/c no 173.837.2 – 10.333.01); (iii) Caledonian Bank & Trust Ltd, New York (A/c no 890-0050-977) (**page 2212, Vol. 8**).

205. Documents within the Claimant's disclosure show two transfers of money that involve both Challenger International and ICC International Credit Corporation, BVI. These are dated 20 May 1994 and 5 September 1995. The details are included in the schedule below of all ICC payments that have been identified from within the Claimant's limited disclosure to date. (The names of the recipients within this schedule are given as they appear in the underlying documents.)

206. Amongst the payments reflected in this table are others that, like the Challenger International payments, are also linked to other entities known to be associated with reputed OCG figures. One of these is a payment on 18 November 1994 from Blonde Investment Corporation Ltd to ICC that is marked "ICC/Trenton". As described above, Trenton was identified in the Stuttgart criminal proceedings as being the "*obchshak*" (war chest) of *Ismailovskaya* OCG and the Claimant has stated in correspondence from his solicitors, that he believes it to have been operated by Malevsky (see paragraph 38 above).

| DATE | SOURCE | RECIPIENT | AMOUNT | PAGE (Vol. 7) |
|---|---|---|---|---|
| 11.04.93 | CCT Consul Consult & Trade | ICC | USD 500,000 | 1711 |

| DATE | SOURCE | RECIPIENT | AMOUNT | PAGE (Vol. 7) |
|------|--------|-----------|--------|---------------|
|  | Establishment |  |  |  |
| 12.07.93 | Furlan Anstalt | ICC Intern.Credit Co (BVI) | USD 60,000 | **1712** |
| 24.08.93 | Furlan Anstalt | ICC Intern. Credit Co., BVI | USD 250,000 | **1713** |
| 02.11.93 | Furlan Anstalt | ICC Intern.Credit Co / BVI | USD 200,000 | **1715** |
| 05.11.93 | Furlan Anstalt | ICC Intern.Credit Co / BVI | USD 2,000 | **1716** |
| 09.11.93 – 10.11.93 | CCT Consul Consult & Trade Establishment | ICC International Credit Corporation (BVI) | USD 500,000 | **1718-1719** |
| 12.11.93 | Furlan Anstalt | ICC Intern. Credit Co. BVI | USD 1,000 | **1716** |
| 20.05.94 | CCT Consul Consult & Trade Establishment | ICC / W. Zemnovitsch | USD 490,000 | **1720-1724** |
| 10.06.94 | Furlan Anstalt | ICC Intern. Credit Co. BVI | USD 2,005 | **1726** |
| 10.08.94 | Blonde Investment Corporation Ltd | ICC/ Cranberry FFR 900' | USD 167,130.92 | **1728-1730** |
| 30.08.94 | Blonde Investment Corporation Ltd | ICC Blonde Mgmt | USD 100,000 | **1731-1733** |
| 21.09.94 | Galenit Foundation | ICC Intern. Credit Co. BVI | USD 1,968.50 | **1734** |
| 15.11.94 | Blonde Investment Corporation Ltd | ICC | USD 1,000,000 | **1735-1736** |
| 18.11.94 | Blonde Investment Corporation Ltd | ICC/Trenton | USD 2,000,000 | **1737-1738** |

| DATE | SOURCE | RECIPIENT | AMOUNT | PAGE (Vol. 7) |
|------|--------|-----------|--------|---------------|
| | | | | |
| 13.12.94 | ICC | Blonde Investment Corporation Ltd | USD 1,000,000 | 1739 |
| 16.12.94 | Blonde Investment Corporation Ltd | ICC/Firster rpmt | USD 1,000,000 | 1740-1742 |
| 19.12.94 | Blonde Investment Corporation Ltd | I.C.C. | USD 225,818.59 | pages 1740, 1741, 1738 |
| 22.12.94 | Blonde Investment Corporation Ltd | ICC International | USD 255.30 | 1738 |
| 07.07.95 | CCT Consul Consult & Trade Establishment | ICC International Credit Corporation | USD 100,000 | 1743-1744 |
| 05.09.95 | Furlan Anstalt | ICC / CHALLENGERS | USD 50,000 | 1745 |
| 10.11.95 | Blonde Investment Corporation Ltd | ICC | USD 264.32 | 1746-1747 |
| 21.03.96 | Furlan Anstalt | ICC / OLYMPICORP | USD 200,000 | 1748-1749 |
| 21.08.96 | Furlan Anstalt | ICC International Credit | USD 2,096.43 | 1750 |
| 27.01.97 | Arbil Real Estate | ICC International Credit Corporation | USD 22,764.81 | 1751 |
| 04.06.97 (bank notice dated 11 June) | ICC International Credit Corporation (BVI) | ICC International Credit Corporation, Turcs and Caicos, account number 371.855.07 at LLB Liechtensteinische | USD 22,764.81 | 1752-1754 |

| DATE | SOURCE | RECIPIENT | AMOUNT | PAGE (Vol. 7) |
|---|---|---|---|---|
| | | Landesbank | | |
| 18.06.97 | Arbil Real Estate | ICC International Credit Corporation | USD 22,764.81 | **1755-1756** |
| 21.07.97 | Galenit Foundation | ICC International Credit | USD 30 million | **1757** |
| 07.08.97 | CCT Consul Consult & Trade Establishment | ICC International Credit Corp. | SFR 2,500 | **1758** |
| 29.09.97 | Galenit Foundation | ICC International Credit | USD 729.17 | **1757** |
| 13.11.97 | Radom Foundation | ICC International Credit Corporation | SFR 1.9 million | **1759-1763** |
| 13.01.98 | CCT Consul Consult & Trade Establishment | ICC International Credit Corp. | USD 60.00 | **1764** |

207.  In addition to the payments listed above, it appears that on 1 July 1993, the Claimant issued a promissory note in favour of ICC International Credit Corporation BVI, for a credit line of five years of up to USD 3 million (**page 1212, Vol. 5**).

208.  In summary:

(a)     There is evidence within the Claimant's disclosure showing that he made direct payments to Tokhtakhounov personally. There is also evidence (from third parties such as Professor Shelley and from Tokhtakhounov himself) suggesting a close association over a long period and evidence of joint travel arrangements. The Claimant ought to make full disclosure of all documents relating to any payments made by him or his companies to Tokhtakhounov, directly or indirectly; and

(b)  There is evidence of very substantial payments being made to ICC International Credit Corporation from the Claimant's companies. There is strong evidence that ICC International Credit Corporation was a criminal company – and that evidence is reinforced by the apparent involvement of other suspect companies such as Trenton and Challenger in the payments. There is at least some evidence to link that company to Tokhtakhounov; whether or not that link can be established at this stage, the payments to ICC require explanation and disclosure ought to be given.

(xiii)    *Abduvaliev*

209.  As set out above, Abduvaliev (also spelled Abduvaliyev and Abdulaev) is reputed to be a leading figure in the Uzbek mafia. He was identified by the Swiss authorities as being one of the leaders of organized crime in "close contact" with the Claimant (**page 2120, Vol. 8**), connections which are evidenced also by the documents referred to at paragraphs 127 to 134 above.

210.  Documents in the Claimant's disclosure evidence payments between companies controlled by the Claimant and Abduvaliev from 1994 onwards, and travel arrangements for Abduvaliyev made by the Claimant's secretary Skir (also known as Lena Skir) and funded by the Claimant's company Furlan Anstalt in 1998 and 1999. Also in 1999, the Claimant, Abduvaliev and Tokhtakhounov were booked on the same flight in Europe (see para. 270 below). When questioned by Israeli police, Skir described Abduvaliev as a friend of the Claimant's from the USSR.

211.  In May 1998, a loan in the sum of USD 600,000 was provided by CCT Consul Consult & Trade Establishment ("CCT") to Beglane Investment Company Establishment ("Beglane"). The loan agreement is undated but was signed by the Claimant on behalf of CCT and, it is apparent from another document (**page 2026, Vol. 8**), signed by Abduvaliev on behalf of Beglane (**page 1796, Vol. 7**). The two signatures appear alongside each other. The interest rate was stated to be the London Interbank rate (LIBOR) plus 5 percent. The Claimant personally instructed Syndikus to transfer funds (**page 1795, Vol. 7**).

212. Abduvaliev gave instructions to Syndikus to repay the loan by fax dated 24 April 1999 (**page 2026, Vol. 8**). A handwritten notation on this fax records that Arik Kislin confirmed that USD 650,000 would be applied to Furlan Anstalt's account at the Israel Discount Bank. The loan appears however not to be repaid until 31 May 2000, with the transfer of USD 650,000 from Beglane to Furlan Anstalt's account at Israel Discount Bank (**pages 2393-2395, Vol. 9**). This represented a repayment of the capital amount and interest of 8.3 percent over two years or 4.15 percent per annum, less than LIBOR (which was around 7.5 percent: **pages 1797-1892 at 1809-1810, Vol. 7**) and significantly less than the stated interest rate in the loan agreement of LIBOR plus 5 percent (which would have been around 12.5 percent per annum).

213. There are other payments to or from Beglane in 1994 and 1999. These are set out in the table below.

| DATE | SOURCE | RECIPIENT | AMOUNT | PAGE (Vol. 8) |
|---|---|---|---|---|
| 15.02.94 | Hiler Establishment | Beglane | USD 50,000 | **2086** |
| 21.05.99 | Archers Trading Ltd | Beglane | USD 15,000 | **2087** |
| 01.06.99 | Archers Trading Ltd | Beglane | USD 10,000 | **2088** |
| 09.06.99 | Beglane | Archers Trading Ltd | USD 25,000 | **2089, 2092, 2093** |
| 22.07.99 | Archers Trading Ltd | Beglane | USD 10,000 | **2094, 2096, 2097** |
| 07.09.99 | Beglane | Archers Trading Ltd | USD 6,000 | **2098** |
| 05.10.99 | Beglane | Archers Trading Ltd | USD 16,000 | **2100** |

214. The document described by the Claimant in his accompanying list of documents as "Annotated Melamed Tours schedule of travel arrangements for various individuals in relation to Furlan Anstalt account for the period 19/01/98

to 21/12/99" contains three entries for "ABDUVALIEV/SALIM" and "ABDUVALIEV/S" (pages 337-343 at 339, 340, 342, Vol. 2).

215. This schedule of travel arrangements appears to show that an airline ticket was booked in the name of Abduvaliev to fly from Tel Aviv to Istanbul on 27 April and was invoiced to Furlan Anstalt on 11 May 1998 (page 339, Vol. 2). Another entry seems to show that an airline ticket for travel from Tel Aviv to Istanbul was booked for Abduvaliev on 3 May and invoiced to Furlan Anstalt on 9 June 1998. The third entry in this document does not include any details of travel but contains Abduvaliev's name and reflects that an invoice was issued to Furlan Anstalt on 26 April 1999.

216. According to an Israeli police surveillance report disclosed by the Claimant, at some time between 18.00 hours on 27 April 1998 and 03.30 hours on 28 April 1998, Abduvaliev was observed entering the Hilton hotel, Tel Aviv. Amongst others, Malevsky was also observed entering the hotel during this time (page 1794, Vol. 7).

217. According to another Israeli police surveillance report, on 30 and 31 December 1999, Abduvaliev was observed with others, including the Claimant, at the Royal Beach Hotel in Eilat (pages 2070-2075, Vol. 8). Israeli surveillance photographs dated 30 and 31 December 1999 and disclosed by the Claimant on 18 October 2011 show the Claimant in the company of Abduvaliev and others (pages 2076-2085, Vol. 8).

218. A record of an Israeli police interview on 23 May 2001 of the Claimant's secretary, Skir, that appears to be signed by her, records that Skir was questioned about making travel arrangements for third parties on behalf of the Claimant. She was also shown an invoice reflecting bookings at the Princess Hotel between 25 December 1999 and 10 January 2000. In response to being shown these documents Skir confirmed that she had made room reservations at the Princess hotel "for Adbuleiv Salim from the Soviet Union, a friend of Misha Zurani" (pages 2216, 2217, 2226, 2227 at 2226 Vol. 8). "Zurani" appears to be a mistransliteration of the Claimant's surname, "Cherney".

219. The reservations had been made through the company, Narkisei Gavriel, about which Skir was asked questions. An English translation of her response reads as follows (**pages 2216, 2226 at 2226, Vol. 8**).

> "Narkisi Israel was founded in 1997, if I am not mistaken. The owners are Elisha Haimov (illegible) and Vitali Shwartzer. Elisha Haimov was the manager of the company for a long period. I have been managing the company since the end of 2000 (illegible). The company belongs to Misha Zurani (or Durani), and since he was all the time abroad and his employees in Israel had to be paid. I refer to the workers Rahaminov Gavriel, Elisha Haimov, Vitali Shwartzer and myself. This is why the company was founded, to pay wages to the workers pay expenses for the office, like telephones, vehicle maintenance, and in addition Misha Zurani had an idea that the company would provide hosting services in Israel to his guests who arrive from abroad, like ordering hotels rooms, air tickets, translation etc. And this is what there was."

220. Approximately four weeks' earlier, on 29 April 2001, the Claimant had been interviewed by the Israeli police during which he was asked about Abduvaliev. He was evasive. I reproduce the relevant questions and answers below (**pages 2204-2211 at 2209-2210, Vol. 8**).

> "Q:   What is your connection to Salim?
>
> A:   I do not remember the last name, I know him from the field of sports in Uzbekistan, he is my friend.
>
> Q-A:   Once he asked to help one factory in Uzbekistan, I do not remember its name.
>
> Q-A:   I do not remember whether I gave him the money, maybe a loan.
>
> Q:   Were you connected to the gangs "Izmaylovskaya" – "Podolskaya", or to someone who represented them?
>
> A:   I do not know any gang."

221. It seems likely that this answer was false and designed to conceal the close connection between the Claimant and Abduvaliev, given the record of payments and meetings referred to above.

222. Material recently disclosed by the Claimant in the form of two DVDs, is said by the Claimant's English solicitors to contain material from the electronic storage facility of the Claimant's Bulgarian lawyer, Todor Batkov (**pages**

3019-3021, Vol. 11). Amongst this material is a document that appears to be a directory of individuals and organisations. One of these entries reads as follows (page 2918, Vol. 10).

> "VITASH Uzbek – Italian – Joint – Venture – Vitash    H. Alimdjana place, 13_A Tashkent 700000    007-371 2/31 01/45   007-371 2/33 21 33  007-371 2/32 74 00   M. Salim ABDUVALIEV"

223. The Claimant has not disclosed any documents evidencing the reasons for: (i) the loan made to Abduvaliev's company Beglane; (ii) the other payments; (iii) his funding of the travel expenses of Abduvaliev and his party in 1999; or (iv) the inclusion of Abduvaliev's name in the directory referred to above. Full disclosure should be made.

(xiv)    *Gaziev*

224. As set out above, Gaziev is the subject of an Interpol Red Notice issued on behalf of the Uzbek government. He is wanted for offences relating to a shoot-out between rival gangs in April 1994.

225. As I have described above, invoices recovered from the Claimant on his arrest by the Swiss police on 21 May 1994, suggest that Gaziev was staying at La Reserve hotel in Geneva between 28 April 1994 and 2 May 1994 at the same time as the Claimant and others (see above paragraph 173). Since the Claimant was found in possession of the invoices, it seems likely that he paid for Gaziev's stay.

226. In addition, documents disclosed by the Claimant reflect that Gaziev also held a "sub-account" on the account of the Claimant's company, Republic Establishment, at the Bank in Liechtenstein. These sub-accounts appear to be mechanisms by which corporate credit cards held by the sub-account holders, such as Gaziev (Bykov and Tiourine), were paid for by the Claimant (**pages 1388-1394, Vol. 6**).

227. It appears from one document that Gaziev held this sub-account or "septo account" from 26 November 1992 (**page 1460, Vol. 6**). Another document which states "information as of 31/10/96" shows against the entry for "Septo L

Gaziev Akmal" a figure of 2,308.01 in a column headed "Eurocard". It is apparent from other documents that Eurocards were credit cards issued to, amongst others, Gaziev, from Republic Establishment (**pages 1224-1247, Vol. 5**).

228. The Claimant has not disclosed any document evidencing the reason Gaziev held a sub-account on the Republic Establishment account at Bank in Liechtenstein or why a credit card was or cards were issued to him. The Claimant should now be required to do so, in addition to disclosing any other documents evidencing his relationship with Gaziev.

   (xv)    *Tiourine*

229. As I explain above, Tiourine has been identified as a leader of *Bratskaya* OCG and also a leading figure in Russian organized crime in Spain. He is currently in custody in Moscow pursuant to a Spanish request for his extradition.

230. The Claimant has refused to search for or disclose documents concerning his dealings with Tiourine. But from such documents as have been disclosed by the Claimant, it can be seen that in 1994 Tiourine received USD 800,000 from the Claimant's company Blonde Investment Corporation, as set out in the table below.

| DATE | SOURCE | RECIPIENT | AMOUNT | PAGE (Vol. 6) |
|------|--------|-----------|--------|---------------|
| 22.06.94 | Blonde Investment Corp. | Vladimir Tiorine | USD 600,000 | **1399** |
| 22.08.94 | Blonde Investment Corp. | Vladimir Tiurine | USD 200,000 | **1399-1401** |

231. In addition, Tiourine was the holder of a Eurocard credit card paid for by the Claimant's entity, Republic Establishment. It is not apparent from the documents disclosed by the Claimant when a credit card was first provided to Tiourine. It would appear, however, that this was before September 1995 since the documents disclose that at that time the card he held was due to expire and

he was issued with a new card, which was valid until September 1997 (**pages 1425-1426, Vol. 6**). Further, three documents which bear the date 14 April 1994 and appear to contain a list of individuals holding "Septo accounts" under Republic Establishment include Tiourine's name (**pages 1393-1394, Vol. 6**).

232.  It also appears that the Claimant organised and paid travel expenses incurred by Tiourine. The name "Tiurine" appears in the document described in the Claimant's accompanying index as "Annotated Melamed Tours schedule of travel arrangements for various individuals in relation to Furlan Anstalt account for the period 19/01/98 to 21/12/99". This is the document referred to above in paragraph 215 in relation to the Claimant's connections with Abduvaliev.

233.  The Furlan Anstalt travel account document contains one entry for "Tiurine/S" against an invoice date of 11 May 1998 (this entry appears below an entry for "Abduvaliev/ Salim" dated "27/4", also with an invoice date of 11 May 1998) (**pages 344-346 at 345, Vol. 2**). Since the Claimant has disclosed no other documents relating to this entry, it is not possible to say with any certainty whether it relates to Tiourine (with the initial wrongly given as 'S'), a relative of his or some unconnected individual.

234.  The Claimant has not disclosed any document evidencing the reason for the payments from Blonde Investment Corporation to Tiourine or the reason why he was a holder of a corporate credit card issued on behalf of Republic Establishment. He should now be required to do so, in addition to disclosing any other documents evidencing his relationship with Tiourine.

(xvi)   *Value Trust Services: Poliakov*

235.  As noted above, Poliakov's name featured in the investigations by the Swiss authorities into the Claimant's use and association with false passports. It appears from the records of this investigation that Poliakov and Value Trust Services were linked to both the Claimant and to Malevsky.

236.  A document produced by the Swiss police in Geneva reflects that following the Claimant's arrest on 21 May 1994 for using false, stolen Polish passports, he

made a declaration to the police (**pages 944-949 at 947-949, Vol. 4**). This document records that the Claimant said the following in relation to Value Trust Services and Poliakov:

> "You have shown me a visitor's card in the [name] of Value Trust Services S.A., also mentioning Vladimir Poliakov, President, 5, rue des Alpes, 1201 Geneva. It concerns a commercial contact I made in Moscow. One day, I asked him how to rent a flat in Geneva. It was with Poliakov, i.e., with his company, that I signed a lease for a flat in Versoix, close to the school that my 16-year-old daughter attends regularly. ... I use this flat when I am in Geneva in order to have a place to live with my daughter who is normally at Leman College.
>
> [...]
>
> Around one month ago, I bought a car in Geneva. It was a Toyota people carrier. Value Trust has all the formalities.
>
> It is probably registered in the name of Value Trust. It is my Director of Finance who is based in Moscow and New York who took care of the transaction. The instructions were sent from New York or Moscow or even Geneva, to my Swiss bank, perhaps by me.
>
> In fact, this company procures services for us and we have being [sic] paying for these services for a long time, as this company has always provided a satisfactory service."

