# Exhibit 43

MICHAEL S. CHERNOI

REPORT ON AGREED UPON PROCEDURES
AND REVIEW OF TRANSACTIONS WITHIN
ENTITIES BENEFICIALLY OWNED BETWEEN
1988-2001

C29968

### Michael S. Chernoi

We were introduced to Mr Chernoi in Tel-Aviv in October 2001. We had not known Mr Chernoi previously and had not carried out any professional work for him or for any of the entities he owns - directly or indirectly.

Mr Chernoi has been carrying on business activities in Russia, CIS states, Bulgaria, USA and elsewhere since 1988 over which time he has accumulated wealth in excess of US$2.3 billion. His main activities especially since 1990 include trading in aluminum, coloured and black metals, coal and coke, investments in companies operating mainly in Russia, the CIS and Bulgaria, investments in real estate and telecommunications.

His business dealings especially until 1993 involved complex barter trading activities that were common in Russia immediately following the collapse of the Soviet Union. As was typical at the time, such transactions were often concluded with poor documentary evidence. Due to the non-existence of a reliable financial and banking system, payments for goods included ruble payments, coupons as well as goods bartered in exchange.

The volatile economic and political climate and general mistrust in state authority and institutions that prevailed for a number of years following the collapse of communism resulted in a general wish to accumulate wealth abroad. This was seen as important for two principal reasons: *Firstly*, to reduce the financial risk by keeping bank balances in more stable and secure countries as well as obtaining access to international financial credit institutions. The *second* reason was that such funds were secure from the risk of nationalisation in the event of return to communism and also from threats from other forces that became prominent at that time.

Confidentiality was important and the organisation structures that were set-up at the time

2

were designed to be complicated and they also employed the discreet services of fiduciaries and professional managers in a number of jurisdictions for that purpose. This was and remains common with East European businessmen.

This report was commissioned by Michael S Chernoi who requested us to perform an independent investigation to verify and report on how his wealth was created and accumulated over the past 12 or so years, from existing financial and accounting records and related information.

Our work performed and findings are detailed in the sections that follow. We have endeavoured to ascertain his business activities for the years 1988 until 31 December 2001, reviewed accounting records of his main trading entities, contracts and agreements whenever available, audited financial statements prepared by reputable accounting firms and obtained information from his business associates and professionals who set-up business deals for him or handled his affairs.

Our report is broken down into a number of sections dealing with his main business activities covering the period 1988-2001 and explains our findings. We summarise the results in our conclusion which contains a summary of his wealth arising from the previous sections. It also includes a list of the main investments which Mr Chernoi holds today.

11 December 2002

3

C29970

## CONTENTS

| | *Section* | *Page* |
|---|---|---|
| 1 | Scope of work | 5-6 |
| 2 | Early trading and barters | 7 |
| 3 | Trans-World Metals SA | 8-9 |
| 4 | Other aluminium/metals trading | 10-15 |
| 5 | Sibirskiy Aluminium | 16-17 |
| 6 | Tyumenskaya Oil Company (TNK) | 18-19 |
| 7 | Eastern Market Telecom Fund (EMTF) | 20-21 |
| 8 | US real estate transactions in USA | 22-23 |
| 9 | Bezeq/Zeevi Global Telecommunications | 24-27 |
| 10 | Investments in Russia | 28-30 |
| 11 | Investments in Bulgaria | 31-34 |
| 12 | Investments in Kazakhstan | 35-36 |
| 13 | Main financing entities | 37-40 |

Lynda Benfield - MC REPORT.doc

| 14 | Net assets and conclusion | 41-42 |

## 1 Scope of work

Horwath Philippides & Partners Chartered Accountants has undertaken this assignment in accordance with the International Standards on Auditing applicable to engagements with agreed-upon procedures. The scope of our work for the purpose of meeting the stated requirements of Mr Chernoi was and remains his sole responsibility. Because the procedures do not constitute either an audit or a review in accordance with International Standards on Auditing, we do not express any opinion regarding the sufficiency of the following procedures, either for the purpose of the present report or for any other purpose.

Our work focused on a review of the financial transactions of those entities detailed in this report which accounted for the major income and transactions. We examined supporting documentation made available to us and which included, inter-alia, bank statements, debit and credit advices, payment instructions, contracts and audited financial statements issued by international audit firms.

We were allowed to view all documents that were available in the offices of Mr Chernoi's fiduciaries and managers, in Switzerland, Cyprus, the Principality of Liechtenstein, and also to documents seized by the Liechtenstein Courts. We did not obtain access to view documents seized by the Swiss Courts as they were subject to a separate investigation at the time of our review and could not be made available to us.

Our work focused on substantiating the nature of the most significant sources of income and accumulation of wealth over the period as described in this report. We did not investigate in full all transactions that had occurred by entities in which Mr Chernoi had or may still have a financial interest but we believe on the basis of representations made to us by Mr Chernoi that our examination covered the most substantial part of his business interests. Our work was restricted by the fact that a significant part of the accounting systems for many entities were maintained by an independent fiduciary and manager in Liechtenstein whose records for a major part of the period under review comprised of bank debit and credit advices without reference to individual contracts or invoices. He did not

C29972

always maintain copies of such documentation, as there was no such requirement under Liechtenstein Law prior to 1999.

As for his early trading activities during 1988-1993, we faced a number of problems in verifying the details of transactions as the majority of these involved complex barter trading which were concluded with little or no available documentary evidence. We were able to ascertain much of the profits accumulated during this period by reviewing the bank statements of the financing entities that were used during that period.

We placed reliance on audited financial statements issued by other audit firms for a number of key entities. We also verified transactions and obtained documentation from professionals who served Mr Chernoi in the USA, Switzerland, Liechtenstein, Bulgaria, Cyprus and Russia which we accepted as genuine.

C29973

## 2     Early trading and barters

Mr Chernoi started his business activities trading in metals and raw materials. He had cultivated contacts with key metals manufacturing mills in Russia and the CIS and actively arranged the supply of raw materials required by manufacturing units to deliver finished products.

During this period, between 1989-93 he teamed up with Semyon Kishlin, a business partner resident in the United States who owned a company called Trans CIS Commodities. We are advised that under his agreement with Mr Kishlin, Mr Chernoi received 50 per cent of the profits generated by Trans CIS Commodities.

It is estimated that Mr Chernoi accumulated profits of approximately US$ 60 million from Trans CIS Commodities. Of these, we traced US$ 40.6 million that was transferred to the bank account of Hiller Establishment, Vaduz in the period from 1992 to early 1995 and which amounts were used to finance Russian aluminium activities.

We were told that the balance (US$ 19.4 million) was also invested in Russia and the CIS especially between 1990-1992 in the form of credits and loans but there exists no documentary evidence as such agreements were informal and often made verbally (see section 5.1).

C29974

### 3    Trans-World Metals SA

During the period from 1992 to 1996, Mr Chernoi worked in partnership with his brother, Lev Chernoi, and with brothers Simon and David Rubens in the development of the business of Trans-World Metals Group (TWG). This group is a major aluminium trader initially buying raw aluminum from Russian and CIS producers, processing on tolling basis and selling to western markets.

Mr Chernoi was personally able to negotiate on behalf of TWG the supply of alumina ore from Pavlador Alumina Plant in Kazakhstan to the Krasnoyarsk and Bratsk aluminium processing plants in Russia.

At a later stage, TWG purchased ownership control of the Krasnoyarsk, Bratsk, Soyanogorsky, Novokuznetsky aluminium plants under the Russian privatisation program.

Under the private agreements between the parties involved in TWG, Mr Chernoi was not a shareholder but was entitled to 25 per cent of the profits generated by the Trans-World Metals Group.

