MISC12 - 0186

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

*U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

2012 MAR -9  AM 10: 42

FILED
CLERK

| |
|---|
| In the Matter of the Application of<br><br>Oleg Vladimirovich Deripaska, for an order, pursuant to 28 U.S.C. § 1782, to obtain discovery from Arik Kislin for use in an action pending in the High Court of Justice, Queen's Bench Division, Commercial Court, styled *Michael Cherney v. Oleg Vladimirovich Deripaska*, Claim No. 2006 Folio 1218. |

Misc. No. _____

WEINSTEIN, J.

**MEMORANDUM OF LAW IN SUPPORT OF
OLEG VLADIMIROVICH DERIPASKA'S APPLICATION
PURSUANT TO 28 U.S.C. § 1782 FOR AN ORDER COMPELLING
<u>DISCOVERY FOR USE IN A FOREIGN LITIGATION</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS .......................................................................................2

I.      THE ENGLISH ACTION.............................................................................2

II.     MR. CHERNEY'S ASSOCIATION WITH ARIK KISLIN ...............................3

III.    THE EVIDENCE MR. DERIPASKA SEEKS FROM MR. KISLIN ..................4

        A.      Blonde Management Corporation..................................................4

        B.      Other Corporations Owned or Operated by Mr. Cherney.................6

        C.      Documents Concerning Mr. Cherney's Ties To Organized Criminal
                Groups ("OCGs")....................................................................7

        D.      Documents Concerning the Purported Sources of Mr. Cherney's Wealth ...........12

ARGUMENT .......................................................................................................16

I.      MR. DERIPASKA'S APPLICATION SATISFIES THE REQUIREMENTS OF
        28 U.S.C. § 1782 ...................................................................................16

II.     THE COURT SHOULD EXERCISE ITS BROAD DISCRETION UNDER §
        1782 AND GRANT MR. DERIPASKA'S APPLICATION ..........................17

        A.      The Requested Discovery May Be Otherwise Unobtainable Absent § 1782
                Relief....................................................................................18

        B.      The English High Court of Justice Would Be Receptive to the Requested
                Discovery Because It Is Highly Relevant to the English Action ...........19

        C.      Enforcing § 1782 Here Would Not Be Unduly Intrusive or Burdensome............20

CONCLUSION.....................................................................................................21

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re Application of Esses,*
101 F.3d 873 (2d Cir. 1996)..........................................................................17

*In re Application of Euromepa S.A.,*
51 F.3d 1095 (2d Cir. 1995).........................................................................18

*In re Application of Gianoli Aldunate,*
3 F.3d 54 (2d Cir. 1993)...............................................................................17

*In re Application of Guy,*
No. M. 19-96, 2004 WL 1857580 (S.D.N.Y. Aug. 19, 2004) .................................18

*In re Application of Malev Hungarian Airlines,*
964 F.2d 97 (2d Cir. 1992)...........................................................................18

*In re Application of Servicio Pan Americano de Proteccion, C.A.,*
354 F. Supp. 2d 269 (S.D.N.Y. 2004).............................................................19

*In re Grupo Qumma, S.A.,*
No. M 8-85, 2005 U.S. Dist. LEXIS 6898 (S.D.N.Y. April 21, 2005) ...................19

*Intel Corp. v. Advanced Micro Devices, Inc.,*
542 U.S. 241 (2004).............................................................................*passim*

*In re Application for an Order Permitting Metallgesellschaft AG To Take Discovery,*
121 F.3d 77 (2d Cir. 1997)...........................................................................20

## Statutes

28 U.S.C. § 1782...............................................................................*passim*

Applicant Oleg Vladimirovich Deripaska respectfully submits this Memorandum of Law in support of his Application for an order, pursuant to 28 U.S.C. § 1782, authorizing the issuance of a subpoena compelling Arik Kislin to produce certain documents for use in a judicial proceeding pending in London, England (the "English Action").

## PRELIMINARY STATEMENT

Mr. Deripaska, who is being sued by Michael Cherney[1] in the English Action, seeks narrowly-tailored discovery from third party Mr. Kislin. As explained further below, Mr. Deripaska's application satisfies each of the statutory requirements of § 1782:

(i)     the person from whom discovery is sought, Mr. Kislin, is present within the judicial district of this Court;

(ii)    the narrowly-tailored discovery requested is sought for use in a proceeding before a foreign tribunal—the High Court of Justice, Queens Bench Division, Commercial Court in London, England; and

(iii)   the application for discovery is made by an "interested person" with respect to the foreign proceeding, as Mr. Deripaska is a defendant in the English Action.

Mr. Deripaska's Application is also consistent with the factors identified by the U.S. Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004). In short, granting Mr. Deripaska's Application would serve § 1782's fundamental purpose of providing an effective means for obtaining evidence from persons in the United States in aid of litigants and tribunals in foreign litigation. Mr. Cherney's lawyers have requested that Mr. Deripaska's application should include a request for certain categories of documents. Mr. Deripaska has consented to include those categories which are accordingly set out at paragraphs 1-9 of Schedule C to the accompanying subpoena.

---

[1] Mr. Cherney's surname is transliterated from Russian in a variety of ways, including Chernoy, Cherniy, Tchernyi, and Tchernyl. For the sake of clarity, he is referred to throughout this Memorandum as "Mr. Cherney."