237.  The minutes of the hearing before the examining judge on 26 May 1994 record that the Claimant said the following about Value Trust Services (**Pages 950-961 at 960, Vol. 4**)

> "You ask me who is the owner of the company Value Trust Services SA, 5 rue des Alpes, Geneva.
>
> I do not know who the owner is. I have not known these people for long. This company looks after the leasing of my flat, hotel reservations, car leasing etc."

238.  The Claimant's evidence in Switzerland seems, therefore, to have been that Value Trust Services was a third party company, whose owner he did not know, which provided services to him of obtaining a car and flat in Switzerland.

239. This seems most improbable. The 1994 FBI Report recorded that "telephone subscriber information" gave Poliakov's US address as the same as that of Arik Kislin's in Natick, Massachusetts (**pages 1-52 at 13, 17, Vol. 1**). Arik Kislin acted as the Claimant's agent during the early 1990s in relation to property transactions, through the company Blonde Management. Arik Kislin is, according to another of the Claimant's former agents, Karam, a cousin of the Claimant (**pages 1-52 at 12, Vol. 1**). It seems, therefore, improbable that the Claimant would not have known who was behind Value Trust Services.

240. Nor does it seem likely that the payments to Value Trust Services were merely for the necessities of life in Geneva. As set out in paragraph 38 of the Fifth Witness Statement of Alexander Gerbi, documents disclosed by the Claimant reveal a number of payments to an entity identified as "Value Trust Ltd" between 9 March 1994 and 16 May 1994. Details of these payments are set out in the table below.

| DATE | SOURCE | RECIPIENT | AMOUNT | PAGE (Vol. 6) |
|---|---|---|---|---|
| 09.03.94 | Hiler Establishment | Value Trust Ltd | USD 120,003.46 | **1396** |
| 29.03.94 | Hiler Establishment | Value Trust Ltd | USD 100,012.70 | **1396** |
| 06.04.94 | Blonde Investment Corp. | Value Trust Ltd | USD 200,000.00 | **1398** |
| 16.05.94 | Hiler Establishment | Value Trust Ltd | USD 50,012.57 | **1397** |

241. It will be recalled that the payments on 9 March and 16 May 1994 each occurred just before the incidents on 11 March and 21 May 1994 (recovery of the false Polish passports and driving licences together with a loaded gun and two silencers from the car at the Swiss border, and an attempt by the Claimant and Tupikova to enter the UK using false Polish passports, respectively).

242. It also appears that Value Trust Services was linked to Malevsky's wife, Malevskaya, and in turn to the Claimant through the apartment in which his family stayed in Geneva. Amongst the false Polish passports and driving licences recovered by the Swiss police on 11 March 1994, which were linked by the Swiss police to Value Trust Services through the individuals Orlov and Khotine, were documents in names of the Claimant and his family members and also "Zanna Malewskaja". The conclusion of the Swiss investigators was that "Zanna Malewskaja" was most likely a relation of Malevsky (**pages 1031-1039 at 1037, Vol. 4**). Malevsky's wife called herself "Janna Anatolyevna Malevskaya" in her witness statement in this action made in March 2008, in which she says she met the Claimant in Geneva in 1994.

243. As I have noted above, the Swiss police had also conducted investigations into Malevsky and discovered that a man had presented a Polish passport in the names of "Antoni Malewski and Anton Malewski", and bearing the passport number AA 2958612 to two Swiss hotels: (i) to Hotel Moevenpick on 22 February 1994 and (ii) to Hotel La Reserve on 2 March 1994 (**pages 906-910, Vol. 4**). This passport number was only three away from that for Zanna Malewskaja (AA 2958609) found in the 11 March 1994 incident. The Swiss police also recorded that this man had been in possession of a Polish driving licence, bearing the number J 0840925 (**page 912, Vol. 4**). This driving licence number was only seven away from that recovered on 11 March 1994 in the name of Zanna Malewskaja (J0840918) (**pages 902-905 at 904-905, Vol. 4**).

244. Amongst the items recovered from the Claimant after his arrest on 21 May 1994, was an airline ticket for travel from London to Geneva in the name of Antony Malevsky and airline tickets in the name of Kharlanova (**pages 913-914 at 914, Vol. 4**). The minutes of the hearing before the examining judge on 26 May 1994 record answers given by the Claimant in relation to the name "Anna Kharlanova" (not Janna), in which he refers to an airline ticket and also apartment 24, Rue du Suisse (**pages 950-961 at 959, Vol. 4**).

245. The Swiss police had discovered that the apartment 24 Rue du Suisse, in which the Claimant's daughters were staying with Tupikova's mother and in which

they had found one of Tupikova's Russian passports, was in the name of "KHARLANOVA ANNA, Value Trust" (**pages 919-928 at 926, and pages 934-935 at 935, Vol. 4**). In his response to the examining judge on 26 May 1994, the Claimant said "I don't really know Ms Anna Kharlanova. I don't remember this person. I may have paid for her hotel or airline ticket" (**pages 950-961 at 959, Vol. 4**).

246.   However, as noted above (see paragraph 40) I have been told that Kharlanova was Malevskaya's surname name before she married Malevsky. This is supported by recent disclosure by the Claimant that has included information said to be from an Israeli travel agency, Melamed Tours. One page relates to travel arrangements for the Malevsky family (**page 492, Vol. 2**) and the passengers names that are recorded are Anton and Janna Malevsky, children Roman and Nikita Malevsky and "Mrs Harlanova/Valentin" (the remainder of the text is obscured).   I have been told the names "Kharlanova" and "Harlanova" are alternative transliterations of the same name and that Malevsky's mother-in-law (Malevskaya's mother) was called Valentina. This makes it even more likely that the name of the person to whom the apartment at 24 Route de Suisse was registered, "Anna Kharlanova, Value Trust Services" and the person "Janna Kharlanova" in whose name the Claimant was carrying airline tickets when he was arrested in May 1994 were in fact references to Malevskaya, using her maiden name.

247.   In short, Value Trust Services is a company which seems likely to be closely linked to the Claimant and to Malevsky. It is a company about which the Claimant has manifestly not been open in his dealings with the Swiss authorities. It is a company which there is very strong reason to suspect was involved in obtaining false passports and other documents for, among others, the Claimant and it appears to have the hallmarks of being a front for organised criminal activity, with which the Claimant had significant financial dealings and about which he has not told the truth.

248. In light of the above, the Claimant should be ordered to disclose all documents evidencing his dealings and relationships with Value Trust Services, Poliakov, Janna (Anna) Kharlanova (Harlanova), and Malevskaya.

(xvii)   *Mogilevich and Ivankov*

249. Unlike the other individuals identified in this section of my Witness Statement, we have not been able to identify – from the disclosure that has been provided by the Claimant to date – any direct payments made to Mogilevich or Ivankov.

250. Even if there were such payments, it would not be surprising that they had not come to light to date. The Claimant has refused to give disclosure of his relationship with any OCG figures other than Malevsky, Popov and Bykov. It is in a sense only through good fortune that the numerous payments referred to above – which may themselves be only the tip of the iceberg – have been brought to light.

251. As set out above:

(a)   There is the strong evidence that Mogilevich and Ivankov were senior OCG figures;

(b)   The FBI's 1994 report identifies the Claimant as an associate of Ivankov (see paragraph 96 above);

(c)   One of the false Polish passports recovered on 11 March 1994 was in the name of "Taim Aleks" which is very similar to the name of Alex Taim, a known associate to Ivankov (see paragraph 155 above);

(d)   A record of a declaration made by the Claimant to a Swiss examining judge on 21 November 1996 reflects that the Claimant was asked about his knowledge of Ivankov. In response, the Claimant stated that he did not know Ivankov but when questioned about his knowledge of Ivankov's son, Eduard Ivankov, the Claimant stated that: "We may have been in a restaurant [in] New York a few years ago, but we didn't know each other. I've never talked to him, and I've never had any contact with

92

him in any way whatsoever" (**pages 979-990 at 987, Vol. 4 and 158-191 at 182, Vol. 1**);

(e)   Both of them were connected with persons with whom the Claimant undoubtedly had connections and to which he made payment. In particular, Ivankov was connected with Popov and the *Podolsk* OCG, and Mogilevich was connected with Tokhtakhounov and the Uzbek mafia; and

(f)   Ivankov was active in the United States, where Arik Kislin was, and where the Claimant says he operated property investments.

252.   Although the Defendant cannot show, from the material disclosed to date, that the Claimant had direct financial connections with either Mogilevich or Ivankov, the close connections that can be shown with other OCG figures, and the close connections between *those* figures and Mogilevich and Ivankov, mean that disclosure of any documents showing meetings with or payments to them should be disclosed.

## F.   Documents concerning Bushaev

253.   Analysis of the disclosure already given by the Claimant appears to demonstrate that there was a connection between the Claimant and Bushaev (also spelled Bushayev), and that Bushaev was in turn connected to Malevsky. Bushaev therefore presents an important point of indirect contact between the Claimant and Malevsky at an early stage in the story. In fact, Bushaev turns out to have links with a number of potentially important figures in this case: with the Claimant, with Malevsky, with TWG and with Value Trust Services and its controller Poliakov (described above). It is not suggested that Bushaev was himself a member or a representative of an OCG.

(i)   *Bushaev's links to Trenton*

254.   The Claimant has disclosed a copy of a request by the Public Prosecutor at the District Court of Darmstadt to the Office of the Examining Magistrate in Geneva for mutual legal assistance (**pages 508-514, Vol. 3**). In this request, the

Public Prosecutor stated that he is conducting an investigation into money laundering on behalf of the Russian criminal organization "Izmajlovskaja", whose leader was Malevsky. Also described are agreements between Trenton and Trans World Metals Ltd or Westdean Metals which, it is said, were entered into by an attorney born in Moscow but resident in Geneva, "Alexander Bushaev" (**pages 508-514 at 510-511, Vol. 3**).

> "who was also authorised to sign for the Trenton Business Corporation and the fictitious companies registered in Panama of Russian clients of the Euro Finanz Treuhand in Lichtenstein. Subsequently, in 1997 several million U.S. dollars from the Trans World Group flooded into the accounts of Malevski and Trenton at the LGT Banque in Liechtenstein.

> Malevski transferred partial amounts to other ISMAJLOVSKAJA accounts, controlled as a priority by AFANASIEV and BUSHAEV."

255. In the Stuttgart Public Prosecutor's Statement of Charges, it is stated that Bushaev "held various entitlements and issued instructions" to the Liechtenstein trustees in respect of certain companies that received payments from Trenton including Berger International Holding, which was "a front for Aksenov" (**pages 515-606 at 591-592, Vol. 3**).

256. A Swiss police report dated 18 July 2001 (**pages 1053-1058 at 1056, Vol. 4**) describes Trenton as being an entity:

> "whose economic beneficiary is MALEVSKIY Anton and for which a proxy has been given to BUSHAEV Alexandre".

257. This is consistent with the 6 December 1994 conversation between Syndikus officers and Arik Kislin and Makhmoudov, the Claimant's agents, in which Syndikus were told that as of 31 December 1994 Arik Kislin would no longer have power of instruction in respect of Trenton and this would be held solely by Malevsky or a person nominated by him (see paragraph 50 above; **pages 1371-1374 at 1373, Vol. 5**).

(ii)     *Bushaev's links to Value Trust Services*

258. As noted in paragraph 247 above, Value Trust Services is a company which seems likely to be closely linked to the Claimant and to Malevsky, and which appears to be connected with organised crime.

259. The papers of the Swiss proceedings reveal that investigators had established a link between Bushaev and Value Trust Services. In a report by the Swiss police dated 16 August 1997 it is noted that the president of Value Trust Services was Poliakov, identified as a leading Russian OCG figure. It is further noted, amongst other things, that Poliakov and "Bushaev, Alexandre Mikhailovich, 06.07.70" who was known to the Swiss authorities for using a stolen Polish passport, represented the interests of two Russian nationals who were looking to invest in the Swiss property market (**pages 1031-1039 at 1035-1039, Vol. 4**). Further on in the report, it is stated that Russian national Victor Sergeevich Orlov (who was also linked to the stolen passports, see paragraph 242 above), gave as his contact details in Switzerland, the address of Value Trust Services and the name Bushaev (**pages 1031-1039 at 1035-1039, Vol. 4**).

(iii)   *Bushaev's links to TWG*

260. In an article in Fortune Magazine published in 2000, Bushaev was described as the "trusted deputy" of Simon Reuben, the owner, with his brother David Reuben and Lev Cherney, the Claimant's brother, of TWG (**pages 2127-2142, Vol. 8**). There are a number of documents disclosed within these proceedings which evidence that Bushaev was a representative of TWG (**pages 1613, Vol. 6; 1697, Vol. 7**).

(iv)   *Direct links between the Claimant and Bushaev*

261. Even on the limited disclosure given by the Claimant, it is possible to identify that Bushaev was responsible for providing the Claimant with the bank account details for Malevsky's personal account at the Israel Discount Bank to enable the Claimant to instruct a transfer of money into that account. This is the first payment identified so far that was made to Malevsky's personal bank account, rather than to Trenton's bank account, where the payment instruction is given

by the Claimant himself, rather than the instruction emanating from Blonde Management.

262. The Claimant's disclosure includes documents relating to this transaction. One is a facsimile reflecting two dates in the header, those of "21/0..." (the text is obscured) and "22 August 1995". The header also contains the name "A M Bushaev" and the number "972 3 5355405". Although the text is very difficult to read, it is just possible to make out the personal bank account details of Malevsky at Israel Discount Bank in Tel-Aviv; in particular one can see that the account number is given as "980 013 484 61 USD" (**pages 1423-1424, Vol. 6**).

263. The number 972 3 5355405 is a telephone line at the Claimant's home address at 52 Ha-Giva St., Savyon, Israel (**pages 1699-1701, at 1699, Vol. 7**). Since the text in the fax header does not line up completely and reflects two different dates, it appears that this document has been faxed twice, once on the 21st and again on 22 August 1995. The date of "Aug 22 '95", time of "11:03AM" and the number 972 3 5355405 all line up and are in the same type face. In contrast, the date "21/0..." (text obscured) and words "A.M. Bushaev" are in slightly darker type. It is reasonable to conclude that the document was faxed on the 21 August, from the number of A.M. Bushaev and re-faxed on 22 August 1995 from the Claimant's home number.

264. Another document contains the instructions for the payment to Malevsky, signed by the Claimant. This document also appears to have been faxed from the Claimant's home fax number 972 3 5355405 and also bears the date of 22 August 1995 (**page 1431, Vol. 6**). (I note that the date, time and number are in the same format as the fax header containing the number 972 3 5355405 in the first document which originated from A.M. Bushaev.) Other documents within the Claimant's disclosure show that on 23 August 1995, a transfer of USD 150,000.00 was made from the LGT Bank in Liechtenstein account of Hiler Establishment, Vaduz, to Malevsky (**pages 1427-1430, Vol. 6**).

265. The Claimant has not disclosed any documents evidencing the reasons for this payment or explaining the role of Bushaev in it.

(v)     *Summary: Bushaev Documents*

266. Bushaev is not reputed to be a member of an OCG. Nonetheless, in light of the documents that can already be identified from within the Claimant's limited disclosure that show dealings between the Claimant, Malevsky and Bushaev, the Claimant should search for and disclose documents relating to any dealings between him and Bushaev, Malevsky (and any entities controlled by him (or his brother Andrei Malevsky) such as Trenton and BCL Business Consulting Ltd) and Bushaev, and any document evidencing any payment to Bushaev.

**Category 2:   Documents Concerning the Claimant's Whereabouts at Particular Times**

267. There are a number of specific periods during which the Claimant's location and activities may be relevant. In relation to those periods, the Defendant seeks disclosure of documents that are likely to show the Claimant's whereabouts and his general activities (e.g., whether he was staying in a hotel). Three classes of document are likely to be of particular significance: credit card statements, mobile telephone records, hotel invoices and travel documents.

268. For example, the Claimant has disclosed only one statement from a credit card held by him, a Eurocard Gold issued on behalf of his company Furlan Anstalt (**pages 1461-1465, Vol. 6**). This statement dated 18 January 1996 reflects items of expenditure and their location between 18 December 1995 and 14 January 1995. From this document it can be seen that during this period, the credit card was used in Istanbul, South Africa and Israel.

269. In his Fifth Witness Statement in these proceedings the Claimant stated that for some time it had been his practice to carry with him two mobile telephones "and I never give them to others for use other than for example asking my drivers to answer my phone if, for example, I am on my other phone" (**para. 9 Vol. 12/A7**). The location and use of these telephones would provide valuable information about the Claimant's own location and activities, particularly if corroborated by credit card statements and any travel documents. The Claimant has disclosed some bills relating to one mobile telephone held by him and paid for by Republic Establishment from which some information can be gleaned as

to the country in which the telephone is used during a particular period, see for example (**page 1640, Vol. 6**).

270. Hotel invoices that were seized from the Claimant upon his arrest by the Swiss authorities on 21 May 1994 revealed bookings in the names of the Claimant, Gaziev and Haimoff (**pages 913-914 at 914, Vol. 4**). In a similar vein, documents recently disclosed by the Claimant which appear to be the records of an Israeli travel agency, Melamed Tours, at which the Claimant's companies Furlan Anstalt and Aluminium Holdings held accounts, disclose travel bookings for the Claimant, his family, friends and associates. These documents span only a limited date range, namely December 1997 to sometime in 2001 and do not appear to be complete records for that period (see paragraphs 298 to 300 below). Nonetheless, even from this limited disclosure, it is possible to identify examples of the Claimant travelling with or to the same place as other people. For example, these documents reflect that on 20 April 1999 the Claimant, "A. Takhtahounov" and Abduvaliev were booked on a flight between Charles De Gaulle airport in France (airport code CGD) and Munich in Germany (airport code MUC) (**pages 338-343 at 342, Vol 2,** ; airport codes CGD and MUC: **pages 2865 and 2867, Vol. 10**).

271. The Defendant therefore seeks an order that the Claimant carry out a reasonable search for and disclose any credit card statements, mobile telephone bills, hotel invoices, travel documents or diaries for the following dates:

(a)   December 1993 to January 1994;

(b)   Late January 1994;

(c)   April 1994 to May 1994;

(d)   October 1995;

(e)   June/July 1996;

(f)   February 1997; and

(g)   December 1999 to January 2000.

98

272. I explain the significance of each of these periods below. But put shortly, each of them is a period during which there is evidence that the Claimant may have been meeting with senior figures in organised crime groups.

(i)    *December 1993 to January 1994*

273. The 1994 FBI Report on Russian and Eurasian organised criminal enterprise, entitled "The Ivankov Aka 'Yaponchik' Organisation", refers to a meeting in December 1993 in Miami, Florida between Ivankov and other figures within Russian speaking OCGs.

274. The 1994 FBI report states that in December 1993, Ivankov was in South Florida meeting with "other OC figures" (**pages 1-52 at 10, Vol. 1**). Ivankov is said to have stayed at the Pan African Hotel on Collins Avenue in North Miami Beach, Florida. Members of another Russian-speaking OCG were also said to be meeting in the Miami area at the same time (**pages 1-52 at 25, Vol. 1**).

275. When the Claimant was questioned by Swiss officials about his use of false Polish passports in May 1994, he stated he was in Miami, Florida for the New Year. This is where he said he acquired the false Polish passports for himself and his family from a man called Dimitri, who he met in early January.

276. The Claimant gave a signed statement to the Department of Justice and Police in the Republic and Canton of Geneva on 22 May 1994 which included the following (**pages 944-949 at 947, Vol. 4**)

> "I formally contest having used a fake Polish passport. In fact, my friend and I obtained these documents legally. I will explain as follows:
>
> In the United States, in Florida, I met a man called Dimitri who spoke Polish, Russian and English. I met him in a bar. He told me that it was now possible to obtain a different nationality from the former republics of the Soviet Union. Dimitri offered me a Polish passport. I received it in January of this year."

277. The Minutes of a hearing before the Swiss Judge on 26 May 1994, which were signed by the Claimant as well as by Tupikova, record the Claimant as having said, amongst other things, as follows (**pages 950-961 at 957-958, Vol. 4**)

"You asked me where I bought the passports and the Polish driving licences found in our possession, seized by the English authorities in London.

I bought these identity documents in Florida. At the beginning of January 1994, I met a man called Dimitri with whom we celebrated the New Year. Dimitri heard that I spoke Russian and approached me. We talked. He told me that he was of Polish origin. I told him my grandfather was also Polish. He told me there was a new law in Poland. Those who still feel Polish can obtain a second nationality, i.e. resume Polish nationality.

I met Dimitri again on a beach and he gave me a number of forms to fill in. I asked him if it was possible to obtain identity documents for my wife and children. I asked him if these Polish passports allowed travel without a visa. He told me I could travel anywhere...