The shareholders of TWG, namely Lev Chernoi, Simon Rubens and David Rubens had persistently declined to provide Mr Chernoi with audited financial statements reflecting the group's financial affairs and in 1997 Mr Chernoi reached an agreement to sell his interest  (accumulated profits)  for an agreed consideration of US$ 410 million.

We traced the receipt of the aforementioned proceeds to the bank accounts of CCT Consul Consult and Trade Establishment in 1997, a Liechtenstein registered company beneficially owned by Mr Chernoi (see section 13.1).

Other distributions made by TWG to CCT Consul Consult and Trade Establishment and constituting profit distributions were made as follows:

8

| Year | US$ |
|------|-----|
| 1993 | 1.833.000 |
| 1996 | 26.107.559 |

All of the aforementioned payments were effected by Global Treasury Services Limited, an entity controlled by the shareholders of Trans-World Metals SA, a Bahamas registered entity.

TWG continues to act as a major metals trading group, specialising in the aluminium and steel sectors. Mr Chernoi ceased his involvement with the Group since the sale of his participation in the business. There continues to be a legal dispute between Mr Chernoi and TWG (see section 4.1 (a)).

9

Case 1:12-mc-00186-JBW   Document 3-44   Filed 03/09/12   Page 11 of 44 PageID #: 493

## 4   Other aluminium /metals trading

### 4.1 Bluzwed Metals Limited (1997-1998)

The company was incorporated in the British Virgin Islands on 5 July 1994 and its principal activity is that of an investment company.

We reviewed all financial records of the company from incorporation to 31 December 2000.

The Company was managed by the office of Mr Joseph Karam in Switzerland. Mr Karam , a banker, provided fiduciary, administration and management services to a number of prominent Russian businessmen and corporations. Mr Karam provided the bank signatories, controlled the accounting function and provided the corporate managers and directors for the entities under his management detailed below.

The net assets of the company as at 31 December 2000 amounted to US$ 158.466.802 and represented loans granted to a a number of entities related to Sibirskiy Aluminium (see section 5.1) The aforementioned amount was generated during the years 1996 and 1997, as follows:

*a) Tradalco Group*

On 1ª December 1995, Bluzwed Metals Ltd established a joint venture (50 per cent participation) with the Trans-World Metals group (Trans-World Metals SA, Bahamas) for the purpose of producing aluminium under tolling arrangements and selling the finished products in the international markets.

The main manufacturer was the Sayansk Aluminium plant in Russia. Tolling arrangements were common in Russia and persisted for many years as the manufacturing plants did not possess the financial means to finance their own production. By entering into tolling arrangements where the raw materials were supplied by the customer, and by receiving partial advance payments for their

processing, Russian manufacturing plants were able to continue operations, otherwise they would likely face bankruptcy. The customers were able to use their financial strength to significantly reduce their costs as the prices they negotiated with the manufacturers under tolling arrangements often simply covered only operating and variable costs.

The Tradalco group made the following distributions of profits to Bluzwed Metals Ltd over the period from incorporation until cessation of trade in November 1997:

| Year | | US$ million |
|------|------|------|
| 1996 | 27.6 | |
| 1997 | 81.4 | |
| | Total | 109.0 |

We reviewed the audited financial statements of Tradalco Group performed by BDO Binder SA, Switzerland for the period from 1 December 1995 to 28 February 1997. The financial statements were free of audit qualifications.

We also reviewed an interim report also prepared by BDO Binder SA for the period from 1 December 1995 to 31 January 1998 describing in detail the transactions performed by Tradalco Group and the group structure in which no material discrepancies were noted. The aforementioned distributions (US$ 109 million) were confirmed in the audited financial statements and in the interim report. We vouched the receipts of the aforementioned distributions into the bank accounts of Bluzwed Metals Ltd.

Tradalco group ceased trading in November 1997. As at 31 January 1998 there remained approximately US$ 30 million in undistributed profits that are currently the subject of a legal dispute between Bluzwed Metals Ltd and Trans-World Metals SA.

b) *Alucor Trading S.A.*

Alucor Trading S.A. was incorporated on 24 September 1997 in the British Virgin Islands as a wholly owned subsidiary of Bluzwed Metals Ltd. Its principal activities were the purchase of alumina and other raw materials, their transformation under

11

tolling arrangements into aluminium and the sale of finished products.

The company commenced trading activities in November 1997 and during the 14 months from incorporation to 31 December 1998 realised profits of approximately US$ 44 million on sales of approximately US$ 244 million.

US$39.510.000 was distributed to Bluzwed Metals Ltd by way of dividends during 1998 and US$ 1.070.000 the following year. We agreed the receipt of these distributions to the bank accounts of Bluzwed Metals Ltd.

The Swiss Courts have seized Alucor Trading SA's financial records and we were unable to obtain access to them at the time of this report. However, we were able to confirm US$ 189.422.139 of total sales (representing cost of sales) to the general ledger of Alpro SA, the company's major customer. We agreed the general ledger of Alpro SA to the audited financial statements that were prepared for that company by Deloitte & Touche Experta SA for the period from 1 January 1998 to 30 September 1998 including comparatives for year 1997. Alpro SA's sales were made to third parties.

We have also reviewed a report prepared by Deloitte & Touche on the commercial activities of Alucor Trading SA, for the period from 1 November 1997 to 31 May 1998. This report identifies the following, as the key data of Alucor Trading SA:

|  | US$ million |
|---|---|
| Sales aluminium | 193.8 |
| Purchases of alumina | 67.4 |
| Purchases of pet coke | 14.9 |
| Tolling costs | 77.6 |

We are advised that Alpro SA was not and is not related to Mr Chernoi. It was, however, managed on behalf of other businessmen by Joseph Karam.

c)   *Alucor Alumina Trading S.A.*

Alucor Alumina Trading SA was incorporated on 29 October 1997 in the British Virgin Islands. It commenced trading activities in November 1997 and its principal activity was

the purchase of raw material aluminium, mainly from Pavladar Aluminium Plant (PAZ) in Kazakhstan, and its sale to related parties for the production of aluminium.

Bluzwed Metals Ltd's interest in the company was 33.3 per cent. It received US$ 8.153.900 which represented 33.6 per cent of the total distributions made by Alucor Alumina Trading S.A. during the year 1998. We have traced this amount in the bank accounts of Bluzwed Metals Ltd.

The financial documentation of Alucor Alumina Trading SA was also seized by the Swiss Courts and as already mentioned, we were not able to obtain access to them at the time of our review.

Bluzwed Metals Ltd utilised the profits generated from the results of its joint venture and its subsidiaries to grant loans to various entities related to and holding shares in OAO Sibirskyi Aluminium of Russia. As at 31 December 2000 the major balances outstanding and due to the company included:

|                              | US$         |
|------------------------------|-------------|
| Maddox Investments Limited   | 122.541.870 |
| Aluminium of Siberia S.A.    | 4.510.000   |
| Benet Invest & Trade Corp.   | 15.225.409  |
| G.S.A.(Cyprus) Ltd           | 12.691.350  |
| Total                        | 154.968.629 |

On 11 March 2002 the company received an amount of US$129.043.495 in partial settlement of the balances outstanding.


## 4.2  Aluminium of Siberia SA, Panama (1998-2000)

The company was incorporated on 11 March 1998 and commenced trading operations in May 1998. Its activities concerned the purchase of alumina and other raw materials, their transformation under tolling arrangements into aluminium and the sale of the finished product.

Mr Chernoi's beneficial shareholding in the company was 50 per cent.