1

## STATEMENT OF FACTS

I.   **THE ENGLISH ACTION**

Mr. Cherney filed the English Action against Mr. Deripaska in 2006. (Declaration of Judd R. Spray, dated March 8, 2012, ("Spray Dec."), ¶ 3.) Mr. Cherney claims that he is contractually entitled to, inter alia, a portion of Mr. Deripaska's interest in a Russian aluminum company, OJSC United Company Sibirskiy Aluminium ("Sibal"). Mr. Deripaska vigorously disputes Mr. Cherney's claims, and asserts that any prior relationship between himself and Mr. Cherney arose out of an extortion racket ("krysha") through which Mr. Cherney demanded protection payments ("dolya") from Mr. Deripaska. Mr. Cherney's claims against Mr. Deripaska are set forth in an amended pleading titled "Amended Particulars of Claim," dated December 2, 2007. (Spray Dec., Ex. 1.) Mr. Deripaska's primary defenses are set forth in a pleading titled "Defence," dated March 22, 2010. (Spray Dec., Ex. 2.) Mr. Cherney's response is set forth in a re-amended pleading titled "Re-Amended Reply," dated October 27, 2011. (Spray Dec., Ex. 2A.) Messrs. Deripaska and Cherney jointly submitted a "Case Memorandum" to the English Court describing in further detail the issues in dispute. (Spray Dec., Ex. 3.)

Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") represents Mr. Deripaska in the English Action, through attorneys in its London office, and Dechert LLP ("Dechert") represents Mr. Cherney in the English Action. (Spray Dec., ¶ 3.)

II.   **MR. CHERNEY'S ASSOCIATION WITH ARIK KISLIN**

Arik Kislin[2] was a long-term agent and associate of Mr. Cherney and played an important role in Mr. Cherney's business affairs from at least 1992 until the two apparently parted ways in 2007 or thereabouts. (Spray Dec., ¶ 5.)  Evidence adduced in the English Action evidences a number of different relationships between Mr. Kislin and various corporations owned or operated by Mr. Cherney.  Prior to his apparent parting of ways with Mr. Cherney, Mr. Kislin served as a "mandator" or "beneficiary" for, and/or was authorized to "give instructions" on behalf of, various corporations owned or operated by Mr. Cherney through the Liechtenstein-based fiduciary Praesidial Anstalt and/or its subsidiary company Syndikus Treuhandanstalt (together, "Praesidial").  Set forth below is a table listing various corporate entities owned or operated by Mr. Cherney through Praesidial, and the roles that Mr. Kislin played in the management of those entities.

| CORPORATE ENTITY | MANDATOR ("M") /BENEFICIARY/AUTHORIZED TO GIVE INSTRUCTIONS ("ATGI") | DOCUMENT EVIDENCING MR. KISLIN'S AUTHORITY |
|---|---|---|
| Archers Trading Limited | Arik Kislin  ("ATGI") | Spray Dec., Ex. 4 |
| | Arnold Kislin ("ATGI") | Spray Dec., Ex. 5 |
| | Arik Kislin ("ATGI") | Spray Dec., Ex. 6 |
| Bluzwed Metals Limited | Arik Kislin ("ATGI") | Spray Dec., Ex. 7 |
| Furlan Anstalt | Arnold Kislin ("M"), ("ATGI") | Spray Dec., Ex. 8 |
| | Arnold Kislin (Beneficiary) | Spray Dec., Ex. 9 |

---

[2]   Mr. Kislin is sometimes referred to in documents as Arnold Kislin, Arnold Aric Kislin, or Arik Mikhailovitch Kislin.  In the English Action, Mr Cherney admits that Arnold Kislin is indeed the same person as Arik Kislin.  Arik Kislin should not be confused with Mr. Sam Kislin. Sam Kislin is Arik Kislin's uncle. Mr. Cherney alleges that from 1989-1992 he managed his metals and raw materials business in partnership with Trans Commodities Inc. and its president Sam Kislin. For the avoidance of doubt, there is no overlap between the disclosure application for category 6 documents in the English Action (Spray Dec., Ex. 32, ¶¶ 372-408) — which covers documents relating to Sam Kislin and Trans Commodities Inc. — and this application.

3

|  | Arnold Kislin ("ATGI") | Spray Dec., Ex. 10 |
|---|---|---|
| Galenit Foundation | Arnold Kislin ("ATGI") | Spray Dec., Ex. 11 |
| Hades Foundation | Arik Kislin ("ATGI") (on behalf of Blonde Management) | Spray Dec., Exs. 12; 13 |
| Hiler Establishment | Arnold Kislin ("M"), ("ATGI") | Spray Dec., Ex. 14 |
| Republic Establishment | Arnold Kislin ("M") | Spray Dec., Exs. 15; 16; 17 |
|  | Arnold Kislin ("ATGI") | Spray Dec., Ex. 18 |
|  | Arnold Kislin (Beneficiary) | Spray Dec., Exs. 19; 20 |
| Tenida Anstalt and Financial Assets & Investments Ltd | Arik Kislin ("ATGI") | Spray Dec., Ex. 21 |

In addition to these corporate entities, Mr. Kislin's involvement with Mr. Cherney in the company Blonde Management Corporation ("Blonde Management") is described below.  Mr. Kislin is highly likely, given his prominence in the management of Mr. Cherney's various businesses, in particular Blonde Management, to be in possession of documents relevant to matters at issue in the English Action.