At the end of March or beginning of April 1994, Dimitri called me at my office in New York. We met at my hotel. He gave me the Polish passports and driving licences and told me we have been recognised as Polish."

278. Although they are difficult to read, the copies of passports originally disclosed by the Claimant appear to reflect that USSR passport numbered 02 No. 0034564 was stamped upon entry into the United Kingdom on 9 October 1993 (**pages 1116-1132 at 1120, Vol. 5**). The next legible stamp in time that has been identified is one dated 20 January 1994 contained within USSR passport numbered 21 No. 1015582, which indicates that it was stamped in Geneva (**pages 1152-1168 at 1162, Vol. 5**). On 18 October 2011, the Claimant disclosed a further copy of pages 25 and 26 from USSR passport numbered 21 No. 1015582, which he had disclosed previously (the originally disclosed copies of which are at pages **1152-1168 at 1164, Vol. 5**). This new copy of pages 25 and 26 of the passport now includes a US I-94 departure record which bears a New York US Immigration stamp dated "Nov 23 1993" (**page 1169, Vol. 5**). It appears from the website of the US Customs and Borders Protection within the US Department of Homeland Security, that the I-94 departure record is stamped on arrival into the US (**pages 2435-2436, Vol. 9**). Whilst this newly disclosed material makes it even more likely that the Claimant was in the United States in December 1993 and January 1994 it discloses only his port of entry and does not, for example, disclose the destination for any domestic flights.

279. It appears likely, therefore, that the Claimant was in South Florida at exactly the time when the FBI have identified a meeting of OCG figures, including Ivankov (with whom the FBI allege, but the Claimant denies, the Claimant had close connections), and was there making arrangements to buy false passports. Records such as those that the Defendant seeks are likely to confirm that, and to show exactly when the Claimant was in South Florida, whether he was staying at the Pan African hotel, and what he was doing.

280. The Claimant did not provide any further information when this matter was raised before the Court in June and July this year notwithstanding that he had the opportunity to do so. The matter is, however, important, and one that ought to be subject to proper, rather than piecemeal, disclosure.

281. There is another reason why it is important to ascertain the Claimant's whereabouts at the end of December 1993 and the beginning of January 1994. The Claimant has asserted that he met the Defendant in October 1993. This is disputed by the Defendant. The Claimant has disclosed two photographs, which are described in his list of documents as "31/12/93 Photograph of Oleg Deripaska and Arik Kislin's parents, Paris [C]48970" and "31/12/93 Photograph of Michael Cherney, Oleg Deripaska, Anna Toupikova's parents and Arik Kislin's father, Paris [C]48971" (**pages 1220, Vol. 5**). The photographs themselves do not bear a date (**pages 1222-1223, Vol. 5**). Not only does the Defendant dispute the Claimant's assertion that they met in October 1993, he also disputes being in Paris with him on 31 December 1993. Again, for this reason, the whereabouts of the Claimant on 31 December 1993 is a matter of importance and one that ought to be subject to proper disclosure.

(ii)     *Late January 1994*

282. The book on Russian criminality by A. Maximov refers to a meeting in late January 1994 of senior figures in various "Slavic" Russian OCGs in Vienna, Austria (**pages 1704-1710 at 1709, Vol. 7**).

283. As I noted above, the stamps in the copies of the Claimant's passports that have been disclosed are difficult to read. The Claimant's USSR passport

numbered 02 No. 0034564 shows entry and exit stamps for Bulgaria on 29 and 30 January 1994 (**pages 1116-1132 at 1117, Vol. 5**). The Claimant's USSR passport numbered 21 No. 1015582 bears a Geneva stamp dated 20 January 1994 (**pages 1152-1168 at 1162, Vol. 5**). It has not been possible to identify from the copies of the Claimant's passports that have been disclosed any legible immigration stamps that would indicate his whereabouts between 20 and 29 January 1994.

284. It accordingly seems possible that the Claimant was in Vienna in late January 1994, during which time there was a meeting of senior figures of Russian-speaking OCGs. If that were the case it would be a material fact.

(iii) *April to May 1994*

285. I have referred above on various occasions to the evidence (including admissions made by the Claimant, statements made by Tupikova, police reports and hotel invoices recovered when the Claimant was arrested on 21 May 1994) which show that the Claimant was staying at the La Reserve hotel in Geneva in April and May 1994, at a time when a number of reputed OCG related figures were also staying there. Some of those figures can be linked directly to the Claimant, for instance by hotel invoices. Others (such as Mikhailov) the Claimant says he just happened to encounter during this period, and denies having met to discuss (legitimate or illegitimate) business.

(iv) *October 1995*

286. The document that appears to be an FBI report on Eurasian organized crime from 1996 notes that Mikhailov, together with Mogilevich, Averin and others, attended a summit meeting of Russian OCG figures in Tel Aviv, Israel from 10 to 19 October 1995 (**pages 53-157 at 80, Vol. 1**).

287. At that time the Claimant was resident in Israel; there is also evidence (for example from the travel document described at paragraph 233 above) that on other occasions the Claimant organised travel for reputed OCG figures visiting Israel. Whether or not the Claimant attended a meeting of OCG figures in

Israel in October 1995 is material to this action, particularly since the participants included Mikhailov, with whom the Claimant has denied having any connection beyond a chance encounter in a hotel in 1994.

(v)    *May to July 1996*

288.  Within the INTERPOL document certified by the Bulgarian National Security Directorate, that has been disclosed by the Claimant, it is stated that he participated in what is described as "a meeting of the Russian organized crime groups' leaders" in June or July 1996 in Baden-Baden in Germany (**pages 158-191 at 181, Vol. 1**). THE INTERPOL document records that the meeting was organised by Fanchini Riccardo and the Claimant; amongst other reported attendees is Averin, who is described as a prominent member of the "Solncevskaya" OCG. As noted above, the *Solntsevskaya* OCG was reportedly led by Mikhailov.

289.  The passports disclosed by the Claimant show that between May and July 1996, the Claimant travelled from Israel on a number of occasions. From these documents it is not possible to identify the countries he visited during these trips, with the exception of Turkey between 15 and 17 May 1999. The immigration stamps that can be identified show the following travel (**pages 1438-1449, Vol. 6**):

(a)    15 May 1996: departed Israel

(b)    15 May 1996: entered Turkey

(c)    17 May 1996: departed Turkey

(d)    27 May 1996: departed Israel

(e)    3 June 1996: entered Israel

(f)    8 July 1996: departed Israel

(g)    12 July 1996: entered Israel

(h)    8 August 1996: departed Israel.

290.  The Claimant was therefore absent from Israel at least between 27 May 1996 and 3 June 1996, and between 8 July 1996 and 12 July 1996. If he was in

Baden-Baden during this period, meeting members of OCGs, that would be a material fact.

(vi)    *February 1997*

291.   According to the INTERPOL document certified by the Bulgarian National Security Directorate, in February 1997 the Claimant travelled to South Africa with Tokhtakhounov (**pages 158-191 at 181, Vol. 1**). As set out above in paragraphs 116 to 122, the evidence suggests that Tokhtakhounov is a notorious figure within Russian-speaking OCGs.

292.   The passports disclosed by the Claimant show that during February 1997, the Claimant travelled from Israel on at least three occasions. From these documents it is not possible to identify all the countries he visited during these trips. They do, however, show that the Claimant entered South Africa on 8 February 1997 and entered Israel on 21 February 1997 (**pages 1432-1456 at 1436,-1442, Vol. 6**).

293.   The documents sought by the Claimant are likely to show whether the Claimant did travel to South Africa during this period (and if so, when and where he stayed); they may well also contain evidence which would help to identify whether he did so alone, or in the company of others, such as Tokhtakhounov. They ought therefore to be disclosed.

(vii)   *December 1999 to January 2000*

294.   The Claimant has disclosed material showing that his secretary, Skir, admitted to the Israeli police that she had made hotel reservations for a number of individuals, including Abduvaliev, in Eilat between 25 December 1999 and 10 January 2000. As set out in paragraphs 127 to 134 above, Abduvaliev is reputed to be one of the leaders of organised crime in Uzbekistan. Although the document is difficult to read, the Claimant's Israeli passport numbered 9017525 appears to contain an Israeli entry stamp dated 26 December 1999 (**pages 1987-2020 at 1998, Vol. 8**). Documents recently disclosed by the Claimant from the Israeli travel agency Melamed Tours show that on 26

December 1999, the Claimant flew from Paris Orly airport in France (ORY) to Tel Aviv in Israel (TLV) (**page 348, Vol. 2**;  airport codes: **pages 2869 and 2870, Vol. 10**). Even more recently, on 18 October 2011, the Claimant disclosed Israeli surveillance photographs which identified him in the company of Abduvaliev and others on 30 and 31 December 1999 (**pages 2076-2085, Vol. 8**). A number of the individuals in these photographs are not identified by name.

295. The Defendant seeks documents to establish the Claimant's whereabouts during the period from 25 December 1999 to January 2000 and the identity of the individuals in whose company he spent this period, in addition to Abduvaliev. Such documents are likely to establish whether the Claimant spent this period in the company of other OCG figures.

**Category 3:   Documents relating to Travel Arrangements**

296. As noted above (e.g. paras. 169, 174, 210, 214, 232 and 233), the Claimant has recently disclosed documents evidencing that the Claimant had, through his companies, Furlan Anstalt and Aluminium Holdings, been paying for the flights, other travel and hotels of himself, his family members and people such as Malevsky, Popov, Lalakin (and their families), Tokhtakhounov and Abduvaliev.

297. These documents consist of the following (I identify the document production numbers, but have not exhibited the documents in full):

  (a)  Schedule of Melamed Tours invoices for Furlan Anstalt relating to travel arrangements for various individuals between 15/3/00 and 3/11/00 (**pages 349-367, Vol. 2**);

  (b)  schedule of Melamed Tours invoices for Aluminium Holdings relating to travel arrangements for various individuals between 28/6/00 and 29/3/01 (**pages 375-392, Vol. 2**);

  (c)  Melamed Tours screen prints of travel arrangements for various individuals dated 31/5/01, 7/6/01 and 14/6/01 (it appears that,

notwithstanding the apparent dates, the earliest travel date may be 6/11/97) (**pages 393-491, Vol. 2**); and

(d)   Melamed Tours schedule of travel arrangements for various individuals in relation to the Furlan Anstalt account for the period 19/01/98 and 21/12/99 (it appears that the earliest travel date may be 19/10/97 and the latest date 16/12/99) (**pages 338-343, Vol. 2**).

298.   These documents contain important evidence, in particular evidence connecting the Claimant with representatives of OCGs. However, they do not appear to be complete, and complete documents ought to be disclosed.

299.   The Claimant has not provided any English translations of these documents, the text of which is in Hebrew although numbers of course are not. The document entitled in the Claimant's list of documents 'Melamed Tours schedule of travel arrangements for various individuals in relation to the Furlan Anstalt account for the period 19/01/98 and 21/12/99' (the "Melamed Tours travel schedule 1998-1999"), contains in the top left hand corner the text "01Jan98-01Apr00". A Hebrew-speaking employee of my firm has informed me that this seems to reflect the date range of the invoices reflected in the document (the invoice dates are contained within the sixth column of the schedule, which is the second column if reading right to left in Hebrew). The document does not, however, include any information for invoices issued in January, February and March 2000. The latest date of an invoice is 21/12/99 (**pages 338-343 at 343, Vol. 2**). In the bottom right hand corner of this page appear, I am told, words in Hebrew that mean in English "continuing on the next page", but there is no continuation page. It appears, therefore, that this document is not complete.

300.   The same Hebrew-speaking employee has told me that the numbers in the third column of the Melamed Tours travel schedule 1998-1999 are docket numbers that correspond to the Melamed Tours screen prints that are documents stamped C2349-62366, C62373-C62414, 62415-62453 (**pages 393-410, 411-452, 453-491, Vol. 2**). An attempt has been made to reconcile the docket numbers appearing on the Melamed Tours travel schedule 1998-1999 to the

Melamed Tours screen prints that have been disclosed. It has not been possible to reconcile all those docket numbers with corresponding screen prints, which means that screen prints have not been disclosed in respect of that docket. A schedule of the missing dockets/screen prints is provided as Appendix 3 to this statement.

301. The importance of being able to reconcile these documents can be shown through the following example, which illustrates that the Melamed Tours travel schedule 1998-1999 records only the first passenger in a group, whereas the corresponding screen prints also identifies any co-passengers. The Melamed Tours travel schedule 1998-1999 reflects that on 29 December Pavlov was booked on a flight from TLV-ETH (Tel Aviv to Eilat), docket number 645290 (**pages 337-343 at 339, Vol. 2**). The corresponding screen print is page stamped C62356 (**page 347, Vol. 2**), which reflects that the other passengers travelling included Malevsky, his wife Malevskaya, children Roman and Nikita Malevsky and "Valentin" (Valentina) Harlanova. That information is not contained in the travel schedule. As I have described in paragraphs 83 and 84 above, Pavlov is reputed to have been a leading figure in the Russian OCG *Ismailovskaya*, who took over leadership of the group following Malevsky's death. Documents evidencing associations between Pavlov and Malevsky, particularly where connected to the Claimant as here, are relevant to the Defendant's case that the Claimant acted as a representative of OCGs.

302. The following is an example of where this reconciliation exercise has not been possible because the relevant screen print is not amongst the Claimant's disclosed documents. The page stamped C62368 (**pages 337-343 at 339, Vol. 2**) of the Melamed Tours travel schedule 1998-1999 reflects that Abduvaliev and "S Tuirine" were booked on a flight from TVL (Tel Aviv) to IST (Istanbul) on 27/4, the relevant invoice being dated 11 May 1998 (**pages 2870 and 2872, Vol. 10**). The docket numbers for Abduvaliev and Tuirine are 647076 and 647085, respectively. Neither of those docket numbers appears on the Melamed Tour screen prints that the Claimant has disclosed. It is not, therefore, possible to ascertain who, if anyone, accompanied Abduvaliev and Tuirine, as it was in the above example of Pavlov and the Malevsky family.

303. In addition to the Melamed Tours documents described above that were disclosed on 2 September 2011, the Claimant earlier disclosed three documents that appear on their face to be hotel vouchers produced by Melamed Tours (**pages 368-370 Vol 2**). These three documents all relate to hotel bookings in the name of the Defendant. No other similar documents have since been disclosed.

304. As noted above in paragraphs 40, on his arrest in Switzerland on 21 May 1994, the Claimant was found in possession of airline tickets in the names of "MALEVSKY Antony" and "KHARLANOVA Janna " (**pages 913-914 at 914, Vol. 4**). Since, as described above, the Claimant's disclosed documents reveal that at least one travel agency, Melamed Tours, operated accounts for the Claimant's companies, it is likely that he used the services of travel agencies earlier in time to book these tickets. Relevant documents do not seem to have been disclosed.

305. As described above in paragraph 218 the transcript of the Claimant's secretary, Skir's, interview with Israeli police in May 2001 reveals that she stated that the Claimant caused an Israeli company, Narkisei Gavriel Company, to be established for the purpose, amongst other things, of providing "hosting services in Israel to his guests who arrive from abroad, like ordering hotel rooms, airtickets, translation etc. And this is what there was" (**pages 2216-2235 at 2226, Vol. 8**).

306. It therefore seems unlikely that relevant documents evidencing travel arrangements of the Claimant and his associates are limited to the narrow period between the end of 1997 and early 2001 that have been disclosed by him to date.

307. Accordingly, the Defendant seeks an order that the Claimant:

(a)   confirm, by specific disclosure statement, that he has caused reasonable searches to be made for all documents relating to travel arrangements made on his behalf, whether through his companies or otherwise, for himself and others between the period 1992 to 2005 (the latest travel date

referred to in (**para. 91, Vol 12/A1**) and that these have been reviewed for the purposes of disclosure;

(b)   disclose a complete copy of all pages of the "Melamed Tours schedule of travel arrangements for various individuals in relation to the Furlan Anstalt account for the period 19/01/98 and 21/12/99" (stamped C62367-C62372); and

(c)   disclose all screen prints identified in the schedule contained in Appendix 3 to this statement.

**Category 4:   Passports**

308.   The Claimant accepts that passports held by him fall to be disclosed as part of his standard disclosure. File 213 of the Claimant's disclosure contains copies of a number of passports and travel documents that the Claimant has held between 1992 and April 2011. A copy of the Claimant's index to file 213 is at **page 2701, (Vol. 10)**. The file contains three passports issued within the former USSR and seventeen Israeli passports and travel documents.

309.   In my firm's letter of 15 August 2011, we asked that the Claimant disclose all other passports and travel documents he has or has had or, if it is the Claimant's position that he has and <u>has had</u> no other such documents beyond those already disclosed, that this should be expressly confirmed by him. No further documents were disclosed but this express confirmation as to passports that the Claimant had in the past was not forthcoming. Instead, the Claimant's solicitors responded as follows (**pages 3026-3034 at 3034, Vol. 11**, with emphasis added).

> "We are instructed that our client <u>does not have</u> any further passports or travel documents beyond those already disclosed. Nevertheless, were any to come to light at a later stage in these proceedings they will be disclosed."

310.   On 18 October 2011, the Claimant served further copies of documents relating to passports held by him. As noted above (see paragraph 278), he served a new copy of a page already disclosed from his USSR passport numbered 21 No

1015582 containing a US I-94 departure record (**pages 1097-1101 at 1101, Vol. 5**). The Claimant also served new copies of pages 11 and 12 from his USSR passport numbered 02 No. 0034564 which had been disclosed previously, which also show a US I-94 departure record stamped "Mar 03 1993" (**pages 1116-1132 at 1131, Vol. 5**), and an additional page showing another US I-94 departure record stamped "Dec 17 1992" (**pages 1116-1132 at 1132, Vol. 5**). Importantly, however, the Claimant also disclosed pages from an entirely new Russian language passport, numbered CR I No. 606275. These pages show that the passport was valid from 13 November 1990 to 13 November 1995 and contain a one year multiple entry visa to the USA issued in Moscow on 10 September 1991, a US entry stamp dated 16 November 1991 and a US I-94 departure record showing an entry into the US, at New York on 28 December 1991 (**pages 1097-1101 at 1098, Vol. 5**).

311.  The Claimant has a history of using multiple passports and using, and being associated with, false passports. In May 1994 the Claimant told a Swiss examining judge that he had four or five passports. This examination occurred following the Claimant's deportation to Switzerland from the United Kingdom after he and his partner Tupikova had unsuccessfully tried to enter the country using false Polish passports. Against this background and as set out below, it appears that the Claimant has not disclosed all the passports he has held since 1992 or provided an explanation as to why such passports cannot now be disclosed.

312.  The Claimant and his partner Tupikova were deported from the United Kingdom to Switzerland on 21 May 1994, after they attempted to enter the country at Heathrow airport by presenting passports that had been stolen in Poland as blank documents[8]. On their arrival in Switzerland they were arrested and questioned about the circumstances in which they obtained these false passports and about their knowledge of other false Polish passports, which bore approximations of their names and the names of persons associated with them

---

[8]   As noted above, evidence of that incident in this witness statement is covered in some detail in the Fifth Witness Statement of Alexander Joseph Gerbi, at paragraphs 13-55 (**Vol. 13/B6**). This notes that copies of the false passports presented by the Claimant and Tupikova were apparently confiscated by the UK immigration officers on 21 May 1994.

that had been seized by Swiss police on the border with Germany on 11 March 1994. The minutes of the hearing before the examining judge in Geneva on 26 May 1994 record that the Claimant said the following (**pages 950-961 at 956, Vol. 4**)

> "You ask me why I hold two passports from the former Soviet Union and why I sometimes use one and sometimes the other to obtain visas. I have 4 or 5 passports of this type. Since applying for visas takes time, I submit one passport while using another".

313. It is apparent from the documents that have now been disclosed by the Claimant that he held a number of passports that were concurrently valid. For example, in May 1994, the Claimant had at least four valid USSR passports as well as a false Polish passport. This can be seen from the schedule below of disclosed passports held by the Claimant as of May 1994 plus the false Polish passport presented at Heathrow airport on 21 May 1994.

| PASSPORT NUMBER | ISSUE DATE | EXPIRY DATE | PAGE (Vol. 5, except where indicated) |
|---|---|---|---|
| Cr. I No. 606275 | 13/11/1990 | 13/11/1995 | **1097** |
| 02 No. 0034564 (USSR) | 23/06/1992 | 23/06/1997 | **1116** |
| 41 No. 0573675 (USSR) | 23/06/1993 | 23/06/1998 | **1203** |
| 21 No. 1015582 (USSR) | 25/02/1993 | 25/02/1998 | **1153** |
| AA2964595 (false Polish) | | | **2043-2044, Vol. 8** |

314. If, as the Claimant told the Swiss judge on 26 May 1994, that he had "four or five". concurrent USSR passports, then as of that date he may have held an additional passport (the fifth) that he has not disclosed.