Aluminium of Siberia SA reported profits of US$ 40 million for the calendar year 1998, US$ 107 million for 1999 and US$ 66 million for 2000. Deloitte & Touche Experta SA, Suisse, audited the years 1998 and 1999, the year 2000 was audited by Deloitte & Touche, Cyprus and in all cases the audit opinions were without any qualifications.

Aluminium of Siberia SA changed its name to Metcare Management SA during 1999.

The balance sheet of the company as at 31 December 2000 showed net assets of US$ 4 million. An amount of US$ 208 million was distributed to the shareholders during the years 1998 to 2000, of which Mr Chernoi received US$104 million. The dividends were paid to Benet Invest & Trade Corp., which we are advised by Mr Chernoi is an independent financial company registered in the British Virgin Islands, and were used to finance the aluminium activities and investments in Russia (section 5.1).

Metcare Management SA ceased operations at the beginning of 2000.

### 4.3   Blonde Investment Corp. Ltd (1994-2000)

Blonde Investment Corp. Ltd is a private company incorporated in the Cayman Islands in 1994. Its activity is to trade in commodities, mainly copper, on the international markets. Blonde has reported a total net income for the years from 1995 to 2000 of US$ 65 million. The company ceased operations in April 2000.

The Swiss fiduciary Joseph Karam advised us that Mr Chernoi's beneficial interest in the company was 99 per cent.

The financial statements of the company for the years from 1995 to 2000 were audited by Deloitte & Touche Expert SA, Suisse, who issued unqualified audit opinions for all years. The financial statements for the year ended 31 December 1994 were not audited. The income generated for the period ended 31 December 1994 was US$ 53 million.

In total, Blonde Investment Corp. Ltd generated profits of US$118 million and distributions were made to the following entities beneficially owned by Mr Chernoi:

14

C29981

|  | US$ |
|---|---|
| million |  |
| Hiller Establishment BVI (section 5.1) | 12 |
| Hiller Establishment Vaduz (section 5.1) | 15 |
| Operator Trade Center (section 13.2) | 52 |
| CCT Consul Consult and Trade Establishment (section 13.1) | 16 |
| Total | 95 |

## 4.4  Liberty Metals Group SA, Bahamas

Liberty Metals Group SA was incorporated in February 1996 in Nassau, Bahamas. Its principal activity concerned the trading of commodities, mainly steel products on the international markets.

The financial statements of the company for the 23 months from incorporation to 31 December 1997, which have been audited by Deloitte & Touche Expert SA, Suisse, show net income for the period of US$ 9 million (see section 5.1).

C29982

## 5   Sibirskiy Aluminium

### 5.1  Sale of shares

Under an agreement dated 1 March 2001 and a subsequent amendment of 10 March 2001 between Mr Chernoi and Oleg Deripaska, Mr Chernoi agreed to sell his shareholding of 17.5 per cent of OAO Russian Aluminium (which group was formed through the merger of Sibirskiy Aluminium and a number of other aluminium manufacturing groups) to Mr Deripaska for a purchase consideration that was determined as follows:

    a) settlement of the loans granted by Bluzwed Metals Ltd, detailed in the previous section of this report (see section 4.1), for the amount of US$ 150 million

    b) initial payment of US$100 million that was substantially effected through the transaction detailed below (see section 5.2)

    c) a further amount based on the market value of Russian Aluminium (RusAl), calculated at 20 per cent of the prevailing market value of RusAl less US$ 250 million. The market value is to be calculated as the average price of shares sold to third parties. The payment is to be settled within five years of the date of the agreement.

The total proceeds expected to be realised by Mr Chernoi for the sale of his interest in RusAl are in the region of US$400 to US$500 million.

We were unable to verify how the shares in OAO Sibirskyi Aluminium were held, as the aforementioned agreement between Messrs Chernoi and Deripaska had been entered into prior to our engagement and the control of the holding entities had passed to Mr Deripaska or affiliated persons or successors. It is our understanding from discussions held with members of RusAl's legal department that the shareholding structures were under the control and supervision of Mr Deripaska and his legal department and that Mr Chernoi was never provided with the precise details of his investment holdings nor was he provided with documents to support his legal entitlement to the aforementioned shareholdings.

16

We are advised that Mr Chernoi's interest in the group was held through a number of offshore entities (under the control of Mr Deripaska) and mainly through Nash Investments Ltd and Maddox Investments Ltd, both Cyprus incorporated entities, and further, that his interest mainly comprised of loans that were provided to finance the aluminium operations. The net investments and loans made by Mr Chernoi in the aluminium business were as follows:

| Source | Amount US$ million | Section ref: |
|---|---|---|
| Early trading and barters | 60.0 | 2 |
| Bluzwed Metals Ltd | 158.5 | 4,1 |
| Metcare Management SA | 104.0 | 4.2 |
| Hiller Establishment BVI | 12.0 | 4.3 |
| Hiller Establishment Vaduz | 15.0 | 4.3 |
| Liberty Metals Group SA, Bahamas | 9.0 | 4.3 |
| CCT Consul Consult & Trade Establishment | 30.8 | 13.1 |
| Net loans and advances made through Operator Trade Center Ltd | 10.5 | 13.2 |
| Net investments and loans advanced | 399.8 | |

### 5.2 Hillgate Financial Corp.

Hillgate Financial Corp. was incorporated on 11 December 1997 in the British Virgin Islands and was dormant up until 2001 when it was used as a vehicle for receiving US$ 91 million of the consideration for the sale of Mr Chernoi's interest in the OAO Sibirskyi Aluminium group referred to in 5.1 above.

A profit of US$ 91 million was made during the year 2001 on the purchase and sale of shares in OJSC United Company Siberian Aluminium. The transaction involved the purchase of shares from a Russian entity and their sale to GSA (Cyprus) Ltd, an entity controlled by Mr Deripaska.

We reviewed the contracts for the purchase and the sale of the shares in March/April 2001 and traced the money flows for both the purchase and the sale through Hillgate's bank accounts. We also received extracts from the share register of OJSC United Company Siberian Aluminium, evidencing the proper registration of the shares in

C29984

Hillgate's name and the subsequent transfer on the sale.

## 6 Tyumenskaya Oil Company (TNK)

During the period from December 1997 to January 1998 Mr Chernoi acting together with close business associates, realised approximately US$ 212 million profit through a complex series of transactions that were described to us as follows:

a) The following promissory notes issued by ODAO Nizhnevartovskneftgas, a subsidiary of TNK that was at the time facing bankruptcy proceedings, were purchased from two other subsidiaries ODAO Samotlorneft and ODAO Nizhnevartovskneft at a 40 per cent discount.

| Purchased by | Description | Nominal Value RUR | Consideration RUR | Consideration US$ |
|---|---|---|---|---|
| Arufa Invest & Trade SA | Nos 2203592-7, 2203604 | 65 billion | 39 billion | 6.55 million |
| Krein Invest & Trade Ltd | Nos 2203591, 2203605-10 | 70 billion | 42 billion | 7.1 million |
| Lotharco Trading Ltd | Nos 2203598-2203605, | 55 billion | 33 billion | 5.5 million |

b) The aforementioned promissory notes were presented to ODAO Nizhnevartovskneft for payment. The company settled its liabilities by issuing/transferring the following shares:

| Issued to | Company | Number of shares |
|---|---|---|
| Arufa Invest & Trade SA | ODAO Samotlorneft<br>ODAO Nizhnevartovskneft | 1.723.290<br>474.400 |
| Krein Invest & Trade Ltd | ODAO Samotlorneft<br>ODAO Priobneft<br>ODAO Belozerneft | 1.718.770<br>62.126.620<br>180.002.035 |
| Lotharco Trading Ltd | ODAO Nizhnevartovskneft<br>ODAO Priobneft<br>ODAO Belozerneft | 430.825<br>63.021.732<br>179.024.765 |

c) The shares were then sold to entities and individuals related to Alfa Bank Group, Russia for the following consideration:

18

Case 1:12-mc-00186-JBW   Document 3-44   Filed 03/09/12   Page 20 of 44 PageID #: 502

C29985

| Company | | Number of shares | Average Price US$ | Proceeds US$ |
|---------|---|---------|---------|---------|
| ODAO Samotlorneft | | 3,442,060 | 10.98 | 37,799,760 |
| ODAO Nizhnevartovskneft | | 905,225 | 41.42 | 37,498,655 |
| ODAO Priobneft | | 125,148,352 | 0.30 | 37,478,242 |
| ODAO Belozerneft | | 359,026,800 | 0.10 | 37,406,234 |
| Total | | | | 150,182,891 |

Additionally, Arufa Invest & Trade SA sold the following investments that it and Operator Trade Center Ltd (see section 13.2) had previously acquired to entities and individuals related to the Alfa Bank Group, Russia:

| Company | No of shares | US$ |
|---------|---------|---------|
| Tumenskaya Oil | 113.878.382 | 125.000.000 |
| Priobneft | 13.440.000 | 10.021758 |
| Belozerneft | 60.027.000 | 10.093.766 |
| Nizhnevartovskneftgas | 1.918.474 | 60.000.000 |
| Samotlorneft | 679.653 | 9.700.240 |
| Nizhnevartovskneft | 74.587 | 10.001.345 |
| Total | | 224.817.109 |

CCT Consul Consult and Trade Establishment loaned Arufa Invest & Trade SA an amount of US$ 83 million for the purposes of the transaction (see section13.1). Operator Trade Center Ltd had invested US$ 48.8 million in shares of TNK (see section 13.2).

We were not able to obtain access to the records of Arufa Trade Invest & Trade SA as Mr Chernoi was not a beneficial shareholder of this entity. We were therefore unable to identify the transaction flows through the company's records or to obtain documentary evidence regarding the above transactions. The above information was provided by lawyers working for Mr Chernoi and his partners, namely Iskandar Mahmudov, Michael Nekritz and Andrei Bokarev (see section 10).

Of the total proceeds of approximately US$ 375 million from the sale of TNK shares, US$362 million were distributed as follows:

19

C29986

|  | 1998 US$ million | 1999 US$ million | Section |
|---|---|---|---|
| Operator Trade Center Limited | 68 | 162 | 13.2 |
| Zeevi Global Telecommunications |  | 112 | 9 |
| EMTF | 20 |  | 7 |

## 7  Eastern Market Telecom Fund (EMTF)

Eastern Market Telecom Fund Limited is an international business company established in August 1997 under the laws of the Commonwealth of the Bahamas.

The subscribers to EMTF's share capital were Rojena Services Limited (US$ 38 million), Neoton Management Limited (US$ 34 million) and European Minerals Trading Company Establishment (US$ 28 million) that was paid up in 1997.

The requisite funds were provided by CCT Consul Consult & Trade Establishment (US$ 80.1 million, section 13.1) and by Arufa Invest & Trade (US$ 20 million, section 6).

During 1998 the Fund invested an initial amount of US$ 60 million to purchase 99,9 per cent of the issued share capital of Mobitel EAD A.D., Bulgaria's largest mobile telephone operator.  The actual payment was made to CCT Consul Consult & Trade Establishment which had originally paid the purchase price to the sellers.

During 1998 the Fund advanced loans amounting to DM  44 million (approximately US$ 26 million) to Mobitel EAD  to finance its investment program.  The balance of loans outstanding at 31 December 2000 included accrued interest for approximately DM 48,5 million (US$ 28.5 million).

During 2000, 5 per cent of the shares of Mobitel were transferred to M.C.G. Holding Limited, a Cyprus entity beneficially owned by Mr Chernoi.

We reviewed the audited financial statements for EMTF for the periods ended 30 September 1998 and 30 September 1999 that were audited by Panel Kerr Forster, Nassau, Bahamas and who had issued  unqualified audit opinions.

We also reviewed the consolidated financial statements of Mobitel EAD for the years ended 31 December 1997 to 31 December 2000 that were audited by Arthur Andersen OOD, Bulgaria.

Case 1:12-mc-00186-JBW Document 3-44 Filed 03/09/12 Page 22 of 44 PageID #: 504

C29987

During November 2000, a Protocol of Intentions was signed between Mr Chernoi and Lev Levaev under which Mr. Levaev was to purchase 100 per cent of the shares in Mobitel EAD for a total consideration of US$ 1.137 billion. On 27 March 2001, we were told that following the receipt of the requisite approvals from the Bulgarian regulatory authorities, EMTF transferred the shares in Mobitel EAD to LL Telecommunication Holding B.V. a Dutch entity that was ultimately owned and controlled by Lev Levaev.

The shares of LL Telecommunication Holding B.V. were subsequently transferred on 5 April 2001 to Mr Uri Bregman, an Israeli advocate, as trustee for the sale until such time as Lev Levaev was able to pay the consideration price. It soon became evident that Lev Levaev was unable to pay and the shares in LL Telecommunication Holding B.V were eventually transferred in January 2002 to Dr Werner Lobl, an Austrian advocate in trust for EMTF. The shares were eventually sold for US$ 680 million to a consortium of five investors who created an Austrian registered holding entity, Mobitel Holding GmbH for that purpose.

We are advised that the Bulgarian fiscal authorities investigated the transaction and that all necessary approvals and permits have been issued. We reviewed a copy of the stock purchase agreement and copies of the bank statements evidencing the payment of the sale proceeds into the Fund's bank accounts with the Austrian Postal Savings Bank.

It shall be noted that EMTF, Rojena Services Ltd, Neoton Management Ltd and European Minerals Trading Establishment were all managed and controlled by Mr Todor Batkov, a Bulgarian advocate that acted as Mr Chernoi's fiduciary and nominee, controlling various other fiduciaries and acting as the sole point of contact. Mr Batkov advised us that he was the creator of the holding structure and was responsible for all negotiations that were made with regard to the purchase and eventual sale of Mobitel EAD.

21

## 8   US real estate transactions in USA

During 1993 Mr Chernoi invested in a number of real estate properties in the United States where he made a profit of approximately US$26 million from their eventual disposal and from which he received approximately US$14 million by way of interest on loans granted to various entities to fund the transactions.

A number of U.S. entities that were either controlled by or acting on behalf of Mr Chernoi purchased loan notes and leases from financial institutions that had granted loans secured by mortgages to customers that had defaulted on their repayment obligations. By selling the loan notes and leases the financial institutions realised part of the debt due to them from their customers.

Subsequently, the mortgages were crystallized and the properties were transferred to other companies as listed below:

| Company acquiring notes | Item | Consideration U.S. million | Property name | Subsequent transferee |
|---|---|---|---|---|
| Around The Clock Corp | Notes | 12,0 | Manhattan Industrial Center | CMC MIC Holding Company L.L.C |
| LIC Mortgage Corp. | Notes | 14,0 | Falchi Building | CMC Falchi Building Co. L.P. |
| The Factory L.P. | Lease | 3,0 | The Factory | CMC Factory Holding Company L.L.C. |
| Center Building | Notes | 6,125 | Center Bulding | CMC Center Holding Company L.L.C. |
| | | <u>35,125</u> | | |

During 1998 and 1999 the above properties were sold for a consideration of US$114 million resulting in a profit of US$78 million.

Each of the transferee companies had common and preferred share capital. MC Holding

Ltd, a company beneficially owned by Mr Chernoi owned the whole of the preferred capital that was in each case subject to preferential interest of 10 per cent per annum and also owned 52 per cent of the common share capital.