III.   **THE EVIDENCE MR. DERIPASKA SEEKS FROM MR. KISLIN**

Mr. Deripaska seeks four categories of documents from Mr. Kislin: (i) documents concerning Blonde Management, which Mr. Cherney has acknowledged are relevant to the English Action but has purportedly been unable to procure from Mr. Kislin; (ii) documents concerning other corporations owned or operated by Mr. Cherney; (iii) documents concerning Mr. Cherney's ties to organized criminal groups; and (iv) documents concerning the sources of Mr. Cherney's wealth and related matters.

A.   **Blonde Management Corporation**

In the English Action, Dechert has identified Blonde Management as one of the "fiduciaries and accountants" that has provided services to Mr. Cherney in the past.  (Spray Dec., Ex. 22 at 2-3 ("Our client has used the services of the following fiduciaries and accountants from time to time . . . Blonde Management Corp., a U.S. company, provided services to our client.").)

4

Dechert subsequently informed counsel for Mr. Deripaska that Blonde Management had been owned by Mr. Kislin, (*id.*, Ex. 23 at 2), and that Dechert believed Mr. Kislin had taken possession of documents previously held by Blonde Management. (*Id.*, Ex. 24 at 2.) Dechert has since denied that Mr. Cherney has the ability to compel Mr. Kislin to produce Blonde Management's documents for inspection. (*Id.*, Ex. 25 at 2 ("It is possible that some time ago our client would have been successful in asking [Blonde Management] to provide him with documents but our client's relationship with Mr. Kislin is now such that our request to Mr. Kislin to provide documents has gone unanswered.").)

Mr. Deripaska has managed to gather substantial evidence suggesting that Blonde Management not only provided services to Mr. Cherney, but that Mr. Cherney in fact owned and operated Blonde Management for some amount of time in the 1990s. For example, in a declaration Mr. Cherney gave to the Swiss Police on May 22, 1994, following his arrest in connection with the use of a false Polish passport, Mr. Cherney described Blonde Management as a Russian-American company, based in New York, of which he was the vice-president. (Spray Dec., Ex. 26 at 2 of ICD_00000038_036.) Similarly, in a statement before the Swiss Investigating Judge on May 26, 1994, Mr. Cherney described Blonde Management as "my company." (Spray Dec., Ex. 27 at 4 of the English translation.) In a prior proceeding before Justice Kornreich of the New York Supreme Court, an attorney from Weil, Gotshal & Manges LLP (acting for Blonde Management) indicated that Messrs. Cherney and Kislin were "Blonde Management principals." (Spray Dec., Ex. 28 at 5.) In addition, one of Mr. Cherney's business cards has Blonde Management's name, address, and contact details in New York and Moscow (Spray Dec., Ex. 29.) and Blonde Management appears also to have shared an address—459

West 15th Street, New York, NY 10011—with Chernoy Trading Company, a corporation indisputably associated with Mr. Cherney. (Spray Dec., Ex. 30 at 2; Ex. 31.)

In short, there can be no real dispute that (i) Mr. Cherney has extensive ties to Blonde Management; and (ii) any documents Mr. Kislin holds concerning Blonde Management are relevant to the English Action. Indeed, Mr. Cherney's own counsel has asked Mr. Kislin to identify any Blonde Management documents in his possession, thereby acknowledging the relevance of such documents to the matters in dispute in the English Action. (Spray Dec., Ex. 24 at 2.) As stated above, to date, Mr. Kislin has not responded to Dechert's request. (Spray Dec., Ex. 25 at 2.)

B.     **Other Corporations Owned or Operated by Mr. Cherney**

Mr. Kislin also played an important role in a number of the companies owned or operated by Mr. Cherney in addition to Blonde Management, including at least Archers Trading Limited, Bluzwed Metals, Furlan Anstalt, Galenit Foundation, Hades Foundation, Hiler Establishment, Republic Establishment, and Tenida Anstalt and Financial Assets & Investments Limited. Mr. Deripaska seeks documents from Mr. Kislin concerning these companies to help establish Mr. Kislin's exact role in relation to these companies, and in particular to establish whether he was acting as Mr. Cherney's agent in managing and operating these companies. To highlight a single example, Mr. Kislin, acting through Hiler Establishment, appears to have purchased a Russian company named AO Mirabel (described in more detail below) in 1992. Mr. Deripaska seeks documents concerning whether Mr. Kislin conducted that transaction as an agent for Mr. Cherney.

6

C.   **Documents Concerning Mr. Cherney's Ties To Organized Criminal Groups ("OCGs")**

Mr. Deripaska's primary defense in the English Action is that Mr. Cherney, acting with various associates in organized crime, including Anton Malevsky and Sergei Popov (as to which see further below), extorted *dolya* payments from Mr. Deripaska—including the payment of $250 million evidenced by Agreement No. 1—as part of a *krysha* protection racket. To support his defenses in the English Action, Mr. Deripaska has presented evidence to the English court concerning Mr. Cherney's involvement in organized crime and extensive ties to well-known organized crime groups (OCGs) operating in the former Soviet Union. As one would expect, however, Mr. Cherney and his associates conducted their criminal enterprises in a manner that makes obtaining direct evidence of their activities difficult. Among other means of camouflaging their activities, OCGs conducted business through a complex network of seemingly legitimate businesses, creating a paper trail that is difficult to unravel. Payments to OCGs might be given the veneer of legitimacy through legal documents.