315. Moreover, there are two references to one other passport that has not been disclosed by the Claimant; these are contained within two documents disclosed by the Claimant that relate to his company Furlan Anstalt. The first is a copy of a stock purchase agreement signed by the Claimant and dated 17 August 1994

by which the Claimant sold shares in AOZT Podolsk to Parrilla Limited of the BVI (**pages 1357-1367, Vol. 5**). The second appears to be a receipt signed by Arik Kislin on behalf of the Claimant for a cheque from Parrilla Holdings Limited of Cyprus for USD 6 million in payment for the shares (**page 1368, Vol. 5**). In both documents, the Claimant is described as an Uzbekistan citizen with passport number VI - I0C 680502, having an address at 6 Rostovsky Pereulok, Apt 4, 119121 Moscow.

316.   No passport with such a number has been disclosed by the Claimant. It is not clear whether the documents are referring to an Uzbekistan passport or to another USSR passport, perhaps one issued in Uzbekistan, that the Claimant held. But in either case the document should have been disclosed.

317.   In summary:

(a)   When questioned by the police over the use of stolen and forged passports in 1994, the Claimant asserted that he customarily made use of "four or five" passports at one time, but has disclosed pages of only four apparently genuine passports (there being one false Polish passport that he cannot disclose because it was confiscated).

(b)   The Claimant offered confirmation that all passports and travel documents that he <u>has</u> have been disclosed, but has not given disclosure of passports he previously held. The confirmation was given in correspondence by his solicitors on instructions and not by the Claimant himself. That confirmation, given by letter of 15 August 2011, was incorrect since on 18 October 2011, the Claimant disclosed pages from yet another passport. No explanation has been given for this error.

318.   The documents disclose that the Claimant did have at least one additional passport which he has not disclosed. In these circumstances, it is appropriate that the Claimant should (himself, in a disclosure statement) provide a full and complete account of all the passports he has held over the period relevant to this action (1992-2005), so that any that he has been unable to disclose (and the

112

reasons for that) can be identified. Accordingly, the Defendant seeks an order that the Claimant:

(a)   identify every passport (including every false passport) he has held during the relevant period, specifically identifying those that he has had in the past but cannot now disclose and the reasons for that;

(b)   disclose the remaining pages of the passport numbered CR I No. 606275;

(c)   confirm by a disclosure statement the statement made by his solicitors in correspondence; and

(d)   confirm that in respect of the passports that he has disclosed, these have been disclosed in their entirety.

**Category 5:   Inadequate Searches of Computers, Email Accounts and Office Premises and Failure to Request Copies of Documents Seized by the Israeli Authorities**

319.   For reasons that I explain below, the searches that have been carried out by the Claimant in relation to his personal computers, email accounts used by him, and his own office premises, appear to have been inadequate, and the information provided about them by the Claimant seems to be incomplete or incorrect. For that reason the Defendant seeks appropriate relief (in the form of either further searches or more informative disclosure statements to explain the nature of the searches carried out) to ensure that a proper search has been carried out.

320.   By way of background, it appears that much of the Claimant's disclosure has been provided from documents maintained not by him, but by agents or fiduciaries, such as Syndikus. For example, in the region of 108 files of documents have been disclosed that appear to comprise in large part if not in whole documents maintained by Syndikus, and much of the recent disclosure seems to come from files maintained by the Claimant's lawyer, Batkov and his associates. While that disclosure is obviously important, it is equally important to ensure that any documents maintained by the Claimant himself or by his personal staff have been adequately searched. In that regard, the Claimant

accepts that there are significant "gaps" in the disclosure he has provided. For instance, as noted above in paragraph 7, the Claimant accepts that, for a variety of reasons, he has not been able to disclose documents previously held by:

(a)   Skir, the Claimant's personal assistant in Israel for many years;

(b)   Karam, the Claimant's fiduciary in Switzerland; and

(c)   Arik Kislin, the Claimant's fiduciary in New York.

### A.   Computers

321.   For the reasons set out below, it appears that the Claimant has failed to comply with his obligations to disclose his own computers and computer records.

322.   In his disclosure statement, the Claimant states that searches have been made of his secretary Skir's computer (and the computers of various advisors).  The Claimant also states that he bought a computer in late 2008 or early 2009 which is located at his home address of Hagiva 52 Savyon, Tel-Aviv, Israel but this has not been searched as "I do not use it and have never stored documents on it" (**pages 2955, 2967, Vol. 11**).

323.   In paragraph 5 of a letter from the Claimant's solicitors dated 17 December 2010, it is stated that (**page 2936, Vol. 11**):

"Our client has previously purchased computers for members of his family, including a computer which is located at the address identified in our client's Disclosure Schedule. We are instructed that our client does not use and has never stored documents on this computer or any other computers used by members of his family".

324.   In summary, there has been no mention by the Claimant of any other computer or computers that he may have owned or used prior to late 2008.

325.   In other proceedings, however, the Claimant has admitted owning a computer prior to that time.

326.   In 2008, the Claimant commenced proceedings in the Tel-Aviv District Court against the Defendant herein and others for, amongst other claims, defamation

and breach of the Law of Computers (**pages 2492-2515, Vol. 9**). The Claimant swore an affidavit in those Israeli proceedings which was signed by him on 24 February 2008 and has disclosed a copy of it with an English translation in these proceedings (**pages 2516-2540, Vol. 9**).

327. In paragraph 23 of his statement, the Claimant made accusations against Andrey Kalitin, saying that he:

> "broke into my computer, which is used by Mr Dmitry Radyshevsky (who is employed by me) in his work for me."

328. In paragraph 26 of his statement, the Claimant alleged that this event occurred in October 2007 and, in paragraph 27, repeated that the allegation concerned "my computer that is used, as aforesaid, by Mr Radyshevsky" (**page 2523, Vol. 9**). This is about one year before "late 2008/early 2009", which is identified by the Claimant in his Disclosure Statement in these proceedings as the date when he purchased his computer (**pages 2952-2978 at 2967, Vol. 11**).

329. Neither the Claimant in his Disclosure Statement nor his solicitors in correspondence makes any reference to this earlier computer owned by the Claimant. Similarly, neither the Claimant in his Disclosure Statement nor his solicitors in correspondence has made any reference to the Claimant's employee, Radyshevsky, or to any computer or other documents that he holds or has held in the past on behalf of the Claimant.

330. It is unclear how long the Claimant had owned this computer or employed Radyshevsky to operate it. It is likewise unclear whether the Claimant owned any computer or computers prior to October 2007 and, if so, what happened to them. It is, of course, a common practice, when a person changes or upgrades a computer, to transfer material from the old computer's hard drive to the new computer's hard drive. It is also common practice to make "back-up" copies of data on a computer, by regularly copying files (or the whole computer hard drive) to disks or other types of storage media. Consequently, the computer that the Claimant owned in or before October 2007, which he has failed to disclose, may have included material dating from many years before this.

331. Accordingly, the Claimant should be ordered to provide details, under a declaration of truth, of:

    (a)   the date from which he employed Radyshevsky;

    (b)   which computer or computers of the Claimant was or were used by Radyshevsky;

    (c)   the dates of purchase of any computers that the Claimant owns or has previously owned;

    (d)   what happened to each of those computers; and

    (e)   what happened to the hard drives of those computers, the data on those computers, and any back-up digital storage of the data on those computers.

332. Similarly, the Claimant should be ordered to undertake thorough searches at the home or business premises of Radyshevsky to locate any computers, hard drives, other forms of digital data storage, and any other types of documents relevant to the issues in these proceedings.

**B.**    **Searches of the Claimant's emails**

333. For the reasons set out below, the Defendant seeks an order requiring the Claimant to make searches for relevant documents related to the following email addresses: (i) any email address used by Radyshevsky in respect of his employment by the Claimant; (ii) <offekltd@netvision.net.il>; (iii) <offek@netvision.net.il>; (iv) <sfi@isdn.net.il>; and (v) <info@sibalum.com>.

334. As noted above, the Claimant has stated in other proceedings that he owned a computer prior to late 2008 and this was operated for him by his employee, Radyshevsky. Since most computers are linked to the Internet and have email facilities, it seems likely the Claimant (or Radyshevsky, or other employees, on his behalf) had one or more e-mail addresses that they accessed from that computer.

335. There are indications in the disclosed documents that this was the case. For example, the Claimant has disclosed in these proceedings an article dated 20 December 2006 from the Financial Times FT.com (**pages 2481-2483, Vol. 9**). The Claimant has asserted that he cannot speak or read English. If that is correct, the article must have been identified, downloaded from the internet, and printed off for him by someone else – presumably a member of his staff such as Radyshevsky.

336. There are also indications that the Claimant's staff made use of email to communicate on his behalf. The first page of the FT.com article refers to a statement of the Claimant "sent through a spokesman" and notes the Claimant denying any connection to Goldovsky's bid for a Romanian refinery aside from selling some acquired debt to Goldovsky. The article quotes the Claimant as saying "I had nothing to do with purchases of those stocks" by Goldovsky in "an e-mail statement", which may be a reference to the content of the email statement "sent through a spokesman". If so, someone was sending emails on behalf of the Claimant in 2006.

337. In these proceedings, the Claimant has not, however, disclosed any emails to or from any such email address and the Claimant's Disclosure Statement makes no reference to any search for documents being undertaken in the e-mail records of this computer or any request to the Internet Service Provider ("ISP") for that computer or Radyshevsky.  In contrast, the Claimant has declared in his disclosure statement that requests have been made of the ISPs for Elisha Ben-Tamar and Skir for copies of all emails sent to and/or from their email addresses and any documents sent to and/or from those email addresses.

338. There is further evidence that the Claimant used e-mail for correspondence. There is a contract between the Hades Foundation and the Claimant's Liechtenstein fiduciary agents Praesidial-Anstalt in respect of CCT on 27 March 2006, in which the Claimant is identified as the person authorised to give instructions (**pages 2426-2432, Vol. 9**) and to another contract between the Galenit Foundation and Praesidial-Anstalt's successor, Kaiser Ritter Partner Trust Services, also in relation to CCT and also in which the Claimant is

identified as the person authorised to give instructions, on 22 September 2009 (**pages 2658-2661, Vol. 10**). In these contracts, the Claimant gave his e-mail address as:

<offekltd@netvision.net.il>

339. The reference to Offek in this email address seems likely to be a reference to a company owned by the Claimant that was incorporated in Israel and named Offek (M.L.M.) Investment 1994 Ltd (to which I refer further below, see paragraphs 357-362).

340. In the 2009 contract, the Claimant gave two email addresses, in addition to various telephone and fax numbers. The first of these is the offekltd email address noted above. The second is:

<dannimar@bezeqint.net>

341. In correspondence, the Claimant's solicitors have confirmed that this is an email address for a Daniel Mazin. In their letter of 8 February 2011, it is stated that Mazin disposed of his computer by placing it in the refuse at his home, he did not maintain any form of copy of back up of his electronic records on external hard-drives or remote services, and that his email address has been searched by him. Mazin is an agent of the Claimant whose conduct was the subject of contempt proceedings before Mrs Justice Proudman in *Cherney v Neuman & Ors*. On 27 July 2010, Proudman J gave an interlocutory judgment: *Cherney v Neuman* [2010] EWHC 2319 (Ch) (**pages 2682-2690, Vol. 10**). The judgment summarises the evidence of the Claimant's own solicitor, Mark Buckley, that Mazin had earlier given false evidence to the Court (**page 2686, para. 27, Vol. 10**). Proudman J also states that there was "a good arguable case to this effect ... the court was deliberately lied to" (**page 2689, para. 44, Vol. 10**). The Claimant's counsel submitted that Mazin "went off on a frolic of his own, because of a personal vendetta against Mr Neuman and possibly partly also out of misplaced loyalty to Mr Cherney" (**page 2685, Vol. 10**). Proudman J noted that (**page 2689, para. 47, Vol. 10**):

> "It seems from the recently disclosed documents that he [Mazin] has justified his actions on the basis of his perception that Mr Neuman has been guilty of fraud and that this ought to override all other considerations".

342. The final judgment of the substantive case was given by Mr Justice Henderson: *Cherney v Neuman* [2011] EWHC 2156 (Ch) on 5 August 2011 (**pages 2711-2816, Vol. 10**). In that judgment, Henderson J made the following observation about the timing of the settlement of the case as between the Claimant and Neuman (the action having continued against the other defendants) (**page 2801, para. 282, Vol. 10**):

> "It is almost certainly no accident that it [the compromise] was concluded shortly before the resumption of the committal proceedings before Proudman J. and there are good grounds for supposing that Mr Cherney may have been ready to settle on terms favourable to Mr Neuman because he feared a damning judgment against him..."

343. The remarks of both Proudman J and Henderson J. give rise to considerable concerns about the veracity of what Mazin has told the Claimant's solicitors in this action about the searches he has undertaken. Further, whilst in the Claimant's solicitors' letter of 8 February 2011 it is said that Mazin refused to disclose to the Defendant's solicitors the identity of his ISP, the Claimant has not confirmed in his disclosure statement that any request has been made by his solicitors of Mazin's ISP for a search for emails and documents.

344. By reason of the above, there are serious reservations about Mazin (who is not, as far as we know, a lawyer) carrying out the search. But at least some sort of search has apparently been conducted. In contrast, the Claimant has not confirmed that the offekltd email address has been searched. The Claimant's Disclosure Statement of March 2011 makes no reference to any search for documents being undertaken in the Israeli offices of Offek (M.L.M.) Investment 1994 Ltd and no reference to any computer records of that company. Even if the company was no longer operating by the date of disclosure in these proceedings, one would expect that company's paper and computer records to have been stored somewhere. One would also expect those records to have been searched for any documents relevant to these proceedings.

345. To date, only one email addressed to or emanating from this offekltd email address has been identified from within the Claimant's disclosures in these proceedings. This email was only recently disclosed and it is amongst material that in correspondence, the Claimant's solicitors have confirmed was seized from the office of Karam by the Swiss authorities and thereafter held by the Claimant's Bulgarian lawyer, Todor Batkov (**pages 3019-3021, Vol. 11**). It is thus apparent that the document has not emanated from a search of the offices of Offek Ltd. This document has been disclosed in electronic format only, and so does not bear a stamped disclosure number (*e.g.*, C00001).

346. The email is dated 26 January 2000 and is from the email address "Joseph gce@swissonline.ch", which appears to be a reference to Karam, addressed to <offekltd@netvision.net.il> (**page 2110, Vol. 8**). The subject line of the email reads "Att : Lena", which appears to be a reference to the Claimant's secretary Skir, also known as Lena. The body of the email reads:

> "Please find herewith the paicment order
> Best regards and better health
> Agnès"

347. It thus appears that the Claimant was, through his secretary, receiving correspondence at this email address by at least the beginning of 2000.

348. Further material served by the Claimant for the purposes of his application of 26 July 2011 reveals that the Claimant's secretary is still receiving correspondence at the offekltd email address. Pages 12 and 13 of the exhibit "ET1" to the Witness Statement of Evgeny Traspov ("Traspov"), one of the Claimant's Israeli lawyers, is said by him to be a copy of correspondence between himself and the Claimant's mobile phone provider (**page 2705, Vol. 10**) and an English translation of the same (**page 2706, Vol. 10**). The letter indicates that it was sent to Traspov care of "Ms Elena Skir, by email offekltd@netvision.net.il" (**page 2706, Vol. 10**). (I note that in the English translation of the letter, the email address is incorrectly stated to be offek@netvision.net.il but the original Hebrew letter reflects the "offekltd" email address.)

349. It appears, then, that this address is still in use by the Claimant, through his secretary.

350. The Claimant has disclosed a small file of documents for "Sibirsky Aluminium Israel", that is the company Sibirsky Aluminium Group Ltd. This disclosure relates to the years 2000 and 2001, when the company's address was given as at 12/1 Trumpeldor Str, Tel-Aviv (an address to which I shall return below). Two examples of the disclosed documents are a fax and an e-mail, that are reproduced at **pages 2111 and 2112 (Vol. 8).** These two documents refer to two e-mail addresses of Sibirsky Aluminium Group Ltd during the years 2000 and 2001, which are as follows:

<sfi@isdn.net.il>

<info@sibalum.com>

351. Only three e-mails (neither of them to or from the Claimant) appear to have been disclosed by the Claimant which bear either of these addresses (**pages 2115-2117, Vol. 8**). The Claimant's Disclosure Statement makes no reference to any search for documents being undertaken at 12/1 Trumpeldor Str, Tel-Aviv, or in any other Israeli office of Sibirsky Aluminium Group Ltd, and no reference to any computer records of that company. Even if the company was no longer operating by the date of disclosure in these proceedings, one would expect the company's paper and computer records to have been stored somewhere and to have been searched for any documents relevant to these proceedings.

352. An order is therefore sought that the Claimant:

   (a)   identify every email address, including corporate email addresses, used by him (directly or through his staff) between 1992 and to date;

   (b)   confirm that each such email address has been searched, or explain why it has not been searched; and

   (c)   disclose any relevant documents produced by such a search.

**C.**   **Searches for documents in the offices of the Claimant's Israeli companies**

353.   In his disclosure statement (**pages 2953-2978, Vol. 11**), the Claimant states that he has conducted a search of his own property at Hagiva 52 Savyon and a property at 501 Beit Ha Opera, Tel-Aviv. The Claimant has resided at 52 Hagiva Street, Savyon for many years. For example, documents within the Claimant's disclosure from his Liechtenstein agents, Syndikus Treuhandanstalt and Praesidial-Anstalt, and LGT Bank in Liechtenstein record the Claimant's address in 2001, 2004 and 2005 as 52 Hagiva Street, Savyon (**pages 2243, 2244, 2245, Vol. 8**) That same address is noted for the Claimant in a record created by the Swiss police following the Claimant's arrest and questioning on 21 November 1996 (**pages 971, 975, Vol. 4**).

354.   Paragraph 3 of the Claimant's solicitors' letter of 17 December 2010 (**page 2936, Vol. 11**) reads as follows in respect of the Claimant's residential properties

> "Our client does not maintain separate business or commercial premises. Nor does our client utilise external storage or archive facilities. Rather it is our client's practice for his business documentation to be held either with his personal secretary, lawyers and/or fiduciaries as appropriate."

355.   This seems to be incorrect, at least as a statement of the Claimant's general practice. The documents that he has disclosed and inquiries that my firm have made show that the Claimant's practice has been to maintain and use business premises. Whether those premises are still maintained, and whether they or the documents emanating from them have been searched, is not clear.

356.   As noted above, the Claimant has disclosed a small file of documents for "Sibirsky Aluminium Israel", that is Sibirsky Aluminium Group Ltd, for the years 2000 and 2001 when it was located at 12/1 Trumpeldor Str, Tel-Aviv. However, the Claimant owned other companies and businesses that have been active in Israel. One of these has been liquidated during the course of these proceedings.

357.   References in the Claimant's disclosed documents and searches of the Israeli Ministry of Justice's corporate registry show the Claimant as having been a

shareholder in three private limited companies incorporated in Israel (**pages 2826-2836, Vol. 10**). These are:

(a)   Offek (M.L.M.) Investment 1994 Ltd;

(b)   F.I.E. First Israel Financial Company Ltd; and

(c)   Aluminum Holdings (A.H.) Ltd.

358.   The Claimant's disclosure statement of March 2011 (**pages 2953-2978, Vol. 11**) does not refer to these companies or any offices they have or had in Israel. The Claimant has also not provided any disclosures about these three companies, although the name Offek sometimes appears on bank account documentation of other companies as being the transferor or transferee of funds (see, for example, **page 1411, Vol. 6**). As set out above, an Offek email address also seems to have been used by the Claimant for business communications, and documents such as the agreement relating to TWG to which I refer at paragraph 430 below seem to have been faxed from Offek's offices.

359.   I have caused company searches to be carried out in relation to these companies. The search for F.I.E. does not provide any address for the company. The search for Aluminium Holdings (A.H.) Ltd, gives an address for the company of "2 Yehezkel Kaufmann Street, Tel Aviv – Jaffa, 68012" and the search for Offek (M.L.M.) Investment 1994 Ltd, gives an address for the company of "3a Jabotinsky Street, Ramat Gan, 52520 at Diamond Tower – Level 25" (**pages 2826-2836, Vol. 10**). The searches do not reveal the dates on which these company operated from those addresses. However, the Claimant gave this address in a letter dated 24 July 1996 and signed by him addressed to his own company, CCT concerning the legal ownership of a promissory note in the sum of USD 14 million (**page. 1609, Vol. 6**). Similarly, documents disclosed by the Claimant show that in December 1996, his Liechtenstein fiduciaries, Prasidial Anstalt, sent credit card application forms to him and his wife to this address (**pages 1614-1615, Vol. 6**).