The loans which amounted to US$36 million were granted by CCT Consul Consult and Trade Establishment.

We traced all of the loan advances as well as the repayment of capital and interest to the bank account of CCT Consul Consult and Trade Establishment. We also obtained and reviewed the relevant contracts for the granting of the loans, the purchase of the loan notes, the transfers of the properties and contracts for the eventual sale of the properties as well as correspondence with the US lawyers that advised on the transactions.

Following the sale of these properties, MC Holdings Ltd received an amount of US$26 million as its share of the profits realised on disposal and a further US$14 million was received by CCT Consul Consult and Trade Establishment as preferred interest on the preferential capital.

23

9     **Bezeq/Zeevi Global Communications Limited**

Under an option agreement dated 21 October 1999 Zeevi Global Communications Ltd,
a British Virgin Islands international business company granted to Tenida Anstalt, a
trust created under the laws of the Principality of Liechtenstein, an option to acquire 50
per cent of the share capital of C.S.S Computer Systems Services BV (CSS), a company
incorporated under the laws of the Netherlands.

We are advised that Zeevi Global Communications Ltd is beneficially owned by Gad
Zeevi, a businessman resident in Israel. Mr Chernoi is the sole beneficial shareholder of
Tenida Anstalt.

The Option Agreement, of which we obtained a copy from the documents in the
Liechtenstein court, stated that CSS had created two wholly owned Israeli companies,
namely Zeevi Communications Holdings Ltd and Zeevi Communications-Management
& Financing Limited on 10 October 1999. These companies were formed for the
purpose of purchasing 20 per cent of the share capital of Bezeq, the Israeli
Telecommunications Corporation Limited from Cable & Wireless Plc for a purchase
price in the region of US$ 650 million.  For this purpose the Israeli companies were to
enter into a Stock Purchase Agreement with Cable & Wireless plc.

The option was granted for a period of 5 years from the date of exercise of the Stock
Purchase Agreement with Cable & Wireless, and could be extended at Tenida's sole
discretion by providing 90 days' notice prior to the expiry of the first five-year period.

The option price was determined at 50 per cent of the cost of purchasing the shares in
Bezeq.

Tenida could exercise the option only if it should "...have obtained all licenses and
permits required for the holding (directly or indirectly) of such quantity of shares in
Bezeq, duly issued by the Israeli Ministry of Communications and any other relevant

24

Israeli authority, as may be required under all relevant laws and regulations.."

The consideration for the option stipulated that:

(a) the delivery to Zeevi Global Communications Ltd within 40 days of the execution of the stock purchase agreement with Cable & Wireless Plc of an irrevocable, unconditional, "on demand", transferable and endorsable bank guarantee or stand-by letter of credit of US$ 150 million valid for a period of 5 years from the date of its issuance

(b) a bank guarantee or stand-by letter of credit for US$ 30 million valid for 60 days and which was required to finance the deposit that was required to be made to Cable & Wireless Plc under the stock purchase agreement on its execution

(c) if any amounts were paid under the second guarantee in (b) above, then such amount paid would be deducted from the first guarantee so that Tenida would not provide guarantees exceeding the sum of US$ 150 million. This amount could be reduced should Zeevi require less to finance the stock purchase transaction

(d) during the period of the option, the Israeli companies (Zeevi Communications Holdings Ltd, Zeevi Communication Management & Financing Ltd) would utilise the dividends received from Bezeq to proportionally repay the loans raised from financial institutions (amount not specified) and the bank guarantee provided by Tenida. The shares of CCS would be held by an escrow agent and 50 per cent of any dividends received from the Israeli companies would be placed in the escrow account

(e) the escrow account would be distributed to Tenida as its consideration for providing the guarantees

(f) in the event that the option was not exercised at the end of the first five year period, then Zeevi Global Communications Ltd would return the bank guarantees provided by Tenida together with the amount collected in the escrow account, provided that this amount would be at least US$ 100 million, otherwise Zeevi would make up the

25

Case 1:12-mc-00186-JBW   Document 3-44   Filed 03/09/12   Page 27 of 44 PageID #: 509

shortfall.

An Escrow Agreement and amendment to the original option agreement was signed on 30 November 1999 between the parties and Financial Assets and Investments (FAI), a company registered in the BVI beneficially owned by Mr Gad Zeevi.  Mr Michael Komissar and Mr Gad Naschitz were appointed as the escrow agents.

The terms of this agreement were the following:

a) Mr Komissar and Mr Naschitz were appointed as the escrow agents, as agreed under the original Option Agreement.

b) A number of amendments to the original Option Agreement were made to reflect the fact that the entire issued share capital of Zeevi Communications Holdings Ltd and Zeevi Communications-Management & Financing Ltd were transferred to Zeevi International Communications Ltd (ZIC), a new Israeli company incorporated on 29 November 1999 which was entirely owned by Gad Zeevi instead of CSS as was originally agreed.

c) Consequently, all rights and obligations of Zeevi Global Communications Limited arising from the Option Agreement now lie with Mr. Gad Zeevi and the option granted to Tenida to acquire 50 per cent of Zeevi was amended to an option to acquire 50 per cent of ZIC.

d) The bank guarantee and preliminary bank guarantee were replaced by total cash advances of US$143million that would be deposited to the bank account of FAI with The First International Bank of Israel Ltd, Tel Aviv as security against letters of credit for the same amount issued by The First International Bank of Israel, Switzerland in favour of Bank Hapoalim B.M. and serving as partial security for the loan of US$ 643 million granted to Zeevi Communications-Management & Financing Ltd for the purchase of the Bezeq shares.

e) Gad Zeevi would deliver to Tenida all share certificates of FAI which were to be held by Tenida for as long as the Option Agreement was in force.

f) Upon the signing of the Escrow Agreement it was agreed that undated blank

26

Case 1:12-mc-00186-JBW   Document 3-44   Filed 03/09/12   Page 28 of 44 PageID #: 510

C29993

Deeds of Transfer for 50 per cent of the issued shares of ZIC together with resolutions of the board of directors of ZIC would be deposited with the escrow agents.

g)   The escrow agents were explicitly instructed in the agreement that they should "not sell, transfer, deliver, pledge, encumber or otherwise transact in the ZIC Shares, or any part thereof, by virtue of the Escrow Documents held by the Escrow Agent, but in full compliance and in strict adherence to the provisions of Israeli Telecommunications Law 1982 (hereinafter: "Bezeq Law"), and all other Israeli laws, statutes, by-laws and regulations, including without limitation to the Bezeq Order (Determination of Essential Services Provided by Bezeq, The Israeli Telecommunications Corporation Ltd), 1997 (hereinafter: "Bezeq Order")". Furthermore they were not to "..sell or transfer the ZIC Shares....nor encumber the pledge shares or grant any rights in ZIC shares in favour of a person not having all the necessary due permits to acquire the ZIC Shares under the above-mentioned Bezeq Law and Bezeq Order.."

Tenida granted the aforementioned guarantees through LGT Bank in Liechtenstein by providing cash collateral for US$ 143 million that it in turn received from the following entities:

|                          | US$ million | Section |
|--------------------------|-------------|---------|
| Arufa Invest & Trade SA  | 112.0       | 6       |
| Operator Trade Center Ltd | 11.3       | 13.2    |
| Carbopower Establishment | 7.9         |         |
| Artex Corp.              | 4.1         |         |
| MTF Group                | 3.0         |         |
| Preston Services Ltd     | 1.7         |         |
| Other                    | 3.0         |         |
|                          | 143.0       |         |

We vouched the aforementioned money flows through the general ledger of Tenida and to the bank statements issued by LGT Bank Liechtenstein.