To help untangle this web of criminal wrongdoing, Mr. Deripaska has submitted evidence on the practices of OCGs from a variety of sources including, *inter alia*, an FBI report on Russian and Eurasian criminal organizations; the testimony of Professor Louise Shelley of George Mason University, an expert in the development of organized crime in the former Soviet Union and Eastern Europe; scholarly works; and evidence from other court proceedings, including a money laundering trial of several OCG members before the Stuttgart Regional Court (5th Criminal Division), in Germany. Much of this evidence is summarized in the witness statement of Quinn Emanuel attorney Susan Prevezer QC submitted in support of a discovery motion in the English Action. (Spray Dec., Ex. 32 (the "Prevezer Statement")).

7

The Prevezer Statement contains an overview of Russian organized crime in the 1990s. (Spray Dec., Ex. 32, ¶¶ 26-35.) It also contains an extensive discussion of Mr. Cherney's relationships with individuals and companies alleged to be involved in OCGs, which is derived from Mr. Cherney's disclosure to date. (*Id.*, ¶¶ 14-266.) It is apparent from Mr. Cherney's disclosure to date, however, that there should exist other documents, which have not been disclosed, that are relevant in the English Action. Despite Mr. Deripaska's efforts to gather information concerning Mr. Cherney's connections to these OGCs, there are still gaps in the evidence. Mr. Cherney contends that he has never been connected with organized crime and that Mr. Deripaska's allegations to the contrary are "nonsense." (*Id.*, ¶ 17.) Mr. Deripaska seeks documents from Mr. Kislin to bolster the evidence that not only was Mr. Cherney associated with organized crime at the relevant time, but that he has in fact derived much of his personal wealth from those associations. Set forth in the following paragraphs are the persons and corporations for which Mr. Deripaska seeks discovery from Mr. Kislin. With regard to each, Mr. Deripaska expects documents to shed light on (i) Mr. Cherney's connections to OCGs; (ii) payments from or to OCGs affiliated with Mr. Cherney; (iii) Mr. Cherney's sources of wealth; (iv) the implausibility of Mr. Cherney having acquired a substantial stake in Sibal in the 1990s; or (v) some combination of these issues relevant to the English Action. Each of these matters is relevant to the English Action.

1.   Anton Malevsky, Sergei Popov, Sergei Lalakin, and Anatoly Bykov

Mr. Deripaska seeks documents from Mr. Kislin concerning Mr. Cherney's relationships with Anton Malevsky, the former reputed leader of the Russian OGC known as *Ismailovskaya*; Sergei Popov, the reputed leader, along with Sergei Lalakin, of the *Podolskaya* OCG; and Anatoly Bykov, a gang leader and former general director of the Krasnoyarsk aluminum plant. Substantial evidence already adduced in the English Action demonstrates that Mr. Cherney had

8

extensive dealings with these men in the 1990s, and Mr. Cherney has acknowledged in the
English Action that he has an obligation to disclose all documents relating to his relationship and
dealings with Messrs. Popov, Malevsky, and Bykov (along with Malevsky's brother, Andrei
Malevsky). (Spray Dec., Ex. 32, ¶ 16.)  Evidence concerning Mr. Cherney's relationships with
Messrs. Malevsky, Popov, and Bykov is described in detail in the Prevezer Statement.
(*Id.*, ¶¶ 39-74.)

        2.      Trenton Business Corporation

        Mr. Deripaska also seeks documents concerning a company known as Trenton Business
Corporation ("TBC"), which functioned as the "treasury" for the *Ismailovskaya* OCG before it
was dissolved in 2004. (Spray Dec., Ex. 32, ¶ 81.)  Mr. Cherney asserts in the English Action
that TBC was owned or controlled by Mr. Malevsky, (*id.*), and documents produced in the
English Action suggest that in 1994 Mr. Kislin had "powers of instruction" with regard to TBC.
(Spray Dec., Ex. 39, ¶ 2 (recording Mr. Kislin as one of the persons authorized to give
instructions as of January 12, 1994) and Ex. 33, ¶ 5 of the English translation (stating, under the
heading "Trenton Business Corp.," that "Mr. Arik Kislin will no longer have powers of
instruction for this company after 31 December 1994.")  Further, Mr. Kislin and Mr. Cherney
have made numerous deposits into various TBC accounts at various times.  Their dealings with
TBC include at least the following:

- On February 9, 1994, Mr. Kislin instructed Hiler Establishment to transfer
  100,000 Swiss Francs to a Liechtenstein bank account of TBC.  (Spray Dec., Ex.
  34.)

- On April 25, 1994, Messrs. Cherney and Kislin authorized the transfer of 30,000
  Swiss Francs from an account of Hiler Establishment to TBC's Liechtenstein
  bank account.  (Spray Dec., Ex. 35.)

- On or about January 17, 1995, Mr. Kislin instructed Hiler Establishment to
  transfer 54,406.75 Swiss Francs to TBC.  (Spray Dec., Ex. 36.)