360. In paragraph 3 of the Claimant's solicitors' first letter of 11 August 2011 (**pages 2986-2995, Vol. 11**), reference is made to documents seized by the Israeli authorities (in March 2001) from offices "at Koifman 2, Beit HaTextile, Tel-Aviv which offices were used by our client and his representatives for the operation of various companies including Sibirsky Aluminium Israel and Aluminium Holdings Israel" (**pages 2986-2995 at 2987, Vol. 11**). This address seems likely to be the same as the address given for Aluminium Holdings (A.H.) Ltd. These offices are not recorded as having been searched by the Claimant or his lawyers in the Claimant's disclosure statement. It is therefore unclear what happened to any other documents that had been held at the Koifman 2 address but which had not been seized.

361. Several questions arise from this. First, if the Claimant's company was still using those offices in March 2011, why were those offices not searched for documents? Secondly, if these offices were no longer being used by the Claimant and his companies by March 2011, when did this cessation occur and did the operations and staff move elsewhere? Thirdly, if the company did move, to what address and where were its documents and records stored? Fourthly, have those documents and records been searched? No other office premises in Israel appear from the Claimant's disclosure statement of March 2011 to have been searched.

362. The Claimant's disclosure statement makes no reference to the address 3a Jabotinsky Street, which as I noted above, is recorded as the current address for Offek (M.L.M.) Investment 1994 Ltd. The same four questions therefore arise in respect of this address and this company's records. It appears from the records that this company went into voluntary liquidation in January 2008, the liquidator being the Claimant's secretary Skir (named as Yelena Sakir in the English translation). She was appointed liquidator on 14 January 2008 and gave a similar address (3 Jabotinsky Street, Ramat Gan) to that of the company (3a Jabotinsky Street, Ramat Gan). The company was dissolved on 4 January 2009. This liquidation process took place after the commencement of this litigation. The claim was issued on 24 November 2006 and the amended claim form is dated 2 December 2007. Skir made a witness statement in these

proceedings on 27 March 2008 (**Vol. 12/A2**). One might reasonably assume that the Claimant's solicitors would have advised her of the need to retain all relevant documents from the commencement of the claim.

363.   In addition, the address of 12/1 Trumpeldor Str, Tel-Aviv was recorded for many years in many documents as an address for the Claimant as well as an address for his Israeli companies. It seems to have been central to the Claimant's business operations in Israel.

    (a)    As I noted above, the Claimant's company Sibirsky Aluminium Group Ltd was located in 2000 and 2001 at 12/1 Trumpeldor Str, Tel-Aviv.

    (b)    I refer to pages (**pages 2022-2025, Vol. 8**), which are documents of the Claimant's Liechtenstein agents Syndikus Treuhandanstalt taken from his disclosure. These record the Claimant's address in 1999 and 2000 as 12 Trumpeldor Str, Apt 1, Tel-Aviv (although other documents of Syndikus for this period, as noted above, record his address as 52 Hagiva Street, Savyon).

    (c)    On 2 April 1997 Praesidial-Anstalt (Syndikus) had written to the Claimant at the 12 Trumpeldor Str, Apt 1, Tel-Aviv address (**pages 2021-2025, Vol. 8**).

    (d)    12 Trumpeldor Str, Tel-Aviv address was the subject of "secret listening" (i.e. covert recordings of telephone conversations) by the Israeli Police following a Judge's order on 3 June 1999 (**pages 2039-2042, Vol. 8**). The "grounds for the application" reproduced on (**page 2040, Vol. 8**) read, in part:

> "As it follows from the secret listening, the business representative and assistant of Misha Chernoy in Israel is a person named Zeev Rom. Rom works at the offices located at 12 Trumpeldor St in Tel-Aviv. These offices belong to the companies that are officially owned by Zeev Rom, Misha Chernoy, Grigory Luchansky and other Chernoy's employees".

364. 12/1 Trumpeldor Str, Tel-Aviv was not included in the Claimant's disclosure statement as a property at which searches for documents had been undertaken. Whether it has been searched and what has happened to the documents which must previously have been kept there is obscure.

365. Therefore an order is sought that:

    (a) the premises at 12/1 Trumpeldor Str, Tel-Aviv, Koifman 2, Beit HaTextile, Tel-Aviv and 3 (or 3a) Jabotinsky Street, Ramat Gan 52520 (Diamond Tower) be searched for documents relevant to these proceedings;

    (b) if the premises are no longer in the ownership or occupation of the Claimant or any companies owned or operated by him, that those documents and computers previously held at the address, wherever they are now held, be reviewed for any documents relevant to these proceedings; and

    (c) the Claimant make a declaration verified by statement of truth containing (i) a list of all residential and commercial properties, including storage facilities, used by him or companies controlled by him in whole or in part since 1992; and (ii) a statement that all such properties have been searched for documents relevant to these proceedings and, if not, an explanation why this has not been done.

**D.**    <u>**Failure to Request Copies of Documents Seized by the Israeli Authorities**</u>

366. The Claimant says that the Israeli police seized documents from Skir, himself and "offices used by [him] and his representatives" in 2001 in respect of two investigations and later in 2007 in respect of a third investigation (**pages 2986-2995 at 2987, para. 3, Vol. 11**).

367. His solicitors have described the 2001 investigations as relating to "allegations that our client had bribed Oleg Chernomoretz, a member of the Eilat Municipal authorities... [and] [t]he second concerned investments in Bezeq Telecommunications Company" (**pages 2986-2995 at 2987, para. 3, Vol. 11**).

126

The Claimant says that under Israeli law, he is not entitled to be given access to all of the documents seized in the 2001 investigations, rather, "access is limited to documents which have been designated by the Prosecution (or the Court in the case of an application to the Court for access to documents) as being part of the "*investigation material*" in the respective Eilat and Bezeq Cases".

368. In respect of documents seized in 2007, the Claimant's solicitors have stated that "these were seized in connection with an investigation concerning Mr Libermann [sic], the Israeli Minister of Foreign affairs [sic]. We are instructed that neither our client nor his Israeli lawyers have, to date, been given access to those documents at all because they are not currently entitled to such access under Israeli law" (**pages 2986-2995 at 2987, para. 3, Vol. 11**).

369. Further information was provided by the Claimant in a letter from his solicitors dated 9 September 2011. Therein it is said that the Claimant has been given access to the documents seized in 2001 that have been classed as "investigation materials" but he has "no further right of access" to documents seized that have not been classified as investigation materials (**pages 3026-3034 at 3031, para. 23, Vol. 11**). In respect of the documents seized in 2007, the Claimant says that he has no right under Israeli law to have access to the documents because an indictment has not yet been filed against him. He further says that his lawyers have nonetheless requested access to the documents but that they have been unable to comply with the Israeli prosecutor's request that they specify the documents to which they require access because he was not provided with an itemized list of the documents seized in 2007 (**pages 3026-3034 at 3031, para. 24, Vol. 11**).

370. On behalf of the Defendant my firm instructed Israeli lawyers to consider what the Claimant has said about his rights under Israeli law to gain access to seized documents. In summary, without waiving privilege more generally, the Israeli lawyers have advised that whilst the Claimant may not have an automatic right of access to documents for the reasons outlined in correspondence from his solicitors, he could nonetheless make an application to an Israeli court to be granted such access. Moreover, the Israeli court has a broad discretion to grant

such an application under either sections 34 or 35 of the Criminal Procedure [Arrest and Search] Ordinance [New Version], 1969 (the statutory provision depends on whether the seizure of documents occurred more or less than six months before the date of the application) and this could include taking copies of seized material. A copy of the letter containing this advice is at **pages 2839-2842, Vol. 10**.

371. Accordingly, the Claimant should be ordered to make an application to the Israeli court to obtain access to all documents seized from him and to take copies of relevant documents for the purpose of disclosure in these proceedings.

**Category 6:   Documents Relating to the Claimant's Partnerships and Sources of Wealth**

372. In his First Witness Statement (**Vol. 12/A1**) and in Further Information served on 11 January 2011 (**Vol. 12/A5**), the Claimant has given a detailed account of the origins and sources of the wealth that he used (he said) to invest in the Defendant's business.

373. The Claimant says that he was a legitimate, though unconventional, businessman, who became wealthy in the late 1980s and early 1990s. By his account his "skills and talents were in agreeing strategies, using my extensive contacts and in arranging the financing of, and negotiating, deals" (**para. 8, Vol. 12/A1**).

374. According to the Claimant, his "first substantial business activities began in 1989 and involved trading in metals and raw materials" (**para. 12, Vol. 12/A1**). He says that from 1989 until the end of 1992 "I managed all this business in partnership with Trans Commodities Limited  and its president Sam Kislin", deriving (with his "partner" Kislin) a profit of around USD 100 million (**para. 12, Vol. 12/A1**).

375. In 1992, the Claimant says, after his business with Kislin ended, he offered his manager Makhmoudov "the opportunity to become my partner in the business I then had in the CIS", in a partnership that he says ultimately involved him

holding 50 percent, and Makhmoudov and some "junior partners", Michael Nekritz and Andrei Bokarev, the remaining 50 percent. (**paras. 13 and 14, Vol. 12/A1**) The partnership is said to have involved "companies and assets in the business of the processing and sale of copper, the sale and purchase of commodities and raw materials in ferrous and non-ferrous metallurgy, and, later energy resources (coal, oil), machine engineering, ports, etc." That relationship is said to have ended on 1 July 2002, its demise (and, according to the Claimant, its nature) being recorded in a declaration among the partners (Claimant's First Witness Statement, **para. 14, Vol.12/A1**; the document in question is at **pages 2250-2257, Vol.9**). When it ended, the Claimant says, his 50 percent share was worth about USD 1 billion. I refer further to this declaration later in this statement.

376.   The Claimant relies on the partnership with Makhmoudov as being "the template for my partnership with Mr Deripaska" (**para. 14, Vol. 12/A1**).

377.   The Claimant also says that, in 1992, he formed yet another "partnership", this time with the group Trans World Group ("TWG"), which was controlled by two brothers, David and Simon Reuben (**para. 16, Vol. 12/A1**). On this occasion, on his case, the Claimant and his brother, Lev Cherney, had a 50 percent interest, and the Reuben brothers shared a 50 percent interest. The business developed from buying and selling metals, through processing them, and began to acquire interests in aluminium. The Claimant says that through their contacts, he and his brother were "personally" able to negotiate supplies of alumina from refineries to aluminium smelters, and that it was mainly due to his contacts that he and his brother were given a partnership interest in TWG. He claims to have been "in charge of implementation of programmes and projects aimed at purchasing shares of the state-owned metallurgical plants" and related matters, and to have continued this work even after he left Russia in 1994 (**para. 17, Vol. 12/A1**). It was he says, agreed (though without any "formal" contract) that he would be entitled to a 25 percent share.

378. After about five years (in 1997), that "partnership" ended, and the Claimant's share was, he says, bought out for a sum of USD 410 million (**para. 20, Vol. 12/A1**).

379. These three "partnerships" – with Kislin through Trans Commodities Inc, with Makhmoudov, and with TWG, are identified by the Claimant, both in evidence and in the Further Information he served on 11 January 2011 (**Vol. 12/A5**), as the source of the "substantial assets" he had available through which – as explained below – he says he invested in an aluminium business in which the Defendant was a partner with him.

380. The Claimant also relies on his relationship with TWG and the payment by TWG of commission from which joint aluminium assets could be purchased, or provision of such assets as compensation for services to TWG (**answer 15.1, Vol. 12/A6**). He further relies on it as a way in which he was able to influence TWG to secure the Defendant's appointment as General Director of SAAZ in November 1994 (**para. 27, Vol. 12/A1**).

381. For the purposes of this application, the following are salient features.

  (a) There is, on any view and on his own case, a distinct pattern to the Claimant's apparent investment practices: a "partnership" of some sort is formed but not in any way recorded; that "partnership" continues for a number of years; it is then "terminated" with a large payment being made to the Claimant. That pattern applies, on the Claimant's own case, to his partnerships with Kislin, with the Reubens and Lev Cherney, with Makhmoudov, Nekrich and Bokarev, and (on his case) with the Defendant.

  (b) The Claimant positively relies on these other partnerships as indicative of the unconventional way in which he did business. He holds up the Makhmoudov "partnership" explicitly as the "template" for his relationship with the Defendant.

(c)   The Claimant advances, as part of his positive case (both in evidence and in pleading) an account of how he became – as he says, legitimately – wealthy and was able to fund investments into the aluminium business. That is an important part of his positive case, for it is designed both to explain how he was able to acquire a 50 percent share of the Defendant's business and is put forward as refuting allegations of criminal connection by presenting himself as an honest and successful businessman.

382.   A witness statement by George Philippides has been submitted on behalf of the Claimant. Philippides is a Cypriot accountant who was then of the firm Horwath Philippides & Partners. The report by Philippides dated 11 December 2002 has been disclosed by the Claimant (**page 296, Vol. 2**): "the Philippides Report". Philippides was instructed in late 2001 by the Claimant who

> "requested us to perform an independent investigation to verify and report on how his wealth was created and accumulated over the past 12 or so years, from existing financial and accounting records and related information" (**pages 294-336 at 296, Vol. 2**).

383.   The purpose of that investigation appears to have been to refute concerns about the Claimant's alleged criminal connections by showing how he had legitimately acquired his wealth. The Philippides Report is of some significance in this litigation. To the extent that it is consistent with the Claimant's current case as to the sources of its wealth, it supports that case, but the question arises whether it is correct. To the extent that it is inconsistent, the question arises: why is it inconsistent? Such inconsistencies may be evidentially significant as showing either that the Claimant's case in this action is not true; or as showing that he misled Philippides (which would in turn support an inference that he did so because the true sources of his wealth were illicit), or both.

384.   In section 14 of his report Philippides stated that the Claimant had accumulated approximately USD 2.3 billion in wealth from 1998 to 2001 (**pages 335-336, Vol. 2**). Of this, the amounts seemingly attributable to the Claimant's alleged partnerships with Kislin and Trans Commodities Inc, TWG and Makhmoudov

(including a particular transaction involving the Tyumenskaya Oil Company: "TNK") were as follows (excerpts from the table at **pages 335-336, Vol. 2**).

| SOURCE OF WEALTH | PERIOD | AMOUNT |
|---|---|---|
| Early trading and barters | 1989-1993 | USD 60 million |
| Trans-World Metals | 1993-1996 | USD 28 million |
| Trans-World Metals | 1997 | USD 410 million |
| Gain on sale of TNK | 1998-1999 | USD 212 million |
| Gain on sale of investments in Russia | 2001 | USD 575 million |
| TOTAL | | USD 1,285 million |

385. On the same pages, Philippides states that as at 31 December 2001, the Claimant's main assets totalled USD 2,267 million. However, USD 985 million of that (almost half of the Claimant's alleged wealth) is recorded as a receivable for "sale of Investments in Russia" (that is money the Claimant was apparently to be paid by Makhmoudov, Nekritz and Bokarev).

E.   **Documents relating to Kislin and Trans Commodities**

386. As noted above, according to the Claimant, his "first substantial business activities began in 1989 and involved trading in metals and raw materials". He says that from 1989 until the end of 1992 "I managed all this business in partnership with Trans Commodities Inc and its president Sam Kislin", deriving a profit of around USD 100 million, apparently for the Claimant himself (Claimant's First Witness Statement, **para. 12, Vol. 12/A1**; see also Claimant's Further Information of 11 January 2011, **para. 1(39), Vol. 12/A5**).

387. The Claimant has disclosed some contracts and bank transfer documents concerning Trans Commodities Inc to which I refer below; but the disclosure is either substantially incomplete or the Claimant's case is manifestly unlikely to be true.

388. I first refer to page 7 of the Philippides Report (**pages 294-336 at 300, Vol. 2**) disclosed by the Claimant. This states (with my emphasis added)

> "During this period, between 1989-93 he teamed up with Semyon Kislin, a business partner resident in the United States who owned a company called **Trans CIS Commodities**. We are advised that under his agreement with Mr Kishlin (sic), Mr Chernoi received 50 per cent of the profits generated by **Trans CIS Commodities**. It is estimated that Mr Chernoi accumulated profits of approximately US$ 60 million from **Trans CIS Commodities**. Of these, we traced US$ 40.6 million that was transferred to the bank account of Hiler Establishment, Vaduz in the period from 1992 to early 1995 and which amounts were used to finance Russian aluminium activities".

389. The Report makes the direct claim that money from the Claimant's partnership with Kislin was used by the Claimant to "finance Russian aluminium activities".

390. It is already apparent that there is inconsistency between the Philippides Report and the Claimant's case in this action: the profit earned is substantially less (USD 60 million as opposed to USD 100 million and only USD 40.6 million traced by Philippides); and the time period during which it is said to have been obtained (1992 to 1995) does not square with the Claimant's account, according to which this partnership ended in 1992. There is, however, a further and more important inconsistency. To the innocent eye, there might seem to be little difference between Trans Commodities Inc, the company operated by Kislin and referred to in the Further Information, and Trans CIS Commodities – the company referred to by Philippides. But in fact they were quite different companies.

391. Trans CIS Commodities was a different company to Kislin's Trans Commodities Inc. The Claimant may well have received substantial monies from Trans CIS Commodities but there is nothing to suggest that this was anything to do with Kislin or Trans Commodities Inc (although it does raise the question of what Trans CIS Commodities was doing or why the Claimant was involved with it).

392. Trans CIS Commodities seems to have been a company owned or operated by Lev Cherney. It appears to have done business in Russia including with TWG. Trans CIS Commodities was not Kislin's Trans Commodities Inc.

393. Kislin's Trans Commodities Inc was a New York corporation. This company is referred to by Richard Behar in his article "Capitalism in a Cold Climate" (**pages 2127-2142 at 2139, Vol. 8**) where he says (in respect of what he calls the "central bank caper")

> "In the middle of the transactions sat two similar-sounding entities: Trans-CIS Commodities, run by Lev [Cherney] and formed with the help of David Reuben and Trans Commodities, a firm based in New York in which Michael [Cherney] was a 50% partner. (Michael's partner in Trans Commodities was an American émigré named Semyon 'Sam' Kislin … )."

394. The fact that Kislin's Trans Commodities Inc was a New York corporation (and not the same as Trans CIS Commodities) is also shown by a contract apparently dated 1 January 1991, two copies of which have been disclosed by the Claimant (**pages 1102-1103, Vol. 5**). This contract refers to Trans Commodities Inc as "a New York corporation formed and operating under the laws of the State of New York". Both copies of the document purport to be a contract with the Claimant's company Furlan Anstalt but the name is incorrectly spelt as "Furlant-Anstalt" and the Claimant's own disclosures suggest that he did not own Furlan Anstalt until sometime in 1992. I return to this document later in this statement.

395. The Claimant has also disclosed further documents that appear to be contracts with Kislin's Trans Commodities Inc dating from 15 March and 30 July 1993 (**pages 1170-1176, 1213-1218, Vol. 5**: the Claimant has not provided a translation of the 30 July 1993 contract at **pages 1213-1215 (Vol. 5)** so a translation has been prepared by my firm). I refer to these contracts further below but for the present note that all these contracts refer to Trans Commodities Inc and not to Trans CIS Commodities. In particular, page C12699 of the 30 July 1993 contract (**page 1215, Vol. 5**) refers to Trans

134

Commodities Inc of the USA with the address 1325 Avenue of the Americas, Suit 803, New York, NY 10019 U.S.A.

396. In contrast, Trans CIS Commodities Ltd was a company incorporated in July 1992 in the British Virgin Islands (initially named Trans-CIS Holdings Limited) and which was administered from Monaco by Simon Reuben and a company named Landal SAM. The Claimant's brother Lev Cherney was a director and chairman of Trans-CIS Commodities Ltd. Documents evidencing these points are at **pages 1135-1138, Vol. 5**.