The cash collateral plus interest was sufficient to fully collaterise the guarantee. We are advised that the guarantees were eventually exercised and that the bank withdrew the

27

C29994

cash collateral that was provided.

We also reviewed letters of correspondence exchanged between Zeevi Global Communications Ltd and Tenida that revealed that there was a dispute between the parties as Tenida felt that Zeevi had used funds provided for purposes other than had been agreed between the parties.

## 10   Investments in Russia

Under a joint venture agreement made around July 1997, Mr Chernoi agreed to finance the acquisition of controlling stakes in various heavy manufacturing industries in the Russian Federation using substantially the proceeds received from the sale of his interest in TWG.   The object was to purchase heavy industries that at the time were facing considerable financial difficulties and to provide the necessary capital required for the introduction of new technologies and working capital so as to allow the factories to compete internationally and become profit making.

Mr Chernoi's role was limited to simply providing the necessary financing in return for which he received 50 per cent of the shares purchased under the venture.   The other joint venture partners, namely Iskander Mahmudov, Michael Nekritz and Andrei Bokarev were responsible for making the necessary arrangements for the acquisitions, setting up the holding structures and also exercised the management of the acquired companies.  Under the agreement, Mr Chernoi's effective voting rights in the acquired companies were to be exercised by his partners in the venture.

The following investments were made over the period from July 1997 to July 2000:

| Name of entity | Date acquisition registered | % shareholding | Purchase price US$ mil | Additional financing provided US$ mil | Total Investment US$ mil |
|---|---|---|---|---|---|
| KuzbassRazrez | 1-8-1998 | 51 | 80 | 30 | 110 |
| Ural Mining and Metallurgical Co | 3-12-1998 | 70 | 150 | 50 | 200 |
| Altai Koks | 15-5-1999 | 64 | 25 | 15 | 40 |
| Energoprom group | 9-9-1999 | 65 | 40 | 20 | 60 |
| Total | | | 295 | 115 | 410 |

Mr Chernoi disposed of his interests in the aforementioned joint venture controlled entities under an agreement between the parties made on 31 January 2001.  The

Case 1:12-mc-00186-JBW   Document 3-44   Filed 03/09/12   Page 31 of 44 PageID #: 513

C29996

aforementioned joint venture partners of Mr Chernoi agreed to purchase his interest at a valuation and total consideration of US$ 985 million to be paid in agreed installments from 1st January 2005 to 1st January 2009. The parties were instructed to immediately transfer Mr Chernoi's interests and to cancel all instruments of trust issued in his favour. The other parties acknowledged that their relationship changed from that of partners to that of simple debtors.

The joint venture partners provided us with a copy of a declaration, explaining the nature of their relationship, the investments that were made and the terms of Mr Chernoi's subsequent departure together with extracts from the relevant share registries showing that the aforementioned shareholdings were registered in the names of a number of offshore/foreign entities. We were also provided with the relevant statutory and incorporation documents of the holding entities together with the declarations of trust and share certificates that were issued by their professional nominees. The said declarations of trust were issued in favour of Mr Chernoi's joint venture partners and to other individuals controlled by them and they in turn issued Mr Chernoi with declarations of trust for fifty per cent of those shares that were beneficially owned by him. We verified that the relevant instruments of trust were cancelled on conclusion of the sale 31 January 2001.

The aforementioned investments were not made by simple purchase agreements. The shareholding was acquired in many cases by a complicated series of transactions involving the purchase of promissory notes and the subsequent renegotiation of the debt for shares. We were also advised that a large number of payments were made to a large number of entities to obtain blocks of available shares. During our discussions with the joint venture partners we were advised that the whole process of acquiring the relevant shareholdings was controlled by themselves and by their legal teams. Mr Chernoi was not aware of the specific details of the transactions involved.

The aforementioned financial resources were provided by Mr Chernoi as follows:

| Name of entity | 1997 US$mil | 1998 US$mil | 1999 US$mil | 2000 US$mil | Total US$mil | Section |
|---|---|---|---|---|---|---|
| CCT Consul Consult | 174.5 | 10.0 | 5.0 | 7.5 | 197.0 | 13.1 |

30

| Operator | - | 65.0 | 100.8 | ·50.0 | 215.8 | 13.2 |
| Total · | 174.5 | 75.0 | 105.8 | 57.5 | 412.8 | |

The above table summarises the payments made. They comprise of a large number of often sizeable amounts, most of which were unsupported by specific contracts or agreements and which have been categorized as above on the basis of representations made by Mr Chernoi.

31

C29998

## 11   Investments in Bulgaria

### 11.1 Roseximbank AD

Mr Chernoi purchased 36 per cent of the issued share capital of Roseximbank AD, a Bulgarian bank in Sofia. The contract with the main shareholder of the bank, Emil Kyulev, was concluded in July 1998 under which it was agreed that the shares would be acquired at their nominal value (BL3.6 billion) and that the purchaser would subscribe for 36 per cent of a new issue of shares having nominal value of BL 20 billion for a further BL 7.2 billion.

Mr Chernoi subsequently purchased a further 13.85 per cent such that he presently owns 19 936 353 shares out of a total issued share capital of 40 000 000 shares of BLG 1 each.

We traced the shareholdings as at 31 December 2001 to the following companies owned by Mr Chernoi:

|  | No. of shares | US$ |
|---|---|---|
| Neoton Management Ltd, Cyprus | 3 960 304 | 1.939.323 |
| M.C.G. Holdings Ltd, Cyprus | 3 837 822 | 1.639.514 |
| Sicavo Trading Ltd, Cyprus | 3 974 712 | 1.944.729 |
| Rojena Services Ltd, Cyprus | 3 912 600 | 1.913.828 |
| Beldown Trading Ltd, Cyprus | 3 660 915 | 1.650.339 |
| M & V Inn EAD, Bulgaria | 590 000 | |
| Total | 19.936.353 | 9.087.733 |

We reviewed the audited financial statements for all the aforementioned Cyprus international business companies to 31 December 2000 and also draft (unaudited) financial statements for the year ended 31 December 2001 that were prepared by K. Treppides & Associates, Certified Accountants, Cyprus whose audit reports were without audit qualifications. The results and balance sheets of these companies were in line with our expectations having regard to the information that was provided regarding the investments held.

All of the aforementioned entities were under the management of Mr. Todor Batkov who

Case 1:12-mc-00186-JBW   Document 3-44   Filed 03/09/12   Page 34 of 44 PageID #: 516

C29999

controlled the various fiduciaries that acted as nominee shareholders and directors.

### 11.1 PFC Levski AD

PFC Levski AD is a popular football club in Bulgaria having an estimated one million fans.

The issued capital of the company is BGN 500.000 comprising 50.000 shares of BGL 10 (ten) each.

Mr Chernoi controls 34 007 shares or 68,014 per cent of the capital of the company through the following entities:

M & V Inn EAD - 9 507 shares;

Sedian Commercial Limited, Cyprus - 24 500 shares.

### 11.2 Standard News EAD

Standard News publishes the third largest daily political newspaper Standard with average daily circulation of 70 000. The capital of the company is BGN 360 000 all of which are owned by MCG Holding Limited, Cyprus. MCG purchased the newspaper for an amount of US$2 million along with 50 per cent of the capital of 7 Dni Sport newspaper.

### 11.3 7 DNI Sport EOOD

7 DNI Sport EOOD publishes the largest sports daily newspaper, 7 DNI Sport, with average daily circulation of 25 000.

### 11.4 M & V Inn EAD

Mr Chernoi is the sole shareholder of M & V Inn EAD, a company registered in Bulgaria with share capital of BGL 640 000.