9

### 3.   Other Individuals Associated with Organized Crime Groups

While Mr. Cherney has acknowledged his obligation to produce documents concerning

Messrs. Malevsky, Popov, and Bykov, he has otherwise denied any obligation to produce

documents concerning OCGs.  However, the Prevezer Statement describes in detail the

connections between Mr. Cherney and other individuals connected with OCGs, including:

Sergei Aksenov, Natalia Aksenova, Dimitriy Pavlov, Berger International Holding, and Nika

Holding (Spray Dec., Ex. 32 at ¶¶ 78-89, 159-170); Sergei Lalakin (*id.*, ¶¶ 90-91, 171-184);

Vyachislav Ivankov (*id.*, ¶¶ 91-99); Alimjhan Tokhtakhounov (*id.*, ¶¶ 115-125, 196-208); Salim

Abduvaliev (*id.*, ¶¶ 126-133, 209-223); Vladimir Poliakov (*id.*, 144-157, 235-248); and

Alexandre Mikhailovich Bushaev (*id.*, ¶¶ 253-266).  With regard to each such individual

described in the Prevezer Statement, evidence already adduced in the English Action is

sufficient, at a minimum, to support Mr. Deripaska's application for discovery from Mr. Kislin

concerning Mr. Cherney's business dealings with these same individuals. The Prevezer

Statement also identifies a number of other OCG individuals with whom Mr. Cherney appears to

be connected, namely, Sergei Mikhailov and Semion Mogilevech (*id.*, ¶¶ 100-113, 185-195);

Akmal Gaziev (*id.*, ¶¶ 134-139, 224-228); and Vladimir Tiourine (*id.*, ¶¶ 140-143, 229-234), but

Mr. Deripaska is not pursuing the disclosure of documents evidencing Mr. Cherney's

connections with those individuals in the English Action and does not therefore seek discovery

of such documents by Mr. Kislin on this application, unless such documents relate to Mr.

Cherney's relationship with the other OCG individuals identified above.

10

4. <u>ICC International Credit Corporation and Challenger International</u>
<u>Corporation</u>

At least one of Mr. Cherney's OCG associates, Mr. Tokhtakhounov, (*see* Spray Dec., Ex.

32, ¶¶ 115-125, 196-208), appears to be linked to a company known as ICC International Credit

Corporation ("ICC"). There appear to be companies of this name incorporated in both the

British Virgin Islands and the Turks and Caicos Islands. Dechert has stated that ICC was a

service company of Praesidial Anstalt which was available for use by the clients of Praesidial

Anstalt's sister company, Syndikus Treuhandanstalt ("Syndikus"), and that its purpose was to act

as a maker and recipient of payments to conceal the real identity of clients making and receiving

payments. *See* Spray Dec., Ex. 53 ¶¶ 33. Mr. Deripaska does not know whether this is true or

not, but even if true, the potential for use of ICC in this manner as a money laundering entity is

obvious. Mr. Kislin was involved in instructing transfers of money to ICC, or via ICC. Certain

of those transfers also involved a company known as Challenger International Corp.

("Challenger"), a Mr. Walerij Zemnovitsch, and a company known as Arbil Real Estate. A

search of public records revealed that Mr. Kislin has been affiliated with both Arbil Real Estate

Corp. and Challenger, both having an address at 907 Avenue U, Brooklyn, New York 11223-

4137. (Spray Dec., Ex. 38 at 4.) An FBI report of December 1994 states:

> ARIK KISLIN
>
> ARIK KISLIN's name (along with VALERIY ZIMNOVICH) is [lis]ted on a
> bank account for Challenger International of [Br]ooklyn, New York, a front
> company believed to be laundering [pro]ceeds from extortion and other OC
> activities. The account has [?]tained almost $2 million of deposits, with a $1.2
> million [dep]osit from ICC International Credit in the British Virgin [Isl]ands.

(Spray Dec., Ex. 37 at 16.)

The existence of a Challenger International bank account in Brooklyn is

confirmed by a debit advice dated December 19, 1994 regarding the transfer to that

11

account of $50,000 from CCT Consul Consult & Trade Establishment of Vaduz,

Liechtenstein, another corporation owned and controlled by Mr Cherney. (Spray Dec.,

Ex. 40).

D.   **Documents Concerning the Purported Sources of Mr. Cherney's Wealth**

Mr. Cherney has made a number of suspicious claims in the English Action concerning

the sources of his wealth, which are summarized in the Prevezer Statement. (Spray Dec., Ex. 32,

¶¶ 372-467.) The truth or falsity of Mr. Cherney's claims is highly relevant to the English

Action for at least two reasons. First, Mr. Cherney's claims concerning the sources of his wealth

tend to obscure the fact that much of Mr. Cherney's wealth was in fact accumulated through Mr.

Cherney's association with organized crime. Second, putting aside Mr. Cherney's associations

with OCGs, Mr. Deripaska seeks to establish not only that Mr. Cherney did not own 40% of

Sibal's shares as of March 10, 2001, but also that there was no realistic possibility that he could

have owned this volume of shares, given that Mr. Cherney appears to have invested millions of

dollars in U.S. real estate in the 1990s.

Given Mr. Kislin's prominent position in the management of Mr. Cherney's various

businesses, he is in a unique position to provide documents concerning the true state of Mr.

Cherney's financial affairs in the 1990s. Mr. Deripaska thus seeks limited, narrowly-tailored

discovery from Mr. Kislin concerning certain entities owned by or affiliated with Mr. Cherney.