397. I also refer to some further documents (**pages 1133-1134, Vol. 5**) concerning Trans CIS Commodities Ltd which refer to its Monaco address and which also evidence that this was not the same company as Kislin's Trans Commodities Inc. **Pages 1133-1134, Vol. 5** are a contract dated 9 July 1992 between the Claimant's company Hiler Establishment and Trans CIS Commodities Ltd (with its Monaco address) for the purchase by Hiler Establishment of some aluminium. **Page 2124, Vol. 8** is a communication from the Ministry of the Interior of the Russian Federation addressed to Trans CIS Commodities Ltd at its Monaco address referring to "charges against Mr Chernoy as an employee of your company" and confirming that "in the process of investigation no infringement of the law of the Russian Federation has been found to have been committed by Trans CIS Commodities Ltd, or by Mr Chernoy".

398. In all of the Claimant's disclosure, my firm has to date located only two payments from Kislin's Trans Commodities Inc to the Claimant or his companies. These appear on a bank statement (**page 1149, Vol. 5**) for the Bank in Liechtenstein account numbered 387.283.1 – 10.402.01 for Hiler Establishment from 30 September to 31 December 1992 in the amounts of 1,214,128.44 and 1,137,654.18 – the currency of this account is noted as "LG", although the account was later expressed to be in British pounds. Consequently, the Claimant has only evidenced his receipt of GBP 2.4 million from Kislin's Trans Commodities Inc and not evidenced his alleged receipt of USD 100 million, not USD 60 million, nor even USD 40.6 million.

399. There is, in addition, a payment by Kislin personally to the Claimant's company Furlan Anstalt (**page 1219, Vol. 5**). The Philippides Report does not appear to mention this payment. It is a payment of USD 2,996,924 (that is USD 3 million less charges of USD 3,076) on 9 August 1993 from "Mr Semyon Kislin" to the Bank in Liechtenstein account number 317.992.3 – 10.333.01 of Furlan Anstalt. The Claimant does not appear to have disclosed any documents explaining why Kislin should, in 1993, be making a personal payment to one of the Claimant's companies. This is especially important because, as noted above, the Claimant says that his partnership with Kislin ceased at the end of 1992.

400. Furthermore, the Claimant's companies Furlan Anstalt and Hiler Establishment appear to have made a number of payments which were stated to be made to, or on behalf of Kislin's Trans Commodities Inc. These payments by the Claimant's companies, which seem to total more than the claimant's receipts from Trans Commodities Inc, are evidenced at the following pages of the Claimant's disclosures:

| DATE | AMOUNT | PAGES (Vol. 5) |
|---|---|---|
| 21 October 1992 | USD 1,400,497.40 | **1139-1140** |
| 11 November 1992 | USD 241,123.08 | **1141-1143** |
| 12 November 1992 | USD 312,790 | **1144** |
| 13 November 1992 | USD 2,975,000 | **1145-1146** |
| 13 November 1992 | USD 482,070.31 | **1147-1148** |
| TOTAL | USD 5,411,480.79 | |

401. Thus, whereas the Claimant claims to have derived a profit of USD 100 million from his partnership with Kislin and Trans Commodities Ltd:

(a)    the Philippides Report suggests receipts not from Kislin's company but from a different – though similarly named – company operated by the Reubens and Lev Cherney;

136

(b)   the Philippides Report suggests – even in relation to those payments – that the Claimant's estimated receipts (of USD 60 million, of which only USD 40.6 million could be traced) were less than the Claimant now claims;

(c)   the Philippides Report suggests the receipt of that smaller sum over a period which is hard to square with the Claimant's account (according to which the receipts would have been expected to be obtained between 1989 and 1992);

(d)   the Claimant has disclosed documents that evidence only his receipt of USD 0.1 million and GBP 2.4 million from Kislin's Trans Commodities Inc (and a payment of USD 3 million from Kislin personally after their relationship apparently ended) but has evidenced his own companies paying out (apparently to or on behalf of Kislin's Trans Commodities Inc) over USD 5.4 million; and

(e)   apart from the document referred to below (which does not appear to be genuine) and with the caveat that we are continuing our review of the 56,011 documents recently disclosed, no documents evidencing or recording the alleged partnership with Kislin have been produced.

402.   Those few documents that have been disclosed which relate to the alleged partnership with Kislin give rise to suspicion as to whether they are genuine or correctly dated. I referred above to a purported contract between Kislin's Trans Commodities Inc and the Claimant's company Furlan Anstalt (but the name of which is incorrectly spelt as "Furlant-Anstalt") apparently dated 1 January 1991 (**pages 1102-1103, Vol. 5**). This simple contract, in English, appears to provide for the Claimant's company "Furlant-Anstalt" to receive 50 percent of the gross income of Trans Commodities Inc during the years 1991 and 1992.

403.   The document purports to be dated 1 January 1991. The Claimant's disclosures for Furlan Anstalt do not suggest that he owned or had any interest in Furlan Anstalt (apparently formed in 1973) until April 1992 and do not evidence the existence of any bank accounts for Furlan Anstalt prior to January 1992. There

is no disclosure to suggest that the Claimant was ever "chairman of the board" of Furlan Anstalt (or that Furlan Anstalt ever had a "chairman of the board"). The earliest bank statement for Furlan Anstalt disclosed by the Claimant is for January to March 1992 at **page 1107, Vol. 5,** and the earliest of the Claimant's Liechtenstein fiduciaries' administration documents mentioning the Claimant are dated April 1992 at **pages 1108-1115, Vol. 5**.

404. As noted, the Claimant has disclosed documents that appear to be contracts with Kislin's Trans Commodities Inc dating from 15 March and 30 July 1993 **(pages 1170-1176, 1213-1218, Vol. 5)**. The 15 March 1993 documents purport to divide contracts (yet to be performed) between Trans Commodities Inc and "Furlan Anshtalt" (presumably yet another error for Furlan Anstalt). The 30 July 1993 contract is for the sale and purchase of some gasoline and diesel fuel.

405. The date of these purported contracts is inconsistent with the Claimant's account, according to which his business with Trans Commodities Inc. (USA) and its president Kislin lasted only until the end of 1992 **(para. 12, Vol. 12/A1)**. The contract at **pages 1213-1218, (Vol. 5),** is said to be between Trans Commodities Inc and "Blonde Management Group" in New York. My firm has caused searches to be made in New York and there does not appear to have been any company named "Blonde Management Group". There was a company named Blonde Management Corporation (on which see para 7(a) above).

406. In short, if the Claimant's account of his partnership with Kislin – the original source of his wealth, generating a USD 100 million profit by the time it ended in 1992 – is correct, the disclosure that has been provided is obviously incomplete. A thorough search for relevant documents ought to be carried out, and a specific disclosure statement made. If that statement is to the effect that full disclosure has been given, that will in itself be material evidence contradicting the Claimant's account of the origins of his wealth.

407. Accordingly, an order is sought that the Claimant conduct a thorough search for and disclose, in a specific disclosure statement:

138

    (a)    any documents evidencing any partnership or similar agreement between (i) the Claimant or any company or entity owned or controlled by him and (ii) Kislin or Trans Commodities Inc, and evidencing the cessation of any such partnership;

    (b)    any documents demonstrating the receipt of funds by the Claimant or any company or entity owned or controlled by him from Kislin or Trans Commodities Inc between 1989 and 1993;

    (c)    all agreements pursuant to which such funds were received; and

    (d)    any documents evidencing any monies alleged by the Claimant to have been owed to him or any company or entity owned or controlled by him, by Kislin or Trans Commodities Inc.

408. Furthermore, in view of the confusion between Trans Commodities Inc and Trans CIS Commodities Ltd, and the likelihood that it is this latter company and not Kislin's that was the source of substantial money during 1993 to 1995, the Claimant ought also to conduct a reasonable search for:

    (a)    any documents evidencing the receipt by him or any company he controlled of money from Trans CIS Commodities Ltd in the period from 1992 to 1995; and

    (b)    all agreements pursuant to which such funds were transferred or received.

F.    **Documents Relating to TWG**

409. The Claimant alleges that he was entitled to 25 percent of profits from TWG from 1992 to 1996 (**para. 19, Vol. 12/A1**) and also to USD 410 million as "agreed consideration for my interest" and which he had agreed to "sell my 25% in TWG to my brother" (**paras. 20 and 30, Vol. 12/A1**). The Claimant states that he "was never a shareholder in any of the TWG companies" (**para. 19, Vol. 12/A1**).

410. The Philippides Report (**pages 294-336 at 301, Vol. 2**) states that:

"During the period from 1992 to 1996, Mr Chernoi worked in partnership with his brother, Lev Chernoi, and with brothers Simon and David Rubens (sic) in the development of the business of Trans-World Metals Group (TWG). This group is a major aluminium trader initially buying raw aluminium from Russian and CIS producers, processing on tolling basis and selling to western markets. Mr Chernoi was personally able to negotiate on behalf of TWG the supply of alumina ore from Pavlodar Alumina Plant in Kazakhstan to the Krasnoyarsk and Bratsk aluminium processing plants in Russia."

411.   The Claimant has not disclosed any documents evidencing his alleged negotiation of this supply of alumina ore from the Pavlodar Alumina Plant. Therefore, whether that was his role (or an example of his role) when working with TWG remains unclear.

412.   The Philippides Report continues (on the same page):

"Under the private agreements between the parties involved in TWG, Mr Chernoi was not a shareholder but was entitled to 25 per cent of the profits generated by the Trans-World Metals Group."

413.   The Philippides Report states that as a result the Claimant received USD 1,833,000 and USD 26,107,559 in 1993 and 1996 respectively as "profit distributions" and also USD 410 million in 1997 for "his interest (accumulated profits)"(**pages 301-302, Vol. 2**). The Philippides Report adds that:

"All of the aforementioned payments were effected by Global Treasury Services Limited, an entity controlled by the shareholders of Trans-World Metals SA, a Bahamas registered entity."

414.   The Claimant says that he has disclosed "documents in his possession evidencing receipts from TWG companies, and such agreements as he has connected to those receipts" (**pages 3026-3034 at 3031, Vol. 11**). Apart from such documents however, he has declined to disclose "documents showing or providing a line of enquiry that could show the basis for, and the nature, extent and operation of [his] relationship with TWG, the Reuben Brothers and Lev Chernoy, or any of them in relation to TWG" (**pages 2996-3018 at 3002, Vol. 11**).

415. From the Claimant's disclosures, we have identified payments from "TransWorld Metals" or "Trans-World Metals SA" to the Claimant's company CCT (paid into its LGT bank account number 0211926AC). The payments total USD 1.8 million in 1993 and USD 26.1 million in 1996 and so these appear to be the "profit distributions" to which the Philippides Report refers.

| VALUE DATE | DESCRIPTION | AMOUNT (USD) | PAGE (Vol. 5) | PAGE (Vol. 5) |
|---|---|---|---|---|
| 20/04/1993 | Transworld Metals | 1,833,000.00 | 1206 | 1187 |
| 10/04/1996 | Trans-World Metals SA | 1,963,533.65 | 1207 | 1188 |
| 18/04/1996 | Trans-World Metals SA | 2,000,000.00 | 1207 | 1189 |
| 19/04/1996 | Trans-World Metals SA | 4,622,263.48 | 1207 | 1190 |
| 25/04/1996 | Trans-World Metals SA | 4,466,104.76 | 1208 | 1191 |
| 26/04/1996 | Trans-World Metals SA | 849,519.38 | 1208 | 1192 |
| 08/05/1996 | Trans-World Metals SA | 1,915,839.85 | 1208 | 1193 |
| 13/05/1996 | Trans-World Metals SA | 3,842,064.54 | 1208 | 1194 |
| 17/05/1996 | Trans-World Metals SA | 1,045,646.25 | 1209 | 1195 |
| 21/05/1996 | Trans-World Metals SA | 250,000.00 | 1209 | 1196 |
| 24/05/1996 | Trans-World Metals SA | 1,250,000.00 | 1209 | 1197 |
| 21/06/1996 | Trans-World Metals SA | 2,490,416.64 | 1209 | 1198 |
| 24/06/1996 | Trans-World Metals SA | 1,123,634.51 | 1210 | 1199 |
| 08/07/1996 | Trans-World Metals SA | 283,888.88 | 1211 | 1200 |
| 21/08/1996 | Trans-World Metals SA | 4,650.09 | 1211 | 1201 |
| Total | | 27,940,562.03 | | |

416. It can be seen that two of the payments made by Trans-World Metals SA (those on 24 June and 9 July 1996: **pages 1187-1201 at 1198, 1200, Vol. 5**) are stated to have been made "on behalf of Bluzwed Metals Ltd" and the latter quoted a contract number; that is "*N TU 01*". Neither of these payments seem to have anything to do with a profit distribution, as alleged by the Claimant and the Philippides Report, from TWG.

417. There are many media reports (to one of which I refer below) and the Claimant's witness statement appears to agree (because he claims his 25 percent interest in profits was worth over USD 410 million) that TWG made profits of hundreds of millions of dollars in the period 1992 to 1997. However, if, as the Claimant alleges, he was entitled to 25 percent of profits, it is curious that he only received money in 1993 and 1996 (and in a relatively small amount) before the large payment (or alleged "buy-out") in 1997. Of course, this might be accounted for by TWG profits being accumulated (as the Philippides Report implies) rather than being distributed.

418. However, the Claimant has not disclosed any partnership document or any other documents from the period 1992 to 1996 (such as letters or notes of meetings) evidencing any such partnership that he had with Lev Cherney, Simon Reuben and David Reuben. Although he has disclosed some documents evidencing payments from "TransWorld Metals" or "Trans-World Metals SA" in 1993 and 1996, he has not disclosed any other documents concerning the alleged distribution or accumulation of profits. Even if there was, as the Claimant says, no formal partnership contract, it seems inconceivable that a partnership could have been formed and operated over several years without generating any evidence of agreement, any relevant correspondence evidencing the agreement, any minutes of partnership meetings, any partnership accounts or any other documents evidencing the partnership prior to its dissolution. Yet no such documents have been disclosed. This is so improbable that it should be the subject of a specific disclosure statement by the Claimant confirming that there is no such document, if such be the case.

419. The Claimant's alleged sale of his 25 percent interest in TWG raises more questions and displays further serious gaps in his disclosure. It also illustrates contradictions in his claims and raises doubts about the authenticity of documents upon which the Claimant relies.

420. The Philippides Report states that the Claimant received USD 410 million in 1997 for "his interest (accumulated profits)". We have identified the following payments from "Global Treasury Serv. Ltd." to the Claimant's company CCT (paid into its LGT bank account number 0211926AC). These payments total USD 410 million and so they appear to be the "agreed consideration" for the Claimant's alleged interest.

| VALUE DATE | AMOUNT (USD) | PAGE (Vol. 6) |
|---|---|---|
| 18 Jun 1997 | 40,000,000.00 | 1650 |
| 19 Jun 1997 | 40,000,000.00 | 1651 |
| 23 Jun 1997 | 20,000,000.00 | 1652 |
| 24 Jun 1997 | 10,000,000.00 | 1653 |
| 25 Jun 1997 | 20,000,000.00 | 1654 |
| 26 Jun 1997 | 5,000,000.00 | 1655 |
| 27 Jun 1997 | 15,000,000.00 | 1656 |
| 07 Jul 1997 | 10,000,000.00 | 1657 |
| 10 Jul 1997 | 5,000,000.00 | 1658 |
| 15 Jul 1997 | 6,000,000.00 | 1659 |
| 18 Jul 1997 | 8,000,000.00 | 1660 |
| 22 Jul 1997 | 6,500,000.00 | 1661 |
| 24 Jul 1997 | 5,500,000.00 | 1662 |
| 28 Jul 1997 | 4,500,000.00 | 1663 |
| 30 Jul 1997 | 4,500,000.00 | 1664 |
| 04 Aug 1997 | 5,500,000.00 | 1665 |
| 19 Aug 1997 | 10,500,000.00 | 1666 |
| 20 Aug 1997 | 8,000,000.00 | 1667 |
| 22 Aug 1997 | 6,000,000.00 | 1668 |
| 26 Aug 1997 | 4,000,000.00 | 1669 |
| 27 Aug 1997 | 6,500,000.00 | 1670 |

| VALUE DATE | AMOUNT (USD) | PAGE (Vol. 6) |
|---|---|---|
| 29 Aug 1997 | 4,500,000.00 | 1671 |
| 29 Aug 1997 | 5,000,000.00 | 1672 |
| 02 Sep 1997 | 5,000,000.00 | 1673 |
| 05 Sep 1997 | 4,500,000.00 | 1674 |
| 09 Sep 1997 | 6,000,000.00 | 1675 |
| 11 Sep 1997 | 5,500,000.00 | 1676 |
| 15 Sep 1997 | 6,500,000.00 | 1677 |
| 18 Sep 1997 | 7,000,000.00 | 1678 |
| 23 Sep 1997 | 4,500,000.00 | 1679 |
| 26 Sep 1997 | 6,000,000.00 | 1680 |
| 30 Sep 1997 | 5,000,000.00 | 1681 |
| 10 Nov 1997 | 5,000,000.00 | 1682 |
| 12 Nov 1997 | 4,500,000.00 | 1683 |
| 21 Nov 1997 | 10,000,000.00 | 1684 |
| 24 Nov 1997 | 11,000,000.00 | 1685 |
| 25 Nov 1997 | 12,500,000.00 | 1686 |
| 26 Nov 1997 | 10,500,000.00 | 1687 |
| 28 Nov 1997 | 9,500,000.00 | 1688 |
| 01 Dec 1997 | 4,000,000.00 | 1689 |
| 02 Dec 1997 | 5,000,000.00 | 1690 |
| 03 Dec 1997 | 11,500,000.00 | 1691 |
| 05 Dec 1997 | 6,000,000.00 | 1692 |
| 05 Dec 1997 | 7,500,000.00 | 1693 |
| 09 Dec 1997 | 6,000,000.00 | 1694 |
| 09 Dec 1997 | 7,000,000.00 | 1695 |
| **Total** | **410,000,000.00** | |

421. The credit advices for the payments made to CCT by Global Treasury Services Ltd from 21 November 1997 are noted as "by order of Transmetal" but in each case, the credit advice refers to a contract number "UC-97/0387 DD 3.11.97", which appears to mean a contract with number "97/0387" and dated 3 November 1997. I refer to this point again below (see paras. 430 to 438).

422. As regards this alleged 1997 buyout, the Claimant has disclosed two agreements. The first is an agreement numbered 001/06 ("Agreement 001/06") noted as signed on 17 June 1997 (**pages 1645-1649, Vol. 6**). This is between the Claimant and Mr L.S. Ch (presumably his brother Lev Cherney) "at presence and participation of Mr S.R. Mr D.R" (presumably Simon Reuben and David Reuben). Agreement 001/06 purports to record that each of the Claimant, Lev Cherney, Mr S.R. and Mr D.R. are "equal partners/shareholders of 25 percent shares each in the following companies Trans-World Metals SA No 35738B". Agreement 001/06 also records that the Claimant had decided to sell his 25 percent of "the holding", his brother Lev Cherney had decided to acquire that 25 percent and that Mr S.R. and Mr D.R had no objection to the sale. The price at which the Claimant was selling his 25 percent holding was recorded as USD 300 million. There are references to the Claimant selling "shares" (rather than a 25 percent interest in a partnership) in numbered paragraphs 1, 4, 5, 6, 7, 8, 10, 12, 12.1 and 15. There are references to the Claimant as a "shareholder" in numbered paragraphs 3, 10, 11, 13.1, 14 and 15.

423. Mr L.S. Ch (presumably Lev Cherney) was required to pay USD 150 million within five days of the signature of the agreement (apparently 17 June 1997) "to the account of Mr M.S.Ch according to the bank requisites that are given in the appendix which is an integral part of the present agreement". The Claimant has not disclosed any such appendix. Mr L.S. Ch was required to pay the remaining USD 150 million within three months (90 calendar days) of the signature of the agreement.

424. Before considering the other agreement disclosed by the Claimant, discrepancies should be noted between Agreement 001/06 and the description by the Claimant (and in the Philippides Report) of the Claimant's alleged interest in TWG and the terms of the alleged 1997 buyout of the Claimant's interest. I noted above that the Claimant stated explicitly that he was "never a shareholder in any of the TWG companies" (and the Philippides Report also stated that the Claimant was not a shareholder) but only a partner who was entitled to 25% percent of the profits of TWG. Yet, Agreement 001/06 describes the Claimant (in many clauses) as a shareholder in Trans-World

Metals SA. Either Agreement 001/06 is incorrect or the Claimant's witness statement and the Philippides Report are incorrect.

425. In the recital at the foot of page 1 of Agreement 001/06 there is reference to "a full list of such companies/enterprises [in which Trans-World Metals S.A. had interests] ... may be made up and attached to the present agreement as an appendix". A copy of this appendix has not been disclosed.