The company has the following assets:

a)    1 000 sq. metres prime land situated in the centre of Sofia, and which was purchased at a cost of US$ 1 million

b)    700 sq. metres prime land with an old building situated in the centre of Sofia, and

33

which was purchased at a cost of US$ 0.5 million.

c)      590 000 shares in the capital of Roseximbank AD and 9 507 shares in the capital of
PFC Levski AD as described above.

## 11.5 Cherno More AD, Varna

Cherno More AD, Varna is a factory producing radar equipment for civil and military
purposes.

The capital of the company comprises 508 441 shares, 70,69 per cent of which are owned
by the Workers and Managers Company Cherno More 2001 AD, and 29,31 per cent are
owned by the Bulgarian state.    We are advised that Mr Chernoi  beneficially owns 51 per
cent of the share capital of the Workers and Managers Company Cherno More 2001 AD
through another company beneficially owned by Mr Chernoi. The shares were purchased
for EUR 400.000.

## 11.6 Liberty Metals Group, Burgas

Liberty Metals Group is a company specialising in ship cutting for scrap metal purposes,
with capacity of 200.000 tonnes annually. Its facilities are located in the Bourgas shipyard.

The capital of the company comprises BGL 4 426 000,  67 per cent of which is beneficially
and by Mr Chernoi through Marcoma Overseas Limited, a Cyprus registered company that
is managed and controlled by Br Batkov. The other shares are held by the Bourgas
Shipyard.

## 11.7 M.C.G. Holding Limited

M.C.G. Holding Limited was incorporated on 25 November 1998 in Cyprus as a limited
liability company and as we are advised, Mr Chernoi is the sole beneficial shareholder of
the company.  We have reviewed the company's financial statements for the period from
incorporation to 31 December 1999 and for the year ended 31 December 2000, audited by
G. Papadopoulos & Co, Certified Public Accountants, Cyprus.

The balance sheet of the Company as at 31 December 2000 includes the following

34

C30001

Investments in Bulgaria:

| Company | Date of acquisition | Number of shares | Holding % | Cost US$ |
|---|---|---|---|---|
| Roseximbank | 23/06/99 | 590.000 | 2,95 | 303.795 |
| Planeta Sport | 18/11/99 | 501 | 50,1 | 12.898 |
| M Tel Sport | 15/04/99 | 2.750 | 55,0 | 15.106 |
| Mobil Tel | 18/04/00 | 61.897 | 5,0 | 4.889.229 |
| Standard News | 11/04/00 | 324.000 | 90,0 | 1.000.000 |
| Seven Days Sport | 29/05/00 | 50 | 50,0 | 1.000.000 |
| | | | | 7.221.028 |

MCG Holding received loans of DM 5 million and  US$ 2 million from Eastern Market Telecom Fund (EMTF).

C30002

## 12  Investments in Kazakhstan

During the period 1997 –1998 CCT Consul Consult and Trade Establishment advanced a total amount of US$38.7 million to Mineral Resources Establishment for the purchase of shares in Kazakhstan metals producers (see section 13.1).

We obtained extracts of the share registries of the following companies showing that Kazakh Mineral Resources Corporation (KMRC) was the registered owner of the following shares:

|  | Per cent (%) |
|---|---|
| Eurasian Energy Corp | 36,5 |
| AOOT Sokolovska Sarbaiskaye | 28,5 |
| Kazchrom | 31,6 |
| Aluminium of Kazakhstan | 31,0 |

We obtained copies of the articles of association of KMRC which showed that 40 per cent of the company was owned by KMR-1 Ltd, a Maltese company.   We also obtained copies of the relevant statutory documents of the aforementioned companies showing that the shares of KMR-1 Ltd were in turn owned by Kazakh Mineral Resources Limited, again registered in Malta.  This company's shares were in turn owned by International Mineral Resources Ltd of Malta whose registered shareholder was Andrei Malevski.  We were provided with a copy of a declaration of trust under which Andrei Malevski declared that he held the shares of International Mineral Resources Ltd 50 per cent for his brother, Anton Malevski, and 50 per cent for Michael Nekritz.  Andrei Malevski was a director of all of the aforementioned holding companies.  Mr Nekritz advised us that he was acting as nominee for Mr Chernoi.

Towards the end of 1999 Andrei Malevski (on behalf of the beneficial shareholders) signed an agreement selling the effective stake in KMRC for US $100 million.  We are advised that subsequently KMRC and the Maltese companies were liquidated.  Mr Chernoi's share in the proceeds from the sale (US$ 50 million) were remitted to Operator Trade Center Ltd in 2000 (see section 13.2).

Anton Malevski held the only copy of the sale agreement and it has not been possible to trace a copy of it since his death.

The US$ 100 million sale price would place a value of approximately US$ 800 million in the Kazakh companies.   The financial statements of the aforementioned entities for the year ended 31 December 1998, prepared by Deloite & Touche showed the following net asset positions: .

|  | Net assets ($ million) |
|---|---|
| Eurasian Energy Corp | 4,0 |
| AOOT Sokolovska Sarbaiskaye | 77,0 |
| Aluminium of Kazakhstan | 41,0 |
| Divisions of Kazchrom: | |
| Ferrochrome | (9,5) |
| Aksusky Ferro Alloy | 12,8 |
| Donskoy Gok | 58,6 |
| Total | 183,9 |

The sale price represented approximately four times the net asset value of the entities concerned.  This is considered reasonable given the strategic position and potential of the companies concerned.

C30004

## 13  Main financing entities

The main financing entities owned by Mr Chernoi were CCT Consul Consult & Trade Establishment, Operator Trade Center Limited, Furlan Anstalt and Tenida Anstalt.

### 13.1  CCT Consul Consult and Trade Establishment, Liechtenstein

CCT Consul Consult and Trade Establishment acted as a major financing company for Mr Chernoi's business activities. The company was incorporated in Liechtenstein on 28 April 1987 and was purchased by Mr. Chernoi in 1993.

We obtained access to the company's documents seized by the Liechtenstein courts and reviewed all bank statements and payment orders. There were no copies of contracts filed, as there was no legal requirement to keep such documentation in the Principality of Liechtenstein up until 1999.

The following is a summary of the main cash inflows and outflows that occurred during the period:

|  | US $ million | Section |
|---|---|---|
| *Cash inflows* | | |
| Transworld Metals SA | 437.9 | *3* |
| Net cash flows from US real estate transactions | 18.9 | *8* |
| Net receipts from Blonde | 16.2 | *4.3* |
|  | 473.0 | |
| *Cash outflows* | | |
| Nash Investments Ltd –Russian joint venture | (174.5) | *10* |
| Arufa Invest & Trade SA | (83.0) | *6* |
| EMTF net advances made | (20.0) | *7* |
| Acquisition of Mobitel (EMTF) | (60.1) | *7* |
| Payments in respect of Mobitel obligations | (31.3) | *7* |
| Mineral Resources Establishment (Kazakhstan) | (38.7) | *12* |
| Operator Trade | (10.0) | *13.2* |
| Other cash flows –Russian joint venture | (22.5) | *10* |
| Net other cash flows to finance aluminium activities | (30.8) | *5.1* |
| (472.0) | | |
| *Net cash balance at 31 December 2000* | 1.0 | |

38

Case 1:12-mc-00186-JBW   Document 3-44   Filed 03/09/12   Page 40 of 44 PageID #: 522

C30005

### 13.2  Operator Trade Center Limited, Gibraltar

Operator Trade Center Ltd was incorporated in Gibraltar on 16 October 1996 as a limited liability company. The company did not carry out any trading activities and was used as a financing company.