1.   Furlan Anstalt, Hiler Establishment, AO Mirabel (and transactions
     involving Trans-CIS Commodities Ltd)

As pointed out in the Prevezer Statement, a report on Mr. Cherney's wealth prepared by

George Philippides (the "Philippides Report") identifies an income of $40.6 million from Trans-

CIS Commodities Ltd ("Trans-CIS"). (Spray Dec., Ex. 32, ¶ 388.) Trans-CIS was a company

incorporated in the British Virgin Islands and apparently owned or operated by Lev Chernoy,

12

Mr. Cherney's brother. (*Id.*, ¶¶ 391-92.) Trans-CIS appears to have benefitted financially from frauds committed upon the Russian Central Bank (the "false aviso scandal") in late 1992 and 1993. Another company involved in the false aviso scandal was a Russian company named AO Mirabel. In April or May 1992, Mr. Kislin became the mandator of, and was authorized to give instructions for, Hiler Establishment – a company used by Mr. Cherney for many years afterward for his various business activities. Also in May 1992, Hiler Establishment purchased all the shares of AO Mirabel. (Spray Dec, Ex., 14 and Ex. 41.)

The false aviso (credit note) banking frauds took place in Russia in 1992-1993 and resulted in the theft of billions of dollars from the Russian Central Bank. The Central Bank established a number of regional branches (Payment Processing Centers, ("PPCs")). All payments by most new private enterprises and banks were to be made through a PPC. Banks were to have correspondent ("nostro") accounts with the PPC of their region to conduct money transfers.

An "aviso" (credit note) was a payment order from one PPC to another, instructing the credit of a bank's nostro account and the credit of its client's bank account. Most avisos were transferred via telegraph. These were encrypted manually and the control measures were not effective to prevent massive fraud. Fraudsters were able to encrypt avisos, imitate telegraph transmitters' codes and send false payment instructions. As a result, PPCs executed the avisos and credited the state's money to the correspondent (nostro) account of the payee company's bank. The payee company's bank, in turn, wired money to the bank account of the payee company, which became able to use the funds. Because the avisos were forged, money was never debited from the payor company accounts.

13

There were no proper payment verification systems between PPCs. Reconciliation between PPCs took 25 to 40 days (often much longer), thus making the conduct of the fraud easier. At the end of 1992 the Central Bank instructed PPCs to request confirmations from a PPC from which an aviso was allegedly sent, but the fraudsters in many cases succeeded in forging the confirmation cables.

From documents available to Mr. Deripaska, it appears that many of the frauds involved Trans-CIS and at least one also involved AO Mirabel. A resolution of June 16, 2003 of the Investigative Committee of the Ministry of Internal Affairs of Russia refers to certain of the false aviso transactions in 1992 and 1993 that involved Trans-CIS and AO Mirabel (decribed in the translation as JSC – or Joint Stock Company Mirabel). (Spray Dec., Ex. 42 at 1.)

2.    Mr. Cherney's Real Estate Business

Mr. Deripaska seeks discovery from Mr. Kislin concerning four particular commercial properties in which Mr. Cherney, and/or entities controlled by him, held a beneficial interest during the period 1992-2001 (together, the "Properties"). The Properties are:

1.    31-00 47th Avenue, Long Island City, New York, known as the Falchi Building;

2.    47-44 31st Street, Long Island City, New York, known as The Factory;

3.    33-00 Northern Boulevard, Long Island City, New York, known as the Center Building; and

4.    78-92 10th Avenue, Long Island City, New York, known as the Manhattan Industrial Center.

It is apparent from the disclosure made by Mr. Cherney in the English Action, in particular the Philippides Report (Spray Dec., Ex. 43 at 22-23), that in the mid 1990s, Mr. Cherney invested $35.125 million in acquiring the Properties. In light of these investments, there is a real doubt as to whether Mr. Cherney would have had available funds to invest in the aluminum industry in Russia at the time he alleges he did in the English Action.

14

The Philippides Report also notes that in 1998 and 1999, the Properties were sold for a combined consideration of $114 million, generating a profit of $78 million. (Spray Dec., Ex. 43 at 22.) Mr. Deripaska has not been able to establish the veracity of that statement, however, since, to date, Mr. Cherney has failed to disclose any sale contracts in relation to those transactions, or bank statements of entities and/or agents who might have received, and then distributed, those profits. Indeed, by analyzing Mr. Cherney's disclosure in the English Action, it has been possible to trace only $20 million of the purported $78 million profit back to Mr. Cherney, and/or to entities which he controlled or was beneficially interested in.

It is apparent from the documents disclosed in the English Action, however, that the entities listed below either owned or had an interest in the Properties during the relevant period. It is possible, therefore, that the sale of the Properties to third parties, and any distribution of profits, was effected by these entities (together, the "Companies"):

1.  CMC Falchi Holding Company LLC (Spray Dec., Ex. 44);
2.  CMC Factory Holding Company LLC (Spray Dec., Ex. 45);
3.  CMC Center Holding Company LLC (Spray Dec., Ex. 46);
4.  CMC MIC Holding Company LLC (Spray Dec., Ex. 47);
5.  LIC Mortgage Corp (Spray Dec., Ex. 48);
6.  The Factory LP (Spray Dec., Ex. 45);
7.  Center Building [*precise corporate status unknown*] (Spray Dec., Ex. 43 at 22);
8.  Around the Clock Corp. (Spray Dec., Ex. 49 and Ex. 43 at 22);
9.  Falchi Building Co. L.P. (Spray Dec., Ex. 44);
10. The Center Boulevard Building Co LP (Spray Dec., Ex. 46);
11. MIC Building Co LP (Spray Dec., Ex. 47);
12. MIC Leasing Co LP (Spray Dec., Ex. 47); and
13. MC Holdings Company LLC (Spray Dec., Ex. 50).