426. The payment records disclosed by the Claimant do not evidence payments by Lev Cherney but, as the Philippides Report stated, by "Global Treasury Services Limited, an entity controlled by the shareholders of Trans-World Metals SA, a Bahamas registered entity" (**pages 294-336 at 302, Vol. 2**). It is unclear why an entity apparently controlled by Simon Reuben, David Reuben and Lev Cherney should be making payments that were apparently only due to be paid by one of them (Lev Cherney). The Claimant has not disclosed any documents evidencing why payment was made in this manner (although a number of the transfer documents stated that Global Treasury Services Ltd was paying "by order of Lathercole SA").

427. It took until 27 June 1997 for the payments to the Claimant to amount to USD 150 million (rather than within three days of the signature of Agreement 001/06). The next USD 150 million appears to have been paid to the Claimant by 30 September 1997, that is about two weeks after the deadline of three months or 90 calendar days required in agreement 001/06. The Claimant has not disclosed any documents relating to these payments being made late, for example correspondence from him asking his brother or Global Treasury Services Limited why payments were late or requesting the payment of interest for late payment.

428. Accordingly, it appears that the Claimant has failed to disclose his true relationship with the Reuben brothers and TWG or the true reason for the large amount of money that the Claimant or his companies appear to have received from TWG or Global Treasury Services.

429. Agreement 001/06 provided for the Claimant to receive only USD 300 million for his alleged 25 percent share. As noted, more than USD 300 million was paid by Global Treasury Services to the Claimant's company CCT. These further monies amounted, by 9 December 1997, to a further USD 110 million.

430. The Claimant has disclosed a second agreement, entitled "*The contract of Agency N UC – 97/0387*" ("contract N UC 97/0387") apparently made between Transmetal Limited and "Consul Consult and Trade Establishment" which is presumably the Claimant's company CCT. A copy of this document, together with a fax sheet dated 20 November 1997 is at **pages 1406-1410 (Vol. 6)**. Contract N UC 97/0387 states that it was "made on" 10 January 1995. It provides for CCT to be paid USD110 million during 1995 to 1996 (amended in manuscript to read 1997) for certain services relating to cargos and the transportation of materials.

431. One copy of this agreement has been disclosed by the Claimant, a copy of which was apparently faxed by the Claimant on 20 November 1997 to Domenjoz of his Liechtenstein agents and fiduciaries, Syndikus. Although purportedly made on 10 January 1995, the Claimant has not disclosed any copy of it pre-dating 20 November 1997. This suggests that the document has been backdated. Furthermore, the existence of this additional agreement was not disclosed in any of the Claimant's three statements made in support of his application to serve the proceedings out of the jurisdiction, even though he had described his relationship with TWG and referred to agreement 001/06 in the context of that application.

432. Various questions arise from this document.

(a) The title of this agreement includes the figure "97", which is improbable if the document was made, as it purports to have been, in January 1995. The agreement appears to have been sent to Domenjoz of Syndikus in relation to amounts of USD 4.5 million and USD 5 million that (as at 20 November 1997) had "arrived last week".

(b)   The Claimant has not disclosed any documents evidencing the services (as set out in clause 1) for which it was to be paid USD 110 million being provided to or on behalf of Transmetal Ltd (or of CCT ever providing any such services at all). Furthermore, it is unclear how CCT could have provided these services as it is not apparent from the Claimant's disclosures that CCT had any employees who could provide these services. Nor is it apparent why any such services would have been relevant to the "buy-out" of the Claimant's "interest" in TWG.

(c)   The relationship between Transmetal Ltd and TWG appears to be unclear. Why would an obligation upon Transmetal Ltd (to pay CCT the sum of USD 110 million for services) be relevant to an alleged buyout by Lev Cherney or by the Reuben brothers of the Claimant's alleged 25 percent interest in TWG?

(d)   There are a number of other points of detail: the name "Consul Consult and Trade Establishment", rather than the true name of the Claimant's company CCT Consul Consult & Trade Establishment, is used. It appears in a different font. There is a reference to an "attached schedule" that has not been disclosed. There are various typographical errors, spelling errors, and errors of grammar.

(e)   The provision for payment under contract N UC 97/0387 is unusual. It is reasonable to expect CCT to invoice Transmetal Ltd for the services it provided, or for the contract to describe the services and provide for a fee for those services. Instead, it provides as originally typed (before amended in manuscript – seemingly only by the Claimant as I explain below) that "Principal has to pay to Agent agent's commission fee 110,000,000 [text obscured] (one hundred ten million) USD only, that correspond to 668,661.815 MT of aluminium delivered during 1995 - 1996". It is unclear how the parties could, in January 1995, know what tonnage of aluminium would be delivered over the following two years, or why the services would be worth USD 110 million (or how that figure corresponded to a certain tonnage of aluminium).

(f)     The payment clause in contract N UC 97/0387 has been amended in manuscript and signed at each side of the page. To the untrained eye, the signatures look the same and look like the signature on the last page of the agreement (for Consul Consult and Trade Establishment) (**pages 1406-1410 at 1409, Vol. 6**). This in turn looks like the signature of "M.S.Ch." on the last page of Agreement 001/06 (**pages 1645-1649 at 1649, Vol. 6**). It therefore appears that only the Claimant signed the manuscript amendments to this payment clause. There is nothing to indicate that the other party to this contract N UC 97/0387, that is Transmetal Ltd agreed to the amendments. The amendment seems to delete the word "commission", extend the dates "1995 - 1996" by a year to "1995 – 1997" and seemingly add the words "not later than 15.12.97" (**pages 1406-1410 at 1407, Vol. 6**).

(g)     Further, the credit advices that we have located for the payments to CCT "by order of Transmetal" each refer to the contract number "UC-97/0387 DD 3.11.97", which appears to mean a contract with a number "97/0387" and dated 3 November 1997. The copy of contract N UC 97/0387 disclosed by the Claimant does not bear this date of 3 November 1997 but only the date of 10 January 1995.

433.   Taking all these points together, it would seem that the most likely explanation of this document is that it is a false document, designed in 1997 to provide some justification for payments received by the Claimant relating to the "termination" of the TWG partnership interest. This in turn raises the question as to why such a false document was produced. If, as the Claimant says, he had an acknowledged interest which was being bought out by his brother for USD 410 million, why should that be recorded in part by way of a falsely dated contract purporting to relate to agency services that had not in fact been provided? Why should the full value of his interest not have been recorded in Agreement 001/06?

434.   The situation appears to be that a TWG company (Global Treasury Services) paid the Claimant's company USD 410 million between June and December

1997 despite the fact that the Claimant had no shareholding in any TWG company. The Claimant has failed to disclose any partnership agreement with the Reuben brothers and failed to disclose any other documents (such as correspondence or accounts) evidencing a partnership. The Claimant has not disclosed any documents evidencing any financial investment made by him in the TWG companies, nor any documents evidencing anything he did to benefit the alleged partnership (for example, as noted above, any documents evidencing his alleged negotiation of a supply of alumina ore from the Pavlodar Alumina Plant).

435. The few documents that the Claimant has disclosed to justify the payments that he received raise questions about when they were produced or amended, contradict his own story (by portraying him as a shareholder) or on their face relate to services allegedly provided prior to the alleged buyout in June 1997.

436. Finally, no documents evidencing the negotiation of either Agreement 001/06 or the so-called "agency" agreement have been produced. It is curious that such significant agreements involving at least four parties were produced without any form of negotiation, without drafts, without any correspondence, and without any advice. Nothing of this sort has been disclosed. Page 2 of Agreement 001/06 records that the Reuben brothers "participated in the negotiations, together or separately, that took place in May 1997, and from their side there were no oral or written objections, veto or other prohibitive actions or offers against or concerning the above saidtransaction" (**pages 1645-1649 at 1646, para. 2, Vol. 6**). If no documentation evidencing such negotiations exists, this should be specifically confirmed in a disclosure statement.

437. An order is requested that the Claimant disclose:

(a)   any documents evidencing whether (and if so, when) he acquired any shares in Trans-World Metals SA (as referred to in Agreement 001/06) or any other TWG related entity (including those "companies/enterprises" referred to in Agreement 001/06 as ones in which TWG had an interest),

the price he paid for them or any other consideration he provided in exchange for those shares;

(b)    any documents predating 17 June 1997 evidencing any agreement among or between Lev Cherney, David Reuben, Simon Reuben and the Claimant that the Claimant was a partner, or had any similar interest, in TWG (or any other company), or any other form of partnership with Lev Cherney, Simon Reuben and David Reuben, and evidencing the extent or terms of any such partnership;

(c)    any documents evidencing any consideration he provided in exchange for that partnership interest;

(d)    any documents evidencing or relating to the negotiation of Agreement 001/06 among David Reuben, Simon Reuben, Lev Cherney and Michael Cherney;

(e)    any appendix to Agreement 001/06;  and

(f)    any correspondence or other documents evidencing why payments under Agreement 001/06 were made late, or requesting the payment of interest for late payment.

438.  Further, an order is requested that the Claimant disclose:

(a)    any other copies of contract N UC 97/0387, purportedly dated 10 January 1995, between CCT and Transmetal Ltd;

(b)    any schedule that was ever attached to any copy of contract N UC 97/0387;

(c)    any documents evidencing or relating to the negotiation or creation of contract N UC 97/0387;

(d)    any documents evidencing any agreement or negotiations between Transmetal Ltd and "Consul Consult and Trade Establishment" or CCT

Consul Consult & Trade Establishment or the Claimant as to manuscript amendments to be made to contract N UC 97/0387;

(e)   any documents evidencing that Transmetal Ltd was owned or operated by any of David Reuben, Simon Reuben or Lev Cherney or that Transmetal Ltd was otherwise linked to any of them, or to TWG;

(f)   any documents evidencing that contract N UC 97/0387 or any services or payments provided under it were linked to any alleged purchase by David Reuben, Simon Reuben or Lev Cherney of the Claimant's alleged 25 percent interest in TWG;

(g)   any documents evidencing the services provided by "Consul Consult and Trade Establishment" or CCT Consul Consult & Trade Establishment (or any person or company on its behalf) under contract N UC 97/0387 contract; and

(h)   any documents evidencing instructions by Transmetal Ltd under contract N UC 97/0387.

439.   Further, an order is sought that, if the Claimant's position is that no documents of the type listed above are in his control, he specifically confirm this to be the case in a disclosure statement in which he explains why this is the case.

## G.   The Partnership with Makhmoudov

440.   As set out above, the Claimant's case is that he had a partnership with Makhmoudov (with Nekrich and Bokarev as junior partners) which was the "template" for his partnership with the Defendant.

441.   That partnership is significant for the following reasons:

(a)   The Claimant's case is that the "partnership" he had with Makhmoudov was the "template" for his relationship with the Defendant. The Defendant is entitled to test that assertion, and cannot do so without documents showing the nature of that partnership. Many of the

companies through which the Claimant pleads that he made investments into the aluminium business he had with the Defendant (Blonde Management, Liberty Metals, CCT, Arufa, and OTC) seem to have been connected with Makhmoudov. On the Defendant's case, as set out in Further Information served on 5 August 2011, many of those so-called investments were in fact paid to companies (such as Nash Investments) which were being used for Makhmoudov's business. The nature and scope of the arrangements between the Claimant and Makhmoudov is accordingly relevant to the proper characterization of these payments: were they investments in the Defendant's business, or transfers within the business that the Claimant himself asserts he had with Makhmoudov?

(b)   The Claimant, in his Further Information of 11 January 2011 (**para. 1(39), Vol. 12/A5**) relies on his partnership with Makhmoudov as a relevant source of wealth for investment in the aluminium business. Whether this is correct cannot be ascertained without knowing what the business was and to what financial resources it gave the Claimant access.

(c)   The Claimant has in that regard relied on the Declaration of 1 July 2002 (to which I refer below) as evidencing the partnership arrangements. Did it? How did it come to be negotiated? Was it a genuine document, pursuant to which the Claimant received large sums of money? The Defendant is entitled to test this. For example, to understand how the partnership came to be negotiated or whether the Declaration was a false document, designed to explain the Claimant's wealth or the cover for the termination of a *krysha* arrangement with Makhmoudov.

(d)   For similar reasons, the Makhmoudov partnership arrangements are at the heart of the Philippides Report, whose relevance is explained above (paras. 382 and 383).

442.  The Claimant has disclosed only very limited documents relating to this partnership with Makhmoudov. He has disclosed the Declaration, referred to in the Philippides Report, which is said to have marked the termination of the partnership. But he has refused to disclose "all documents which relate to our

client's dealings with Makhmoudov and his associates" or "all documents which show the basis for, and the nature, extent and operation of our client's relationship withMr.Makhmoudov, his associates or the UMMC Group (whatever that may be) or documents leading to a train of enquiry thereto" (**para. 19, pages 3026-3034 at 3030, Vol. 11**). The Claimant appears to consider that disclosure should be limited to "any documents ... which shed any light on the purposes for which the payments relied upon in our client's further information were made".

443. In the light of that response, the Defendant has reconsidered the question of disclosure relating to Makhmoudov. On the one hand, the Defendant can see that disclosure of all documents bearing in any way on that relationship would be disproportionate. On the other hand, the disclosure promised by the Claimant is defined very vaguely, but seems unduly narrow. In light of this response, a proportionate disclosure exercise should involve a search for documents which are likely to explain the terms of the partnership itself – such as partnership agreements, meetings and the like. Such an exercise will enable the Claimant to exclude from consideration detailed information about particular transactions, while providing sufficient information to the Defendant to enable him to understand how the alleged "template", on which the Claimant relies, was supposed to, or did, operate.

444. The Claimant's case is that he did not rely on written agreements, but based his business on trust. But, whatever might be the validity of that argument in 1990, it must be questionable whether a business worth, by 2002, USD 2 billion could have proceeded without any written documentation. In relation to the alleged partnership with the Defendant, the Claimant does rely on written documentation: on the Radom structure, on various structure charts prepared (it is said) to show how the group was organised, on minutes of meetings at which decisions about the partnership are said to have been taken. He says that, in both businesses, he was an important decision-maker and deal-maker. If this is true, the likelihood is that there should be some documents, even if they do not resemble a formal partnership deed, which record the nature of the Claimant's

interest in the Makhmoudov "partnership", its key businesses and business decisions, the principal companies through which it operated.

445. Moreover, the Declaration of 1 July 2002 (**pages 2250-2257, Vol. 9**) itself shows that there were such documents. It refers to "investment plans and proposals that were prepared by IM [Makhmoudov], MN [Neckrich, also spelled Nekritz] and AB [Bokarev] which detailed the financing required, prospects, opportunities and expected returns" (**page 2252, Vol. 9**). It refers to Makhmoudov being "responsible for advising MC [the Claimant] of progress in meeting plans and targets and also in keeping MC advised of such developments that a shareholder would normally be expected to be advised of with regard to performance, profitability, prospects etc" (**page 2252, Vol. 9**). It also refers to Makhmoudov and the other two partners acting as nominees of the Claimant with regard to his beneficial shareholding participation and being "responsible for providing any documents that might be required proving his beneficial entitlement" (**page 2253, Vol. 9**). There is reference to notices "in writing" to Makhmoudov as to how he was to vote the shares to which the Claimant said he was entitled (**page 2253, Vol. 9**). There are also references in the Philippides Report to the preparation of "declarations of trust and share certificates" by professional nominees (**pages 294-336 at 323, Vol. 2**). None of those documents, which are likely to assist in understanding the partnership, the companies through which it operated, the assets it acquired, and the Claimant's role in it have been disclosed.

446. So far as the Declaration is concerned, it is reasonable to expect that it would have been preceded by some sort of negotiation between the parties which would have been documented. The Declaration appears to be a professionally prepared document. Further, it is not unreasonable to expect that payments made under the Declaration (if there were payments) would be documented in some manner. Furthermore the Declaration refers to the Claimant having sold "his interest in the Joint Venture to the other Partners" on 31 January 2001. That transaction is likely to have been the subject of negotiation and to have been documented in some way.

447. If the answer to this request is that a thorough search has been made and no documents exist or ever existed, then that will itself be useful. But the search should be carried out.

448. Accordingly an order is sought that the Claimant carry out a thorough search for and disclose, by way of specific disclosure statement:

(a)   any documents evidencing any agreement between the Claimant and Makhmoudov (alone or with others) that the Claimant had any partnership (or partnerships), joint venture (or joint ventures) or similar arrangement with Makhmoudov, and the extent or terms of any such partnership(s) during the period from 1 January 1992 to 31 December 2001, and in particular, except to the extent that they have already been disclosed:

(i)    any written partnership agreement or joint venture agreement;

(ii)   any minute or note recording an oral partnership agreement or joint venture agreement; and

(iii)  minutes or notes of any meetings between the Claimant and Makhmoudov (alone or with others) relating to any joint business;

(b)   any written agreement concerning the dissolution of the partnership or the sale of any partnership interest by the Claimant to Messrs Makhmoudov, Nekritz and/or Bokarev (or any entities associated with those individuals);

(c)   correspondence, transfer instructions, debit advices, credit advices and bank statements evidencing the payment of the sums referred to in the Philippides Report and in the Declaration; and

(d)   any documents evidencing or relating to the negotiation and performance of the agreement/declaration dated 1 July 2002 relating to that partnership.

H.   **Transactions involving the Tyumenskaya Oil Company**

449.   The Philippides Report contains an account of a series of transactions involving the Claimant (or companies operated by him) and shares in the Tyumenskaya Oil Company ("TNK"). With the exception of one fax (**pages 2236-2237, Vol. 8**) and various bank statements and ledgers which may include sums relating to these transactions, no documents relating to this transaction have been disclosed. The Claimant has refused to give further disclosure of documents relevant to the TNK transaction because they are said to be irrelevant to any pleaded issue (**para. 48, pages 3023-3025 at 3024, Vol. 11**).

450.   In what follows it is explained what is known about the TNK transactions from the Philippides Report and the Claimant's First Witness Statement, and what can be surmised about them from the limited documents that have been disclosed. The issues to which the documents will be relevant and the disclosure sought are then identified.

   (i) *The TNK Transaction*

451.   In his First Witness Statement (at **para. 10, Vol. 12/A1**) the Claimant says that "in about 1997 I sold (for about US$425m) a 35% stake in an oil company but a written agreement about the same was only signed after several payment instalments had already been made". This was relied upon by the Claimant as exemplifying "another feature of my business dealings", namely that "[i]n the 1990s, deals in the former Soviet Union were often based on nothing more than a handshake or a primitive agreement".

452.   A more detailed explanation of the outlines of the TNK transactions was set out in the Philippides Report (**pages 294-336, Vol. 2**). The transactions were apparently described to Philippides as follows.

453.   The first set of transactions concerned promissory notes.

   (a)   On a date that is not identified in the report but appears to be December 1997, three companies (Arufa Invest & Trade SA, and two companies

identified in the report as "Krein Invest & Trade Ltd" and "Lotharco Trading Ltd") bought promissory notes issued by one subsidiary of TNK (ODAO Nizhnevartovskneftegas) from two other subsidiaries of TNK at a 40 percent discount. The consideration for the purchase was a total of USD 19.15 million; it follows that the value of the promissory notes (from which this figure was a 40 percent discount) must have been USD 31.92 million.

(b)     Those promissory notes were then presented to Nizhnevartovskneftegas – a company said to be "facing bankruptcy proceedings" – for payment, and were settled by issuing or transferring shares in four subsidiaries of TNK.

(c)     The shares were then sold to entities and individuals related to the Alfa Bank Group, realising USD 150,182,891. The date of this sale is not given, but it appears to have been in or around January 1998. This aspect of the transaction therefore yielded a profit of around USD 123 million.

454.    The second set of transactions concerned a "pure" share sale. Apparently Arufa and OTC had acquired various shares in TNK and some of its subsidiaries "previously". These were sold to entities and individuals related to the Alfa Bank Group for just under USD 225 million. The cost of acquiring the shares seems to have been a total of just under USD 132 million: USD 48.8 million was invested by OTC in 1997 and 1998 to acquire shares (**pages 294-336 at 332, Vol. 2**); USD 83 million was lent by CCT to Arufa to acquire shares (**page 331, Vol. 2**). Although the date of the Arufa investment cannot be ascertained from the Report, the OTC investment occurred in 1997 and 1998, i.e. shortly before the sale to entities and individuals related to Alfa Bank. This aspect of the transaction yielded a profit of USD 93 million.

455.    If both aspects of the transaction as described in the Philippides Report are put together, they suggest that the TNK transactions yielded cash of around USD 375 million – some way short of the USD 425 million claimed by the Claimant in his First Witness Statement, but still a very substantial sum.