We have reviewed the company's ledgers for the years from 1996 to 1998 and summarised the main transactions in the table below. For the years 1999 to 31 March 2001 we reviewed copies of the company's bank statements. The major transactions are summarised below.

| | 1996 | 1997 | 1998 | 1999 | 2000 | 31 March 2001 | Total | Section |
|---|---|---|---|---|---|---|---|---|
| | US$ mil | US$ mil | US$ mil | US$ mil | US$ mil | US$ mil | US$ mil | |
| *Inflows* | | | | | | | | |
| Blonde Investments Ltd | 1.4 | 13.1 | 19.8 | | | 18.0 | 52.3 | *4.3* |
| Proceeds from sale of Mineral Resources Establishment | | | | | 50.0 | | 50 | *12* |
| Repayments of loans to aluminium businesses | 0.2 | 2.5 | | | 67.1 | | 69.8 | *5.1* |
| CCT Consul Consult & Trade Establishment | | 1.1 | | | | 10.0 | 11.1 | *13.1* |
| Neoton Management Ltd | | 16.0 | | | | | 16.0 | |
| Arufa Invest & Trade Establishment | | 0.3 | 68.2 | 162.1 | | | 230.6 | *6* |
| Nash Investments Limited | | | 15.1 | | | | 15.1 | |
| | 1.6 | 33.0 | 103.1 | 162.1 | 117.1 | 28.0 | 444.9 | |
| *Outflows* | | | | | | | | |
| Sundry loans and advances | 1.4 | 8.4 | | | 20.0 | 1.1 | 30.9 | |
| Investments under Russian JV | | | 65 | 96.3 | 50.0 | | 211.3 | *10* |
| Tenida Anstalt for Bezeq loan | | | | 11.3 | | | 11.3 | *9* |
| Tenida Anstalt for other investments | | | | | | 1.0 | 1.0 | |
| Payments for shares in TNK | | 19.8 | 29.0 | | | | 48.8 | *6* |
| Commissions | | | 14.1 | 14.5 | 7.7 | | 31.8 | |
| Loans and investments in aluminium business | | | | 35.5 | 39.4 | | 74.9 | *5.1* |
| Investments in Bulgaria | | | | | | 25.9 | 25.9 | *11.2* |
| | 1.4 | 27.2 | 108.1 | 157.6 | 117.1 | 28.0 | 439.4 | |
| *Net movement* | 0.2 | 4.8 | (5.0) | 0 | 0 | 0 | 0 | |
| *Balance at the beginning of the year* | | 0.2 | 5.0 | 0 | 0 | 0 | 0 | |
| *Balance at the end of the year* | 0.2 | 5.0 | 0 | 0 | 0 | 0 | 0 | |

Apart from the documentation with regard to the Russian Joint Venture, we traced

payments to supporting contracts that were mainly loan agreements which totalled approximately US$ 126 million.

### 13.3 Furlan Anstalt, Liechtenstein

Furlan-Anstalt was incorporated in Liechtenstein in August 1973 and was purchased by Michael S Chernoi in 1992.

We have reviewed the company's financial records, which have been seized by the Liechtenstein Courts and have identified the following major cash payments and receipts during the years from 1992 to 2000.

|  | US$ million |
|---|---|
| *Inflows* |  |
| Galaxy | 8.4 |
| Repayments of loans granted | 25.3 |
| Sotinco | 1.4 |
| Semyon Kislin | 2.0 |
| Sloboda Ltd | 1.3 |
| Blonde Investment Limited | 6.4 |
| Sale of shares in AOZT "Concern Podolsk" | 6.0 |
|  | 51.8 |

|  | US$ million |
|---|---|
| *Outflows* |  |
| Drawings | 19.3 |
| Trans commodities | 1.1 |
| Blonde Management | 4.6 |
| CCT Consul Consult & Trade Establishment | 1.6 |
| Other loans | 23.6 |
|  | 50.2 |

We have traced the above amounts to the Furlan's bank accounts but we did not find any supporting documentation for these transactions so as to be able to identify their nature.

40

C30007

### 13.4 Tenida Anstalt, Liechtenstein

Tenida Anstalt was incorporated in January 1958 in Liechtenstein and was purchased by Mr Chernoi in 1992.

We have reviewed copies of the general ledgers of the Company for the years from 1995 to 1998 and we did not identify any significant transactions during those years.

During 1999 Tenida entered into the agreement with Zeevi Global Communications Ltd, referred to in section 9.

C30008

### 14.  Net assets and conclusion

Michael Chernoi has accumulated approximately US$2.3 billion in wealth from 1988 to
2001 from the following activities:

|  |  | US$ million | Section |
|---|---|---|---|
| Early trading and barters | (1989-1993) | 60 | 2 |
| Trans -World Metals | (1993-1996) | 28 | 3 |
|  | (1997) | 410 | 3 |
| Other aluminium metals trading: |  |  |  |
| Tradalco group | (1996-1997) | 109 | 4.1 |
| Liberty Metals Group SA | (1996-1997) | 9 | 4.4 |
| Alucor Trading SA | (1997-1998) | 40 | 4.1 |
| Alucor Alumina SA | (1998) | 8 | 4.1 |
| Aluminium of Siberia | (1998 –2000) | 104 | 4.2 |
| Blonde Investment Corp.Ltd | (1995-2000) | 95 | 4.3 |
| Estimated gain on  Sibirsky Aluminium | (2001) | 50 | 5 |
| Gain on US real estate transactions | (1998-1999) | 40 | 8 |
| Gain on sale of TNK | (1998-1999) | 212 | 6 |
| Gain on sale of Mobitel | (2001) | 568 | 7 |
| Gain on sale of investments in Russia | (2001) | 575 | 10 |
|  |  | 2,308 |  |

As at the 31 December 2001  Michael Chernoi's main assets were as follows:

|  | US$ million |
|---|---|
| Cash and bank balances: |  |
| - received on sale of Sibirsky Aluminium | 91 |
| Receivables: |  |
| - for sale of Mobitel (net) | 670 |
| - for sale of Sibirsky Aluminium | 352 |
| - for sale of Investments in Russia | 985 |
| - Gad Zeevi | 143 |

42

Investments in Bulgarian assets at cost (including loans granted)        26

                                                                      2.267

Our review of the available bank statements revealed that the majority of transactions comprised large value bank transfers and no evidence of suspicious or criminal dealings was identified. Further, as at the time of our report the investigations into the affairs and records of entities owned by Mr Chernoi and that were carried out by the authorities in Switzerland and in Liechtenstein were terminated on the grounds that there was insufficient evidence to suggest that any offence had been committed.

Mr Chernoi's activities were largely carried out through nominees, agents and managers and significantly they were the signatories of the bank accounts of the companies that they managed. We consider that we have received adequate explanations from these persons.

Mr Chernoi's activities in aluminium trading since his departure from Trans-World Group are well documented and were audited by reputable auditors. This was largely due to the manager's concerns that adequate documentation be maintained for the purposes of maintaining banking relations and good order.

Similarly, the investment and proceeds from the eventual sale of Mobitel are well documented and are supported by audited financial statements of international audit firms.

Michael Chernoi's other activities involved mainly financing and investment activities, in entities in which he did not exercise hands on management or control. Such activities were carried out by his "partners" who eventually purchased his interests. To a large extent the documentation concerning the actual investments made was controlled by his partners and was not made available to us. Having said that, our discussions with his partners did not reveal any discrepancies with what we were advised by Mr Chernoi and further the explanations that we received were consistent with the overall money flows that we identified in the bank accounts of the financing entities. The degree of secrecy concerning actual ownership of shares in Russia is common especially where such investments are in politically sensitive or strategically important assets.

43