At the relevant time, Mr. Cherney either controlled, or was beneficially interested in, each of the Companies. Mr. Deripaska thus seeks discovery from Mr. Kislin in light of Mr. Kislin's role in managing Mr. Cherney's business affairs at that time.

15

Obtaining discovery of the above mentioned documents is clearly pertinent to the issues in the English Action. In particular, it would assist in establishing the accuracy, or otherwise, of the section in the Phillipides Report concerning U.S. real estate and the alleged profit of $78 million made by Mr. Cherney (Spray Dec., Ex 43 at 22).

**ARGUMENT**

I.   **MR. DERIPASKA'S APPLICATION SATISFIES THE REQUIREMENTS OF 28 U.S.C. § 1782**

Section 1782 of Title 28 of the United States Code, entitled "Assistance to foreign and international tribunals and to litigants before such tribunals," is designed to assist applicants, such as Mr. Deripaska, in obtaining evidence that is accessible in the United States and relevant to proceedings in foreign jurisdictions. The statute provides, in relevant part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusations. The order may be pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.

28 U.S.C. § 1782 (2007). The Second Circuit has stated that 28 U.S.C. § 1782 has taken on increasingly "broad applicability" to litigation with international aspects. *In re Application of Gianoli Aldunate*, 3 F.3d 54, 57 (2d Cir. 1993).

In order to invoke § 1782, an applicant must meet three conditions:

> (1) that the person from whom discovery is sought reside (or be found) in the district of the district court to which the application is made, (2) that the discovery be for use in a proceeding before a foreign tribunal, and (3) that the application be made by a foreign or international tribunal or "any interested person."

*In re Application of Esses*, 101 F.3d 873, 875 (2d Cir. 1996) (per curiam); *see also Aldunate*, 3 F.3d at 58.

16

Mr. Deripaska's application satisfies each of these three conditions. First, the party from whom discovery is sought, Mr. Kislin, is present within the Southern District of New York. Second, the documents requested are for use in, and narrowly tailored to, the English Action. *See, e.g., In re Application of Guy*, No. M. 19-96, 2004 WL 1857580, at *3 (S.D.N.Y. Aug. 19, 2004) (refusing to vacate grant of discovery pursuant to § 1782 for use by the English High Court of Justice, finding that "the High Court of Justice, Chancery Division . . . hears the testimony of witnesses and receives documents in evidence, very much as American courts do"). Third, Mr. Deripaska is clearly an "interested person," as he is defending himself against Mr. Cherney's claims in the English Action.

As Mr. Deripaska's application meets all of the requirements of § 1782, this Court should authorize service of a subpoena commanding Mr. Kislin to produce documents for use in the English Action.

## II.     THE COURT SHOULD EXERCISE ITS BROAD DISCRETION UNDER § 1782 AND GRANT MR. DERIPASKA'S APPLICATION

Where, as here, the statutory requirements for § 1782 are satisfied, Courts in this Circuit are encouraged to exercise their broad discretion and grant the requested discovery. *See In re Application of Euromepa S.A.*, 51 F.3d 1095, 1102 (2d Cir. 1995) ("We read section 1782's investment of broad discretion in the district courts as an invitation for district judges to fashion creative means of implementing the statute's double goal: promoting efficiency in international litigation and persuading other nations, by example, to do the same."); *see also Aldunate*, 3 F.3d at 57 (quoting from the record of the U.S. Senate, S. Rep. No. 88-1580, ¶ 9 (1964), as reprinted in 1964 U.S.C.C.A.N. 3782, 3788 ("the primary intent of [§ 1782] was to 'clarify and liberalize' existing U.S. procedures for assisting foreign and international tribunals and litigants in obtaining oral and documentary evidence in the United States.")); *In re Application of Malev*

*Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992) ("28 U.S.C. § 1782 leaves the issuance of an appropriate order to the discretion of the court") (internal citations omitted).

Importantly, each of the considerations identified by the Supreme Court in *Intel*, 542 U.S. 241, weighs in favor of granting the discovery Mr. Deripaska seeks. These considerations include whether: (1) a foreign court could order the parties to produce the requested evidence; (2) the nature or character of the foreign tribunal and proceeding indicate that the foreign government may not be receptive to U.S. discovery; (3) it appears that the applicant may be attempting to circumvent foreign discovery limits; or (4) enforcing the statute would be "unduly intrusive or burdensome." *Intel*, 541 U.S. at 264-65.

Because the *Intel* factors here weigh in favor of permitting the requested discovery, Mr. Deripaska's application should be granted. *See, e.g., In re Application of Servicio Pan Americano de Proteccion, C.A.*, 354 F. Supp. 2d 269, 275 (S.D.N.Y. 2004) (granting application for discovery upon consideration of Intel factors and a determination that, as a whole, the information requested was directly relevant to the party's defense in the foreign suit and most efficiently obtained in the U.S.); *In re Grupo Qumma, S.A.*, No. M 8-85, 2005 U.S. Dist. LEXIS 6898, at **11-12 (S.D.N.Y. April 21, 2005) (granting request for discovery upon finding factors in support of § 1782 application more persuasive than those in opposition, where the discovery was sought in good faith from a non-participant to the foreign litigation, and the litigation was between private parties in civil court).