(ii) *The disclosure given in relation to this transaction*

456. The disclosure that the Claimant has given so far in relation to this transaction is quite obviously (and is, apparently, admitted to be) incomplete. The most significant deficiencies are as follows.

(a)   Although the Claimant asserted in his First Witness Statement that the transaction was the subject of a written agreement made after some parts of the consideration had been paid, no such agreement has been disclosed.

(b)   Of the three companies which were involved in the transaction, the Claimant has disclosed documents relating to Arufa only. Those documents show payments totalling USD 277 million being made by an entity called "Fairfax Services Limited" to Arufa between 4 February 1998 and 25 February 1999, which are presently thought to be related to the TNK transactions:

| DATE | AMOUNT (USD) | PAGE (Vol. 7) |
|------|--------------|---------------|
| 04 Feb 1998 | 124,999,993.50 | **1784** |
| 05 Feb 1998 | 14,999,993.50 | **1784** |
| 05 Feb 1998 | 14,999,993.50 | **1785** |
| 05 Feb 1998 | 14,999,993.50 | **1785** |
| 05 Feb 1998 | 14,999,993.50 | **1785** |
| 05 Feb 1998 | 14,999,993.50 | **1785** |
| 15 May 1998 | 12,999,993.50 | **1786** |
| 15 May 1998 | 12,999,993.50 | **1786** |
| 15 May 1998 | 12,999,993.50 | **1786** |
| 15 May 1998 | 12,999,993.50 | **1786** |
| 15 May 1998 | 12,999,993.50 | 1787 |
| 01 Oct 1998 | 1,999,993.50 | **1788** |
| 29 Jan 1999 | 2,999,993.50 | **1789** |
| 05 Feb 1999 | 999,993.50 | **1790** |
| 10 Feb 1999 | 999,993.50 | **1791** |
| 25 Feb 1999 | 4,999,993.50 | **1792** |

| DATE | AMOUNT (USD) | PAGE (Vol. 7) |
|------|--------------|---------------|
| Total | 276,999,896.00 | |

(c)  There has also been disclosed a fax dated 28 May 2001 from Tony Wyss
(who worked for the Claimant's Liechtenstein fiduciaries, Syndikus) on
behalf of Arufa Invest & Trade in which he says "we have earned the
money in 1998 because of the sale of the following shares … total
amount USD 375,000,000.00" (**pages 2236-2237, Vol. 8**).

(d)  None of the other documents that one would expect to have been
produced by such a transaction (such as copies of promissory notes,
documents demonstrating the acquisition of shares, or negotiating
documents) have been produced.

457.  In short, on the basis of the material that has been produced it is hard to
understand the transactions, and hard to square the two accounts that have been
given of them (by the Claimant in his First Witness Statement, and by the
Philippides Report) with each other.

### (iii) *The significance of the TNK Transaction*

458.  It is accepted that the TNK Transaction is not itself directly "in issue" in this
action. It is, however, relevant to matters that are in issue.

459.  First, the Claimant has himself relied on this transaction as exemplifying what
he says was a significant "feature" of his business practices at the material
time, namely the way in which they were documented (see para. 451 above).

460.  Secondly, the Claimant has accepted that he believed Popov "may have been"
involved in the TNK transaction (**para. 48.3, pages 3023-3025 at 3024, Vol.
11**). The Claimant should know whether Popov was involved in the
transaction, and if he was, then precisely how he was involved. It is said that
the Claimant "does not have documents recording [Popov's] involvement", but
it is not clear how that can be said unless a proper disclosure exercise in
relation to the TNK transaction has been carried out to ascertain what the

nature of his involvement was. If Popov was involved that would be an important fact, precisely because it is alleged that TNK had nothing to do with the so-called partnership with the Defendant. If the Claimant was involved with Popov on business wholly unrelated to the Defendant, that would tend to cast doubt on his story that Popov was introduced to the "Radom" structure only at the Defendant's request for reasons the Claimant did not understand.

461. Thirdly, the TNK transaction is relevant because of what it is likely to show about the Claimant's interest in the company "Lothario Trading Limited". The Claimant's pleaded case is that Lothario was the Defendant's company, and it has been asserted in correspondence that the Claimant had no interest in it (**para. 28, pages 3026-3034 at 3032, Vol. 11**).   The Claimant relies on payments from a company called Liberty Metals to Lothario as payments made to the Defendant as part of the "partnership" (**Further Information served 11 January 2011, para. 1 (31), Vol. 12/A5**); he alleges that it was a company beneficially owned by himself, the Defendant and Makhmoudov (**Further Information served 11 July 2011, para. 29.2, Vol. 12/A6**). The Defendant, for his part, asserts that Lothario was a company that was in practice (and, from mid-1997 entirely) completely or predominantly part of Makhmoudov's UMMC group (**Further Information served 5 August 2011, para. 101, Vol. 12/A8**).

462. It seems likely that "Lotharco", referred to in the Philippides Report as having been involved heavily in the TNK transactions, is a typographical error for "Lothario". (A similar typographical error seems likely to have been made in respect of "Krein Invest & Trade Ltd" for the BVI entity, "Kraine Invest & Trade Ltd") If so, its involvement in the TNK transactions in late 1997, just six months after the last of the payments relied on by the Claimant, may well be material in establishing who owned and controlled Lothario at the material time. If, as he asserts, the Claimant is not able to disclose Lothario's own documents relevant to that issue, full disclosure of such documents as he does have relative to the TNK transaction which might cast light on the ownership and control of Lothario is important.

463. Fourthly, disclosure of these documents is evidentially significant because of what they are likely to reveal about what the Claimant told Philippides. There are a number of respects in which, on the face of it, the Claimant's account to Philippides appears to have been false, or at any rate at variance with his case in this action.

(a) Philippides was apparently told that the TNK transactions yielded in total USD 375 million, but the Claimant has asserted in his evidence in this action that they yielded USD 425 million.

(b) Philippides was told, when he prepared his report in late 2001 and 2002, that the Claimant was not a beneficial owner of Arufa, and as a result that they had been unable to obtain access to the records of the entity. But the Claimant's case in these proceedings is that he was the beneficial owner of Arufa ( or "alternatively the Claimant and Mr. Makhmoudov": see **Further Information served 11 July 2011, para. 35, Vol. 12/A6**). Evidence suggests that the company was regarded as jointly owned by the Claimant and Makhmoudov (**pages 2920-2921 at 2920, Vol. 10**). There is evidence that the Claimant assigned his interest in Arufa to Makhmoudov in February 2004 (**pages 2352-2353 at 2352, Vol. 9**). But it appears that the Claimant misled Philippides about the ownership of Arufa at the material time (and, about his ability to supply relevant records, since he has been able to supply at least some such records in this action).

(c) Philippides was told about the involvement of Makhmoudov, Nekrich and Bokarev in the TNK transaction (**pages 294-336 at 312, Vol. 2**), but was apparently not told about any involvement of Popov, although the Claimant now seems to accept that he was involved.

464. As set out above, these are not merely points going to credibility (though, of course, they do). They have a greater significance. The whole point of the Philippides Report was that it was to "verify how [the Claimant's] wealth was created and accumulated" with the objective, it appears, of dispelling the suspicion that it was illegitimately acquired. If, as appears to be the case, the

Claimant did not provide true and complete explanations to the accountant he had engaged to carry out that task, the Court may be asked to infer that this was because he wished to conceal the truth which was (as the Defendant alleges) that much of the Claimant's wealth was not honestly acquired.

465. Fifthly the Claimant relies on the TNK transaction as evidence of the fact that his honest and legitimate business transactions in the former Soviet Union were not documented in a conventional way. However, if the transaction was not in fact an honest and legitimate business transaction, a different conclusion might be drawn.

466. On the face of it the transaction is one with no sensible commercial rationale. A subsidiary of TNK sells promissory notes (payable by a related company) at a discount of 40 percent, and within two months they are redeemed by the promisor, within the same group, by the provision of shares worth nearly 8 times what was paid for the promissory notes. Or, put differently, a single group of companies first sells some promissory notes at a discount of 40 percent, and then repurchases them very shortly thereafter at a premium of 560 percent. The whole transaction takes place within a matter of two months or so. It is, on its face, a most surprising transaction. The commercial rationale of the transaction is hard to discern and in the absence of proper explanation the Court would be entitled to infer that it was not an honest transaction. Given that it is said by the Claimant to be typical of his way of doing business, disclosure ought to be given so that the matter can be understood and relied on, as appropriate, at trial.

### (iv) *Conclusion*

467. Therefore an order is sought that the Claimant disclose all documents in his control relating to the TNK transaction as described in Section 6 (at pages 18-20) of the Philippides Report (**pages 294-336 at 311-313, Vol. 2**) and in particular:

(a)    any agreement or document evidencing any agreement relating to that transaction or the negotiation of any agreement (including the agreement

referred to in paragraph 10 of the Claimant's First Witness Statement, **Vol. 12/A1**) concerning TNK or its subsidiaries identified in the Philippides Report between December 1997 and January 1998;

(b)   any document evidencing that Arufa Invest & Trade SA and/or Operator Trade Center Ltd acquired shares or promissory notes in TNK, OAO Nizhnevartovskneftegas, ODAO Priobneft, ODAO Belozerneft, ODAO Samotlorneft and ODAO Nizhnevartovskneft, evidencing the date of purchase, the identity of the person or company from whom such shares or promissory notes were acquired and the price at which they were acquired;

(c)   any agreement or document evidencing any agreement by Arufa Invest & Trade SA, Operator Trade Center Ltd, Krein Invest & Trade Ltd (or Kraine Invest & Trade Ltd) or Lothario Trading Ltd (or Lotharco Trading Ltd) for the sale of any shares in TNK or its subsidiaries as aforesaid, and the identity of the person or persons to whom such shares were sold;

(d)   any document evidencing the receipt of sums in respect of shares in TNK or its subsidiaries as aforesaid by Arufa Invest & Trade SA, Krein Invest & Trade Ltd (or Kraine Invest & Trade Ltd) and Lotharco Trading Ltd (or Lothario Trading Limited) or otherwise on behalf of the Claimant; and

(e)   any documents evidencing the role, involvement or interest in the TNK transaction of Popov or of any company in which he had an interest in any of the aforesaid matters.

**Category 7:   Documents relating to the Claimant's settlement with the Israeli tax authorities in 2003**

468.  The Claimant has disclosed a copy of an Agreement between him and the State of Israel dated 2 March 2003 for the payment of taxes (the "Israeli Tax Agreement") (**pages 2342-2347, Vol. 9**). In the Israeli Tax Agreement, it is stated that the taxpayer (the Claimant) has property and assets of approximately 2 billion dollars that were acquired and originated from outside

Israel (**pages 2342-2347 at 2345, Vol. 9**). A letter dated 2 December 2002 from Dr Weinroth, the Claimant's lawyer, and Zeev Feldman, CPA (presumably an accountant) to the tax assessor Shuki Vita states the same (**pages 2334-2337 at 2336, Vol. 9**).

469. In my firm's letter of 15 August 2011, we raised with the Claimant's solicitors this issue of the lack of disclosure of any materials underlying the 2 March 2003 Israeli Tax Agreement, which the Claimant had previously disclosed. My firm explained that material evidencing the Claimant's amount of and source of wealth was relevant to the issue of establishing whether the Claimant had available to him the assets and funds he has alleged were invested in the aluminium business and used to "finance or arrange the financing of the acquisition of assets held by the [alleged] partnership" (**pages 2996-3018 at 2997, Vol. 11**). In their response of 9 September 2011, the Claimant's solicitors stated that "[y]ou do not explain why you contend that the documents underlying the tax agreement are or might be relevant to the pleaded issues in dispute or within the scope of standard disclosure" (**pages 3026-3034 at 3028, Vol. 11**).

470. The relevance of the documents underlying the agreement relates, for present purposes, solely to the sources of the Claimant's wealth and to what the Claimant told the Israeli authorities about it. There must have been some information provided to produce the statement referred to above.

471. It appears that the "audit" of the Claimant's wealth by Philippides was conducted, and the Philippides Report of November 2002 was produced, for the purpose of showing the Israeli authorities the extent of the Claimant's wealth and the sources of that wealth. The Philippides Report contains sections on the Claimant's alleged investments in the aluminium business in Russia and Philippides is one of the Claimant's witnesses in this case.

472. Although, apart from the Agreement itself, a small amount of correspondence relating to it was disclosed on 11 August 2011, the Claimant has not disclosed any documents confirming whether the Philippides Report was in fact submitted to the Israeli tax authorities, or what other information was provided,

what (if any) questions were asked about it, and what (if any) answers were given. All such material is relevant to the issue identified above.

473. It is accepted that correspondence with the Israeli Tax authorities other than in so far as it concerns the extent and sources of the Claimant's wealth is not generally disclosable. Accordingly an order is sought that the Claimant disclose all correspondence with the Israeli Tax Authorities leading to the conclusion of the Israeli Tax Agreement dated 2 March 2003 in so far as that correspondence relates to the sources and extent of the Defendant's wealth at that date.

## Category 8:   Documents relating to the bank accounts of the Claimant's entities

474. The Defendant has instructed Philip Haberman, a partner of the accounting firm Ernst & Young LLP, to act as an expert witness in the area of forensic accountancy. The parties agree in principle that each should be permitted to adduce evidence at trial from an expert forensic accountant.

475. As part of his instructions, Haberman has been asked to consider whether the funds alleged by the Claimant to have been used by the Defendant to finance the acquisition of shares in, and operation of, SaAZ or other aluminium assets in Russia derived from funds held in the Claimant's various companies and offshore entities as alleged in the Claimant's Further Information of 11 January 2011 (**para. 4, Vol.12/A5**).

476. Haberman has written to my firm to identify the potential difficulties in that enquiry due to the lack of relevant documents disclosed by the Claimant (**pages 2843-2863, Vol. 10**). In his letter, Haberman states that in order to complete his task he needs access to underlying documentation relating to the payments pleaded by the Claimant, both documents relating to the Claimant's "paying entities" and those entities of the Claimant that provided the funds to the paying entities to enable the pleaded payments to be made (the "contributing entities"). Specifically, Haberman states that he needs bank statements and accounting documents such as cash books and accounting ledgers, relating to

all the bank accounts of the paying and contributing entities for the period starting January 1992 and ending in December 2000. Haberman explains in his letter that accounting documents are necessary because they may provide a greater amount of narrative about the payments in question, which may or may not be accurate, than that which may be contained in the bank statements alone. He anticipates that he will also require sight of payment documentation from banks where the bank statements and accounting documents do not provide adequate information.

477. Haberman identifies those entities that he considers relevant. Since the Claimant has disclosed some documents in respect of those entities, Haberman attaches a schedule to his letter identifying the gaps in that disclosure (**pages 2843-2863 at 2846-2863, Vol. 10**). I do not repeat that information herein apart from noting that the Claimant's entities that are identified in Haberman's letter are as follows:

    (a)    Arufa Invest & Trade SA;

    (b)    Blonde Investment Corporation Ltd.;

    (c)    CCT Consul Consult & Trade Establishment;

    (d)    Eastern Market Telecom Fund;

    (e)    Furlan Anstalt;

    (f)    Galenit Foundation;

    (g)    Hiler Establishment (Vaduz);

    (h)    Hiler Establishment Ltd. (BVI);

    (i)    Liberty Metals Group SA;

    (j)    MCG Holding Ltd.;

    (k)    Metacontact Anstalt (Vaduz);

(l)     Operator Trade Centre Ltd.;

(m)    Pelir Invest & Trade SA;

(n)     Republic Establishment; and

(o)     Tenida Anstalt.

478.  Lastly, Haberman asks that the Claimant provide confirmation that (i) no other bank accounts existed for the entities he has identified during the relevant period and (ii) there was no activity on those accounts noted as having a zero balance at the earliest or latest dates disclosed, outside those periods.

479.  Accordingly, at this stage an order is sought that the Claimant be required to:

(a)     disclose all bank statements and accounting documents identified in the schedule to Haberman's letter; and

(b)     confirm under a statement of truth that (i) no other bank accounts existed for the identified entities during the period from January 1992 to December 2000 and that on those accounts noted as having a zero balance at the earliest or latest dates reflected in the disclosed documents, there was no activity outside those periods.

**Category 9:   Documents relating to the Claimant's personal bank accounts**

480.  In my firm's letter of 15 August 2011 we pointed out that the Claimant had not disclosed any bank statements from his own personal accounts, despite the fact that it appears from documents within his disclosure that he held personal accounts at a variety of financial institutions. Schedule 2 of the letter contained a list of the Claimant's known personal bank accounts and credit cards that were apparent from his disclosed documents (**pages 2996-3018 at 3008, Vol. 11**).

481.  In response to this, the Claimant's solicitors accepted the relevance of the personal bank account documents and stated in their letter of 9 September 2011 that they have made enquiries with numerous banks with a view to obtaining

copies of bank statements from the date of account opening until 31 December 2001 (**pages 3026-3034 at 3027, para. 7, Vol. 11**). In respect of documents received from Israeli Discount Bank attempts were being made to obtain payer and payee information for the recorded transactions (**para. 7.5, page 3028, Vol. 11**).

482.   In this letter of 9 September 2011, it was asserted that the Claimant was unable to find an address for United Global Bank or its successor in order to make enquiries for documents relating to the account held there by Blonde Investment Corporation. An address for the bank is, however, contained within documents recently disclosed by the Claimant. This disclosure is said to comprise material originally seized by the Swiss authorities from the offices of Karam and then, on return, retained within the electronic storage facility of the Claimant's Bulgarian lawyer, Todor Batkov (**pages 2986-2995 at 2986, 3019-3020 at 3020 and 3021, Vol. 11**). Such material as my firm has been able to review to date includes three documents that appear to be a directory of individuals and organisations. In these documents there is an entry for United Global Bank, which reads (**page 2909, Vol. 10**)

> "UNITED GLOBAL BANK LIMITED – Bureau Administratif LANDAL S.A.M. Avenue des Citronniers 6 98000 Monte-Carlo   00377/93 25 48 63 00377/93 50 34 98 M. Simon D. REUBEN" -

483.   A number of other contact addresses are provided in this document for Simon Reuben and his brother David, who were according to the Claimant his partners in TWG until 1997. These include addresses in the United Kingdom, at Trans-World House, 100 City Road, London EC1Y 2BJ and in Monte Carlo, at "Le Formentor", 27 Avenue Princess Grace, 9800 Monte Carlo (**pages 2911-2912, Vol. 10**). The Claimant could cause enquiries to be made on the basis of this information.

484.   This newly disclosed directory also contains entries for approximately seventy-five banks and financial institutions. In light of this, the Claimant should be required to provide a list, verified on oath, of all bank accounts held in his name. He should also be required to confirm in this declaration that efforts

have been made to obtain documents relating to these accounts with a view to disclosing those which are relevant and fall to be disclosed in these proceedings and, if this has not been done, to explain why not.

485. Since my firm's letter of 15 August 2011, an additional bank account in the name of the Claimant has been identified from the disclosed documents, namely an account held at the Bank Leumi le Israel B.M, Tel-Aviv from which USD 2 million was transferred to the account of the Claimant's company Furlan Anstalt held at Bank in Liechtenstein on 4 January 1995 (**pages 1402-1403, Vol. 6**). The Claimant's enquiries should be extended to include this bank account and a search of related documents to identify any that fall to be disclosed in these proceedings.

486. Finally there is the question of the relevant date. The Claimant has sought to limit disclosure of his personal bank account details to a period ending on 31 December 2001. The Defendant's case is that he made payments to the Claimant during 2001 and 2002: see paragraph 12.9 of the Defence (**Vol. 13/B3**), and the Claimant's case is that the parties had not substantially performed their obligations under the first stage of the agreement until April 2002. It is relevant to analyse what use the Claimant made of the money he was paid, and for that purpose his personal bank accounts ought to be disclosed up to the end of 2002, not 2001.

487. In summary, an order is sought:

(a)   that the Claimant make a list, verified by a statement of truth, identifying each personal bank account operated by him in the period from 1992 to 31 December 2002; and

(b)   that the Claimant give disclosure of the statements of each such account after making reasonable inquiries including contacting the bank in question to obtain statements; in so far as documents cannot be obtained, the disclosure statement should identify what documents are missing and explain why.

170

### III.   <u>Conclusion</u>

488.   For the reasons set out above, an order for disclosure and further searches to be
made by the Claimant is sought in the terms of the draft order enclosed with
this application. Such an order is necessary to ensure a fair trial of the action.

<u>Statement of truth</u>

I believe that the facts stated in this witness statement are true.

Susan Rachel Prevezer QC

Dated: 1 November 2011