A.   **The Requested Discovery May Be Otherwise Unobtainable Absent § 1782 Relief**

Section 1782 is designed to allow parties to avail themselves of discovery that may not otherwise be obtainable. *See In re Application for an Order Permitting Metallgesellschaft AG To Take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997) ("if it were clear that discovery were equally

18

available in both foreign and domestic jurisdictions, a district court might rely on this evidence to conclude that the § 1782 application was duplicative"). As the Supreme Court recognized in *Intel*, the need for the U.S. courts' assistance is most apparent where, as here, discovery is sought from a non-participant in the foreign proceedings. *See Intel*, 542 U.S. at 264 ("in contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid."); *In re Application of Guy*, 2004 WL 1857580, at *3 (authorizing discovery from non-participants to action pending before the English High Court of Justice).

In response to Mr. Deripaska's discovery requests in the English Action, Mr. Cherney has denied having custody of or control over Blonde Management's documents. Mr. Cherney claims that the documents are within Mr. Kislin's possession in this District, and that he has asked Mr. Kislin to produce the documents voluntarily. Because Mr. Kislin has failed to respond to Mr. Cherney's requests, those documents, as well as other documents pertaining to other corporations owned or operated by Mr. Cherney, the sources of Mr. Cherney's wealth and his ties to OCGs, which are likely to be within Mr. Kislin's possession, cannot be obtained without this Court's assistance.

B. **The English High Court of Justice Would Be Receptive to the Requested Discovery Because It Is Highly Relevant to the English Action**

Mr. Deripaska's application also satisfies the second and third *Intel* tests: there is no reason to believe the English Court would not be receptive to this discovery and Mr. Deripaska is not seeking to circumvent foreign discovery limits. Where discovery pursuant to § 1782 will produce information that is relevant to the underlying foreign dispute, it is more likely that the foreign court would be "receptive" to such evidence. *See In re Application of Servicio Pan Americano de Protection*, 354 F. Supp. 2d at 274 (granting discovery request under § 1782 based

19

in part upon the court's finding that "the discovery Pan Americana is seeking would be readily available and relevant to the litigation [in Venezuela]").

The discovery that Mr. Deripaska seeks is directly relevant to the English Action.

As courts in the Southern District have previously observed, English trial courts, including the High Court of Justice, are receptive to relevant discovery obtained via a § 1782 order:

> Here, the English Action is pending in the High Court of Justice, Chancery Division, a trial court which (as even a quick perusal of its July 30, 2004 decision makes clear) hears the testimony of witnesses and receives documents in evidence, very much as American courts do.  And the nature of the English Action suggests that discovery is appropriate to obtain relevant testimony and documents.

*In re Application of Guy*, 2004 WL 1857580, at *2 (ordering discovery pursuant to § 1782 for use in English action pending in English High Court of Justice).  Here, the English Court will presumably be "receptive" to the requested discovery.  *See Intel*, 542 U.S. at 265 (noting that § 1782 relief should be granted where the requested discovery would be of assistance in the foreign proceeding due to the "receptivity of the foreign government" to "U.S. federal-court judicial assistance").

C.   **Enforcing § 1782 Here Would Not Be Unduly Intrusive or Burdensome**

Finally, the narrowly-tailored discovery that Mr. Deripaska requests would be neither intrusive nor burdensome for Mr. Kislin to produce.  *See Intel*, 542 U.S. at 265 (citing burden and intrusiveness as relevant considerations).  The potential burden and expense of compliance would be minimal because the requested discovery is limited.  The relevant documents should thus be easily identifiable, readily accessible and not burdensome to produce.  *See, e.g., In re Application of Esses*, 101 F.3d at 876 (affirming limited discovery where there was no "indication that the district court's order is overly burdensome or duplicative").  Further, it is a

20

matter of public record that Mr. Kislin has already disclosed "thousands of pages" of documents relating to the Claimant in the *Gliklad* litigation before the Supreme Court of New York (Index No. 602335/09) (Spray Dec., Ex. 51 ¶¶ 15). Mr. Kislin therefore has no basis to argue that this application would be unduly intrusive, burdensome or cause him significant inconvenience.

*       *       *

In sum, Mr. Deripaska satisfies the three statutory requirements of § 1782 and as a result, this Court has broad discretion to grant the instant application. Because each of the *Intel* considerations weighs in favor of allowing discovery here, Mr. Deripaska's application should be granted.

## CONCLUSION

For all of the foregoing reasons, Mr. Deripaska respectfully requests that this Court authorize issuance of the proposed subpoena commanding Mr. Kislin to produce the requested documents.

DATED:   New York, New York
         March 8, 2012

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: _____

Judd R. Spray
(juddspray@quinnemanuel.com)
Christopher Kercher
(christopherkercher@quinnemanuel.com)
Zena Mount-Namson
(zenamountnamson@quinnemanuel.com)

51 Madison Avenue, 22nd Floor,
New York, New York  10010-1601
(212) 849-7000

*Attorneys for Applicant Oleg Vladimirovich
Deripaska*